**MORRILL LAW. P.L.C.**
ATTORNEYS AT LAW
8857 N. 63rd Place
Paradise Valley, Arizona 85253
Telephone (602) 432-6291
Fax (480) 584-3157

K. Layne Morrill #004591
klaynemorrill@gmail.com
Attorney for Plaintiffs

## UNITED STATED DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| KEVIN H. RINDLISBACHER and JAMI L. RINDLISBACHER, husband and wife; and PIANO SHOWROOM OF ARIZONA, INC., an Arizona corporation, | Case No.: _____ |
| Plaintiffs, | **COMPLAINT** |
| v. | **(Nondisclosure/Constructive Fraud; Fraudulent Misrepresentations and Fraudulent Omissions.)** |
| STEINWAY & SONS, INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

     COME NOW Plaintiffs KEVIN H. RINDLISBACHER and JAMI L. RINDLISBACHER, husband and wife (the "Rindlisbachers") and PIANO SHOWROOM OF ARIZONA, INC., an Arizona corporation (known prior to July 1, 2017 as STEINWAY PIANO SHOWROOM OF ARIZONA, INC.) ("Showroom"), by and through their undersigned counsel, and for their Complaint against STEINWAY & SONS, INC., a Delaware corporation ("Steinway") allege as follows:

### OVERVIEW

     1.    In 2010, while Steinway occupied a longstanding relationship of trust and

confidence toward Rindlisbachers as its Spokane, Washington dealer, Steinway induced Rindlisbachers to become its Phoenix dealer by fraudulent representations concerning reasonable annual sales performance goals for the Phoenix market.

2.      Plaintiffs were ignorant of the falsity of the representations.

3.      Plaintiffs were willing to invest the money, time, and effort to be Steinway's Phoenix dealer for the sales results Steinway represented to be reasonable.

4.      Given Steinway's position of trust and confidence toward Rindlisbachers, and its position of superior knowledge concerning sales in the Phoenix market, Plaintiffs justifiably relied on Steinway's fraudulent representations by becoming Steinway's Phoenix dealer, leasing and improving store locations, hiring employees, making a large initial inventory purchase, and diligently performing as a Steinway dealer from December 1, 2010 to July 31, 2017 (the "Dealer Period").

5.      Had Steinway's representations been true Plaintiffs' efforts would have attained approximately the levels of sales performance Steinway had represented to be reasonable and Plaintiffs had viewed as adequate inducement for the required investment of money, time, and effort to become and perform as Steinway's Phoenix dealer.

6.      Instead, Steinway's representations were false and Plaintiffs' investment of money, time, and effort yielded a small fraction of the sales performance levels Steinway represented to be reasonable for the Phoenix market.

7.      Upon information and belief Steinway has made similar fraudulent misrepresentations to others to induce them to become Steinway dealers and make large initial inventory orders.

8.      Steinway terminated Plaintiffs' Phoenix dealership effective July 1, 2017.

9.      In this Action Plaintiffs seek to recover all damages flowing from Steinway's fraudulent conduct, including but not limited to: the incremental profits they would have earned in the Phoenix market had Steinway's fraudulent representations been true (believed to exceed $10 million); certain out-of-pocket losses; and damages for foreseeable mental anguish, all in amounts to be determined at trial. In addition, Plaintiffs

seek an award of punitive damages to deter future similar conduct and to punish Steinway for its past conduct.

## PARTIES

10.     Rindlisbachers, husband and wife, reside in Maricopa County, Arizona.

11.     Rindlisbachers incorporated Showroom in Arizona to conduct business as a Steinway dealer in Arizona; and Showroom has its principal place of business in Scottsdale, Maricopa County, Arizona.

12.     Steinway is a corporation formed under the laws of Delaware with its principal place of business in New York.

13.     At all relevant times, Robert Snyder ("Mr. Snyder"), Todd Sanders ("Mr. Sanders"), and Ron Losby ("Mr. Losby") were duly authorized officers, employees, or agents of Steinway who acted in furtherance of Steinway's business and in the course and scope of their employment or agency such that Steinway is bound by and vicariously liable for their acts and omissions.

## JURISDICTION AND VENUE

14.     Plaintiffs are citizens of the State of Arizona.

15.     Steinway is a citizen of the States of Delaware and New York.

16.     This Action is between citizens of different states and the matter in controversy exceeds the statutory sum or value of $75,000 exclusive of interest and costs, so it is within the Court's jurisdiction under 28 U.S.C. §1332(a)(1).

17.     This Court has personal jurisdiction over Steinway because it: (a) caused events to occur in Arizona out of which arise the claims set forth herein: (b) purposefully availed itself of the privilege of conducting activities in Arizona that are part of the basis for the claims; and (c) committed intentional acts, expressly aimed at Arizona by virtue of Plaintiffs' citizenship and permanent residence in Arizona and which carried the risk of foreseeable harm to Plaintiffs in the District.  Those elements satisfy the due process standards of the Arizona Constitution and the U.S. Constitution as adopted in Arizona Rule of Civil Procedure, Rule 4.2(a).

18.     Venue is proper in this Court under:

A.     28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District and Steinway's conduct outside the District was intended to cause injury, and did cause injury, to Plaintiffs in the District; and

B.     28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Steinway.

## STEINWAY AND ITS PIANOS

19.     Since 1853, Steinway has manufactured best-in-class pianos at its New York factory and sold them across the United States through its dealer network.

20.     At all relevant times Steinway has held a position of dominance in the domestic manufacture and sale of pianos due to: 125 patents on various facets of piano manufacture, the quality of its Steinway & Sons® instruments, and the brand awareness and loyalty generated by more than 160 years in business.

21.     Steinway & Sons® pianos are the unquestioned leader over all other pianos and are the pianos by which all pianos are judged.

22.     Nationwide, many universities, colleges, conservatories, and concert halls are all-Steinway institutions, meaning that all their grand pianos are of the Steinway & Sons® brand.

23.     Nineteen in 20 concert pianists prefer Steinway & Sons® grand pianos for their performances.

24.     More than 1,600 concert pianists are or during their lives were Steinway Artists meaning they personally own a Steinway & Sons® grand piano and in their professional performances utilize the more than 300 concert grand pianos with a retail value of over $22 million (as of 2010) Steinway and its dealers hold and maintain for Steinway's Concert and Artists program.

25.     Included in Steinway's list of Steinway Artists are such immortals as:

A.     Sergei Rachmaninoff, who wrote: "Dear Mr. Steinway, I am very

happy to have the opportunity of using your pianos for my concerts because I consider them to be perfect in every way."

        B.    Vladimir Horowitz, who wrote: "Steinway has been my faithful and inseparable friend since the inception of my concert career."

        C.    Van Cliburn, who wrote: "The Steinway piano – with its beauty and power – is the perfect medium for expressing the performer's art, drama, and poetry."

26.    Steinway & Sons® grand pianos currently sell at retail prices ranging from about $69,700 to $171,100 compared with grand pianos from lesser brands that sell at retail for prices ranging from about $8,000 to about $35,000.

27.    Steinway raised its "New York Price" (suggested retail price) on Steinway & Sons® grand pianos by about 30% from 2009 through 2018.

28.    Steinway raised its Wholesale Price on Steinway & Sons® grand pianos by about 59% from 2009 through 2018.

29.    The disparity between Steinway's increases in the New York Price and in the Wholesale Price caused a reduction of the approximate dealer gross margin for Steinway & Sons® grand pianos by about 29% from 2009 through 2018.

30.    Because of the high price points of Steinway & Sons® grand pianos, Steinway also distributes two lines of "Steinway Designed Pianos" known as Boston® (manufactured in Japan and Indonesia) and Essex® (manufactured in China).

31.    Boston® and Essex® grand pianos are about 35% and 20% respectively of the price of Steinway & Sons® grand pianos.

### STEINWAY'S RELATION OF TRUST AND CONFIDENCE TOWARD RINDLISBACHERS

32.    Rindlisbachers have been in the retail piano business for 35 years.  In 1968 Mr. Rindlisbacher's father, Hal, started a music business in Salt Lake City, Utah, known as Riverton Music.  Mr. Rindlisbacher joined the company in 1983 and took control at his father's retirement in 1991.  Riverton Music now has three stores in the Salt Lake area. Riverton Music, Inc. is owned 100% by Rindlisbachers.

33.     Over time, Riverton Music has sold new Baldwin®, Petroff®, Pearl River®, and Young Chang® pianos and Weber®, as well as Roland® and Technic® digital pianos. None of those piano manufacturers required Riverton Music to sign a written dealer agreement.

34.     In 2002, Mr. Rindlisbacher approached Steinway's Western District Sales Manager, Mr. Snyder, about becoming a Steinway dealer in Tucson, Arizona.

35.     Mr. Snyder responded that Tucson was not available but that a dealer opportunity existed in Spokane, Washington.

36.     After speaking with Mr. Snyder, visiting Spokane, and considering that market, Rindlisbachers decided to pursue Steinway's Spokane dealership.

37.     Rindlisbachers then embarked upon a four-year journey to become Steinway's dealer for Spokane.

38.     At every significant step along that journey Mr. Snyder advised, counseled, and assisted the Rindlisbachers.

39.     At every significant step along that journey Rindlisbachers relied upon Steinway's trustworthiness and superior knowledge in taking the actions Steinway required.

40.     Among other things, the Rindlisbachers' journey to Steinway dealership included:

A.     Responding to Mr. Snyder's request for detailed information on the Rindlisbachers' experience in the piano industry, their methods of operation over the years, and the operational and financial results of their businesses, much of which was confidential and proprietary information. Mr. Snyder asked many follow-up questions to which Mr. Rindlisbacher provided answers.

B.     Mr. Snyder providing to Mr. Rindlisbacher during many phone calls, emails, and meetings information about Steinway's products, dealer program, and how it expected dealers to operate.

C.     Mr. Rindlisbacher visiting Steinway stores in cities to which he

travelled and conferring with the employees and owners of those stores about their experience as Steinway dealers and then conferring with Mr. Snyder about what he had learned.

        D.     Mr. Snyder requiring that to become the Spokane Steinway dealer, the Rindlisbachers must sell their Utah piano businesses in order to devote full time to the Steinway dealership and to address concerns of Steinway's Salt Lake City dealer about the Spokane dealer continuing to own piano businesses in the Salt Lake market.

        E.     Mr. Snyder requiring that before becoming a Steinway dealer in Spokane, Rindlisbachers successfully establish a business presence in Spokane.

        F.     Mr. Snyder requiring that to become the Spokane Steinway dealer, Rindlisbachers re-locate their family of seven from Salt Lake City to Spokane to provide hands-on management over the store.

        G.     Rindlisbachers purchasing, in May 2005, the Davis & Hosch ("D & H") piano store in Spokane that sold primarily Kawai® pianos.

        H.     Rindlisbachers operating D & H for approximately 1½ years in Spokane before becoming the Steinway dealer and discussing regularly with Mr. Snyder the results of those operations (which was confidential and proprietary to the Rindlisbachers) and the nature of the competition in Spokane.

        I.     Rindlisbachers attempting, for nearly three years, to sell their Utah piano businesses as Mr. Snyder had required and providing periodic progress reports to Mr. Snyder.  The offers that materialized fell through.  Ultimately, Steinway waived this requirement based on the Rindlisbachers' commitment not to make any sales of Steinway & Sons® pianos into Salt Lake City.

        J.     Mr. Rindlisbacher conferring with Mr. Snyder concerning possible retail locations in Spokane and Mr. Snyder's approving of both the interim and permanent locations selected.

        K.     Mr. Rindlisbacher conferring with Mr. Snyder and receiving his recommendations on the planning, layout, and finishes for the Spokane Steinway Gallery.

L.     Rindlisbachers developing, by the summer of 2006, a plan Mr. Snyder approved, for transitioning from the D & H business to the Steinway dealership. That plan included leasing an interim shopping mall location for the Steinway store while Rindlisbachers would construct a permanent, free-standing store nearby.

M.     Steinway providing Mr. Rindlisbacher on July 5, 2006, a "comfort letter" stating its intention to award him the Spokane dealership (the "Comfort Letter").

N.     Rindlisbachers securing a lease on the temporary mall location and financing for the free-standing permanent location in reliance on the Comfort Letter.

O.     Steinway presenting to Mr. Rindlisbacher on or about October 1, 2006, Steinway's standard form Dealer Agreement for Spokane County, Washington, which Mr. Rindlisbacher signed on behalf of Steinway Piano Gallery of Spokane, Inc., a Washington corporation ("Gallery") he had formed to carry on that business.

P.     In a telephone conversation Mr. Snyder said Steinway did not make changes to its form of Dealer Agreement, which was offered on a take-it-or-leave-it basis.

Q.     Mr. Rindlisbacher executing a personal guaranty of the Spokane Dealer Agreement.

41.     The provisions of the Spokane Dealer Agreement confirm Steinway's position of dominance and control and the Rindlisbachers' position of dependence and subservience in the manufacturer-dealer relationship, in at least the following ways:

A.  Prohibition of solicitation of sales out of Territory and prohibition of sales for resale.

B.  Dealer minimum inventory requirement.

C.  Dealer must service all pianos even if not sold by the dealer.

D.  Steinway requirements for store layout and display.

E.  Dealer must "always represent the Steinway brand in advertising and sales presentations as the unquestioned leader over all other pianos."

F.  Dealer must provide financial statements, sales reports, and inventory reports to Steinway which Steinway acknowledges are "confidential and

proprietary."

42.      Steinway represented in Article III of the Spokane Dealer Agreement that certain "annual sales performance goals for Steinway Designed Pianos . . . are reasonable for the Territory" as follows:

| Brand | Grand Pianos | Upright Pianos |
|---|---|---|
| Steinway & Sons® | 6 | 2 |
| Boston® | 6 | 4 |
| Essex® | 8 | 8 |
| Totals | 20 | 16 |

43.      Mr. Rindlisbacher and Gallery agreed to the reasonableness of the annual sales performance goals solely in reliance upon Steinway's representation of reasonableness due to Steinway's exclusive and superior knowledge of historic sales in the Spokane market and other similar markets.

44.      The Spokane Steinway Gallery opened at the interim mall location on or about October 1, 2006; and moved to the permanent free-standing location on or about June 1, 2008.

45.      In the operational phase of the Spokane dealership from 2006 through the summer of 2010 Rindlisbachers continued their close working relationship with Mr. Snyder as their district sales manager and liaison with Steinway.

46.      During its first year of operation in 2007, the Spokane Steinway Gallery sold 17 Steinway & Sons® grand pianos (283% of the "reasonable" goal) and received Steinway's Dealer of the Year award for small markets.

47.      From 2007 through July 31, 2017, the Spokane Steinway Gallery's cumulative sales exceeded its cumulative annual "sales performance goals" by about 25% for grand pianos of all three brands and by about 89% for upright pianos of all three brands.

48.      The Spokane Steinway Gallery also received Steinway's Dealer of the Year award for small markets in 2010.

49.     As a result of their extensive and frequent interactions over eight years in which Mr. Snyder mentored the Rindlisbachers along their path to the Spokane Steinway dealership and its operation Steinway occupied a relationship of trust and confidence toward the Rindlisbachers.

## STEINWAY INDUCES RINDLISBACHERS TO BECOME ITS PHOENIX DEALER

50.     At the September 2010 Steinway Dealer Conference in Chicago, Illinois, Mr. Rindlisbacher heard Steinway might need a dealer in Phoenix, Arizona.  He inquired of  Mr. Snyder, who said Steinway had developed plans to open a company-owned store there but might consider appointing a dealer.

51.     Mr. Rindlisbacher knew that Sherman Clay, a large regional piano retailer, had been Steinway's Phoenix market dealer for about five years.

52.     Mr. Rindlisbacher considered the Phoenix market possibility and on September 3, 2010 emailed Mr. Snyder asking whether Steinway would consider appointing a dealer for the Phoenix market or had decided on a company-owned store.

53.     Mr. Snyder was receptive to the inquiry because of Steinway's relation of trust and confidence toward Rindlisbachers and their successful performance as Steinway's Spokane dealer.

54.     In a September 7, 2010 telephone call Mr. Snyder and Mr. Rindlisbacher discussed competitors in the Phoenix market.

55.     Mr. Snyder indicated that he would be in Scottsdale on September 22 and 23, 2010, and suggested that Mr. Rindlisbacher meet him there to see the area and to discuss issues relating to becoming Steinway's dealer for the Phoenix Market.

56.     During their meetings in Scottsdale on September 22 and/or 23, 2010:

A.     Mr. Rindlisbacher and Mr. Snyder visited the Scottsdale Store and observed the "store closing sale" Sherman Clay was then executing, which Mr. Snyder said was going gangbusters.

B.     Mr. Snyder identified what Steinway envisioned for the Phoenix

Market.  He also told Mr. Rindlisbacher that if he wanted the Phoenix market dealership he would have to relocate from Spokane to Phoenix and hire at least one of Sherman Clay's sales people in order to assist with continuity.

C.   Mr. Snyder described Steinway's company-owned store in Hollywood, California and the "recipe" its manager was following.  He represented to Mr. Rindlisbacher that the Hollywood store was "very profitable" and encouraged Mr. Rindlisbacher to visit that store before making a decision on the Phoenix market.

D.   Mr. Snyder represented that the Phoenix Market was capable of selling 70 Steinway & Sons® grand pianos per year.

E.   Mr. Snyder represented that 45  Steinway & Sons® grand pianos per year was a reasonable number for sales in the Phoenix Market.

57.   On or about September 28, Mr. Rindlisbacher, in Spokane, had a conference call with Mr. Sanders, Steinway's Vice President of Sales and Mr. Losby, Steinway's President for the Americas, who were in New York.

58.   In that conversation Mr. Sanders and Mr. Losby asked about the specific plans Rindlisbachers intended to pursue if they were appointed Steinway's dealer for the Phoenix market; and Mr. Rindlisbacher laid out their plans, with Mr. Sanders and Mr. Losby offering comments and suggestions on those plans.

59.   On or about October 10, 2010, either Mr. Losby or Mr. Sanders or both, from New York, notified Mr. Rindlisbacher (in Spokane) by phone that Rindlisbachers had been approved as Steinway's Phoenix dealer subject to final approval of store location and initial inventory order.

60.   On or about October 25, 2010, Mr. Rindlisbacher visited Steinway's Hollywood store.

61.   On October 30, 2010, Mr. Rindlisbacher requested a conference call with Mr. Snyder and with Gavin English, the manager of Steinway's Hollywood store.  That phone call occurred a few days later.

62.   Mr. Rindlisbacher emailed Mr. Snyder on October 30 noting the

demographic differences among Hollywood, Phoenix, and Spokane: Los Angeles County had 77,000 households earning more than $250,000 per year; Maricopa County had 24,000; and Spokane had 1,853.

63.    In mid-November, 2010, in Arizona, Mr. Rindlisbacher:

A.    Reached agreement on a lease for a store located in the same Scottsdale shopping center in which the previous Steinway dealer had operated, and Steinway approved the location.

B.    Contracted for tenant improvements in the rented location.

C.    Identified and made offers to employees to staff the Scottsdale store.

64.    On or about November 23, 2010, Mr. Snyder, from his Oregon location, emailed to Mr. Rindlisbacher at his Washington location, Steinway's standard form of Dealer Agreement and related documents for the Phoenix market.

65.    Mr. Snyder asked Mr. Rindlisbacher to "give me a call with any questions, comments, etc. – Then once we've talked, you can print TWO copies of each of the [documents], sign all six, then send all six to New York."

66.    In Article III of Steinway's Phoenix Dealer Agreement Steinway represented that the following "annual sales performance goals are reasonable for" Maricopa County:

| **Brand** | **Grand Pianos** | **Upright Pianos** |
|---|---|---|
| Steinway & Sons® | 45 | 12 |
| Boston® | 45 | 27 |
| Essex® | <u>45</u> | <u>60</u> |
| Totals | 135 | 99 |

67.    On or about November 30, Mr. Rindlisbacher from his location in Washington spoke briefly with Mr. Snyder at his location in Oregon concerning the Dealer Agreement documents for the Phoenix market.

68.    During that conversation, Mr. Snyder, as he had in an earlier conversation concerning the Spokane Dealer Agreement, indicated that Steinway would make no

changes to its standard form dealer agreement, effectively creating a take it or leave it situation.

69.     On or about December 1, 2010, Mr. Rindlisbacher in Washington signed the documents Mr. Snyder had provided and mailed them to New York.

70.     Rindlisbachers and Showroom agreed to the reasonableness of the sales performance goals solely in reliance on Steinway's representation of reasonableness due to Steinway's position of superior knowledge of historic sales in the Phoenix market and other similar markets and its relation of trust and confidence toward Rindlisbachers.

**OPERATION OF PHOENIX DEALERSHIP**

71.     In 2013 when the lease on Showroom's Scottsdale store was about to expire, Mr. Rindlisbacher consulted with Steinway on possible new locations.

72.     Mr. Rindlisbacher found a new Scottsdale location on the east side of Scottsdale Road across from his then location containing about 4,600 square feet.  The owner offered a five-and-a-half-year lease with six months' free rent at a monthly rental of $4,970 starting in month seven for an effective net rent of $11.70 per year, a gross rent equivalent of about $17,00 per square foot.  The Rindlisbachers wanted to move to this location.  But when they presented it to Mr. Losby and Mr. Snyder at a Dealer Meeting in Chicago in late August 2013 they rejected it out of hand.

73.     Instead, Steinway identified two small locations (about 2,000 square feet) near Fashion Square Mall and told Mr. Rindlisbacher to lease one of those spaces.  Mr. Losby said that Mr. Rindlisbacher needed to be in an upscale shopping area, in order to better follow the "recipe" used in the Hollywood company-owned store.

74.     Mr. Rindlisbacher was concerned about the small size, high cost per square foot, and seven-year term of the Scottsdale Fashion Square location and expressed those concerns to Steinway.

75.     On or about March 1, 2014, Mr. Rindlisbacher did as Steinway instructed and leased the 2,185 square foot Suite 105 at 4545 N. Scottsdale Road just east of Scottsdale Fashion Square at a gross-rent equivalent of $42.32 per year or  $7,723.92 per

month; with an automatic 2.5% rental increase each year. The landlord required a seven-year lease and a personal guaranty of the lease by Mr. Rindlisbacher.

76.    In the late spring of 2016, Mr. Losby visited Showroom's Scottsdale Fashion Square store.  He told Mr. Rindlisbacher to replace the dark wood floor with a lighter colored floor and to remove much of the art work from the walls.

77.    Mr. Rindlisbacher did as Steinway instructed incurring an expense of about $10,000 to redo the floor and also removed much of the art from the walls.

78.    Throughout the Dealer Period, Mr. Rindlisbacher attended annual Steinway Dealer meetings, participated in training and educational programs provided by Steinway, and regularly communicated with his District Manager – Mr. Snyder until January 6, 2016 and thereafter with Mr. Thomas Edds ("Mr. Edds").

79.    Throughout the Dealer Period, Rindlisbachers exercised their best efforts to perform as a Steinway dealer in the Phoenix market, hiring experienced and skilled sales people and employing the same programs, procedures, and techniques that had been successful in the Spokane market.

80.    During the Dealer Period, Showroom's unit sales of Steinway & Sons® grand pianos were about 30% of the cumulative "reasonable" annual sales performance goals for Steinway & Sons® grand pianos in the Phoenix market.

81.    The most Steinway & Sons® grand pianos Showroom sold in the Phoenix market in any year was 24 in 2014 which was only 53% of the "reasonable" annual sales performance goal.  That volume was achieved due to a heavily advertised "store closing sale" incident to the Rindlisbachers' move to the new Scottsdale Fashion Square location.

82.    During the Dealer Period, Showroom's combined unit sales of Boston® and Essex® grand pianos were 19% and 68% respectively, of the cumulative "reasonable" annual sales performance goals for Boston® and Essex® grand pianos in the Phoenix market.

**STEINWAY TERMINATES THE PHOENIX DEALERSHIP**

83.    On or about February 20, 2017, Showroom's sales person heard from Irwin

Pasternick, a sales prospect of several years' development.  Mr. Pasternick reported he had just gone to the Steinway factory in New York and had "fallen in love" with a 7' grand piano that he purchased for $165,000.  Not to worry, Mr. Pasternick said, because he had told Steinway's factory salesman that he must purchase the grand piano from his loyal, local sales person in Scottsdale.  And, Mr. Pasternick said, Steinway's factory salesman assured him Steinway would treat the New York sale just as if Showroom had sold him the grand piano in Scottsdale.

84.     If Showroom had sold the 7' grand piano to Mr. Pasternick it would have made a gross margin of approximately $80,000 and its sales person would have received a commission of $13,200, for net revenue to Showroom of $66,800.

85.     Instead of honoring its promise to Mr. Pasternick, on February 21, 2017, Steinway sent Showroom a check for $16,500 and emailed a request that Showroom accept shipment of the grand piano, deliver it to Mr. Pasternick, and tune it for him.

86.     Rindlisbachers were justifiably upset at Steinway's deception of their longstanding prospect, Mr. Pasternick, to the detriment of Showroom.

87.     On February 22, 2017, Mr. Rindlisbacher "replied all" to the email referenced in paragraph 85, and explained why Steinway's conduct was unfair and wrong.

88.     No one from Steinway responded to Mr. Rindlisbacher's February 22 email.

89.     Late on March 6, 2017, Mr. Rindlisbacher sent Steinway a follow-up request for a response to his February 22, 2017 email on the Pasternick sale.

90.     On the morning of March 7, 2017, Mr. Sanders informed Mr. Rindlisbacher by email that he would be at the Scottsdale store on March 21 and was "hoping that you will be as well.  Please let me know."

91.     On March 21, 2017, Mr. Sanders arrived at Showroom's Scottsdale store, took Mr. Rindlisbacher into the recital room, and said "these things are never easy" but then proceeded to inform Mr. Rindlisbacher that Steinway was terminating the

Rindlisbachers' Phoenix-market dealership effective July 1, 2017; and handed him a letter to that effect.  Mr. Sanders told Mr. Rindlisbacher "it's nothing personal, it's just business."

**FIRST CLAIM FOR RELIEF**
**(NONDISCLOSURE / CONSTRUCTIVE FRAUD)**

92.     Plaintiffs incorporate all prior allegations of this Complaint as though fully set forth herein.

93.     Prior to December 1, 2010, due to its relation of trust and confidence toward Rindlisbachers, Steinway had a duty to disclose material facts to Rindlisbachers.

94.     Due to Mr. Snyder's oral representation that the Phoenix Market was capable of selling 70 Steinway & Sons® grand pianos in a year; and the representation Mr. Snyder made orally, which is repeated in Article III of Phoenix Dealer Agreement, that 45 Steinway & Sons® grand pianos was a reasonable sales performance goal, Steinway had a duty to disclose to Rindlisbachers all facts necessary to avoid that representation being materially misleading.

*The Omissions.*

95.     Between November 23 and December 1, 2010, Steinway knew, but omitted to disclose to Mr. Rindlisbacher, at least the following facts (the "Omitted Facts"):

A.   In none of the prior ten years had Steinway sold 45 Steinway & Sons® grand pianos to its then Phoenix dealer.

B.   Typical sales of Steinway & Sons® grand pianos to its then Phoenix dealer over the past ten years had been  in the range of 10-15 per year.

C.   Steinway did not in fact believe that 45 Steinway & Sons® grand pianos was a reasonable annual sales performance goal for its Phoenix dealer.

D.   Sherman Clay had exited the Phoenix market in 2010 in part because of low sales volumes of Steinway & Sons® grand pianos.

E.   In only one year, in the mid 1990s, Steinway sold 70 Steinway & Sons® grand pianos to its then Phoenix dealer.

F.  During that year, ASU had purchased $1,000,000 of Steinway & Sons® grand pianos from the then Phoenix dealer.

G.  In no other year since the mid 1990s had Steinway ever sold 70 Steinway & Sons® grand pianos to its then Phoenix dealer.

H.  ASU had not purchased a single Steinway & Sons® grand piano from Steinway's then Phoenix dealer since that single large purchase.

I.  ASU was dissatisfied with warranty service provided by Steinway and its School of Music had determined not to purchase more Steinway pianos from the Phoenix dealer.

96.  During the conference calls on or about September 28, and October 10, 2010, Mr. Sanders and Mr. Losby failed to disclose the Omitted Facts to Mr. Rindlisbacher.

97.  The Omitted Facts were of such a nature as to justifiably induce Rindlisbachers to act or refrain from acting in their evaluation whether to become Steinway's Phoenix dealer and make its initial inventory purchase.

98.  Steinway breached its duty to disclose the Omitted Facts.

*Consequent Injury and Damage*

99.  As the direct and proximate result of Steinway's failure to disclose the Omitted Facts, Plaintiffs suffered general damages in that actual sales during the Dealer Period were far less than if the Omitted Facts had not existed, and Plaintiffs' profits for the Dealer Period would have greatly exceeded their actual profits if the Omitted Facts had not existed.

100.  Showroom's income statements throughout the Dealer Period provide a rational basis for calculation of lost profits.

101.  Because Rindlisbachers were involved together in a joint family business and because the Phoenix dealership required relocating their large family from Spokane, Washington, to Scottsdale, Arizona, when Steinway failed to disclose the Omitted Facts it was foreseeable that Steinway's conduct would cause mental anguish and emotional

distress to Rindlisbachers.

102.   As the direct and proximate result of Steinway's failure to disclose the Omitted Facts, Rindlisbachers suffered foreseeable mental anguish and emotional distress.

*Corroboration*

104.   Upon information and belief, between September 2010 and the present, Steinway has failed to disclose to other new dealers facts comparable to the Omitted Facts while inducing them to become Steinway dealers and to make large initial inventory purchases.

*Punitive Damages*

105.   Steinway's fraudulent conduct toward Plaintiffs is evidence of evil motive and was carried out with reckless indifference to Plaintiff's rights and interests warranting the imposition of punitive damages to deter similar conduct in the future and to punish Steinway for its conduct.

106.   An award of punitive damages is justified against Steinway.

107.   In September 2013, the hedge fund Paulson & Co., Inc. acquired 83.8% of Steinway's common stock in a tender offer for more than $440,000,000, indicating a then-fair-market value of about $527,000,000 for Steinway.

108.   According to recently published reports, Steinway's annual revenues are about $400,000,000, up from about $354,000,000 in 2012.

*Discovery*

109.   On or about May 27, 2015, at a Steinway Dealer Meeting in Orlando, Florida, Eric Schwartz, the owner of Sherman Clay, asked if he could sit with Rindlisbachers at a luncheon.

110.   During the luncheon, Mr. Schwartz inquired of the Rindlisbachers how things were going in Phoenix.

111.   Before they could answer, Mr. Schwartz said "Let me guess:  Steinway told you 25 Steinway & Sons® grand pianos per year was reasonable; and you sell about 10 or

12."

112.   As the conversation continued, Mr. Schwartz stated that Sherman Clay's 2005 to 2010 sales of Steinway & Sons® grand pianos in the Phoenix market were in the range of 10-15 per year.

113.   After March 21, 2017, Mr. Rindlisbacher sought out and spoke with store managers for other Steinway dealers in the Phoenix market and learned that their annual sales, too, had been a fraction of the 45 Steinway & Sons® grand pianos Steinway had represented to be a reasonable annual sales performance goal for the Phoenix market.

114.   Prior to May 27, 2015, Plaintiffs did not know they had been injured by Steinway's failure to disclose the Omitted Facts nor should they have discovered such injury in the exercise of reasonable diligence.

115.   Because of Steinway's relation of trust and confidence toward Rindlisbachers, and because of Steinway's superior knowledge, Plaintiffs had no duty to investigate.

**SECOND CLAIM FOR RELIEF**
**(FRAUDULENT REPRESENTATIONS AND OMISSIONS)**

116.   Plaintiffs incorporate by reference all prior allegations of this Complaint.

*The Representations*

117.   On September 6, 2010 Mr. Snyder emailed Mr. Rindlisbacher representing that the "Greater Phoenix market has 1.4336 BPI Points – and it is ranked 13th in the nation" which, he said, "is actually slightly higher than what I told you."

118.   While in Scottsdale on September 22, 2010, Mr. Rindlisbacher and Mr. Snyder visited the existing Steinway store in north Scottsdale, which was having a "store closing sale." Mr. Snyder represented to Mr. Rindlisbacher that Sherman Clay was ceasing to be Steinway's Phoenix market dealer because of a very expensive ten-year retail space lease on the north Scottsdale store that had been signed in 2005 and which had a termination option at the end of the fifth year.

119.   While in Scottsdale on September 22 and/or 23, 2010, Mr. Snyder made

representations to Mr. Rindlisbacher concerning the Phoenix market, including but not limited to:

> A. The Phoenix market is capable of selling 70 Steinway & Sons® grand pianos in a year.
>
> B. Given then market conditions a reasonable annual sales performance goal for the Phoenix market is 45 Steinway & Sons® grand pianos (and comparable quantities of Boston® and Essex® grand pianos plus lesser quantities of upright pianos of all three brands).

120.   On October 7, Mr. Sanders provided to Mr. Rindlisbacher a list of possible institutional customers in the Phoenix market.

121.   Mr. Snyder then pared down the list and sent the revised institutional customer list to Mr. Rindlisbacher also on October 7.

122.   The largest potential institutional customer on both lists was Arizona State University.

123.   By email on October 30, Mr. Snyder noted that the Phoenix market is "about one third the market size and potential of greater Los Angeles."   He then represented that notwithstanding the demographic differences Mr. Rindlisbacher had identified, "there's simply no doubt as to the [Phoenix market's] potential."

124.   The representations alleged in paragraphs 116-122 are hereinafter referred to as the "Initial Express Representations."

125.   By making the Initial Express Representations, Mr. Snyder impliedly represented that:  (1) Steinway's actual historic sales into the Phoenix market supported the Initial Express Representations; and (2) Steinway did not know any facts that were inconsistent with the Initial Express Representations (collectively the "Implied Representations").

126.   By failing to disclose the Omitted Facts, Steinway is deemed to have represented the non-existence of the Omitted Facts (the "Deemed Representations").

127.   Steinway's Initial Express Representations and the Implied Representations

were misleading without disclosure of the Omitted Facts.

128.    In letters Mr. Snyder sent to Mr. Rindlisbacher in Arizona over the years, with copies to Mr. Sanders, Mr. Snyder repeatedly reaffirmed that the represented annual sales performance goals were reasonable by continuing to affirm the capacity of the Phoenix market while blaming Plaintiffs for not realizing that potential through inadequate or misguided promotional activity (the "Continuing Representations").  For example:

A.    In a letter dated July 7, 2011, Mr. Snyder referred to "the size and importance of the greater Phoenix market" and stated that with the right approach "I am convinced that things will turn in the right direction."

B.    In a letter dated July 12, 2012, Mr. Snyder acknowledged "it has taken longer to gain traction [in Scottsdale] than we both expected, or we both hoped would be the case"; but "I firmly believe" that an increase in effort "will result in a major and positive change in the number of 'Family of Steinway Designed Piano' sales that you experience.  To that end, I look forward to working with you the remainder of this year and beyond."

C.    In a letter dated January 17, 2013, Mr. Snyder stated that if certain actions were taken "I am confident that we'll see a major turn in the right direction in 2013."

D.    In a letter dated January 20, 2013 [sic: 2014], Mr. Snyder referred to "the size of the greater Phoenix area market" and stated it was urgent that "we put together a business plan that gives us a high level of confidence as to a major increase in Steinway grand piano sales."

E.    In a letter dated January 26, 2015, Mr. Snyder referred to Showroom's Phoenix business being "up just a hair under $1M" as a "very significant increase in our business" but stated that "the market itself has the potential for even greater numbers."

F.    In a letter dated July 15, 2015, Mr. Snyder stated:   "In DMA

rankings, Phoenix is now ranked number 13.  In terms of Buying Power (retail strength of market), the last report that was created (2009) had Phoenix ranked at number 12.  As a 'top 20' market, it is important to see things improve here."

   G. In a letter dated February 1, 2017, Mr. Edds, who had replaced Mr. Snyder as Western District Manager, stated that Showroom's level of sales is a "disconnect"  because "other markets" the size of  Phoenix's  "1.5 million [residents]" are "having more success than we have been experience in the Phoenix market."

   H. In an email on May 22, 2017 to Plaintiffs in Arizona, Steinway still insisted on the truth of its fraudulent representation that 45 Steinway & Sons® grand pianos was a reasonable annual sales performance goal for the Phoenix market, by stating that Mr. Rindlisbacher and Steinway "simply do not agree on the market's potential."

*Corroboration*

 129. Upon information and belief, from September 2010 to the present, Steinway has made representations similar to the Representations to induce other persons to become Steinway dealers and make large initial inventory purchases to the great detriment of those persons.

*Falsity*

 130. The Initial Express Representations, the Implied Representations, the Deemed Representations, and the Continuing Representations (collectively the "Representations") were false, because:

   A. In none of the prior ten years had Steinway sold 45 Steinway & Sons® grand pianos into the Phoenix market.

   B. Upon information and belief, the typical sales of Steinway & Sons® grand pianos into the Phoenix market over the past ten years had been about 10-15 per year.

   C. Upon information and belief, Sherman Clay had exited the Phoenix market in 2010 in part because of low sales volumes of Steinway & Sons® grand pianos.

   D. The year in which 70 Steinway & Sons® grand pianos were sold in

the Phoenix market was in the mid 1990s.

E.    During that year, ASU had purchased $1,000,000 of Steinway & Sons® grand pianos.

F.    Upon information and belief, in no other year since the mid 1990s had Steinway ever sold 45 Steinway & Sons® grand pianos into the Phoenix market.

G.    Steinway did not in fact believe that 45 Steinway & Sons® grand pianos was a "reasonable sales performance goal" for the Phoenix market.

H.    ASU had not purchased a single Steinway & Sons® grand piano since that year.

I.    ASU was dissatisfied with warranty service provided by Steinway and its School of Music told Steinway's then dealer it would never purchase another Steinway piano.

*Materiality*

131.   Rindlisbachers reasonably attached importance to the Representations in determining whether to become Steinway's Phoenix dealer.

132.   Steinway knew or had reason to know that Rindlisbachers did or would likely regard the Representations as important in determining whether to become Steinway's Phoenix dealer.

*Speaker's Knowledge of Falsity or Ignorance of Truth*

133.   As of September 22, 2010, Mr. Snyder had been Steinway's Western District Manager and/or Senior District Manager for more than 25 years; had supervised Steinway's various Phoenix market dealers during that time; and was intimately familiar with, and had ready access to, Steinway's actual sales into the Phoenix market over that 25-year period.

134.   Mr. Snyder knew the Representations were false, believed them to be false, or made them with reckless disregard for their truth.

135.   As Steinway's Vice President Sales & Marketing and as a participant in evaluating a possible Steinway company-owned store in the Phoenix market in August

and September 2010, Mr. Sanders, upon information and belief, knew the Representations were false, believed them to be false, or made them with reckless disregard for their truth.

136.    As Steinway's President of the Americas and as a participant in evaluating a Steinway company-owned store for the Phoenix market in August and September 2010, Mr. Losby, upon information and belief, knew the Representations were false, believed them to be false, or made them with reckless disregard for their truth.

*Speaker's Intent That Representations Be Acted Upon.*

137.    The Representations were made in the context of Plaintiffs' consideration whether to become and remain Steinway's dealer for the Phoenix market.

138.    Steinway intended that Plaintiffs would act upon the Representations by becoming its Phoenix dealer, leasing and improving a store location, and making a large initial inventory purchase.

*Hearer's Ignorance of the Representations' Falsity*

139.    Plaintiffs were ignorant of the falsity of the Representations.

*Hearer's Reliance on the Truth of the Representations.*

140.    Plaintiffs relied upon the Representations (among other ways) in deciding in October or November 2010 to become Steinway's dealer for the Phoenix market; Showroom signing the Phoenix Dealer Agreement; Mr. Rindlisbacher executing a personal guaranty of the Phoenix Dealer Agreement; signing in Arizona a lease for the Scottsdale stores and making tenant improvements;  hiring employees for the Scottsdale Store;  placing the initial inventory order for the Scottsdale store for delivery in Arizona; relocating the Rindlisbachers' family of seven from Spokane to Scottsdale; and carrying out diligent and devoted service under the Phoenix Dealer Agreement throughout the Dealer Period (collectively the "Reliance Acts").

*Right to Rely*

141.    Given Mr. Snyder's position as Western District Manager for 25 years, his then position as Senior District Manager, his consequent exclusive knowledge of

historical sales of Steinway & Sons® grand pianos into the Phoenix market, the executive positions of Mr. Sanders and Mr. Losby, and the special relationship of trust and confidence Steinway held toward Rindlisbachers, Plaintiffs had a right to rely on the Representations in carrying out the Reliance Acts.

*Consequent Injury and Damage*

142.   As the direct and proximate result of the fraudulent Representations, Plaintiffs suffered damages in that actual sales were far less than if Steinway's Representations had been true been true, and if the Representations had been true, Plaintiffs' profits would have greatly exceeded their actual profits for that period.

143.   Showroom's income statements throughout the Dealer Period provide a rational basis for calculation of lost profits.

144.   Because Rindlisbachers were involved together in a joint family business and because the Phoenix dealership required relocating their large family from Spokane, Washington, to Scottsdale, Arizona, when Steinway made the fraudulent Representations it was foreseeable that Steinway's fraud would cause mental anguish or emotional distress to the Rindlisbachers.

145.   As the direct, and proximate result of the fraudulent Representations, Plaintiffs severe mental anguish and emotional distress.

**JURY DEMAND**

146.   Plaintiffs hereby demand trial by jury as provided in the Seventh Amendment to the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray Judgment against Steinway as follows:

A.   For the full amount of money required fairly to compensate Plaintiffs for all damages caused by Steinway's constructive fraud, including: (1) general damages consisting of (a) the profits that would have resulted had 45 Steinway & Sons® grand pianos being a reasonable sales performance goal for the Phoenix market, and (b) certain out-of-pocket costs damages including but not limited to rent on a lease

signed in reliance on the Representations; and (2) foreseeable mental anguish and emotional distress, in a combined amount to be proved at trial but in no event less than $75,000.

        B.    For the full amount of money required fairly to compensate Plaintiffs for all damages caused by Steinway's fraudulent Representations, including: (1) general damages consisting of (a) the profits that would have resulted had the Representations been true, and (b) certain out-of-pocket costs damages including but not limited to rent on a lease signed in reliance on the Representations; and (2) foreseeable mental anguish and emotional distress, in a combined amount to be proved at trial but in no event less than $75,000.

        C.    For punitive damages arising because of the conduct alleged in an amount sufficient to deter similar conduct and to punish Steinway for its fraudulent conduct, in an amount to be determined at trial based upon all relevant factors.

        D.    For costs incurred and accruing herein under A.R.S. § 12-341.

        E.    For pre-judgment interest from the date the Complaint is filed to the date of recovery and post-judgment interest, all as provided by applicable law.

        F.    For such other and further relief as the Court may deem just and proper in the premises.

RESPECTFULLY SUBMITTED, this 12th day of April, 2018.

**MORRILL LAW, P.L.C.**


By s/K. Layne Morrill
      K. Layne Morrill #004591
      8857 N. 63rd Place
      Paradise Valley, Arizona 85253
      Attorney for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28