**Lewis Roca Rothgerber Christie LLP**
201 East Washington Street, Suite 1200
Phoenix, AZ 85004

**Bruce E. Samuels** (State Bar No. 015996)
Direct Dial: 602.262.0216
Direct Fax: 602.734.3859
Email: bsamuels@lrrc.com
**Heather Stanton** (State Bar No. 033394)
Direct Dial: 602.262.0864
Direct Fax: 602.262.5747
Email: hstanton@lrrc.com

*Attorneys for Defendant Steinway, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kevin H. Rindlisbacher and Jami L. Rindlisbacher, husband and wife; and Piano Showroom of Arizona, Inc., an Arizona corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Steinway, Inc., a Delaware corporation,<br><br>Defendant. | No. 2:18-cv-01131-MTL<br><br>**DEFENDANT'S *DAUBERT* MOTION[1] TO PRECLUDE OPINIONS OF DAVID R. PERRY**<br><br>(ORAL ARGUMENT REQUESTED) |

This case arises out of a contractual relationship through which Plaintiffs were able to purchase from Steinway new Steinway pianos at a wholesale price, and sell those pianos at a retail price of their choosing in Maricopa County from 2011 to 2017. Plaintiffs' claims hinge on an alleged affirmative duty by Steinway to disclose information never requested by Plaintiff Kevin Rindlisbacher ("Rindlisbacher"): the sales performance of the prior dealer.

---

[1] Undersigned counsel certifies that he spoke with Plaintiffs' counsel on February 13, 2020, about Steinway's intent to file a *Daubert* motion regarding David Perry based on Plaintiffs' speculative damages premise and Perry's analysis and conclusions. The parties were unable to resolve the disputed evidentiary issues.

110253500.6

While there are several deficiencies in Plaintiffs' theories,[2] one of the most bizarre is Plaintiffs' damage claim. Plaintiffs seek between over $7.5 million in tort damages in the form of alleged "lost profits" for pianos they never purchased from Steinway nor sold to any consumer, all based on an alleged omission about the prior piano dealer's sales. Plaintiffs have hired David Perry to opine on damages based on a formula with a faulty assumption: that Plaintiffs are entitled to profits as if they had met the sales performance goals set forth in the Steinway Authorized Dealer Agreement ("Agreement"), regardless of all the variables that can affect a retailer's sales performance. Perry analyzed the alleged profits Rindlisbacher would have generated had he sold 1,521 Steinway pianos over 6 ½ years, rather than the 443 Steinway pianos he actually sold. Plaintiffs are attempting to turn the reasonable sales performance goals into a contractual guaranty that does not exist.

Perry also attempts to assess $252,409 to Steinway based on claimed "out of pocket" losses for the nine-month period after Steinway terminated the agreement. This theory is based on a seven-year lease that Plaintiffs entered into in 2014. Neither Perry nor Plaintiffs can demonstrate how Steinway's alleged omission about the prior dealer's sales in 2010 caused post-termination damages in 2017 and 2018.

Plaintiffs' damages theories do not satisfy *Daubert* scrutiny. Steinway therefore seeks exclusion of Perry's testimony. This motion is supported by the following Memorandum of Points and Authorities and the attached exhibits.

## Memorandum of Points and Authorities

### I. BACKGROUND

Rindlisbacher is a sophisticated and experienced piano retailer who has owned and operated five piano and music retail stores in three states, beginning in 1983. (Doc. 163 ¶ 32). Steinway is a manufacturer of pianos that has for decades entered into dealer

---

[2] Steinway addresses the legitimacy of Plaintiffs' duty-based claim in its separately filed Motion For Summary Judgment #1 (Doc. 205), and the legitimacy of Plaintiffs' damages theories in its Motion for Summary Judgment #2 (Doc. 207).

2

110253500.6

agreements with retailers in various markets. Those dealer agreements allow retailers to purchase Steinway pianos at a wholesale price and to, in turn, sell those pianos at a price of their choosing from a retail store that they own and operate.

In the fall of 2010, Rindlisbacher learned that the existing Steinway dealer in Maricopa County was going out of business. (Doc. 163 ¶¶ 52, 58A). At that time, he had a Steinway dealership in Spokane and three music stores in Utah in which he sold pianos by Steinway's competitors. (Doc. 163 ¶¶ 32-33, 44). He approached Steinway about expanding his retail operations into Arizona. (Doc. 163 ¶¶ 52-54).

After Rindlisbacher conducted due diligence about the Maricopa County market, Rindlisbacher and Steinway signed the Agreement. In the Agreement, Steinway and Rindlisbacher agreed to sales performance goals. Rindlisbacher was aware from his contractual relationship as the Steinway dealer in Spokane that the sales performance goals were based on the Buying Power Index ("BPI") for the market. Steinway used the BPI to set sales goals objectively and uniformly in every market in which Steinway had a dealer. Steinway did not adjust the goals based on a dealer's prior performance in the market. Thus, in 2010, Rindlisbacher's sales goals in Spokane were 34 pianos per year, whereas in Maricopa County they were 234 pianos per year.

Rindlisbacher operated his retail piano store in Scottsdale through which he was authorized to sell new Steinway pianos from December 2011 until July 2017. During that time Rindlisbacher only attained an average of 30 percent of his sales goals per year. Nonetheless, discovery has revealed that Rindlisbacher nonetheless generated $1.974 million in profits as a Steinway dealer in Arizona. (Doc. 163 ¶ 83; Ex. 1 at 260). The parties' Agreement was terminable at any time by either party. In 2017, Steinway terminated the Agreement. A year later, Plaintiffs filed this lawsuit.

Plaintiffs' remaining claims are premised on an alleged affirmative duty by Steinway in 2010 to disclose to Rindlisbacher information about which he showed no

3

curiosity: the former dealer's sales performance. Plaintiffs' damages expert, David Perry, assumes liability but ignores the critical component – causation – which cannot be proven based on Rindlisbacher's testimony. Perry also ignores other facts and variables that make his opinions speculative and inadmissible. Because there is no reliable basis for Perry's opinions, they must be excluded under Federal Rule of Evidence 702 and 703.

## II.     PERRY'S BACKGROUND

Perry is a paid expert witness who regularly performs damages calculations for use in lawsuits. (Ex. 2 Appendix A). He is a licensed CPA. He has no experience in the piano industry, nor has he ever been employed in the retail industry or in a manufacturing business. (Ex. 3 at 42-43). He admits that he is not a piano industry expert. (*Id.*). He has no training in psychiatry or psychology or any other training that would allow him to opine on a person's state of mind. (Ex. 3 at 77). He agrees that he should not provide any opinions on "state of mind." (Ex. 4 at 1). He could not recall any other case in which he was asked to perform damages calculations based on alleged omissions eight years before the lawsuit was filed. (Ex. 3 at 43-44). Perry did not speak with Rindlisbacher in performing his analysis. (Ex. 3 at 61). Rather, all the information he was provided came from Plaintiffs' counsel.

## III.    SUMMARY OF PERRY'S DAMAGES OPINIONS

### A.     "Lost Profit" Damages

Perry assumes that but for Steinway's alleged omission in 2010 about the prior dealer's sales performance, Rindlisbacher would have met the sales goals that he never came close to meeting. (Ex. 2 at 22). More specifically, Perry claims Rindlisbacher would have generated $6 million in gross annual revenue for 6 ½ years simply by knowing about the prior dealer's sales, instead of the approximately $2 million in annual revenues that Plaintiffs actually made. (Ex. 2 at 14; Ex. 3 at 44-45). Put another way, Perry's "damage calculations determine the incremental profits that Plaintiffs would have earned if they sold

4

[234 pianos per year per the goal] as opposed to the actual number of new Steinway pianos that they sold." (Ex. 2 at 20). The actual annual average number of pianos sold was 64.5, creating a "shortfall" of 169.5 pianos per year for 6 ½ years, for a total of 1,073 pianos never purchased from Steinway nor sold by Rindlisbacher. (Ex. 2 at 16).

As support for his assumption as to what Rindlisbacher's sales would have been, Perry reasons that because Rindlisbacher met his much smaller sales goals (34 pianos per year) in a smaller location (Spokane) and in a different time period (from 2007 to 2010), it is reasonable to assume that Rindlisbacher could have met the sales goals (234 pianos per year) for his new store in Maricopa County from 2011 to 2017 if not for Steinway's alleged failure to disclose the prior dealer's sales. (Ex. 3 at 77-79).

Perhaps understanding that this sort of causation link cannot work, Perry claims that he is just calculating damages based on Plaintiffs' alleged "reasonable expectations." As support, Perry, who has no training or expertise in psychiatry or psychology, and who agrees that "state of mind" is an area on which he should not opine, contends that Rindlisbacher "reasonably expected to sell over 1,073 more pianos than he actually sold." (Ex. 2 at 11). Perry's testimony on "reasonable expectations" is not helpful to the trier of fact, and he has no experience that would qualify him as an expert on what is or is not reasonable. Therefore, such testimony is not admissible. Fed. R. Evid. 402, 403, 702, and 703.

### B.    "Out of Pocket" Damages

Perry's out of pocket damages analysis occupies one page of his 24-page report. (Ex. 2 at 23-24). He focuses on the nine months after Steinway terminated the dealer agreement until Plaintiffs became the dealer for Yamaha pianos. (Ex. 3 at 52-54). He claims that Steinway should be liable for $252,409, the amount of the retail store's operating losses, because (1) Plaintiffs were not able to immediately find another piano manufacturer relationship; (2) Plaintiffs had a lease with continuing obligations; and (3)

5

Plaintiffs operated at a loss during those nine months. As explained below, these 2017-2018 damages are too attenuated from the alleged 2010 omission and are not supported by facts in this case.

## IV.     PERRY'S OPINIONS DO NOT SURVIVE *DAUBERT* SCRUTINY

Plaintiffs' damages opinions must be excluded because they are neither relevant nor reliable. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993) (trial court must perform "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"). Perry ignores key variables, which he is not free to ignore in attributing damages, and key facts, which he is not free to assume away. His opinions cannot survive *Daubert* scrutiny.

This Court has a gatekeeper function to scrutinize expert testimony pursuant to Rules 702, 703, 104, 402, and 403. "[T]he Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The objective of *Daubert* "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Regarding relevancy, the Court must ensure that the proposed expert testimony "fits" the facts of the case. *Daubert*, 509 U.S. at 591-92. "Scrutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 145 (4th Cir. 1994) (sources omitted).

The reliability assessment focuses on the validity of the reasoning or methodology. *Daubert*, 509 U.S. at 590. The Court's role is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 150-51. In the damages context, calculations of

6

lost profits or earnings must factor in foreseeable risks. *See Kay v. First Cont'l Trading, Inc.*, 976 F. Supp. 772, 776 (N.D. Ill. 1997) (rejecting expert's opinion as to lost earnings because expert did not factor in any risk despite earnings not being guaranteed). The court noted in *Kay* that when an expert's opinion does not account for risk, the opinion is problematic "because the deceptive appearance of precision [] created by the complex calculations enhances the risk that lay factfinders may swallow the bogus conclusions" that the expert espouses. *Id.*

"In assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 286 (S.D.N.Y. 2000). Perry's opinion, "despite its dazzling sheen of erudition and meticulous methodology, reaches a result which any average person could readily recognize as preposterous." *Id.*

The Ninth Circuit's opinion in *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988), is instructive. Plaintiff's damages expert attributed all alleged lost profits to the acts of Shell Oil Company, yet acknowledged that the other factors could cause a decline in sales. The Ninth Circuit determined that the expert's damages assessment was "hopelessly flawed," and that market conditions could have affected the purported damages, regardless of any acts by Shell Oil Company. *Id.* at 807. The court also concluded that the expert's analysis "rests on assumptions and ignores distinctions crucial to a valid conclusion." *Id.* Citing Rule 403, the Court affirmed the trial court's ruling barring the expert. With plaintiff having no admissible evidence of damages, the Court also affirmed the trial court's summary judgment in favor of Shell Oil. *See also City of Vernon v. Southern California Edison*, 955 F.2d 1361, 1372 (9th Cir. 1992) (affirming summary judgment based on lack of proper proof of damages; expert's opinions were fundamentally flawed).

Perry performed no independent analysis of the retail piano industry. Nor did he

110253500.6

consider variables that may affect the level of piano sales that a retailer could achieve. He did not even have any discussions with Rindlisbacher. Rather, the information he reviewed was provided to him by Plaintiffs' counsel. (Ex. 3 at 61). "What [the expert] has done is to present his own speculative numbers without having tempered them in any way to account for their 'iffy' nature. Those deficiencies involve a fundamental flaw that causes the overall [expert] opinion to be the Rule 702 equivalent of what in early computer vocabulary bore the label 'GIGO' ('garbage in, garbage out')." *Kay v. First Continental Trading, Inc.*, 976 F. Supp. 772, 776 (N.D. Ill. 1997).

Steinway's ability to rebut Perry's opinions is not a legitimate ground for the Court to admit Perry's testimony; otherwise a *Daubert* motion would almost never be granted. *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 458-59 (D.N.J. 1998) (rejecting as "circular" magistrate judge's conclusion that an expert's opinion is admissible because the adverse party could cross-examine and rebut the testimony). "In far too many cases, juries [have been] taken in by business and economic experts, and it was only the vigilance of the appellate court that brought to light the problems with the expert's testimony." R.M. Lloyd, *Proving Lost Profits After Daubert: Five Questions Every Court Should Ask Before Admitting Expert Testimony*, 41 U. RICH. L. REV. 379, 380-81 (2007)

As explained below, Perry's opinions and testimony are neither relevant nor reliable, both of which are required under *Daubert*.

V.  **ARIZONA LAW ON PROOF OF DAMAGES**

Under Arizona law any alleged damages "must be the direct and proximate cause of the wrong alleged." *Schuldes v. Nat'l Sec. Corp.*, 27 Ariz. App. 611, 616 (1976) (holding that the damages were too speculative, and affirming summary judgment in favor of defendant). Arizona's jury instructions provide that before liability can be found, defendant's breach of the alleged duty must be a cause of plaintiff's damages. REVISED ARIZONA JURY INSTRUCTION (CIVIL) Commercial Torts 2 Fiduciary Duty (Causation) (6th

8

ed. 2017). A breach of a duty "is a cause of damages if it helps produce the damages and if the damages would not have occurred without the breach." *Id.* The only profits recoverable for breach of a fiduciary-type duty are the profit that plaintiff "would have received had [defendant] performed his duties." *Id.* Commercial Torts 3 Fiduciary Duty (Measure of Damages).

## VI. PERRY DOES NOT SATISFY *DAUBERT*'S REQUIREMENTS

Perry ignores several critical facts and makes illogical assumptions. His testimony should not be permitted.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). There is too great an analytical gap between the opinions of Perry and the facts.

### A. Both Damages Theories Depend on a Fact that Does Not Exist

Evidence Rule 104 requires the Court to determine whether the evidence proffered by a party "depends on a whether a fact exists." If that fact does not exist, then the proffered testimony is not relevant and should not be admitted.

As an initial matter, Perry ignores key testimony by Rindlisbacher. When asked whether he would have entered into the Agreement had he known about the former dealer's sales, he answered, "I don't know what I would have done." (Ex. 1 at 250-251). Indeed, there is no evidence that, if Steinway had informed Rindlisbacher of the prior dealer's sales performance, Plaintiffs would have acted any differently. If Rindlisbacher had decided not to sign the Agreement, then, of course, there would be no claim for damages because he would have never entered the market.

Furthermore, there is no evidence that, had Rindlisbacher known about the prior dealer's actual sales, he would have actually sold 234 pianos per year for 6 ½ years, or

110253500.6

generated $6 million in annual gross piano sales, as Perry opines. The reality is that, despite badly missing his sales goals each year, Plaintiffs still generated almost $2 million in profits. (Ex. 1 at 260; Ex. 2 at 14). Rindlisbacher was content enough with his sales figures to not exercise his right to terminate the Agreement for six years, despite missing his sales goals by 70 percent per year, until Steinway decided to terminate the Agreement. (Ex. 5).

Perry's analysis is, at best, speculative. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (reversing jury verdict based on faulty testimony of expert in violation of *Daubert*). Plaintiffs, through their expert, are attempting to make this a strict liability case, which the Court should reject. *See* PROSSER AND KEATON ON THE LAW OF TORTS § 43, at 281 ("In so far as the defendant is held liable for consequences which do not lie within the original risk which the defendant has created, a strict liability without fault is superimposed . . . .").

"An expert's opinion as to damages must be causally related to the alleged harm." *Tyger Constr. Co.*, 29 F.3d at 145. Where an expert's opinions are unsupported by the record, the opinions are not relevant, as they do not fit the case. *Id.* ("Expert opinion evidence based on assumptions not supported by the record should be excluded."). The risk of allowing testimony of an expert about assumptions not based on facts is that the expert's testimony will likely mislead the jury. *Id.*

Perry has failed to incorporate Rindlisbacher's testimony that he did not know whether he would have entered into the Steinway dealer agreement in 2010 had he known about the prior dealer's sales. Thus, there is no causation, and any testimony as to causation by Perry must be rejected. *RTC v. Stroock Stroock & Lavan*, 853 F.Supp. 1422, 1429 (S.D. Fla. 1994) (rejecting damages expert because causation was too speculative).

110253500.6

B.   **Alleged Lost Profits Are Speculative**

1.   *Perry Omits All Variables*

Perry acknowledged on cross-examination that there are many variables that can affect a piano retailer's sales performance. (Ex. 3 at 71). Those variables include the state of the economy, consumer preferences and buying trends, increased competition, skills of the dealer's salespeople, level of promotions and advertising, and whether the dealer himself is difficult to work for and has high turnover among his sales team.[3] (Ex. 8 at 217-19). He did not consider those variables.

Indeed, before signing the Agreement, Rindlisbacher acknowledged that the state of the economy, housing prices, and stock market volatility were creating a "perfect storm" keeping buyers out of his Spokane store. (Ex. 6 ). He also has acknowledged that the Internet affected his business because potential piano customers could research prices offered by other Steinway dealers in different markets, thus creating additional competition among dealers. (*Id.*). He further stated that an entire group of consumers ceased to exist – musicians who can no longer afford a piano. (*Id.*).

After Steinway terminated the dealer agreement and after Rindlisbacher flew to New York to try to persuade Steinway to reconsider, he wrote an email to Steinway acknowledging that he had spent the prior six years "trying to create sales in the areas of the least opportunity for success." (Ex. 7). Perry made no adjustments based on Rindlisbacher's admitted failure to focus on what he belatedly came to understand was the optimal sales market and strategy. (Ex. 8 at 187-88).

Perry also ignored Rindlisbacher's written communications during the Agreement in which he complained to Steinway about Steinway's wholesale price increases and their impact on his sales. (Ex. 6 at RIN019644; Ex. 11; Ex. 12; Ex. 13; Ex. 14; and Ex. 15). In

---

[3] Rindlisbacher had high turnover among staff. (Ex. 9 at 54-55; 32-34). His first employee described him as a "bully" who created a "hostile work environment." (Ex. 10). She testified that Rindlisbacher admitted to her that he was an "asshole." (Ex. 9 at 59-62).

11

fact, Plaintiffs state in their complaint that Steinway raised the wholesale price on Steinway & Sons grand pianos by 59 percent from 2009 to 2018.  (Doc. 163 ¶ 28).

Price elasticity is a factor that damages experts should consider in any damages calculation involving the sale of goods.  *See Johnson Elec. N. Am.*, 103 F. Supp. 2d at 274-75 (damages expert included price elasticity as factor in analysis; *Daubert* motion granted on other grounds).  When an expert's opinion "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable," it is not admissible.  *Concord Boat Corp.*, 207 F.3d at 1057 (reversing jury verdict based on faulty testimony of expert in violation of *Daubert*) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

Perry's report does not address any of these variables.  (*Id.* at 220).  Rather, he assumed that, despite all the variables, Rindlisbacher is entitled to "profits" for <u>not</u> selling 1,074 Steinway pianos.[4]  The sales goals are simply that – estimates of the market's potential that both Rindlisbacher and Steinway agreed were reasonable.

The treatise Perry relies upon in his expert report states that "[t]he damage claim must consider all other material factors that could have affected the plaintiff's financial results, and must develop sufficient evidential support for the nexus between the claimed damages and the defendant's wrongdoings."  LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT § 4.5(e), at 25 (6th ed. 2017).  The <u>Litigation Services Handbook</u> observes that when an expert neglects to consider other variables, courts refuse to find causation.  *Id.* § 4.2(a).  "[E]xpert testimony quantifying the amount of damages lacks relevance unless one can show that the damages resulted from defendant's wrongful acts."  *Id.* § 4.7.

---

[4] It is important to note that had Plaintiffs met their goals by selling 1,074 more pianos, Steinway, as the manufacturer, would have benefitted tremendously as well.

110253500.6

One way for an expert to factor in variables is to apply a regression analysis. LITIG. SERVS. HANDBOOK § 4.5(f); *Johnson Elec. N. Am.*, 103 F. Supp.2d at 274-75 (noting that regression analysis is an accepted method for determining damages, but excluding expert opinions on other grounds). Regression analysis is defined as "[a] statistical technique to develop an equation depicting the relation among variables and then uses that equation for a prediction." *Id.* Perry did not use a regression analysis and in no way incorporated any information about how the various variables affected Rindlisbacher's sales.

When a damages expert makes assumptions that fail to take into account risk factors, the opinions are inherently unreliable. *Sun Ins. Mktg Network v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003) (granting summary judgment on damages against plaintiff because its damages expert ignored risk factors). In *Sun Insurance*, an exclusive insurance agent sued the insurance company it had represented for lost profits, after the insurance company terminated the at-will contract. The court struck the expert's opinion on lost profits, concluding that they were uncertain because the contract could have terminated at any time. The court noted that the "case is a good example of the unreliability inherent in basing an opinion on a marketing estimate." *Id.* at 1249.

Similarly, the Arizona Court of Appeals in *Weiner v. Ash*, 157 Ariz. 323, 332 (App. 1988), affirmed the trial court's ruling that plaintiff's alleged lost profits damages were based on speculation. In that case, plaintiffs sought damages for raw land that they claim they would have invested in but for defendant's action, and they would have generated profits from those investments. Plaintiffs' damages were supported by a University of Arizona economist, who noted that plaintiffs had invested in prior land deals that were profitable, and other people had also invested in land that was profitable, and that plaintiff had resources to invest in land before the acts that gave rise to the lawsuit. The court found the evidence and testimony "insufficient to support any award of damages." *Id.*

In *In Re REMAC Inc. Securities Litigation*, 702 F. Supp. 2d 1202, 1272 (S.D. Cal.

2010), plaintiffs' expert opined that the defendant company's stock prices fell due to statements made by the company. The expert failed to address or account for other key variables and potential alternative causes. *Id.* at 1274. The court granted defendant's *Daubert* motion because the expert made "no attempt to account for other possible causes" including "industry-specific news," and "market specific news." *Id.*

Here, Perry attributes all of Plaintiffs' alleged damages to Steinway's alleged omission, despite the many factors that likely contributed to Rindlisbacher's failure to achieve the sales performance goals. When a damages expert "improperly attributed all of plaintiff's losses to the defendants' allegedly illegal acts, despite the presence of significant other factors," his opinions are not relevant and should be disallowed. *First Savings Bank, F.S.B. v. U.S. Bancorp.*, 117 F. Supp. 2d 1078, 1083 (D. Kan. 2000). The *First Savings* court, in excluding a damages expert, stated, "Crucial to the court's determination is the fact that Miller improperly attributed all losses to the defendants' allegedly illegal acts, despite the presence of other factors that could be significant to his analysis." *Id.* at 1084. The expert's failure to consider other factors made "his testimony inherently unreliable and purely speculative." *Id.*; *see also Claar v. Burlington N. RR Co.*, 29 F.3d 499, 503 (9th Cir. 1994) (affirming rejection of expert's opinion that failed to consider other possible causes of the alleged injury); *Johnson Elec. N. Am.*, 103 F. Supp. 2d at, 284 (damages expert's opinion was unreliable).

Because Rindlisbacher testified that he was not certain whether he would have entered into the Agreement had he known about the prior dealer's sales, and because of the other variables that Rindlisbacher and Perry acknowledged could have affected Rindlisbacher's sales performance, Perry's damages model and testimony are not admissible under Rules 104, 402, 403, 702, and 703.

      2.     *Perry Makes a Speculative and Illogical Leap re: Spokane*

As explained above, in analyzing alleged lost profits in Maricopa County from 2011

to 2017, Perry reviewed Rindlisbacher's performance as a Steinway dealer in Spokane from 2007 to 2010. (Ex. 2 at 12). He admits that Spokane and Maricopa County are vastly different markets. Ex. 8 at 165). He admits that, in 2010, Maricopa County was thirteen times greater in terms of relevant market than Spokane. (Ex. 8 at 179-180). He nonetheless assumes that because Rindlisbacher was able to sell 34 Steinway pianos per year in Spokane from 2007-2010, Steinway should be liable for Rindlisbacher's failure to sell 234 pianos per year Maricopa County from 2011-2017. This "warping of underlying assumptions cannot support the admissibility of expert testimony." *Lithuanian Commerce Corp.*, 179 F.R.D. at 460 (rejecting expert opinion as unreliable, in part because the expert concluded that because plaintiff distributor outperformed other distributors in unrelated areas, plaintiff would outperform other distributors in sales performance).

### C. Post-Termination Damages Do Not Pass *Daubert's* Requirements

Perry calculates alleged out-of-pocket damages as the net losses Rindlisbacher experienced after Steinway terminated the at-will dealership agreement and before Rindlisbacher signed on to be a Yamaha dealer. Perry did not know what Rindlisbacher was doing during the nine months after Steinway exercised its right to terminate the dealer agreement, other than not selling new Steinway pianos. (Ex. 3 at 52-54; Ex. 8 at 208). Perry took this nine-month time period from the Complaint. (Ex. 3 at 53-54). He understands that only a few manufacturers, including Steinway and Yamaha, operate through dealer agreements. (Ex. 3 at 109-10). Thus, Rindlisbacher could have sold other pianos.

Indeed, Rindlisbacher testified that most piano manufacturers do not operate with dealer agreements. (Ex. 1 at 30-31). Rindlisbacher also testified that he did not see any advantages of a piano retailer having a dealer agreement. (Ex. 1 at 31). In fact, Plaintiffs acknowledge in their Complaint that in Utah they have sold pianos manufactured by various companies that do not require a dealer agreement, including Baldwin®, Petroff®,

15

Pearl River®, and Young Chang® pianos, as well as digital pianos by Roland® and Technic®.  (Doc. 163 ⁋ 33).

When asked what would have prevented Plaintiffs from selling pianos from other manufacturers during those nine months, Perry testified, "I have – I do not know what – other than he didn't have a dealership agreement, is my understanding, certainly with Steinway.  I don't know specifically what other restrictions would have been in place in . . . that eight-month period." (Ex. 3 at 54-55).  Perry was not aware of any restrictions on Plaintiffs' ability to sell other pianos during the post-termination period. (Ex. 3 at 110). His testimony demonstrates that the out-of-pocket damages are pure speculation and, in any event, are not attributable to any alleged omission about the prior dealer's sales performance eight years earlier.

Furthermore, the post-termination damages hinge on a 2014 lease.  Rindlisbacher made the decision to enter into a seven-year lease.  (Ex. 16).  To the extent Rindlisbacher claims that Steinway told him he should sign a seven-year lease with a personal guarantee, that is simply false.  In negotiating for leased space, Rindlisbacher explained to a potential landlord that he "was open to a 3 year lease but would prefer a 5 year lease with a 5 year option." (Ex. 17).  He also volunteered that he would personally guarantee the lease. (*Id.*). He then ultimately agreed to a seven-year lease with a personal guarantee.  He now wants to stick Steinway with the cost of his own lease decisions, which is unsupportable.

By 2014, any damages Plaintiffs seek based on their inability to terminate their lease were self-inflicted.  Plaintiffs, by then, were well aware of their own sales performance and the fact that they were nowhere near meeting the sales goals set forth in the Steinway dealer agreement.  Furthermore, Plaintiffs were by then aware of the prior dealer's sales. (*See* Rule 11 Motion; *see also* Ex. 18 and Ex. 5, relied upon in the Rule 11 motion).  As Prosser and Keeton instruct, "[i]f . . . plaintiff discovers the truth while the contract is still entirely executory, or almost entirely so, and then performs his part of it, he

has been denied recovery for the resulting damages upon the ground that they are self-inflicted, without reliance upon the representation." PROSSER AND KEETON ON THE LAW OF TORTS § 110, at 770 (5th ed. 1984).

Perry's opinion assumes a causal connection between Rindlisbacher's 2017-2018 post-termination net losses and the alleged omission of information by Steinway about the prior dealer's sales in 2010. There is no evidence to support such a causal connection, and therefore any purported post-termination damages are invalid under *Daubert*. *Tyger Constr. Co.*, 29 F.3d at 145 (granting *Daubert* motion against damages expert where causal connection between facts and damage was not established).

## IV. CONCLUSION

Perry's opinions and conclusions bear no relation to this case or to reality. Rather, his role in this case is an example of "the old problem of expert witnesses who are often the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face, that cannot now be proved by some so-called 'experts.'" *Olympia Equip. Leasing Co., v. W. Union Tel. Co.*, 797 F.2d 370, 382 (7th Cir. 1986). Judge Friendly long ago held that a court should protect a jury from "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it. . . . When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 912 (2d Cir. 1962). Perry should not be permitted to "dazzle[] the jury with an array of figures conveying a delusive impression of exactness . . . because they have no relation to reality." *Olympia Equip.*, 797 F.2d at 382. The Court should exclude him from testifying because his opinions do not satisfy the *Daubert* requirements.

17

110253500.6

RESPECTFULLY SUBMITTED this 20th day of April, 2020.

                LEWIS ROCA ROTHGERBER CHRISTIE LLP

                By: /s/Bruce Samuels
                    Bruce E. Samuels
                    Heather Stanton
                *Attorneys for Steinway, Inc.*

110253500.6

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2020 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

K. Layne Morrill   klaynemorrill@gmail.com

/s/Joye Allen
Lewis Roca Rothgerber Christie LLP Employee