# EXHIBIT 1

# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kevin H. Rindlisbacher and Jami L. Rindlisbacher, husband and wife; and Piano Showroom of Arizona, Inc., an Arizona corporation, | ) ) ) ) ) No. ) 2:18-cv-01131-JJT ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| Steinway, Inc., a Delaware corporation, | ) ) ) |
| Defendant. | ) ) ) |

VIDEOTAPED DEPOSITION OF KEVIN RINDLISBACHER

Phoenix, Arizona

July 17, 2019

Prepared by:

Meri Coash, RMR, CRR
Certified Reporter
Certification No. 50327

Kevin Rindlisbacher                    July 17, 2019

30

1        A.    Yes.

2        Q.    Okay.  And I'm just doing that for the court

3    reporter's benefit.

4               Did you also sell used and consigned pianos

5    during that time?

6        A.    Yes.

7        Q.    Okay.  What manufacture --  It sounds like some

8    manufacturers have dealer agreements and others might not,

9    but I don't know the business like you do.  So is it true

10   that some have dealership agreements and some do not?

11   By -- and by "dealership agreements," I mean written

12   dealership agreements.

13       A.    Yes.

14       Q.    Okay.

15       A.    And I think you know that.  Yes.

16       Q.    I don't know that.  I'm asking you.

17       A.    Well, you have copies of my dealer agreement.

18       Q.    Right.  But I'm -- but what I don't know is --

19   What I'm asking you is whether there are other piano

20   manufacturers who just don't operate through dealers.

21       A.    Most piano manufacturers in today's world do not

22   operate with dealer agreements.  I think the -- the

23   primary piano manufacturers -- Steinway, Yamaha, Kawai --

24   I belive, to the best of my knowledge, use dealer

25   agreements.  Everyone else -- Pearl River, Baldwin --

Kevin Rindlisbacher                    July 17, 2019

31

1    none -- none of them use dealer agreements.

2        Q.    Okay.  Thank you.

3                Are there -- and was that --  You said

4    currently.  I just want to go back in time.  Was that also

5    true, going back to 2010 or thereabouts, that certain

6    dealers had -- operated with dealer agreements and others

7    did not -- certain manufacturers?

8        A.    Yes.  The same thing I just -- I just said.  I

9    think as Chinese manufacturers and Asian manufacturers in

10   general -- but primarily the Chinese manufacturers --

11   started to make more inroads here, for whatever reason

12   their companies did not want to have written dealer

13   agreements, and so they operate without them.

14       Q.    Okay.  Are there advantages for a piano business

15   such as yours to have a dealer agreement with a

16   manufacturer?

17       A.    I haven't -- I -- I haven't found that to be the

18   case.  I -- I don't have an opinion on that.

19       Q.    You don't have an opinion.

20                And just --  Since I don't know the

21   business, these are questions I'm just trying to get some

22   background about.  Are you --  If you have a dealership

23   agreement with Yamaha, for example, does Yama- -- does

24   that mean that Yamaha only sells pianos in Arizona or in

25   that territory through you -- new pianos?

**Kevin Rindlisbacher**                    **July 17, 2019**

250

1   BY MR. SAMUELS:

2       Q.   Showing you what's been marked as Exhibit 147,

3   this is a document that your -- that you produced, and I'm

4   just going to ask what this shows.  This is -- this is --

5   these are sales relating to Spokane, correct?

6       A.   Yes.

7       Q.   If you had known about historical sales in 2010

8   before you entered into the Steinway dealership agreement

9   for Phoenix, would you have entered into the agreement?

10          MR. MORRILL:  Object to form.  It assumes

11   facts that are not in evidence.

12          MR. SAMUELS:  You're not allowed to make a

13   speaking objection.  You can object to form.

14          MR. MORRILL:  I object to form.

15          THE WITNESS:  Your question?  I'm sorry.

16   BY MR. SAMUELS:

17      Q.   If you had known about historical sales by the

18   two -- by the two former Steinway dealers in Phoenix in

19   2010, would you have entered into the dealer agreement?

20      A.   I don't know.  I -- I don't know.  I was never

21   given that opportunity, so I -- I don't know how I

22   would -- what I would have done.

23      Q.   What you had --  If you had known that the

24   historical sales were what you know now, would you have

25   moved your family here and opened up a store and entered

1    into a seven-year lease, et cetera?

2        A.    You told me earlier not to speculate, so I can't

3    speculate on that.  I don't know what I would have done.

4        Q.    Would you have --  When was the first time you

5    recall raising a concern with Bob Snyder or anyone else at

6    Steinway about historical sales not being disclosed to you

7    in 2010?

8        A.    Sometime shortly after the Steinway dealer

9    meeting in Orlando in roughly May -- I think it was

10    May 2015.

11        Q.    But you were aware prior to that that -- of

12    Sherman Clay operating its business in the -- in the red,

13    correct?

14        A.    I speculated that was the case.

15        Q.    And "in the red," by the way, in your

16    terminology, means they were operating at a loss, correct?

17        A.    Correct.  I knew they had high costs --

18    extraordinarily high costs.

19        Q.    And you knew for the prior eight years, Sherman

20    Clay had not met the sales goals or even the sales numbers

21    that you were projecting to sell in 2014, correct?

22        A.    I did not know that with -- we've been down

23    this -- we've discussed this previously, and I did not

24    know that.  I guessed and speculated in an attempt to get

25    some discussion about it with Bob Snyder.

Kevin Rindlisbacher                    July 17, 2019

260

1   Calculations dated 6-21-2019.  And these were a part of

2   the MIDP disclosures in this case.

3               And I just have some specific questions

4   about this document.

5        A.   Okay.

6        Q.   If we turn to the second page of this exhibit,

7   line 14 shows actual net income per year, correct?

8        A.   That's what it says, yes.

9        Q.   Okay.  And is it --  And I just want to make sure

10  I understand.  Does this show that your business in

11  Arizona generated a profit for each of the years that it

12  operated as a Steinway dealership?

13       A.   I believe that's true.

14       Q.   Okay.  And the combined total profit generated

15  during that time period was $1.974 million -- or, to be

16  more -- to be more articulate, $1,974,000 and some change?

17       A.   I believe so.

18               MR. SAMUELS:  Okay.  With that, I think

19  we're ready to conclude this deposition subject to

20  Layne's --

21               MR. MORRILL:  I have a few questions.

22               MR. SAMUELS:  -- opportunity to question the

23  witness.

24               MR. MORRILL:  Thanks.

25

# CORRECTION SHEET

Deposition of:    Kevin H. Rindlisbacher

Regarding:    Rindlisbacher v. Steinway, Inc.

Reporter:    Meri Coash

Please make all corrections, changes, or clarifications to you testimony on this sheet showing page and line number. If there are no changes, write "none" across the page. Sign this sheet on the line provided.

| Page | Line | Change and Reason for Change |
| --- | --- | --- |
| 73 | 17 | Change period to comma and add ", Mr. Snyder gave me all the information I needed."<br><br>To add the reason I did not reach out to the former dealer. |
| 143 | 23 | Delete "email – an email list" and substitute "mailing list."<br><br>I believe the reporter did not hear me correctly. |
| 143 | 24 | Delete "email" and insert "mailing".<br><br>I believe the reporter did not hear me correctly. |
| 144 | 2 | Change "hood" to "had."<br><br>"hood" makes no sense here. |
| 144 | 14 | Delete "email" and insert "mailing list."<br><br>I believe the reporter did not hear me correctly. |
| 155 | 21 | Delete whole line and insert: "Ronnie Ginsburg, former Baldwin Representative for Phoenix area.  Travis Leonhardt, former Baldwin |

| | | Salesperson in Phoenix for several years. Lynn Hannah, who had worked outside sales events for Phoenix Baldwin dealer." I remembered the names of the other persons with whom I had spoken. |
|---|---|---|
| 183 | 12 | After "yes" change period to a comma and add "Three years later." To correct the timeframe. |
| 198 | 1 | After "representation" add "that I could expect to sell 45 Steinway & Sons grand pianos per year" Because that was the specific representation I was referring to in the answer. |
| 199 | 5 | After "cannot" insert "identify an email right now." To clarify what I intended to say. |
| 209 | 15 | Delete "perhaps." To make the statement correct. |
| 217 | 25 | Delete "I knew" and insert "Bob Snyder had told me their rent was extraordinarily high and their square footage large." To state how I knew the information. |
| 218 | 24 | Delete "had commented on" and insert "didn't call when he said he was misquoted." To clarify what Mr. Snyder had "commented on." |
| 220 | 3 | Insert at the beginning of the line "I don't remember." To clarify what I was attempting to say. |

Date:   8-22-19

_____
Signature

18:00:50   1                    THE VIDEOGRAPHER:  This will mark the end of

18:00:53   2    Video Number 5.  This deposition has concluded.  The time

18:01:01   3    is 6 p.m. exactly.  We are off the record.

           4                    (The deposition was concluded at 6 p.m.)

           5

           6

           7

           8                    KEVIN RINDLISBACHER

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

# EXHIBIT 2

# EXHIBIT 2

# Rindlisbacher, et al.

# v.

# Steinway, Inc.

**Expert Report of David R. Perry**

**Sterling Group LLC**

**September 13, 2019**

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

# TABLE OF CONTENTS

**1.   Background** ............................................................................................... **1**

   1.1  Introduction ............................................................................................ 1

   1.2  Scope of Work ....................................................................................... 3

   1.3  Liability ................................................................................................. 4

**2.   Fraud Damages** ....................................................................................... **4**

**3.   Benefit of the Bargain Damages** ......................................................... **5**

   3.1  Information Available to Plaintiffs in Late 2010 ................................... 6

      3.1.1   Unit Sales Information ................................................................ 6

      3.1.2   2007 to 2010 Spokane Income Statements ................................ 8

      3.1.3   2010 Retail and Wholesale Prices .............................................. 9

      3.1.4   Growth Expectations ................................................................ 10

      3.1.5   Information Available to Plaintiffs in Late 2010 Summary ........ 11

   3.2  Information Subsequently Available to Plaintiffs .............................. 11

      3.2.1   Steinway Company-Store Expectations .................................... 11

      3.2.2   Steinway 2011 to 2017 Retail and Wholesale Price Changes ..... 13

      3.2.3   2011 to 2017 Phoenix Income Statements ............................... 13

      3.2.4   2011 to 2017 Phoenix Unit Sales ............................................ 15

      3.2.5   2011 to 2017 Phoenix Unit Sales Mix ..................................... 18

      3.2.6   Information Subsequently Available to Plaintiffs Summary ........ 20

   3.3  Damage Calculations ......................................................................... 20

      3.3.1   Scenario 1 ................................................................................ 22

      3.3.2   Scenario 2 ................................................................................ 22

      3.3.3   Prejudgment Interest ................................................................ 22

   3.4  Benefit of the Bargain Damages Summary ........................................ 23

**4.   Out of Pocket Losses** ........................................................................... **23**

**5.   Conclusion** ............................................................................................. **24**

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

## LIST OF APPENDICES

Appendix A ..........David R. Perry's Resume, Testimony Experience and Publications
Appendix B ..........Information Considered
Appendix C ..........2007 to 2010 Spokane Unit Sales Analysis – Actual Goals
Appendix D ..........2007 to 2010 Spokane Unit Sales Analysis – Revised Goals
Appendix E ..........2007 to 2010 Spokane Income Statements
Appendix F...........2007 to 2010 Spokane Incremental Profit Percentage
Appendix G ..........2010 Steinway Retail and Wholesale Piano Prices
Appendix H ..........2009 Steinway Retail Piano Price Changes
Appendix I ...........2010 to 2017 Steinway Retail and Wholesale Piano Price Changes
Appendix J ...........2011 to 2017 Phoenix Income Statements
Appendix K ..........2011 to 2017 Phoenix Incremental Profit Percentage
Appendix L ..........2011 to 2017 Phoenix New Steinway Piano Sales
Appendix M .........2011 to 2017 Phoenix New Steinway Piano Sales Comparison
Appendix N ..........2011 to 2017 Phoenix New Steinway Piano Sales Shortfall
Appendix O ..........2011 to 2017 Phoenix New Steinway Piano Sales Mix
Appendix P...........Average 2010 Retail Prices Comparison
Appendix Q ..........Benefit of the Bargain Damages – Scenario 1
Appendix R ..........Benefit of the Bargain Damages – Scenario 2

# 1. Background

## 1.1 Introduction

Kevin Rindlisbacher ("Mr. Rindlisbacher") and his wife Jami Rindlisbacher (collectively, "Rindlisbachers") together with an entity entitled Piano Showroom of Arizona, Inc. ("Showroom") are involved in a lawsuit against Steinway, Inc. ("Steinway").[1]  This report refers to Rindlisbachers and Showroom collectively as "Plaintiffs".

Plaintiffs' complaint alleges, inter alia:

> "In 2010, while Steinway occupied a longstanding relationship of trust and confidence toward Rindlisbachers as its Spokane, Washington dealer, Steinway induced Rindlisbachers to become its Phoenix dealer by fraudulent representations concerning reasonable annual sales performance goals for the Phoenix market."[2]

> "Due to Mr. Snyder's oral representation that the Phoenix Market was capable of selling 70 Steinway & Sons® grand pianos in a year; and the representation Mr. Snyder made orally, which is repeated in Article III of Phoenix Dealer Agreement, that 45 Steinway & Sons® grand pianos was a reasonable annual sales performance goal, Steinway had a duty to disclose to Rindlisbachers all facts necessary to avoid that representation being materially misleading."[3]

> "Between November 23 and December 1, 2010, Steinway knew, but omitted to disclose to Mr. Rindlisbacher, at least the following facts (the 'Omitted Facts'):

> A.  In none of the preceding ten years had Steinway sold 45 Steinway & Sons® grand pianos to its then Phoenix dealer.

> B.  Typical sales of Steinway & Sons® grand pianos to its then Phoenix dealer over the five years from 2000 through July 31, 2005 had significantly less that [sic] 45 per year.

> C.  Typical sales of Steinway & Sons® grand pianos to its then Phoenix dealer over the five years from August 1, 2005 to July 31, 2010 had been significantly less than during the preceding five-year period.

---

[1]  "Third Amended Complaint" dated September 7, 2018.
[2]  "Third Amended Complaint" dated September 7, 2018, pages 1 and 2.
[3]  "Third Amended Complaint" dated September 7, 2018, page 16.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

D. Steinway did not in fact believe that 45 Steinway & Sons® grand pianos was a reasonable annual sales performance goal for its Phoenix dealer because it knew that over the most recent five years such sales had averaged a fraction of 45 such units per year and a significantly lower number than in the preceding five-year period.

E. Sherman Clay had exited the Phoenix market in 2010 in part because of low sales volumes of Steinway & Sons® grand pianos which were a fraction of 45 such units per year.

F. In only one year, in the mid 1990s, probably 1997, had Steinway sold 70 Steinway & Sons® grand pianos to its then Phoenix dealer.

G. During that year, ASU had purchased about $1,000,000 of Steinway & Sons® grand pianos from the then Phoenix dealer.

H. In no other year since the mid 1990s had Steinway ever sold 70 Steinway & Sons® grand pianos to its then Phoenix dealer.

I. ASU had not purchased a single Steinway & Sons® grand piano from Steinway's then Phoenix dealer since that single large purchase.

J. ASU was dissatisfied with warranty service provided by Steinway and its School of Music had determined not to purchase more Steinway pianos from the Phoenix dealer."[4]

"The Omitted Facts were of such a nature as to justifiably induce Rindlisbachers to act or refrain from acting in their evaluation whether to become Steinway's Phoenix dealer and make its initial inventory purchase.

Steinway breached its duty to disclose the Omitted Facts."[5]

"By failing to disclose the Omitted Facts, Steinway is deemed to have represented the non-existence of the Omitted Facts (the 'Deemed Representations')." [6]

"Given Steinway's position of trust and confidence toward Rindlisbachers, and its position of superior knowledge concerning sales in the Phoenix market, Plaintiffs justifiably relied on Steinway's fraudulent representations by becoming Steinway's Phoenix dealer, leasing and improving store

---

[4]  "Third Amended Complaint" dated September 7, 2018, pages 16 and 17.
[5]  "Third Amended Complaint" dated September 7, 2018, page 17.
[6]  "Third Amended Complaint" dated September 7, 2018, page 21.

locations, hiring employees, making a large initial inventory purchase, and diligently performing as a Steinway dealer from December 1, 2010 to July 31, 2017 (the 'Dealer Period').

Had Steinway's representations been true Plaintiffs' efforts would have attained approximately the levels of sales performance Steinway had represented to be reasonable and Plaintiffs had viewed as adequate inducement for the required investment of money, time, and effort to become and perform as Steinway's Phoenix dealer.

Instead, Steinway's representations were false and Plaintiffs' investment of money, time, and effort yielded a small fraction of the sales performance levels Steinway represented to be reasonable for the Phoenix market."[7]

"Steinway terminated Plaintiffs' Phoenix dealership effective July 1, 2017."[8]

Plaintiffs allege Steinway's actions represent Nondisclosure / Constructive Fraud (Count One) and/or Fraudulent Representations and Omissions (Count Two).[9]  The Court dismissed Plaintiffs' claims for fraudulent misrepresentations and for breach of contract. Plaintiffs' pending claims include constructive fraud and fraudulent omissions.[10]  This report refers to Plaintiffs' claims against Steinway generally as the "Alleged Fraud".

## 1.2   Scope of Work

Plaintiffs' counsel engaged David R. Perry of Sterling Group LLC ("Sterling") to perform an independent assessment of the economic damages, if any, suffered by Plaintiffs as a result of the Alleged Fraud.

Appendix A contains Mr. Perry's resume and testimony experience.  Mr. Perry is charging $440 per hour for his work in this matter.

Sterling considered the information listed in Appendix B in the process of preparing this report.  Sterling may revise or supplement its opinions if additional information is considered and/or further analysis is performed.  Sterling may also prepare presentation materials, such as charts, tables and other forms of exhibits, to assist in explaining opinions at trial.

---

[7]   "Third Amended Complaint" dated September 7, 2018, page 2.
[8]   "Third Amended Complaint" dated September 7, 2018, page 2.
[9]   "Third Amended Complaint" dated September 7, 2018, pages 16 and 19.
[10]   "Order" dated May 1, 2019 and "Order" dated August 9, 2019.

## 1.3   Liability

For the purpose of this engagement, Sterling was asked to assume that Steinway's liability to Plaintiffs for the Alleged Fraud is established.

## 2.   Fraud Damages

A treatise entitled "Litigation Services Handbook – The Role of the Financial Expert" states:

> "The prevailing approaches for damages in fraud claims are BOB [Benefit of the Bargain] (expectation) and out-of-pocket damages.  In these matters, the plaintiffs can, but need not, ask the court to proceed as though the plaintiff wishes to carry out the contract.  That is, the plaintiff can ask the court to remedy the damage done by the fraudulent activities or, in the alternative, unwind the transaction and rescind the contract.  If the court calculates damages based on the assumption that the plaintiff would carry out the contract, BOB damages provide the usual remedy; reliance damages apply in the rescission scenario.  A minority of jurisdictions recognize other possible techniques for evaluating damages; practitioners should confirm the allowable techniques with counsel."[11]

Plaintiffs' court filing in this lawsuit states, inter alia:

> "The primary rule of general damages for fraud is 'the difference between the value of what he has received in the transaction and the benefit the plaintiff would have realized had the defendant's misrepresentations been true.'  This rule 'has been adopted to provide for fuller recompense to persons defrauded, not to limit damages proximately sustained as a result of fraudulent conduct.'  Obviously, in cases of constructive fraud, or fraudulent omissions, that primary rule of general damages must be modified slightly to address the fraudfeasor's specialized form of fraud.  Where the Defendant's fraud is based on actionable failure to disclose important information, the fraudfeasor is said to have 'the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose.'  Arizona courts recognize this rule."[12]

---

[11]   The treatise earlier defines BOB as "Benefit of the Bargain".  Litigation Services Handbook – The Role of the Financial Expert", Editors - Roman Weil, Daniel Lentz and Elizabeth Evans, Sixth Edition, Wiley 2017, 4.12 and 4.21.

[12]   "Plaintiffs' Fourth Supplemental and Restated MIDP Responses" dated July 22, 2019, page 34.  Citations omitted.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

> "The secondary rule of general damages for fraud is that a plaintiff can also recover 'out of pocket losses' proximately caused by the fraud, as well as 'consequential damages that may arise from the fraudulent conduct . . . as long as there is no 'double recovery' …'"[13]

Based on the above, Sterling determined Plaintiffs' economic damages in this lawsuit based on (i) benefit of the bargain or expectation damages and (ii) out of pocket losses, provided there is no double recovery.

## 3.  Benefit of the Bargain Damages

The "Litigation Services Handbook – The Role of the Financial Expert" states:[14]

> "Expectation damages, as the term connotes, compensate an aggrieved party for the loss of the bargain for which it negotiated.  Courts sometimes refers to expectation damages as 'benefit of the bargain' (BOB) damages."

> "Expectation damages: the difference between the amount which the plaintiff reasonably expected to receive and the actual amount received; also known as benefit of the bargain (BOB) damages."

In this lawsuit, benefit of the bargain damages are the difference between (i) the amounts that Plaintiffs reasonably expected to receive as the Phoenix dealer and (ii) the actual amounts that Plaintiffs received as the Phoenix dealer.  Sterling analyzed the available information to determine these amounts.  The available information includes both (i) information available to Plaintiffs around the time that they agreed to become the Phoenix dealer in late 2010 and (ii) information that became available to Plaintiffs after they were already the Phoenix dealer.

---

[13]  "Plaintiffs' Fourth Supplemental and Restated MIDP Responses" dated July 22, 2019, page 35.
[14]  Litigation Services Handbook – The Role of the Financial Expert", Editors - Roman Weil, Daniel Lentz and Elizabeth Evans, Sixth Edition, Wiley 2017, 4.12.

## 3.1    Information Available to Plaintiffs in Late 2010

Sterling analyzed multiple sources of information that were available to Plaintiffs around the time that they agreed to become the Phoenix dealer in late 2010 including:[15]

### 3.1.1    Unit Sales Information

Information related to unit sales expectations available to Plaintiffs around the time that they agreed to become the Phoenix dealer included:

- The Phoenix Dealer Agreement dated December 1, 2010 states:

    "Steinway and Dealer agree that the annual sales performance goals for Steinway Designated Pianos as set forth in Schedule B are reasonable for the Territory."[16]

- Schedule B contains the following annual unit sales goals:[17]

| Brand | Grand Pianos | Upright Pianos | Total |
|---|---|---|---|
| Steinway & Sons | 45 | 12 | 57 |
| Boston | 45 | 27 | 72 |
| Essex | 45 | 60 | 105 |
| Total | 135 | 99 | 234 |

- Rindlisbachers claim Robert Snyder of Steinway told them during the discussions leading up to the Phoenix dealership that (i) the Phoenix market is capable of selling 70 Steinway & Sons grand pianos per year and (ii) under the economic conditions then prevailing, 45 Steinway & Sons grand pianos per year is a reasonable sales expectation for the Phoenix market.[18]

- Rindlisbachers had been the Steinway dealer in Spokane, Washington for several years before they agreed to become the Phoenix dealer.[19]  The Spokane Dealer Agreements signed in late 2006 and late 2009 contain the following annual unit sales goals:[20]

---

[15]    Sterling understands Plaintiffs did not prepare any written business plans and/or financial projections quantifying the revenues and profits that they expected to earn as the Phoenix dealer around the time that they agreed to become the Phoenix dealer.

[16]    RIN 167.

[17]    RIN 174.  Steinway sells three brands of pianos (Steinway & Sons, Boston and Essex).

[18]    "Third Amended Complaint" dated September 7, 2018, page 11; "Plaintiffs' Fourth Supplemental and Restated MIDP Responses" dated July 22, 2019, page 14.

[19]    RIN 18 and 31.

[20]    RIN 25, 38, 44 and 56.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

| Brand | Grand Pianos | Upright Pianos | Total |
|---|---|---|---|
| Steinway & Sons | 8 (2007 to 2009) 6 (2010 on) | 3 (2007 to 2009) 2 (2010 on) | 11 (2007 to 2009) 8 (2010 on) |
| Boston | 8 (2007 to 2009) 6 (2010 on) | 6 (2007 to 2009) 4 (2010 on) | 14 (2007 to 2009) 10 (2010 on) |
| Essex | 8 (all years) | 12 (2007 to 2009) 8 (2010 on) | 20 (2007 to 2009) 16 (2010 on) |
| Total | 24 (2007 to 2009) 20 (2010 on) | 21 (2007 to 2009) 14 (2010 on) | 45 (2007 to 2009) 34  (2010 on) |

- During the approximately four years that Rindlisbachers had been the Spokane dealer before they became the Phoenix dealer, they had met and exceeded most of the annual unit sales goals in the Spokane Dealer Agreements as detailed in Appendix C and summarized below:

| 2007 to 2010 Cumulative Actual Spokane Unit Sales as Percentage of Actual Unit Sales Goals | | | |
|---|---|---|---|
| Brand | Grand Pianos | Upright Pianos | Total |
| Steinway & Sons | 147% | 18% | 112% |
| Boston | 117% | 63% | 98% |
| Essex | 213% | 180% | 193% |
| Total | 160% | 128% | 146% |

- Sterling understands Steinway revised the annual unit sales goals in the Spokane Dealer Agreements in late 2009.  If the revised annual sales unit goals for Spokane had been used in earlier years, Rindlisbachers would have further exceeded the annual unit sales goals as detailed in Appendix D and summarized below:

| 2007 to 2010 Cumulative Actual Spokane Unit Sales as Percentage of 2009 Unit Sales Goals | | | |
|---|---|---|---|
| Brand | Grand Pianos | Upright Pianos | Total |
| Steinway & Sons | 183% | 25% | 144% |
| Boston | 146% | 63% | 113% |
| Essex | 213% | 247% | 230% |
| Total | 184% | 163% | 175% |

Based on the above, Sterling determined that Plaintiffs' reasonable expectations around the time that they agreed to become the Phoenix dealer were that they would meet, if not exceed, the annual unit sales goals in the Phoenix Dealer Agreement.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

### 3.1.2   2007 to 2010 Spokane Income Statements

The Rindlisbachers' financial performance as the Spokane dealer in the years before they agreed to become the Phoenix dealer is detailed in Appendix E and summarized below:

|  | *2007* | *2008* | *2009* | *2010* | *Total* |
|---|---|---|---|---|---|
| Revenues | $1,986,057 | $1,577,758 | $1,576,380 | $1,749,315 | $6,889,510 |
| Cost of Sales | $1,098,684 | $872,168 | $893,393 | $1,075,782 | $3,940,027 |
| Gross Profit | $887,373 | $705,590 | $682,986 | $673,533 | $2,949,483 |
| Operating Expenses | $569,485 | $603,415 | $549,967 | $516,388 | $2,239,255 |
| Net Profit | $317,887 | $102,176 | $133,020 | $157,145 | $710,228 |
|  |  |  |  |  |  |
| Gross Profit % | 44.7% | 44.7% | 43.3% | 38.5% | 42.8% |
| Net Profit % | 16.0% | 6.5% | 8.4% | 9.0% | 10.3% |

Some of the operating expenses listed on Appendix E would be expected to increase with each additional piano sold (e.g., commissions, bankcard fees, delivery & moving expenses). However, many of the operating expenses listed on Appendix E would not be expected to increase with each additional piano sold (e.g., rent, property taxes, utilities). Furthermore, one of the larger operating expenses on Appendix E, interest expense, would likely have decreased if additional pianos had been sold from existing inventory because Steinway enabled flooring companies like GE Capital to offer interest free financing for 90 days.[21]

Sterling analyzed the expenses on Appendix E to estimate the incremental profit percentage for additional piano sales (i.e., the percentage of the incremental revenues from additional piano sales that would have increased net profits). For the purpose of estimating the incremental profit percentage, Sterling deducted certain larger operating expenses including advertising, business promotion and outside shows/events even though there was no direct correlation in the data between these types of operating expenses and revenues. The results of the Sterling's analysis are detailed on Appendix F and show an overall incremental profit percentage of 25.3%. The 25.3% incremental profit percentage excludes any reduction in the interest expense that would have resulted from faster inventory turnover.

Based on the above, Sterling determined Plaintiffs could reasonably have expected around the time that they agreed to become the Phoenix dealer that at least 25.3% of the revenues from each piano sale would increase the net profit of the business.[22]

---

[21]   RIN 686 and 26915.
[22]   The incremental profit from each piano sale would first be used to cover the business' fixed expenses and then increase the business' net profit.

### 3.1.3   2010 Retail and Wholesale Prices

The 2010 retail and wholesale prices for pianos sold by Steinway dealers provide information on the gross profit percentages that Plaintiffs could reasonably have expected around the time that they agreed to become the Phoenix dealer. The 2010 retail and wholesale prices for pianos sold by Steinway dealers are detailed in Appendix G and summarized below:[23]

| Steinway & Sons | | |
|---|---|---|
| | Average Grand Piano Excluding Model D | Average Upright Piano |
| 2010 Retail Price | $64,120 | $25,100 |
| 2010 Wholesale Price | $31,910 | $13,360 |
| 2010 Gross Profit | $32,210 | $11,740 |
| 2010 Gross Profit Percentage | 50.2% | 46.8% |

| Boston | | |
|---|---|---|
| | Average Grand Piano | Average Upright Piano |
| 2010 Retail Price | $31,000 | $11,267 |
| 2010 Wholesale Price | $15,886 | $5,910 |
| 2010 Gross Profit | $15,114 | $5,357 |
| 2010 Gross Profit Percentage | 48.8% | 47.5% |

| Essex | | |
|---|---|---|
| | Average Grand Piano | Average Upright Piano |
| 2010 Retail Price | $14,840 | $5,440 |
| 2010 Wholesale Price | $7,500 | $2,390 |
| 2010 Gross Profit | $7,340 | $3,050 |
| 2010 Gross Profit Percentage | 49.5% | 56.1% |

The above gross profit percentages based on Steinway's 2010 price lists are higher than the overall 43% gross profit percentage experienced by Rindlisbachers in Spokane from 2007 to 2010. Accordingly, the above gross profit percentages based on Steinway's 2010 price lists support Sterling's determination that Plaintiffs could reasonably have expected around the time that they agreed to become the Phoenix dealer that at least 25.3% of the revenues from each piano sale would increase the net profit of the business.

---

[23]   The 2010 prices shown in the tables are for the lowest price edition and finish of each model.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

Sterling used the information on the 2010 price lists to estimate Plaintiffs' expected annual revenues as the Phoenix dealer by multiplying Plaintiffs' expected annual unit sales by the average retail prices in the above tables.  Specifically:

| Brand | Form | Annual Unit Sales | Average 2010 Retail Price[24] | Annual Revenues |
|---|---|---|---|---|
| Steinway & Sons | Grand | 45 | $64,120 | $2,885,400 |
| Steinway & Sons | Upright | 12 | $25,100 | $301,200 |
| Boston | Grand | 45 | $31,000 | $1,395,000 |
| Boston | Upright | 27 | $11,267 | $304,209 |
| Essex | Grand | 45 | $14,840 | $667,800 |
| Essex | Upright | 60 | $5,440 | $326,400 |
| Total | | 234 | | $5,880,009 |

The above estimate of annual revenues is based on the lowest price edition and finish for each model and excludes any revenues that would have been generated from selling products and services other than new Steinway pianos, such as player units.

### 3.1.4   Growth Expectations

Plaintiffs would have known the price increases that Steinway had made during the years that they had been the Spokane dealer.  Information on the retail price increases made by Steinway during 2009 has been produced in this lawsuit.  This information is detailed in Appendix H and summarized below:

| Brand | Form | Average 2009 Retail Price Increase |
|---|---|---|
| Steinway & Sons | Grand | 4.8% |
| Steinway & Sons | Upright | 4.7% |
| Boston | Grand | 18.4% |
| Boston | Upright | 10.9% |
| Essex | Grand | 3.3% in second half of 2009 (no information is available on retail price changes in first half of 2009) |
| Essex | Upright | 4.8% in second half of 2009 (no information is available on retail price changes in first half of 2009) |

The above retail price increases for Steinway pianos sold by Steinway dealers were higher than inflation.  Specifically, overall inflation was 2.7% from the end of 2008 to the end of

---

[24]   Straight average of retail prices for lowest price editions and finishes of each model (excluding Steinway & Sons model D entirely).  The average retail prices would have been higher if Sterling' analysis had incorporated upgraded editions and finishes and/or the Steinway & Sons model D.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

2009 and inflation for musical instruments and accessories was 1.3% from the end of 2008 to the end of 2009.[25]

Around the time that Plaintiffs agreed to become the Phoenix dealer, overall inflation was expected to average 2.2% annually over the ten years from 2010 to 2019.[26]

Based on the available information, Sterling determined Plaintiffs could reasonably have expected around the time that they agreed to become the Phoenix dealer that their revenues and profits would increase by at least 2.2% annually from 2011 onwards.

### 3.1.5   Information Available to Plaintiffs in Late 2010 Summary

Based on the information available to Plaintiffs around the time that they agreed to become the Phoenix dealer, Sterling determined Plaintiffs could reasonably have expected:

- Annual unit sales of at least 234 new Steinway pianos.[27]

- Annual revenues of at least $6 million.

- Incremental profit on each new Steinway piano equal to at least 25.3% of revenues.[28]

- Annual revenue and profit growth of at least 2.2%.

## 3.2   Information Subsequently Available to Plaintiffs

Sterling analyzed multiple sources of information that became available to Plaintiffs after they became the Phoenix dealer including:

### 3.2.1   Steinway Company-Store Expectations

Sterling understands:

- Steinway has company-owned stores in certain markets and says it was considering a company-owned store in Phoenix before Rindlisbachers expressed interest.

- Steinway has not produced any actual income statements for company-owned stores.

---

[25] Bureau of Labor Statistics data (bls.gov).

[26] Survey of Professional Forecasters for the fourth quarter of 2010 released on November 15, 2010 (philadelphiafed.org).

[27] Steinway & Sons, Boston and Essex combined.

[28] The incremental profit from each new piano sale would first be used to cover the business' fixed expenses and then to increase the business' net profit.

---

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

- Steinway has not produced the document that it prepared showing the expected financial performance of a company-owned store in Phoenix.[29]

- The only document Steinway has produced providing information on the expected financial performance of Steinway company-owned stores is a template for a major-market company-owned store.

The template for a major-market company-owned store produced by Steinway shows various 2010 dates and the following projected annual income statement:[30]

| Revenues | $5,000,000 |
|---|---|
| Cost of Sales | $2,700,000 |
| Gross Profit | $2,300,000 |
| Operating Expenses | $1,165,000 |
| Net Profit | $1,135,000 |
| | |
| Gross Profit % | 46% |
| Net Profit % | 23% |

Both the expected gross profit percentage and the expected net profit percentage on the template for a major-market company-owned store produced by Steinway are higher than the percentages achieved by Rindlisbachers in Spokane from 2007 to 2010. Specifically:[31]

- The gross profit percentage projected by Steinway for major markets of 46% is higher than the average gross profit percentage achieved by Rindlisbachers in Spokane from 2007 to 2010 of 42.8%.

- The net profit percentage projected by Steinway for major markets of 23% is higher than the average net profit percentage achieved by Rindlisbachers in Spokane from 2007 to 2010 of 10.3%.

The profit percentages on Steinway's template suggest Plaintiffs could have reasonably expected a higher incremental profit percentage than the 25.3% discussed in an earlier section of this report.

---

[29] Ron Losby testified that Steinway had prepared a document by August 2010 showing the expected financial performance for a company-owned store in Phoenix (Ron Losby's August 15, 2019 deposition, pages 25 to 28 and 108 to 111). Sterling understands Steinway later informed Plaintiffs that it could not find the actual spreadsheet for Phoenix about which Mr. Losby had testified.
[30] STEINWAY 3898.
[31] Appendix E; STEINWAY 3898.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

### 3.2.2    Steinway 2011 to 2017 Retail and Wholesale Price Changes

The retail and wholesale prices of pianos sold by Steinway dealers changed from 2010 to 2017 as detailed in Appendix I and summarized below:

| Steinway & Sons | | |
|---|---|---|
| | Grands[32] | Uprights |
| 2010 to 2017 Average Annual Retail Price Change (%) | 3.4% | 4.7% |
| 2010 to 2017 Average Annual Wholesale Price Increase (%) | 4.2% | 4.9% |
| 2011 to 2017 Average Gross Profit (%) | 48.4% | 47.0% |

| Boston | | |
|---|---|---|
| | Grands | Uprights |
| 2010 to 2017 Average Annual Retail Price Increase (%) | 1.1% | 1.3% |
| 2010 to 2017 Average Annual Wholesale Price Increase (%) | 1.1% | 1.1% |
| 2011 to 2017 Average Gross Profit (%) | 48.6% | 48.3% |

| Essex | | |
|---|---|---|
| | Grands | Uprights |
| 2010 to 2017 Average Annual Retail Price Increase (%) | 1.6% | 2.7% |
| 2010 to 2017 Average Annual Wholesale Price Increase (%) | 1.5% | 2.0% |
| 2011 to 2017 Average Gross Profit (%) | 50.1% | 56.8% |

The above information shows:

- The retail price changes between 2010 and 2017 varied by brand with the retail prices of Steinway & Sons pianos increasing at a higher average annual rate than the retail prices of Boston and Essex pianos.

- The 2011 to 2017 average gross profit percentages on the pianos sold by Steinway dealers were close to the 2010 average gross profit percentages for the same pianos.[33]

### 3.2.3    2011 to 2017 Phoenix Income Statements

Plaintiffs' actual revenues, expenses and profits in Phoenix in each year from January 2011 through June 2017 are detailed in Appendix J and summarized below:

---

[32] Excluding Steinway & Sons model D.

[33] The average 2011 to 2017 gross profit percentage was slightly higher than the average 2011 to 2017 gross profit percentage for some brands/forms and slightly lower for other brands/forms.

|  | *Average Annual Income Statements*[34] | *Cumulative Income Statement*[35] |
|---|---|---|
| Revenues | $2,186,611 | $14,645,919 |
| Cost of Sales | $1,181,869 | $7,894,419 |
| Gross Profit | $1,004,742 | $6,751,500 |
| Operating Expenses | $733,582 | $4,777,398 |
| Net Profit | $271,160 | $1,974,102 |
|  |  |  |
| Gross Profit % | 45.9% | 46.1% |
| Net Profit % | 12.4% | 13.5% |

Plaintiffs' actual revenues and profits were substantially below the reasonable expectations discussed earlier in this report.

Some of the operating expenses listed on Appendix J would be expected to increase with each additional piano sold (e.g., commissions, bankcard fees, delivery & moving expenses). However, many of the operating expenses listed on Appendix J would not be expected to increase with each additional piano sold (e.g., rent, utilities, professional fees). Furthermore, interest expense would likely have decreased if additional pianos had been sold from existing inventory because Steinway enabled flooring companies like GE Capital to offer interest free financing for 90 days.[36]

Sterling analyzed the expenses on Appendix J to estimate the incremental profit percentage for additional piano sales (i.e., the percentage of the incremental revenues from additional piano sales that would have increased net profits). For the purpose of estimating the incremental profit percentage, Sterling deducted certain larger operating expenses including advertising, business promotion and travel/entertainment/meals even though there was no direct correlation in the data between these types of operating expenses and revenues. The results of the Sterling's analysis are detailed on Appendix K and show an overall incremental profit percentage of 26.9%. The 26.9% incremental profit percentage excludes any reduction in the interest expense that would have resulted from faster inventory turnover.

Appendix K shows the incremental profit percentage was significantly lower in 2014 than it was in all other years. The lower incremental profit percentage in 2014 primarily resulted from the lower gross profit percentage in that year, which was caused by special deals

---

[34]    Average of income statements for six complete years from January 2011 through December 2016.
[35]    Cumulative income statement for January 2011 through June 2017.
[36]    RIN 686 and 26915.

offered at the store closing sale held in 2014.[37]  If the lower incremental profit percentage in 2014 is excluded as an anomaly, the average incremental profit percentage is 29.7%.[38]

The analysis based on the Phoenix income statements provides a more relevant estimate of the expected incremental profit percentage of additional Phoenix piano sales than the earlier analysis of at least 25.3% based on the Spokane income statements because it is based on actual data from the Phoenix business in the relevant time period.

### 3.2.4    2011 to 2017 Phoenix Unit Sales

Sterling analyzed several documents providing information on the number of new Steinway pianos sold in Phoenix from 2011 to 2017 including:

- The monthly sales reports sent by Plaintiffs to Steinway.[39]

- A summary that was prepared from the monthly sales reports sent to Steinway.[40]

- A detailed sales listing produced from Plaintiffs' accounting software.[41]

Sterling's analysis showed the monthly sales reports often repeated the same sales on multiple monthly reports (e.g., four of the six sales listed on the September 2011 monthly sales report were previously listed on the August 2011 monthly sales report).[42] Additionally, the monthly sales reports did not properly account for returns (e.g., the same Essex EGP-155 piano with serial number E143787C is shown once on the December 2014 monthly sales report and twice on the Jan-May 2015 monthly sales report).[43]  Furthermore, Sterling understands that in this litigation neither Plaintiffs nor Steinway has produced monthly sales reports for certain months (e.g., October 2016 and June 2017).  As a result, the available monthly sales reports and the summary prepared from the monthly sales reports inaccurately state the number of new Steinway pianos sold in Phoenix.

Sterling identified the new Steinway pianos on the detailed sales listing produced from Plaintiffs' accounting software and categorized them by brand, form and model.  The results of Sterling's analysis are shown in Appendix L.  The sale dates on the detailed sales listing and Appendix L range from June 19, 2011 through July 30, 2017.  The earliest sale date on the detailed sales listing is June 19, 2011 because that is when sales earlier in 2011 began being entered into the accounting system.  Sterling confirmed the sales shown on

---

[37]  Kevin Rindlisbacher's July 17, 2019 deposition, pages 225 and 227.
[38]  Cumulative incremental profit percentage for 2012, 2013, 2015, 2016 and 2017.
[39]  RIN 387 to 643; STEINWAY 491.  Sterling understands monthly sales reports were not produced by either Plaintiffs or Steinway for certain months.
[40]  RIN 252.
[41]  RIN 26898 to 26908.
[42]  RIN 403 and 407.
[43]  RIN 557 and 561.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

the available monthly sales reports for January through May 2011 are all included on the detailed sales listing.

Appendix M is a comparison of the number of new Steinway pianos sold in Phoenix according to (i) the detailed sales listing and (ii) the summary that was prepared from the monthly sales reports. Appendix M shows the summary overstated the total number of new Steinway piano sales by approximately 10% or 45 pianos. Appendix M also shows the 443 new Steinway pianos sold in Phoenix from January 2011 through July 2017 can be categorized as follows:

| Brand | Form | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|
| Steinway & Sons | Grand | 8 | 13 | 5 | 25 | 8 | 12 | 16 |
| Steinway & Sons | Upright | 0 | 1 | 1 | 1 | 0 | 3 | 1 |
| Boston | Grand | 4 | 5 | 7 | 16 | 10 | 4 | 7 |
| Boston | Upright | 0 | 0 | 4 | 2 | 1 | 4 | 1 |
| Essex | Grand | 21 | 16 | 19 | 52 | 31 | 24 | 13 |
| Essex | Upright | 8 | 6 | 6 | 32 | 21 | 17 | 18 |
| Total | | 41 | 41 | 42 | 128 | 71 | 64 | 56 |

The actual annual unit sales were substantially lower than the expected annual unit sales discussed earlier in this report. The annual unit sales shortfall is detailed in Appendix N and summarized below:

| Brand | Form | Expected Annual Unit Sales [A] | Average Annual Unit Sales[44] [B] | Average Unit Sales Shortfall [A] – [B] |
|---|---|---|---|---|
| Steinway & Sons | Grand | 45.0 | 11.8 | 33.2 |
| Steinway & Sons | Upright | 12.0 | 1.0 | 11.0 |
| Boston | Grand | 45.0 | 7.7 | 37.3 |
| Boston | Upright | 27.0 | 1.8 | 25.2 |
| Essex | Grand | 45.0 | 27.2 | 17.8 |
| Essex | Upright | 60.0 | 15.0 | 45.0 |
| Total | | 234.0 | 64.5 | 169.5 |

---

[44]   Average of actual unit sales in six complete years from January 2011 through December 2016.

Plaintiffs allege Steinway executives informed them around the time that they agreed to become the Phoenix dealer that the Steinway company-owned store in Hollywood was "very profitable" and using a "recipe" that Plaintiffs should follow in Phoenix.[45]   Mr. Snyder testified he told Mr. Rindlisbacher that he should visit the Hollywood store and that it was "very successful".[46]   Documents show Steinway told Plaintiffs the Los Angeles market was about three times the size of the Phoenix market.[47]   Sterling understands Steinway did not disclose documents showing the actual sales of the Hollywood store to Plaintiffs around the time that they agreed to become the Phoenix dealer.  In this lawsuit, Steinway produced a document entitled "Sales Analysis – West Hollywood Store" that shows the Hollywood store sold 46 Steinway & Sons grand pianos in 2010.[48]  If a company-owned Steinway store in a market three times as large as Phoenix sold 46 Steinway & Sons grand pianos in 2010, it suggests a reasonable sales expectation for Phoenix would be approximately 15 Steinway & Sons grands per year.  Sales of 15 Steinway & Sons grand pianos per year is one-third of the unit sales shown on Schedule B of the Phoenix Dealer Agreement but close to Plaintiffs' average actual sales in Phoenix of 13.2 Steinway & Sons grand pianos per year.[49]

Sterling understands Steinway specified a termination date of July 1, 2017 in its termination notice, but Plaintiffs continued to sell new Steinway pianos until Steinway repurchased Plaintiffs' unsold inventory at the end of July.  Plaintiffs sold six Steinway & Sons grand pianos, one Boston grand piano and two Essex grand pianos in July 2017.  Sterling calculated the unit sales shortfall for 2017 on Appendix N using a methodology that results in a lower shortfall than alternative methodologies.  Specifically:[50]

- The 2017 shortfall of 61 new Steinway pianos shown on Appendix N is the difference between (i) the expected unit sales in six months of 2017 (i.e., January through June) and (ii) the actual unit sales in seven months of 2017 (i.e., January through July).   The total 2017 shortfall using this methodology includes 6.5 Steinway and Sons grand pianos.

- If Sterling had calculated the 2017 shortfall as the difference between (i) the expected unit sales in six months of 2017 (i.e., January through June) and (ii) the actual unit sales in six months of 2017 (i.e., January through June), the 2017 shortfall would have been 70 new Steinway pianos including 12.5 Steinway & Sons grand pianos.

- If Sterling had calculated the 2017 shortfall as the difference between (i) the expected unit sales in seven months of 2017 (i.e., January through July) and (ii) the actual unit

---

[45]   "Third Amended Complaint" dated September 7, 2018, pages 11 and 13.
[46]   Robert Snyder's August 7, 2019 deposition, pages 200 to 202.
[47]   For example, STEINWAY 44 and 45.
[48]   STEINWAY 3904.
[49]   87 Steinway & Sons grand pianos sold in 79 months from January 2011 through July 2017 (Appendix M).  87 / 79 * 12 = 13.2.
[50]   Based on data in Appendices L and N.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

sales in seven months of 2017 (i.e., January through July), the 2017 shortfall would have been 80.5 new Steinway pianos including 10.25 Steinway & Sons grand pianos.

As discussed earlier in this report, the damage theory being pursued by Plaintiffs in this lawsuit is based on the lost benefit of the bargain that Plaintiffs experienced as a result of the Alleged Fraud. Plaintiffs allege (i) Steinway's actions resulted in Plaintiffs having overstated unit sales expectations at the time that they agreed to become the Phoenix dealer and (ii) they are entitled to damages for the failure to achieve their unit sales expectations.

### 3.2.5 2011 to 2017 Phoenix Unit Sales Mix

Sterling used the detailed sales information in Appendix L to determine the sales mix of new Steinway pianos within each brand and form. The resulting sales mix is shown in Appendix O and the most frequently sold models summarized below:

- Model B represented 28.7% of Steinway & Sons grand piano sales.

- Model K-52 represented 85.7% of Steinway & Sons upright piano sales.

- Models 163 and 178 each represented 30.2% of Boston grand piano sales.

- Model 118 represented 75.0% of Boston upright piano sales.

- Model 155 represented 80.7% of Essex grand piano sales.

- Model 123 represented 68.5% of Essex upright piano sales.

Sterling used the sales mix in Appendix O to determine weighted average 2010 retail prices and compared the weighted average 2010 retail prices to the straight average 2010 retail prices discussed earlier in this report. This analysis is detailed in Appendix P and summarized below:

| Brand | Form | Average 2010 Retail Prices | | |
|-------|------|------------------|------------------|------------------|
| | | Straight Average | Weighted Average | Dollar Difference |
| Steinway & Sons | Grand | $64,120 | $66,634 | +$2,514 |
| Steinway & Sons | Upright | $25,100 | $28,214 | +$3,114 |
| Boston | Grand | $31,000 | $26,591 | -$4,409 |
| Boston | Upright | $11,267 | $8,467 | -$2,800 |
| Essex | Grand | $14,840 | $12,667 | -$2,173 |
| Essex | Upright | $5,440 | $6,049 | +$609 |

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

The above table shows the weighted average 2010 retail prices were higher than the straight average 2010 retail prices for some brand/forms and lower for others.

As discussed earlier in the report, Plaintiffs' total revenues from new Steinway piano sales would have been $5,880,009 if Plaintiffs had achieved the expected unit sales using the straight average 2010 retail prices. As a comparison to this, Sterling determined Plaintiffs' total revenues from new Steinway piano sales if the expected unit sales had been made in the sales mix achieved in Phoenix as follows:

| Brand | Form | Annual Unit Sales | Weighted Average 2010 Retail Prices | Annual Revenues |
|---|---|---|---|---|
| Steinway & Sons | Grand | 45 | $66,634 | $2,998,530 |
| Steinway & Sons | Upright | 12 | $28,214 | $338,568 |
| Boston | Grand | 45 | $26,591 | $1,196,595 |
| Boston | Upright | 27 | $8,467 | $228,609 |
| Essex | Grand | 45 | $12,648 | $569,160 |
| Essex | Upright | 60 | $6,049 | $362,940 |
| Total | | 234 | | $5,694,402 |

The two alternative estimates of Plaintiffs' total revenues from new Steinway piano sales are approximately 3% apart.[51] Both of Sterling's total revenue estimates are conservatively based on the lowest price edition and finish for each model, and Steinway & Sons grand piano average prices are calculated excluding the most expensive model D. The incorporation of upgraded editions and finishes and/or the model D would result in higher total revenue estimates. For example, the 2010 retail prices for the Steinway piano models that ended up being most frequently sold in Phoenix from 2011 to 2017 ranged as follows:[52]

| Brand | Model | Lowest 2010 Retail Price[53] | Number of Higher Priced 2010 Editions and Finishes | Highest 2010 Retail Price |
|---|---|---|---|---|
| Steinway & Sons | B | $81,200 | 13 | $142,900 |
| Steinway & Sons | K-52 | $29,200 | 2 | $34,100 |
| Boston | 163 | $23,800 | 5 | $26,500 |
| Boston | 178 | $27,900 | 4 | $30,500 |
| Boston | 118 | $6,700 | 6 | $12,400 |
| Essex | 155 | $11,990 | 5 | $15,490 |
| Essex | 123 | $6,090 | 7 | $7,490 |

---

[51]   ($5,880,009 - $5,694,402) / $5,880,009 = 3.2%.
[52]   STEINWAY 3723, 3811 and 3855.
[53]   Sterling's damage calculations use the lowest retail prices for each model.

Additionally, both of Sterling's total revenue estimates exclude any revenues that would have been generated from selling products and services other than new Steinway pianos, such as player units.

### 3.2.6  Information Subsequently Available to Plaintiffs Summary

Based on the above, the information that became available to Plaintiffs after they were already the Phoenix dealer shows:

- Plaintiffs' unit sales expectations around the time that they agreed to become the Phoenix dealer were too high.[54]

- Plaintiffs could reasonably have expected a higher incremental profit percentage than that discussed in the earlier section of the report based on information available to Plaintiffs around the time that they agreed to become the Phoenix dealer.

### 3.3  Damage Calculations

As discussed earlier in this report, the damage theory being pursued by Plaintiffs is based on the lost benefit of the bargain that they experienced as a result of the Alleged Fraud. Plaintiffs allege (i) Steinway's actions resulted in overstated unit sales expectations at the time that they agreed to become the Phoenix dealer and (ii) Plaintiffs are entitled to damages for the failure to achieve their unit sales expectations.  Sterling prepared two alternative benefit of the bargain damage calculations based on the available information.

Both of Sterling's damage calculations assume Plaintiffs' reasonable expectations were to meet the following annual unit sales performance goals in the Phoenix Dealer Agreement:

| Brand | Grand Pianos | Upright Pianos | Total |
|---|---|---|---|
| Steinway & Sons | 45 | 12 | 57 |
| Boston | 45 | 27 | 72 |
| Essex | 45 | 60 | 105 |
| Total | 135 | 99 | 234 |

Sterling's damage calculations determine the incremental profits that Plaintiffs would have earned if they sold the above new Steinway pianos each year as opposed to the actual number of new Steinway pianos that they sold.  Sterling determined Plaintiffs' incremental profits using the unit sales shortfalls and incremental profit percentages discussed earlier

---

[54]  Plaintiffs allege their overstated expectations resulted from Steinway's express statements, its failure to disclose important information it knew concerning the Phoenix market, and that its express statements became misleading by failing to disclose important information it knew relative to these statements.

in this report.  Sterling's damage calculations do not need to incorporate Plaintiffs' fixed expenses because the fixed expenses would not have changed if Plaintiffs had sold additional pianos in each year.

Sterling used conservative assumptions to determine the incremental revenues used in the damage calculations.  For example:

- Sterling assumed Plaintiffs would not have exceeded the unit sales goals in the Phoenix Dealer Agreement even though (i) Rindlisbachers had exceeded most of the sales goals in the Spokane Dealer Agreements in the years before they became the Phoenix dealer and (ii)  Rindlisbachers claim Steinway's representative told them around the time that they agreed to become the Phoenix dealer that the Phoenix market could sell over 50% more Steinway & Sons grand pianos than the goal Steinway included in the Phoenix Dealer Agreement.

- Sterling used a methodology to calculate the unit sales shortfall for 2017 that results in a lower shortfall than alternative methodologies.[55]

- Sterling did not include any incremental revenues or profits for player units that would likely have been sold with some of the additional piano sales.[56]

- Sterling excluded the most expensive model D in calculating the average prices of Steinway & Sons grand pianos.

Sterling also used conservative assumptions to determine the incremental profit percentages used in the damage calculations.  For example, Sterling assumed expenses like advertising, business promotion and travel/entertainment/meals would have varied directly with incremental revenues even enough there is typically a substantial fixed component to these types of expenses.  Additionally, Sterling assumed interest expense would not have decreased as a result of selling pianos in inventory quicker.

The difference between Sterling's two alternative calculations relates to what information was used to determine Plaintiffs' reasonable expectations.  Scenario 1 uses information that was available to Plaintiffs around the time that they agreed to become the Phoenix dealer.  Scenario 2 also incorporates information that became available to Plaintiffs after they had already become the Phoenix dealer.

---

[55]  The differences between the alternative methodologies are discussed earlier in this report.

[56]  Sterling's damage calculations do not include any incremental revenues or profits for either (i) third-party player units or (ii) the Spirio player unit that Steinway introduced in 2016.  Appendix L shows Plaintiffs sold several Steinway & Sons grand pianos with the Spirio player unit in 2016 and 2017.  Sterling understands Plaintiffs made an additional incremental profit of approximately $6,500 on Steinway & Sons pianos sold with the Spirio player unit.

### 3.3.1    Scenario 1

Sterling's Scenario 1 damage calculation is detailed in Appendix Q and based on the following assumptions:

- Plaintiffs would have made additional new Steinway piano sales in each year equal to the expectation shortfalls detailed in Appendix N.

- Plaintiffs' revenues from each additional new Steinway piano sale would have been equal to the 2010 average retail prices for pianos of the relevant brand and form detailed in Appendix G increased by 2.2% inflation annually.

- Plaintiffs' incremental profit from each additional new Steinway piano sale would been equal to the average 25.3% incremental profit that Rindlisbachers achieved in Spokane from 2007 to 2010 detailed in Appendix F.

Appendix Q shows Plaintiffs' benefit of the bargain damages based on Scenario 1 total $7,525,199.

### 3.3.2    Scenario 2

Sterling's Scenario 2 damage calculation is detailed in Appendix R and based on the following assumptions:

- Plaintiffs would have made additional new Steinway piano sales in each year equal to the expectation shortfalls detailed in Appendix N.

- Plaintiffs' revenues from each additional new Steinway piano sale would have been equal to the average retail prices in each year from 2011 to 2017 for each brand and form detailed in Appendix I.

- Plaintiffs' incremental profit from each additional new Steinway piano sale would been equal to the actual incremental profit that Plaintiffs experienced in Phoenix in each year from 2011 to 2017 detailed in Appendix K.

Appendix R shows Plaintiffs' benefit of the bargain damages based on Scenario 2 total $8,623,288.

### 3.3.3    Prejudgment Interest

Both of Sterling's benefit of the bargain damage calculations exclude prejudgment interest. Sterling's exclusion of prejudgment interest from the damage calculations does not mean that Sterling has determined prejudgment interest is not applicable.  This is a matter for

legal determination.  Sterling may calculate prejudgment interest if the legal determination is made.

## 3.4    Benefit of the Bargain Damages Summary

Sterling's analysis shows Plaintiffs' benefit of the bargain damages are $7,525,199 under Scenario 1 and $8,623,288 under Scenario 2.  Both damage amounts are based on several conservative assumptions and exclude prejudgment interest.

## 4.    Out of Pocket Losses

An earlier section of this report states the applicable approaches to determine Plaintiffs' economic damages in this lawsuit are benefit of the bargain damages and out of pocket losses, provided there is no double recovery.

Sterling's benefit of the bargain damages cover the period during which Plaintiffs sold new Steinway pianos in Phoenix (i.e., through July 2017).  Plaintiffs allege that they had entered into an seven-year lease with a personal guarantee for a location in an upscale shopping area at Steinway's instruction in 2014.[57]  As the lease ran through 2021, Plaintiffs needed to continue operations after the Steinway relationship ended to mitigate their damages. Sterling understands Plaintiffs were not able to find a replacement dealer relationship until approximately May 1, 2018 when they became a Yamaha dealer.  Plaintiffs made an overall net loss during the nine months from August 2017 through April 2018 as detailed below:[58]

| Month | Net Profit/(Loss) |
|---|---|
| August 2017 | -$69,318 |
| September 2017 | $12,581 |
| October 2017 | -$7,408 |
| November 2017 | -$49,311 |
| December 2017 | -$29,890 |
| January 2018 | -$18,101 |
| February 2018 | -$17,892 |
| March 2018 | -$46,365 |
| April 2018 | -$26,705 |
| Total | $252,409 |

The net loss of $252,409 suffered by Plaintiffs in the nine months between the end of their Steinway dealer relationship and the start of their Yamaha dealer relationship does not

---

[57]  "Third Amended Complaint" dated September 7, 2018, pages 13 and 14.
[58]  RIN 644 to 663.

represent a double recovery because it covers a different period than the benefit of the bargain damages discussed earlier.[59]

## 5. Conclusion

Plaintiffs' benefit of the bargain damages for the time in which they were the Steinway dealer in Phoenix total at least:

- $7,525,000 based on the information available to Plaintiffs around the time that they agreed to become the Phoenix dealer.

- $8,623,000 based on the information available to Plaintiffs around the time that they agreed to become the Phoenix dealer and subsequently available information.

Plaintiff also suffered a net loss of approximately $252,000 in the nine months between the end of their Steinway dealer relationship and the start of their Yamaha dealer relationship.

Prejudgment interest, if applicable, may be added to the above damages.

Sterling may revise or supplement its opinions if additional information is provided and/or further analysis is performed.

_____          9/13/19
David R. Perry                           Date
Sterling Group LLC

---

[59] Prejudgment interest, if applicable, may be calculated later on Plaintiffs' net loss between August 2017 and April 2018.

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

**Summary**

Mr. Perry is President and Founder of Sterling Group LLC. He is a Certified Public Accountant, Accredited in Business Valuation, Certified in Financial Forensics, Certified Divorce Financial Analyst and a British Chartered Accountant. He has over 30 years of experience in accounting and finance and has primarily focused on damage calculations, financial investigations and business valuations for the last 20 years. He has analyzed companies in numerous industries and been based in the major financial capitals of New York, London and Singapore. He received the highest score in Arizona when he took the examination to become a Certified Public Accountant.

**Commercial Disputes**

Mr. Perry has been engaged on numerous occasions to perform economic analyses, investigations, business valuations and damage calculations related to commercial disputes.

Many of the commercial disputes in which Mr. Perry is hired involve breach of contract claims. Others involve various claims such as defamation, fraud, professional malpractice, breach of fiduciary duty and employment law violations. He has been hired to calculate damages suffered by businesses in numerous industries, including multiple cases with more than $100 million at stake.

Mr. Perry has worked on hundreds of commercial disputes including ones in which he:

- Analyzed the losses experienced by multiple real estate developments due to the lack of a wastewater treatment plant.

- Determined the damages suffered by a business as a result of alleged defamation over a multi-year period.

- Assessed the damages in a contract dispute related to video games owned by a major Japanese corporation.

- Analyzed multiple large electronic data files in a wage and hour employment class action involving a financial institution.

- Performed financial analysis to resolve disputes between various physician groups and a diagnostic imaging services provider.

- Analyzed whether a real estate developer had improperly charged development expenses to a homeowners' association.

- Calculated lost profits in a contract dispute related to the production of an organic beverage.

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

---

- Analyzed the commercial feasibility of a cleaning machine and the damages related to alleged breaches of a contract.

- Determined the loss in value of a distributor as a result of alleged actions taken by a manufacturer.

- Determined the damages in a lawsuit against an insurance carrier related to mold contamination in an apartment complex.

- Assisted a Stanford law professor to determine whether certain companies had complied with various federal and state statutes.

- Assessed the adequacy of reserves held by a homeowners' association at the time of a change in the association's control.

- Calculated damages in a dispute between two large insurance brokerage firms.

- Determined lost profits in a dispute between a homebuilder and a large publicly-traded mining company.

- Calculated damages incurred by a manufacturing company as a result of a fire at one of its production facilities.

- Valued a sports bar in connection with a dispute between a franchisee and franchisor.

- Identified misstatements in financial statements used as the basis for a large corporate acquisition and the related damages.

- Analyzed thousands of legal invoices in connection with a dispute between an insured and multiple insurers.

- Analyzed the damages incurred by the buyers of a business as a result of alleged professional malpractice.

- Identified fund flows and business relationships in a dispute about alleged international money laundering and fraud.

- Determined the present value of utility infrastructure bonds in connection with an alleged securities act infringement.

- Quantified damages in a dispute involving the delayed development of a master-planned community.

## Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

- Valued the business of a homebuilder in connection with a lawsuit with a homeowners' association.

- Analyzed misstatements in financial statements used to calculate the earn-out payments after an acquisition.

- Calculated damages in a lawsuit involving an alleged oral contract and analyzed if the alleged contract was commercially reasonable.

- Analyzed millions of records in multiple databases in connection with a lawsuit alleging failure to make commission payments.

- Assessed what percentage of the change in value of a chiropractic business was caused by alleged professional malpractice.

**Intellectual Property**

Mr. Perry has 20 years of experience calculating damages in intellectual property disputes. He has worked on many cases involving patents, copyrights, trademarks and trade secrets. He has performed numerous calculations of plaintiffs' lost profits, defendants' gained profits and reasonable royalties.

Examples of Mr. Perry's intellectual property experience include:

- In a patent case involving email technology, Mr. Perry issued an expert report and provided testimony explaining (i) errors in the opposing expert's damage calculation and (ii) the appropriate way to calculate damages. Mr. Perry's expert report and opinions formed the basis of a successful motion to exclude against the opposing expert.

- In a patent case involving successful casino table games, Mr. Perry issued an expert report and provided testimony on the plaintiff's damages. The court awarded damages in the exact amount shown in Mr. Perry's expert report.

- In a patent case involving internet search technologies, Mr. Perry issued multiple expert reports on damages suffered by the patent holder as a result of alleged infringement by an industry-leading internet search provider.

- In a patent case involving a product renewal method used by an industry-leading web services provider, Mr. Perry issued multiple expert reports. Mr. Perry's expert reports identified errors in the opposing expert's damage calculations and described the appropriate way to calculate damages.

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

---

- In two patent and trade secret cases involving golf tee time booking systems, Mr. Perry issued an expert report and determined the damages suffered by the intellectual property owners.

- In a copyright case involving software used by major electronic payment processors, Mr. Perry issued multiple expert reports and provided testimony. Mr. Perry's expert reports identified errors in the opposing expert's calculations and explained his own damage assessment.

- In a copyright and trade secret case involving software used in online courses offered by two Silicon Valley companies, Mr. Perry issued multiple expert reports and provided testimony. Mr. Perry's expert reports identified errors in the opposing expert's calculations and explained his own damage assessment.

- In a copyright case involving alleged unauthorized copying by a law firm, Mr. Perry issued an expert report discussing the revenues received by the law firm from the alleged improper acts.

- In a trademark case involving online and brick and mortar sales by an industry leading tire and wheel retailer, Mr. Perry issued four reports and provided testimony. Mr. Perry's expert reports identified errors in the opposing expert's calculations and explained his own damage assessments.

- In a trade secret case involving two large insurance brokers, Mr. Perry issued an expert report. Mr. Perry's expert report identified errors in the opposing expert's calculations and explained his own damage assessments.

Other intellectual property disputes that Mr. Perry has worked on involve such items as golf clubs, agricultural equipment, casino slot machines, outdoor patio products, pest control products, quality improvement methodologies, office products, health products, software products, mining industry equipment, and customer lists.

**Individual Claims**

Mr. Perry is regularly engaged to calculate the present value of economic losses allegedly suffered by individuals and/or to comment on calculations performed by other experts.

Mr. Perry's economic loss assessments are used to help resolve employment, medical malpractice, personal injury and wrongful death disputes.

Examples of the types of analysis that Mr. Perry has performed on numerous occasions related to claims brought by individuals include:

- Determine the present value of lost earnings in an alleged wrongful termination case based on the difference between the plaintiff's expected earnings in the position from which he was dismissed and his expected earnings from replacement position.

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

---

- Calculate the present value of lost earnings and household services in an alleged wrongful death case considering the deceased's future income and personal consumption if he had lived longer.

- Rebut calculations of the present value of an individual's lost earnings, future medical costs and household services prepared by another expert related to a work-related accident.

- Assess the present value of economic losses suffered by an individual as a result of alleged medical malpractice after considering available information and the reports of medical and vocational experts.

**Marital Dissolution**

Mr. Perry is frequently engaged in marital dissolution matters to value closely-held businesses and conduct forensic accounting.

Mr. Perry has several credentials (i.e., Accredited in Business Valuation, Certified in Financial Forensics and a Certified Divorce Financial Analyst) that are useful in marital dissolution matters.

Mr. Perry's marital dissolution experience includes engagements in which he:

- Critiqued another expert's opinions about the value of an executive's alleged book of business, which resulted in a Court finding "…Mr. Perry's criticism of the [other expert's] approach was well-founded and very persuasive."

- Prepared charts and spreadsheets that tracked the flow of funds over time and allowed the attorney and his client to understand where certain community monies had gone.

- Valued a multi-million-dollar business that cleans the tools used to manufacture microchips in connection with a marital dissolution.

- Reviewed accounting and public records for numerous inter-related corporations and partnerships to determine the marital community's interest in each entity.

- Critiqued a valuation of a design business prepared by another expert and prepared a report correcting the other expert's errors.

- Valued over ten billion dollars of interests in public and private telecommunications companies as part of a divorce proceeding.

- Assisted an attorney in preparing for multiple depositions in a complex divorce involving multiple business entities.

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

---

- Analyzed documents to determine whether substantial obligations reported by one spouse were actual debts and/or community liabilities.

**Business Improvement**

Mr. Perry has managed numerous business improvement projects for large corporations and institutions.  Mr. Perry's business improvement experience includes engagements in which he:

- Managed a team of business analysts and computer programmers to design and implement a customer/product information system in over 30 countries.

- Designed and implemented a management information system that provided information on revenues, costs and risks for a business that trades foreign exchange and interest rate products.

- Managed a team to perform an Operational Review of the second-largest bank in Romania and present findings to officials of the World Bank and European Commission.

- Performed a key role in the restructure of the US operations of a major international bank to eliminate duplicate and non-core businesses and increase profitability.

- Managed due diligence assignments for companies seeking to expand in the UK and Eastern Europe and presented comprehensive reports to management and directors.

- Analyzed the benefits, costs and risks of alternative general ledger options for a large US bank, which resulted in higher quality financial reporting and significant cost savings.

- Managed the design and implementation of risk management processes for the US operations of a major international bank resulting in an improved grading by the Federal Reserve Board.

- Prepared a Business Continuity Plan for a complex $30 million business.

- Managed the audit of one of the world's largest banks that involved work in over 30 countries, analysis of complex transactions and direct communication with federal regulators.

- Audited many companies in numerous industries during eight years with a Big-Four public accounting firm.

- Performed numerous investigations involving fraud, conflict of interests, internal controls and compliance with established policies and procedures.

- Analyzed the derivative portfolios and related risk management controls of numerous banks in the United Kingdom and United States.

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

---

**Professional History**

| | | |
|---|---|---|
| Sterling Group | President | Scottsdale |
| The Kenrich Group | Vice President | Phoenix |
| Sterling Group | President | Scottsdale |
| Lancaster Consulting | Principal Consultant | Phoenix |
| Standard Chartered Bank | Vice President - Finance | New York and Singapore |
| KPMG | Senior Manager | London, Houston and New York |

Professional Credentials

Certified Public Accountant (Honored for highest score in Arizona on CPA examination).

Accredited in Business Valuation.

Certified in Financial Forensics.

Certified Divorce Financial Analyst.

Fellow of the Institute of Chartered Accountants of England and Wales.

Professional Affiliations

American Institute of Certified Public Accountants.

Arizona Society of Certified Public Accountants.

Institute for Divorce Financial Analysts

National Association of Forensic Economics

Education and Training

Bachelor's degree in Physics from London University in England (Highest Honors).

Post-graduate studies in accounting leading to Chartered Accountant qualification.

Numerous technical skills and management development courses in the U.K. and U.S.

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

---

**Recent Testimony Experience**

Fernandez v. USI Insurance Services, LLC, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: August 9, 2019

Cannabis Renaissance Group, LLC, et al. v. Fennemore Craig, PC, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: February 13, 2019

Appell, et al. v. Lane & Ehrlich, Ltd., et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: October 30, 2018

Ritchie Capital Management, LLC, et al. v. Dentons US LLP
Circuit Court of Cook County, Illinois
Date of deposition testimony: June 15, 2018

L-3 Communications Corporation, et al. v. Serco Inc.
United States District Court, Eastern District of Virginia
Date of deposition testimony: November 8, 2017

Arizona Oncology Associates, PC v. Nelson
Arbitration in Phoenix, Arizona
Date of deposition testimony: August 4, 2017
Dates of arbitration testimony: August 24 and 25, 2017

Porterfield, et al. v. Hanson Aggregates LLC, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: April 11, 2017

Westminster Securities Corporation, et al. v. Uranium Energy Corporation, et al.
United States District Court, Southern District of New York
Dates of deposition testimony: February 23, 2017 and June 27, 2017

Chu, et al. v. Dam, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: June 14, 2016

Cable Shopping Network, LLC v. AOR Direct, LLC
Maricopa County Superior Court, Arizona
Date of hearing testimony: March 17, 2016

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

Wyle Inc., et al. v. ITT Corp. et al.
Supreme Court of the State of New York, County of New York
Date of deposition testimony: March 2, 2016

Nelson v. Ellis, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: February 24, 2016
Date of trial testimony: September 28, 2016

GoDaddy.com, LLC v. RPost Communications Limited, et al.
United States District Court, District of Arizona
Date of deposition testimony: January 25, 2016

Atkins, et al. v. Snell & Wilmer LLP, et al.
Maricopa County Superior Court, Arizona
Dates of deposition testimony: September 28, 2015 and November 4, 2015
Dates of trial testimony: October 19 and 20, 2016

In the Matter of the Estate of Robert Mazet, III
Maricopa County Superior Court, Arizona
Date of deposition testimony: July 30, 2015

Garcia v. Troon South Investments, LLC, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: June 15, 2015

Fuciarelli v. City of Scottsdale
United States District Court, District of Arizona
Date of deposition testimony: June 5, 2015

Canyon Communications, LLC v. Grandl Corporation, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: April 29, 2015

Giannosa v. Arthur J. Greene Construction Co.
Circuit Court of Cook County, Illinois
Date of deposition testimony: April 10, 2015

Rahn v. City of Scottsdale
Maricopa County Superior Court, Arizona
Date of deposition testimony: March 19, 2015

# Sterling Group LLC
## David R. Perry CPA/ABV/CFF, CDFA, FCA

Crawford v. Freeman
Maricopa County Superior Court, Arizona
Date of deposition testimony: March 13, 2015

Johnson vs. Johnson, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: January 6, 2015

Agostino v. Bridgewater Marketing LLC, et al.
Maricopa County Superior Court, Arizona
Date of hearing testimony: December 3, 2014

Strojnik v. Roadrunner Glass Company, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: November 21, 2014

Abel Commercial Ventures, LLC, et al. v. Southwest Next Partners, et al.
Maricopa County Superior Court, Arizona
Date of deposition testimony: November 4, 2014

Estate of Steven Edward Lewis, et al. v. Lycoming, et al.
United States District Court, Eastern District of Pennsylvania
Date of deposition testimony: June 10, 2014

Winckler v. BNSF Railway Company
Maricopa County Superior Court, Arizona
Date of deposition testimony: April 7, 2011
Date of trial testimony: March 29, 2018

**Publications (last ten years)**

None

TABLES OMITTED

# EXHIBIT 3

# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Kevin H. Rindlisbacher and Jami          )
L. Rindlisbacher, husband and            )
wife; and Piano Showroom of              )
Arizona, Inc., and Arizona               )
corporation,                             )
                                         )
        Plaintiffs,                      )
                                         )
vs.                                      ) No. 2:18-cv-01131-JJT
                                         )
Steinway, Inc., a Delaware               )
corporation,                             )
                                         )
        Defendants.                      )
_____)

DEPOSITION OF DAVID REGINALD PERRY

Volume 1

Pages 1 - 158

Phoenix, Arizona

December 11, 2019

Prepared by:

CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

David Reginald Perry                December 11, 2019

1          Did you -- do you recall any specific

2    deposition transcripts in which the exhibits were not

3    provided, at least initially?

4        A    I don't know whether they had exhibits, but I

5    received the transcript of the piano mover.  I'm

6    forgetting his name right now.  And I don't think I got

7    the exhibits to that particular deposition.

8        Q    Okay.  And if --

9        A    If there were any.

10       Q    If there were any.

11          Are there any others that you recall not

12   receiving exhibits with the transcript?

13       A    Again, I don't recall sitting here specifically

14   which I did and which I did not, other than I know I did

15   for Mr. Rindlisbacher and I know I didn't for the piano

16   mover, if there were any.  But I'm not sure about all

17   the others.

18       Q    Thank you.

19          Attached to your report is a -- what appears to

20   be a current copy of what we'll call a CV.  Is that an

21   accurate term, or do you use some other term that

22   details your background and experience?

23       A    I can call it a CV, a résumé.  I use those

24   terms pretty interchangeably.

25       Q    Okay.  I understand you're currently a licensed

David Reginald Perry                December 11, 2019

1    CPA in Arizona; correct?

2        A    I am, yes.

3        Q    That's a license that remains current; correct?

4        A    It does.

5        Q    Okay.  Have you had -- have you ever held any

6    other licenses in Arizona?  Any other licenses,

7    professional licenses?

8        A    A driver's license, but that's not what you --

9        Q    Okay.  Fair enough.

10           Professional licenses, to be clear?

11       A    I don't recall having any other Arizona

12   professional licenses.

13               THE WITNESS:  May I just get a tissue, if

14   that's okay?

15               MR. SAMUELS:  Of course.  Take your time.

16   Do you need to take a break?  Or are you okay?

17               THE WITNESS:  No, no.  Carry on.

18   BY MR. SAMUELS:

19       Q    So these are, obviously, not meant to be

20   anything other than me making sure that your CV is

21   accurate and updated.

22           Have any of -- you mentioned you don't believe

23   you have any other professional licenses in Arizona.  Do

24   you -- did you at any time hold professional licenses

25   elsewhere?

David Reginald Perry                    December 11, 2019

1  your -- to suggest to your report?

2       A    There were minor comments.  None of the numbers

3  changed.

4       Q    Did you consider or produce to counsel any

5  analysis that is not included in your reports?

6       A    What do you mean by that?

7       Q    Were there other calculations or models that

8  you performed and provided to counsel that were

9  ultimately not included in your final report?

10      A    No.  Everything -- my damage calculations are

11 just the ones in my final report.  I've done no other

12 ones.

13      Q    And I'd like to just confirm some details that

14 I believe should be fairly easy for you to acknowledge,

15 but maybe not.

16           You don't have any experience in the piano

17 industry; correct?

18      A    No.  Not -- I am not -- never been employed in

19 that industry or --

20      Q    You don't have any experience as a retailer;

21 correct?

22      A    Again, not -- I've never been employed in the

23 retail industry.  I've done, you know, calculations of

24 many retailers, of many different products in the

25 purpose of doing damage calculations.

David Reginald Perry                 December 11, 2019

43

1      Q     In terms of your role as an expert witness,
2   you've analyzed some retail establishments; correct?
3      A     Many retail establishments and -- along with,
4   you know, many other, you know, establishments as well.
5      Q     But you've never been employed by or operated
6   or owned a retail establishment; correct?
7      A     I'm just making sure this is correct, but yes,
8   that is correct.
9      Q     And have you ever been employed by, operated
10  or, owned a manufacturing business?
11     A     I have not.
12     Q     Okay.  You're not offering any opinions as a
13  piano industry expert; correct?
14     A     No.
15     Q     I'm sorry.  Let me make sure that question is
16  clear.  I think it's unclear.
17           Are you offering any opinions as a piano
18  industry expert?
19     A     No.  My opinions are based on damages and not
20  specific to the piano industry.
21     Q     Okay.  Have you ever before opined about
22  damages based on alleged omissions that occurred eight
23  years or more before the lawsuit was filed?
24     A     I don't recall.  I've been doing this for 23
25  years, and I just don't recall the answer to that

David Reginald Perry                December 11, 2019

44

1    question.

2        Q    Are you assuming that by plaintiffs opening a

3    store in Scottsdale as a Steinway dealer, that they

4    should have been able to sell 234 pianos per year and

5    generate $6 million in annual revenues?

6                MR. MORRILL:  Object to form.  Misstates

7    testimony.

8                MR. SAMUELS:  You can make a form

9    objection, Mr. Morrill, please.  You don't need to

10   explain it unless I ask you to.

11               THE WITNESS:  I analyzed the available

12   information to determine plaintiffs' reasonable

13   expectations based on the data.  Obviously, the data

14   being the Phoenix dealer agreement and some of the

15   statements, as alleged in the complaint, that they

16   made -- that Steinway allegedly made.

17               Then I looked at the available data then

18   to determine, you know, how they did in Spokane along

19   with other data to work out their reasonable

20   expectations of the time.  And I assumed that they would

21   have only met the sales goals in the -- that Steinway

22   put in the dealer agreement, not exceeded them as they

23   had done in Spokane.

24   BY MR. SAMUELS:

25       Q    So you assumed that they would meet the sales

David Reginald Perry                    December 11, 2019

1    performance goals and generate $6 million in revenue by

2    operating a Steinway dealership; correct?

3                    MR. MORRILL:  Object to form.

4                    THE WITNESS:  An assumption based or

5    analysis or determined based on my analysis.  That's why

6    I'm maybe sort of hedging a little bit.  That's what I

7    assumed based on my analysis, yes.

8    BY MR. SAMUELS:

9        Q    And the alleged damages period is six and a

10   half years; correct?

11       A    For the benefit of the bargain analysis,

12   there's an extra few months at the end for out-of-pocket

13   losses as a second component of my damages.

14       Q    Thank you for that.

15            And so just to be clear, the benefit of the

16   bargain analysis is for 2010 through July of 2017;

17   correct?

18       A    2011 through July of 2017, I believe.

19       Q    Thank you for that.  You are correct.

20            Would you agree that Mr. Rindlisbacher would

21   have been aware of his piano sales in each of those

22   years?

23                    MR. MORRILL:  Object to form.

24                    THE WITNESS:  If you're asking did he know

25   how many sales he was making, one imagines he did, yes.

David Reginald Perry                December 11, 2019

1    Q    Would you agree that lost profits cannot go on
2  indefinitely?
3    A    Lost profits generally have a finite period.
4  Certainly I would agree with you on that.
5    Q    Let's talk about what I think you've referred
6  to as the -- well, the post benefit of the bargain
7  damages.
8         What do you refer to that as?
9    A    Out-of-pocket losses.
10   Q    Let's talk about your opinions with regard to
11 those losses, those alleged losses.
12        What -- what do you base your opinions upon
13 with regard to the out-of-pocket losses?
14   A    Monthly income statements for, I think, an
15 eight-month period in between the closure of the
16 Steinway dealership and the start of the Yamaha
17 dealership.
18   Q    And do you have any understanding as to what
19 Mr. Rindlisbacher was doing as far as piano retail sales
20 during those eight months?
21   A    Not specifically.  There were retail sales.
22 Obviously, not new Steinways.  I could say that.
23   Q    Okay.
24   A    But as to what pianos he was selling
25 specifically in those months, I don't know.  I just know

David Reginald Perry                    December 11, 2019

1  he wasn't a dealer specifically for any -- the

2  dealership agreement for Yamaha hadn't started at that

3  point in time.

4      Q    What's the importance of the dealership

5  agreement for Yamaha in your opinion?

6      A    I understood that made him profitable again,

7  was getting that dealership.  So that's -- you know,

8  there was no loss.  There was no out-of-pocket loss

9  after that point.  Certainly I didn't include any, so

10  there was no -- so my assumption is there was no

11  out-of-pocket loss that was included after that

12  dealership agreement was entered into.

13      Q    And do you know or do you assume that he became

14  profitable once he became a Yamaha dealer?

15      A    That's what -- I'm certainly not including any

16  damages after that.

17      Q    Okay.

18      A    I don't know for certain, but again, it was

19  nothing in my damage calculation to include any amounts

20  after that time.

21      Q    Were you informed by counsel that this was the

22  relevant time period that you should focus on for the

23  cost of -- for that portion of the damages?

24      A    Certainly from the documents I read that have

25  been prepared by plaintiff, the complaint, the

David Reginald Perry                    December 11, 2019

54

1    disclosure statements, etcetera, that talked about that
2    period, and that's what I focused on to -- so my damages
3    for -- was following what the allegations were in the
4    complaint in that regard.
5         Q    Okay.  And you were not provided any data about
6    Mr. Rindlisbacher's profitability as a Yamaha dealer;
7    correct?
8         A    No.  And again, everything I did stopped in
9    early 2018.  I didn't see any relevance to going any
10   further given what was in the claims.
11        Q    Do you have an understanding as to what types
12   of business Mr. Rindlisbacher owns and operates in Utah?
13        A    From his testimony and I -- I understand
14   there's two or three different piano stores if I recall
15   correctly.
16        Q    Do you understand whether he operates through
17   an exclusive dealership agreement at any of those Utah
18   piano stores?
19        A    At this time, no.  I think he's had them in the
20   past, but I'm not sure that there are any today.  So at
21   this time, my answer is, I don't know.  So I'm not
22   saying he doesn't.  I just don't know.
23        Q    Okay.  Do you know whether -- do you have any
24   information about what would have prevented
25   Mr. Rindlisbacher from selling pianos made by other

David Reginald Perry                December 11, 2019

1   manufacturers during that eight-month period?

2       A    I have -- I do not know what -- other than he

3   didn't have a dealership agreement, is my understanding,

4   certainly with Steinway.  I don't know specifically what

5   other restrictions would have been in place in those

6   eight-month period -- in that eight-month period.

7       Q    You reviewed -- let's turn a little bit --

8   let's turn towards the topic of Spokane.

9            You understand that Mr. Rindlisbacher, through

10  a separate company, had a Spokane Steinway dealership

11  from 2006 through 2010; correct?

12      A    Yes.  I believe it continued after 2010.

13      Q    Correct.

14           And you reviewed Mr. Rindlisbacher's

15  performance in Spokane leading up through 2010; correct?

16      A    I did.  And the period subsequent I reviewed as

17  well.

18      Q    And you incorporated into your analysis only

19  the period leading up through 2010; correct?

20      A    I incorporated that into my report because I

21  could use that as the -- a piece of available

22  information that he had at the time he entered into the

23  Phoenix agreement in -- around December 2010.  So that

24  was a hard piece of data that was known to him at that

25  point in time and was relevant information for my

David Reginald Perry                December 11, 2019

61

1        A    I don't recall that.

2        Q    Okay.  Are you aware of any financial proformas

3   he ran or created before he decided to open a Steinway

4   dealership in Scottsdale?

5        A    I haven't seen any.

6        Q    Have you ever had any discussions with

7   Mr. Rindlisbacher?

8        A    No.  I'm -- no.

9        Q    Okay.  So all of your discussions pertaining to

10  your opinions and assignment in this matter have either

11  been with your wife or Mr. Morrill; correct?

12       A    Yes.

13       Q    Have you had any discussions with any other

14  person about this assignment?

15       A    No.  Not about my opinions.

16       Q    Would you agree that a prudent business person

17  would develop a business plan and financial projections

18  or modeling before opening a business?

19       A    I think that's a general statement.  I mean, I

20  didn't prepare a business plan before I opened my

21  consulting business.  I mean, I just felt I knew enough

22  to not do that.  Certainly a lot of people in big

23  organizations would do, but I'm not sure it's necessary

24  in every case.

25       Q    Do you believe a person with a finance degree

David Reginald Perry          December 11, 2019

1    BY MR. SAMUELS:

2        Q    Okay.  In the first part of your report, you

3    have various quotations that are footnoted to the third

4    amended complaint; correct?

5        A    Yes.

6        Q    And you don't have any firsthand information

7    about any of those assertions or allegations; correct?

8        A    Correct.  I'm just setting -- this is in my

9    introduction section of my report.

10       Q    Would you agree that there are a lot of

11   variables that can affect the sales performance of a

12   retail business?

13       A    Maybe you can be more -- are we talking about

14   this specific business or retail businesses generally?

15       Q    Let's start about retail business generally,

16   and then we can get into the specific business.

17            Would you agree with me that there are a lot of

18   variables that can affect sales performance of a retail

19   business?

20       A    There are variables.  I would say "a lot of" is

21   difficult to define.

22       Q    All right.  There are several variables;

23   correct?

24       A    There are variables, certainly, that can affect

25   the sales performance.

David Reginald Perry                    December 11, 2019

1    reasonable sales numbers, reasonable expectations in
2    terms of, you know, what I did included what I said was
3    plaintiffs' reasonable expectations at the time, based
4    on what was in the Steinway dealer agreement and the
5    fact that they he exceeded the sales in Spokane.
6        Q    Do you have any training in psychology or
7    psychiatry?
8        A    No.
9        Q    Okay.  Do you have any training that would
10   allow you to opine on a person's state of mind at a
11   particular period of time?
12       A    No.  I think you asked that before.
13       Q    All right.
14       A    But I -- I mean, I don't know whether you're
15   not understanding what I'm trying to say.
16       Q    I think I understand.
17            You're making the assumption that because he
18   met sales goals in Spokane, he would have no trouble
19   meeting sales goals in Phoenix; correct?
20       A    I didn't assume that he would have exceeded
21   them.  I assumed that he only would have met them.  And
22   based on what was in the agreement -- that Steinway put
23   in the agreements in 2010, given the market conditions,
24   the piano industry conditions, those should all have
25   been accounted for.  Those were reasonable expectations

David Reginald Perry                December 11, 2019

1    at the time.

2        Q    So just to be clear, I didn't ask you about

3    exceeding expectations.

4            You're making the assumption that because he

5    met sales goals in Spokane, he would no doubt be able to

6    meet sales goals in Phoenix; correct?

7                MR. MORRILL:  Object to form.  Misstates

8    testimony.

9                THE WITNESS:  I said the table we just

10   looked at shows he exceeded sales goals in Spokane.  I

11   assumed that it would have been reasonable, for damage

12   calculation purposes, to assume that he would have met

13   at least sales goals in Phoenix.

14   BY MR. SAMUELS:

15       Q    Say that again.

16           You're assuming that it would be reasonable for

17   him to meet the sales goals in Phoenix based on his

18   performance in Spokane?

19       A    And the fact that Steinway had included these

20   in 2010 in the dealer agreement --

21       Q    And --

22       A    -- given its knowledge of everything.

23       Q    And you would agree with me that he had a sales

24   goal in Spokane of 34 units or 34 pianos in 2010;

25   correct?

David Reginald Perry                December 11, 2019

1        A     Yes.  In 2010 on.

2        Q     And his sales goals in Phoenix were 243 pianos;

3   correct?

4        A     According to what Steinway put in the dealer

5   agreement, yes.

6        Q     And to which he agreed; correct?

7        A     That was executed, yes.

8        Q     Let's turn to the next page of your report,

9   please.  Under the first -- well, under the only table,

10  you have a paragraph that says, Some of the operating

11  expenses listed on appendix E would be expected to

12  increase with each piano sold.  And you list the types

13  of expenses that you would expect to increase.  And then

14  other expenses, I'm summarizing, would not be expected

15  to increase the rent, the property taxes, utilities as

16  examples.

17        Then the paragraph below that -- I'm just

18  getting to the question here -- mentions that you

19  deducted certain larger operating expenses; correct?

20       A     Yes.

21       Q     Those operating expenses you deducted in the

22  middle of the last full paragraph -- second to last full

23  paragraph included advertising business promotions and

24  outside shows and events; is that correct?

25       A     They included it.  There were a lot more, yes.

David Reginald Perry                    December 11, 2019

1     Q    Let's turn to the out-of-pocket losses section

2   of your report, which begins on page 23, at least the

3   summary of it.

4          We asked -- I asked some questions about this

5   earlier, but what, again, is the significance of

6   Mr. Rindlisbacher becoming a Yamaha dealer as an ending

7   point in this analysis?

8     A    That -- that was -- he then had a replacement

9   dealer -- I mean dealership and the advantages that

10  brought to his business.  And his losses, the only ones

11  I've captured are the ones where he didn't have a

12  dealership arrangement and the advantages that brought

13  to his business just for that, you know, nine-month

14  period.

15    Q    Do you have any -- did you understand that he

16  did not have an exclusive dealership arrangement in his

17  Utah business at the time?

18    A    As I think we've been through earlier, I don't

19  recall specifically at that point in time what he had in

20  his Utah businesses.

21    Q    Do you understand from his testimony that there

22  are only a few dealers that operate through exclusive

23  dealership agreements, including Yamaha and Steinway?

24  I'm sorry, a few manufacturers.

25    A    Okay.  Yes.

David Reginald Perry                December 11, 2019

110

1     Q     Let me state it more clearly because I don't
2  want to confuse anyone, let alone myself.
3          Do you have an understanding that only a few
4  manufacturers operate through exclusive dealership
5  agreements for piano retailers?
6     A     That is my understanding, yes.
7     Q     And Yamaha and Steinway being two of them;
8  correct?
9                MR. MORRILL:  Object to form.
10               THE WITNESS:  Yes.
11  BY MR. SAMUELS:
12     Q     And whether they're exclusive or otherwise.
13          But your understanding is Yamaha and Steinway
14  operate through dealership agreements; correct?
15     A     Yes.  Because at least I know that
16  Mr. Rindlisbacher was a dealer for those two
17  manufacturers.
18     Q     And do you have any understanding as to what,
19  if anything, prevented Mr. Rindlisbacher from selling
20  pianos, digital acoustic or acoustic pianos from any
21  other manufacturer during that stated time period of the
22  out-of-pocket losses?
23     A     I am not aware of any other restrictions, other
24  than the fact he wasn't a dealer for one of those two
25  major manufacturers.

```
 1   for a few days around the holidays.  But hopefully
 2   between your trip and my trip, we can figure things out.
 3              MR. MORRILL:  Okay.  I'll ask Mr. Perry to
 4   get me some dates that he is available in the next 10
 5   days.
 6              MR. SAMUELS:  And I'm thinking I'll only
 7   need probably another 90 minutes or 2 hours at most.  So
 8   we can -- you know, we can block a morning or an
 9   afternoon.  That should do it.
10              MR. MORRILL:  Okay.
11              THE COURT REPORTER:  Do you want a copy of
12   the transcript, Layne?
13              MR. MORRILL:  Yes.  Electronic and one
14   paper copy.
15              THE COURT REPORTER:  Do you want the
16   exhibits electronic only?
17              MR. MORRILL:  Electronic only, yes.
18              (The proceedings concluded at 2:39 p.m.)
19
20              _____
21                   DAVID REGINALD PERRY
22
23
24
25
```



Coash
&Coash
PHOENIX DEPOSITION REPORTERS

1 of 2

# ERRATA SHEET

DEPOSITION OF:         David Reginald Perry

DEPOSITION DATE:       12/11/2019

CAPTION:               Kevin Rindlisbacher vs. Steinway, Inc.

| PAGE/LINE NO. | CHANGE AND/OR CORRECTION | REASON |
|---|---|---|
| 6 - 9 | "The differences in the two scenarios" s/b "two" in wrong place | |
| 28 - 16 | "evaluation" s/b "valuation" | |
| 34 - 10 | "I" s/b "she" | |
| 35 - 23 | "reference" s/b "referenced" | |
| 42 - 24 | "in" s/b "for" | |
| 44 - 20 | "of" s/b "at" | |
| 47 - 2 | "beyond" s/b "bettering" | |
| 51 - 22 | "the date" s/b "for dates" | |
| 51 - 23 | "and" s/b "as" | |
| 53 - 18 | "it" s/b "there" | |
| 59 - 23 | "so" s/b "that" | |
| 66 - 13 | "not" s/b "somewhere" | |
| 74 - 23 | "of" s/b "from" | |

SIGNATURE: _____   DATE: 1/15/20

OFFICE USE ONLY

Page _____ of _____

1802 N. 7th Street, Phoenix, AZ 85006
602.258.1440 (T)          602.258.2062 (F)
www.coashandcoash.com          staff@coashandcoash.com



Coash
&Coash
PHOENIX DEPOSITION REPORTERS

2 of 2

ERRATA SHEET

DEPOSITION OF:        David Reginald Perry

DEPOSITION DATE:      12/11/2019

CAPTION:              Kevin Rindlisbacher vs. Steinway, Inc.

---

PAGE/LINE NO.         CHANGE AND/OR CORRECTION              REASON

---

77-2        "what I did included what I said" s/b
            "I included what I said"

77-5        "they he"   s/b   "they/he"

88-18       "collaborative"   s/b   "comparable"

142-7       "789,235"   s/b   "7,892.35"

---

SIGNATURE: _____        DATE: 1/15/20

                                          OFFICE USE ONLY

                                          Page _____ of _____

**1802 N. 7th Street, Phoenix, AZ 85006**
**602.258.1440 (T)              602.258.2062 (F)**
**www.coashandcoash.com          staff@coashandcoash.com**

# EXHIBIT 4

# EXHIBIT 4

# Rindlisbacher, et al.

# v.

# Steinway, Inc.

**Rebuttal Expert Report of David R. Perry**

**Sterling Group LLC**

**November 27, 2019**

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

# TABLE OF CONTENTS

1.    Background ............................................................................................................ 1

2.    Analysis ................................................................................................................. 1

    2.1  "Spokane Results Do Not Equate to Phoenix Success".......................................... 2

    2.2  "Reliance on Comparison to Steinway's West Hollywood Location" ................... 4

    2.3  "Sterling Group Ignored Mr. Rindlisbacher's Own Responsibilities" ................... 5

        2.3.1   Performance Reviews ................................................................................. 5
        2.3.2   Balanced Promotional Plan ........................................................................ 6
        2.3.3   Lack of Institutional Sales ......................................................................... 7
        2.3.4   Market Focus .............................................................................................. 7
        2.3.5   Move to Smaller Location .......................................................................... 8
        2.3.6   Multiple Businesses ................................................................................... 9
        2.3.7   Salespeople .............................................................................................. 10
        2.3.8   Quantitative Data ..................................................................................... 11

    2.4  "Sterling Group Ignored Other Market Issues" ................................................... 12

    2.5  "Out of Pocket Losses" ........................................................................................ 14

3.    Conclusion ......................................................................................................... 15

# LIST OF APPENDICES

Appendix B ..........Information Considered – Updated

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

## 1. Background

Sterling issued a report in this matter dated September 13, 2019 ("Initial Report"). Sterling subsequently received a report by David A. Schwickerath ("Mr. Schwickerath") dated November 4, 2019 that includes comments on the Initial Report. Sterling prepared this report to respond to Mr. Schwickerath's report.

Appendix B is an updated list of the information considered by Sterling in this matter. Sterling may further update or supplement its opinions if additional information is considered and/or more analysis is performed. Sterling may also prepare presentation materials, such as charts, tables and other forms of exhibits, to assist in explaining opinions at trial.

Undefined capitalized terms in this report have the same meaning as in the Initial Report.

## 2. Analysis

The summary at the end of Mr. Schwickerath's report states:

> "Sterling Group has ignored a number of actions / inactions by Mr. Rindlisbacher during the 2011 through 2017 time period. Sterling Group has also ignored other market factors and the impact upon Mr. Rindlisbacher's Phoenix operations and performance. Sterling Group has assumed liability with respect to the alleged fraud involving Steinway. Yet, the above discussion of the factors ignored by Sterling Group relative to Mr. Rindlisbacher call into question the damages alleged against Steinway. The damages put forth by Sterling Group are flawed."[1]

With one exception, the above statements by Mr. Schwickerath are inaccurate, speculative and/or misleading for many reasons discussed later in this report. The one exception is that it is true that Sterling "…assumed liability with respect to the alleged fraud involving Steinway." It is typical for damage experts to assume liability to form the basis for a damage calculation. Furthermore, it is typically inappropriate for damage experts to opine on legal and/or state of mind conclusions such as whether the alleged actions by Steinway constitute fraud.

In addition to making inaccurate, speculative and/or misleading statements about alleged flaws in Sterling's damage analysis, Mr. Schwickerath's report has notable omissions. For example, Mr. Schwickerath's report fails to:

---

[1]  Mr. Schwickerath's report, page 35.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

- Provide an alternative assessment of the damage award that Plaintiffs should receive assuming Steinway's liability for the Alleged Fraud is established. Mr. Schwickerath's report does not state that the Alleged Fraud caused Plaintiffs to suffer (i) zero damages or (ii) any damage amount higher than zero but less than Sterling's assessment. Additionally, Mr. Schwickerath's report does not quantify his opinion of the dollar effect, if any, that consideration of any of the factors allegedly ignored by Sterling would have had on the damage calculations.

- Identify any errors in Sterling's damage calculations other than the identification of factors allegedly ignored by Sterling. For example, Mr. Schwickerath's report identifies no problems with (i) the benefit of the bargain and out-of-pocket loss methodologies used by Sterling to calculate Plaintiffs' damages in this matter and/or (ii) the assumptions and computations used by Sterling to determine the additional profits that Plaintiffs would have earned if they had achieved the unit sales on Schedule B of the Phoenix Dealer Agreement.

- Make any use of the Tri-Tech accounting information produced by Plaintiffs in response to a motion to compel after the Initial Report was issued even though Mr. Schwickerath had previously declared:

  o This information was "…important to developing a true understanding of Plaintiffs' actual and projected profits at specific points in time as well as the detailed basis of their financial performance."[2]

  o He would be "…hindered in conducting a thorough and meaningful analysis of Plaintiffs' lost profits claim" without this information.[3]

Mr. Schwickerath's report contains five sections that identify alleged flaws in Sterling's damage calculations. Sterling analyzed the statements made in each of these five sections. Sterling's responses are detailed below in sections that use the same headings as Mr. Schwickerath's report:

## 2.1 "Spokane Results Do Not Equate to Phoenix Success"

Mr. Schwickerath's report states:

> "The analysis of alleged damages by Sterling Group appears dependent on the Plaintiffs' historical performance of the Spokane location between 2007 and 2010. Yet, the two markets are significantly different and the determination that Spokane results equate to Phoenix results is flawed."[4]

---

[2]  Mr. Schwickerath's declaration dated July 29, 2019.
[3]  Mr. Schwickerath's declaration dated July 29, 2019.
[4]  Mr. Schwickerath's report, page 19.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

The above statements are inaccurate and misleading for multiple reasons including:

- The benefit of the bargain component of Sterling's damage assessment represents the extra profits that Plaintiffs would have earned in *Phoenix* from January 2011 to July 2017 if they had achieved the unit sales on Schedule B of the *Phoenix* Dealer Agreement rather than their actual unit sales in *Phoenix* during this period.

- The benefit of the bargain component of Sterling's damage assessment comprises two alternative scenarios (i.e., Scenario 1 and Scenario 2). None of the information used in Sterling's Scenario 2 is based on Plaintiffs' performance in Spokane between 2007 and 2010 and only one assumption in Sterling's Scenario 1 is based on Plaintiffs' performance in Spokane from 2007 to 2010. Other information used in Sterling's Scenario 1 that is unrelated to Plaintiffs' performance in Spokane between 2007 and 2010 includes (i) Steinway's 2010 retail price lists, (ii) inflation forecasts from 2010 published on a Federal Reserve Bank website and (iii) the actual unit sales shortfalls experienced in Phoenix from 2011 to 2017.

- The single assumption used in Sterling's Scenario 1 that is based on Plaintiffs' profitability in Spokane from 2007 to 2010 is a 25.3% incremental profit margin. The Spokane incremental profit margin was used in Scenario 1 because this scenario is based on the available data on Plaintiffs' expectations around the time that they agreed to become the Phoenix dealer in 2010 (i.e., before they opened in Phoenix). Furthermore, the 25.3% incremental profit margin used in Scenario 1 based on Plaintiffs' profitability in Spokane from 2007 to 2010 was lower than the 26.9% incremental profit margin used in Scenario 2 based on Plaintiffs' actual profitability in Phoenix.

- Neither of Sterling's two alternative benefit of the bargain damage calculations utilize Plaintiffs' actual unit sales performance in Spokane from 2007 to 2010. If Sterling had prepared a Scenario 3 based on Plaintiffs' actual unit sales performance in Spokane from 2007 to 2010, it would have resulted in higher damages than either Scenario 1 or Scenario 2 because it would have incorporated the fact that Plaintiffs *exceeded* the unit sales goals in the Spokane Dealer Agreements.[5]

- The out of pocket loss component of Sterling's damage assessment is the loss suffered by Plaintiffs in the course of mitigating their post-termination damages in the Phoenix market between August 2017 and April 2018 and is, in no way, dependent on Plaintiffs' performance in Spokane from 2007 to 2010.

---

[5]  Initial Report, page 7. Sterling understands Mr. Rindlisbacher will testify that he expected to exceed the unit sales goals in Phoenix when he executed the Phoenix Dealer Agreement as he had done in Spokane. However, both of Sterling's alternative benefit of the bargain damage calculations assume the unit sales in the Phoenix Dealer Agreement would have been achieved, but not exceeded.

- Mr. Schwickerath's report states that the Initial Report did not address Spokane's financial results between 2011 and 2017. Sterling considered Spokane's post-2010 financial results in the course of preparing its damage calculations. Sterling did not base the damage calculations on Spokane's post-2010 financial results for multiple reasons including (i) the fact that the markets are different as Mr. Schwickerath agrees and (ii) Sterling understands Mr. Rindlisbacher was primarily focused on Phoenix post-2010 in line with his commitment to Steinway.

## 2.2 "Reliance on Comparison to Steinway's West Hollywood Location"

Mr. Schwickerath's report states:

> "Sterling Group provided an observation that West Hollywood's performance in 2010 served as a way to substantiate the level of sales experienced in Phoenix under Mr. Rindlisbacher as reasonable. Sterling Group identified that 46 Steinway & Sons pianos were sold in West Hollywood for 2010. Drawing from this observation, Sterling Group concluded that because Los Angeles was three times the size of Phoenix based on BPI, annual sales for Steinway & Sons of 15 would be close to the actual annual results of Mr. Rindlisbacher of 13.2 between 2011 and 2016.

> Sterling Group failed to identify that the Los Angeles BPI market did not just encompass the West Hollywood location, but also included another Steinway dealer-owned store in Orange County. Sterling Group also relied upon the results for the year 2010. As demonstrated in this Report, the economic conditions in 2010 were still uncertain give the 'perfect storm' mentioned by Mr. Rindlisbacher. Therefore, this conclusion that Mr. Rindlisbacher's sales were reasonable based on West Hollywood's results for 2010 is flawed and inappropriate."[6]

The above statements are misleading and speculative for multiple reasons including:

- Mr. Schwickerath's report omits any information on the (i) the actual unit sales in the West Hollywood store in any year other than 2010 and/or (ii) the actual unit sales of the Orange County store in any year. Furthermore, Sterling understands Steinway has produced no information on either point in this lawsuit. Therefore, Sterling was, and still is, unable to perform any more comprehensive comparison of unit sales than the one included in the Initial Report.

---

[6]   Mr. Schwickerath's report, page 21.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

- Mr. Snyder of Steinway told Mr. Rindlisbacher in an email on October 30, 2010 that "Your numbers as far as high income households are consistent with the Buying Power Index numbers - - that is, Phoenix / Scottsdale being about one-third the market size and potential of greater Los Angeles."[7]    The "consistent" numbers from Mr. Rindlisbacher that Mr. Snyder was referring to showed the number of high-income households in Los Angeles County was approximately three times that of Maricopa County.  Los Angeles County is different from, and does not include, Orange County.  The high-income household ratio supports the unit sales comparison in the Initial Report.

- Mr. Snyder did not tell Mr. Rindlisbacher in the email on October 30, 2010 that an Orange County store must be considered as well as the Hollywood store when comparing Phoenix to Los Angeles.[8]    Additionally, Mr. Snyder did not mention an Orange County store when he was asked in his deposition about the performance of the West Hollywood store given the size of the Los Angeles market.[9]

## 2.3    "Sterling Group Ignored Mr. Rindlisbacher's Own Responsibilities"

Mr. Schwickerath's report states:

> "Sterling Group fails to address the actions and/or inactions of Mr. Rindlisbacher as part of his involvement as a Steinway Dealer during his time with the Phoenix location from late 2010 through the termination in 2017.  As a result of the items identified below, the determination of damages based on actual results from Mr. Rindlisbacher's performance in the Phoenix market is flawed."[10]

Mr. Schwickerath follows these conclusory statements with information on various subjects.  The above conclusory statements are inaccurate, speculative and/or misleading for multiple reasons including:

### 2.3.1    Performance Reviews

One part of this section of Mr. Schwickerath's report cites various negative comments (a.k.a., areas for improvement) related to promotions, institutional sales and salespeople in the semi-annual performance reviews provided by Steinway to Mr. Rindlisbacher.[11]    The performance reviews also included various positive comments, which were not cited in this section of Mr. Schwickerath's report like the negative comments.  Mr. Snyder testified

---

[7]    Deposition exhibit 93 (Steinway 44 and 45).
[8]    Deposition exhibit 93 (Steinway 44 and 45).
[9]    Robert Snyder's August 7, 2019 deposition, pages 202 to 205.
[10]    Mr. Schwickerath's report, page 22.
[11]    Mr. Schwickerath's report, pages 23 and 24.

about several positive comments in the performance reviews and the fact that the omission of some sections from performance reviews meant he had no significant concerns in those areas.[12]

It is typical (and sometimes compulsory) for performance reviews to include areas for improvement no matter how good an individual's overall performance is. In a situation such as this in which unit sales were substantially below the stated goals, it would have been astounding if Steinway had not included suggestions on areas for improvement in the performance reviews.

Most of the performance reviews cited in Mr. Schwickerath's report were written by Mr. Snyder. Sterling understands Steinway has not produced performance reviews written by Mr. Snyder for (i) other dealers in the same time period (i.e., 2011 to 2016) and/or (ii) the prior Phoenix dealer. Performance reviews for other dealers would provide perspective on the statements made in Mr. Rindlisbacher's performance reviews. For example, it would show whether Mr. Snyder identified similar areas for improvement for other dealers and/or made similar negative comments about other dealers. It is speculative for Mr. Schwickerath to draw any conclusions about Mr. Rindlisbacher from the performance reviews without reviewing Mr. Snyder's performance reviews for other dealers.

### 2.3.2    Balanced Promotional Plan

One part of this section of Mr. Schwickerath's report discusses Mr. Snyder's deposition testimony stating Mr. Rindlisbacher could have implemented a more balanced promotional plan.[13] Mr. Snyder testified that a list of Plaintiffs' in-store recitals and concerts did not reflect a balanced promotional plan.[14]

Subsequent to Mr. Snyder's deposition, Plaintiffs updated their interrogatory responses to include a more comprehensive list of the balanced promotional plan activities that were conducted.[15] These activities were divided into two sections entitled "Prospect Identification & Cultivating Activities" and "Prospect Harvesting Activities".

Mr. Schwickerath's report fails to mention the more comprehensive list of balanced promotional plan activities identified in Plaintiffs' updated interrogatory response. Additionally, Mr. Schwickerath's report does not state that the more comprehensive list does not represent a balanced promotional plan in either Mr. Schwickerath's opinion or Mr. Snyder's opinion.

---

[12]   Robert Snyder's August 7, 2019 deposition, pages 75 to 80, 89 and 95 to 100.
[13]   Mr. Schwickerath's report, pages 25 and 26.
[14]   Robert Snyder's August 7, 2019 deposition, pages 225 and 226; Deposition exhibit 165 (RIN315 to 329).
[15]   "Plaintiffs' Third Supplemental Objections and Answers to Steinway's First Set of Interrogatories" dated August 24, 2019, pages 18 to 21.

### 2.3.3   Lack of Institutional Sales

One part of this section of Mr. Schwickerath's report is entitled "Lack of Institutional Sales" and states (i) Plaintiffs were unable to achieve many institutional sales when they were the Phoenix dealer and (ii) Steinway generates significant piano sales from institutional buyers.[16]

Several pages of Plaintiffs' interrogatory responses discuss the institutional sales and marketing activities conducted by Plaintiffs and the problems faced by Plaintiffs in those endeavors.[17]   Mr. Schwickerath's report fails to mention the institutional sales and marketing activities conducted by Plaintiffs and the associated problems that they faced in this area.  Mr. Schwickerath's report also fails to mention the deposition testimony from Tommy Edds ("Mr. Edds") of Steinway about the relatively limited opportunities for institutional sales in Phoenix.[18]

### 2.3.4   Market Focus

One part of this section of Mr. Schwickerath's report states:

> "…Mr. Rindlisbacher stated in 2017 that, '…I have realized that a lot of my marketing and time investment have been spent on trying to create sales in the areas of least opportunity for success.'  He testified that teachers and musicians are not in a very high income bracket.  These individuals would not likely fall within the majority of clients for Steinway products, including the Steinway & Sons.
>
> Mr. Rindlisbacher's comments about teachers and musicians and their respective income bracket was of note.  Steinway views teachers as a very important referral source for business.  The company values this group to provide avenues to make sales to their respective students."[19]

Mr. Schwickerath's statements suggest Mr. Rindlisbacher's comments indicate that, with the advantage of hindsight, he had spent too little time on teachers and musicians contrary to Steinway's guidance.  The underlying email and associated testimony show Mr. Rindlisbacher's opinion was the opposite of what Mr. Schwickerath suggests.  Mr. Rindlisbacher was informing Steinway that, with the advantage of hindsight knowledge of the Phoenix market, he wished he had focused more on wealthy individuals and less on teachers, musicians and institutions that Steinway recommended.[20]

---

[16]  Mr. Schwickerath's report, pages 26 and 27.
[17]  "Plaintiffs' Third Supplemental Objections and Answers to Steinway's First Set of Interrogatories" dated August 24, 2019, pages 9 to 21 and 24 to 28.
[18]  Tommy Edds' June 10, 2019 deposition, pages 88, 132, 179, 212 and 213.
[19]  Mr. Schwickerath's report, page 27.
[20]  Kevin Rindlisbacher's July 17, 2019 deposition, pages 239 and 240; Deposition exhibit 140 (RIN 24477).

### 2.3.5   Move to Smaller Location

One part of this section of Mr. Schwickerath's report states:

> "Mr. Rindlisbacher testified that with opening a new location in April 2014, he also entered into a warehouse lease for extra space. He stated that it was a mistake, in hindsight, to lease a 2,100 square foot store as there wasn't enough room for three desks and any kind of selection of pianos. Mr. Rindlisbacher's desk ended up at the warehouse and he ended up doing a lot of his work from there. Mr. Rindlisbacher even mentioned to Mr. Losby that he was feeling a little disconnected given he didn't have a desk at the location because of the space considerations, and was spending most of his time at the warehouse."[21]

The above statements are misleading because (i) Steinway recommended that Plaintiffs move to a smaller location in an upscale shopping area in 2014 to better follow the "recipe" for successful stores and (ii) Plaintiffs followed Steinway's recommendation with the expectation that it would increase sales. Specifically, Plaintiffs' complaint states:

> "In 2013 when the lease on Showroom's Scottsdale store was about to expire, Mr. Rindlisbacher consulted with Steinway on possible new locations.
>
> Mr. Rindlisbacher found a new Scottsdale location on the east side of Scottsdale Road across from his then location containing about 4,600 square feet. The owner offered a five-and-a-half-year lease with six months' free rent at a monthly rental of $4,970 starting in month seven for an effective net rent of $11.70 per year, a gross rent equivalent of about $17.00 per square foot. The Rindlisbachers wanted to move to this location. But when they presented it to Mr. Losby and Mr. Snyder at a Dealer Meeting in Chicago in late August 2013 they rejected it out of hand.
>
> Instead, Steinway identified two small locations (about 2,000 square feet) near Fashion Square Mall and told Mr. Rindlisbacher to lease one of those spaces. Mr. Losby said that Mr. Rindlisbacher needed to be in an upscale shopping area, in order to better follow the 'recipe' used in the Hollywood company-owned store.
>
> Mr. Rindlisbacher was concerned about the small size, high cost per square foot, and seven-year term of the Scottsdale Fashion Square location and expressed those concerns to Steinway.

---

[21]   Mr. Schwickerath's report, pages 27 and 28.

On or about March 1, 2014, Mr. Rindlisbacher did as Steinway instructed and leased the 2,185 square foot Suite 105 at 4545 N. Scottsdale Road just east of Scottsdale Fashion Square at a gross-rent equivalent of $42.32 per year or $7,723.92 per month; with an automatic 2.5% rental increase each year. The landlord required a seven year lease and a personal guaranty of the lease by Mr. Rindlisbacher."[22]

### 2.3.6    Multiple Businesses

One part of this section of Mr. Schwickerath's report suggests Mr. Rindlisbacher's involvement in multiple businesses from 2011 to 2017 was a problem for the Phoenix dealership.

Mr. Schwickerath's statement is misleading and speculative for multiple reasons including:

- Mr. Rindlisbacher spent much more time on the Phoenix dealership than his other businesses during the approximately 6.5 years that he ran the Phoenix dealership. Specifically, (i) Mr. Rindlisbacher averaged about two business days per month in each of Spokane and Salt Lake City during the 6.5 years and (ii) Mr. Rindlisbacher was in the Phoenix store approximately 80% to 90% while Janet Sandino worked there during the first approximately 1.5 of the 6.5 years.[23]

- The single document referenced in Mr. Schwickerath's report as indicating Steinway was concerned with the fact that Mr. Rindlisbacher was managing multiple businesses related to a claimed lack of attention given to the institutional sales program in the first six months of the Phoenix dealership's operations.[24]  As discussed earlier in this report, Mr. Rindlisbacher conducted many institutional sales activities with little success as the Phoenix dealer and, with the advantage of hindsight knowledge of the Phoenix market, now wishes he had focused more on other areas.

Furthermore, Mr. Rindlisbacher's primary focus on the Phoenix dealership was likely a contributing factor to the decline in the performance of the Spokane dealership after 2010. Sterling's damage calculations include no amounts related to the decline in Spokane performance because Mr. Rindlisbacher had committed to Steinway to move to Phoenix and focus his attention there.  If any such amounts had been included, Sterling's damage calculations would have been higher than they are.

---

[22]  "Third Amended Complaint" dated September 7, 2018, pages 13 and 14.

[23]  "Plaintiffs Fourth Supplemental Response to Steinway's First Set of Requests for Production" dated October 1, 2019, page 15; Janet Sandino's October 1, 2019 deposition, pages 20, 45 to 47 and 57.

[24]  Deposition exhibit 112 (RIN 191 and 192).

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

### 2.3.7 Salespeople

One part of this section of Mr. Schwickerath's report states Plaintiffs experienced a turnover in salespeople, did not hire the right salespeople and did not have enough salespeople for the Phoenix market.[25]

Mr. Schwickerath acknowledges in a footnote in another part of his report that Mr. Snyder testified that "…finding good, effective salespeople is a challenge for everyone."[26]  Mr. Snyder's testimony on this issue provides important perspective to an evaluation of Mr. Rindlisbacher's sales staffing decisions at the Phoenix dealership.

Furthermore, Mr. Schwickerath cited no data from comparable Steinway dealers in support of his statements about Mr. Rindlisbacher's sales staffing at the Phoenix dealership. Sterling understands Steinway has not produced data showing the number of full-time equivalent salespeople employed by other Steinway dealers and/or the turnover of salespeople experienced by other Steinway dealers.  It is speculative for Mr. Schwickerath to draw any conclusions about Mr. Rindlisbacher's sales staffing at the Phoenix dealership without data on sales staffing at other Steinway dealers.

Much of the information in the section of Mr. Schwickerath's report that discusses sales staffing is based on the testimony of Janet Sandino ("Ms. Sandino").[27]  Ms. Sandino only worked for Mr. Rindlisbacher for around 1.5 of the 6.5 years that he ran the Phoenix dealership.[28]

Determining the appropriate number of salespeople for a business is not easy.  Mr. Rindlisbacher incentivized his salespeople to work hard and make sales by including a commission component to their compensation as is often the case for salespeople.  If Mr. Rindlisbacher had hired additional salespeople and not achieved any or enough additional sales, the average commissions per salesperson would have decreased which could have been demotivating to the salespeople, lead to friction within the organization and increased turnover in salespeople.

Sterling deducted additional expenses in its damage calculations to allow for the fact that higher unit sales would have resulted in higher commission payments.  Specifically, Sterling deducted additional commission expenses equal to 2.2% of extra revenues in Scenario 1 and 6.0% of extra revenues in Scenario 2 based on the actual commission payments made in Spokane and Phoenix respectively.[29]

---

[25]  Mr. Schwickerath's report, pages 28 to 30.
[26]  Mr. Schwickerath's report, page 25.
[27]  Mr. Schwickerath's report, pages 28 to 30.
[28]  Janet Sandino's October 1, 2019 deposition, pages 20, 47 and 57.
[29]  Initial Report, Appendices F and K.  ($88,215 + $62,221) / $6,889,510 = 2.2%; ($590,178 + $289,712) / $14,645,919 = 6.0%.

### 2.3.8  Quantitative Data

Mr. Schwickerath's report omits any quantitative data suggesting Mr. Rindlisbacher's performance was below the level of other Steinway dealers.  It is speculative for Mr. Schwickerath to draw any conclusions about Mr. Rindlisbacher's performance relative to other Steinway dealers without quantitative data.

Sterling understands Steinway has refused to produce quantitative data such as information showing the annual unit sales goals and annual actual unit sales of other Steinway dealers. The limited available data shows many dealers were deemed "underperforming" and/or failed to reach the sales goals in their dealer agreements.  For example:

- Mr. Edds sent a report to other Steinway executives on September 6, 2016 showing the "current underperforming dealers in the Western region."[30]  The produced version of this report has 70 rows of which many were hidden.  Additionally, all information has been redacted on 12 unhidden rows with the only unredacted rows of information being column hearings and Plaintiffs' dealership.  As a result, it is not possible from the produced report to (i) understand the definition of underperformance used for this report, (ii) quantify the number of underperforming dealers in the Western region and/or (iii) determine the overall level of underperformance in the Western region. However, it is clear from the hidden rows and pervasive redactions in the produced report that Plaintiffs were far from the only underperforming Western region dealer in 2016.

- Mr. Edds testified that when he was a District Sales Manager for Steinway approximately 70% of dealers failed to reach the unit sales goals Steinway inserted in their dealer agreements.[31]

Additionally, Plaintiffs' interrogatory response states, "Steinway has now admitted that its sales of Steinway & Sons grand pianos to Sherman Clay Phoenix from August 1, 2005 through July 31, 2010 inclusive had been 53, an average of 10.7 per year."[32]  Sherman Clay was the Phoenix dealer immediately before Plaintiffs.  Plaintiffs sold an average of 13.2 Steinway & Sons grand pianos annually between January 2011 and July 2017.[33]  Therefore, Plaintiffs' annual sales of Steinway & Sons grand pianos were 23% higher on average than the prior Phoenix dealer.[34]

---

[30]  Steinway 4342 to 4354.
[31]  Tommy Edds' June 10, 2019 deposition, pages 63 and 64.
[32]  "Plaintiffs' Third Supplemental Objections and Answers to Steinway's First Set of Interrogatories" dated August 24, 2019, page 4.
[33]  Initial Report, page 17.
[34]  13.2 / 10.7 = 1.23.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

Furthermore, the available data indicates the average annual unit sales of Steinway & Sons grand pianos by the current Phoenix dealer (i.e., the one who took over from Plaintiffs in 2017) have been lower than the 13.2 achieved by Plaintiffs.  Specifically, (i) the piano mover used by the current Phoenix dealer states that he delivered 23 Steinway & Sons grand pianos to customers in the two years from mid-2017 to mid-2019, which is an average of 11.5 per year[35] and (ii) a document produced by Steinway shows the current dealer purchased 19 Steinway & Sons grand pianos in 18 months from mid-2017 to end-2018, which is an average of 12.7 per year.[36]  Ron Losby testified that Steinway is "satisfied" with the performance of the current dealer.[37]

## 2.4    "Sterling Group Ignored Other Market Issues"

Mr. Schwickerath's report states:

> "Sterling Group did not address a number of other market issues which impacted Mr. Rindlisbacher's operations and performance."[38]

The above statement is inaccurate, speculative and/or misleading for multiple reasons including:

- One part of this section of Mr. Schwickerath's report contains information showing the piano industry had declined in the years leading up to the execution of the Phoenix Dealer Agreement in 2010.[39]  Trends in the piano industry were discussed in various documents reviewed by Sterling in the course of preparing the Initial Report.  Sterling's damage calculations are based on the unit sales goals Steinway placed in the Phoenix Dealer Agreement that was executed in December 2010.  Steinway's unit sales goals in the Phoenix Dealer Agreement should have incorporated the prior industry changes that had occurred.

- Other parts of this section of Mr. Schwickerath's report contain information showing economic conditions, such as housing prices, personal income, stock market prices and unemployment rates, were impacting the piano industry, and Steinway specifically, in 2009 and 2010.[40]  Sterling considered the economic conditions in 2009 and 2010 in the course of preparing the damage calculations in the Initial Report.  For example, the Initial Report states that Plaintiffs claim Mr. Snyder told them during the discussions leading up to the execution of the Phoenix Dealer Agreement that (i) the Phoenix

---

[35]  RIN 26883 to 26885.  The data on RIN 26883 to 26885 is more reliable than the estimates the piano mover provided in his deposition on July 15, 2019 (pages 38, 39 and 45).
[36]  Steinway 3609.
[37]  Ron Losby's August 15, 2019 deposition, pages 118 and 119.
[38]  Mr. Schwickerath's report, page 30.
[39]  Mr. Schwickerath's report, pages 30 and 31.
[40]  Mr. Schwickerath's report, pages 31 and 32.

market is capable of selling 70 Steinway & Sons grand pianos per year and (ii) <u>under the economic conditions then prevailing</u>, 45 Steinway & Sons grand pianos per year is a reasonable sales expectation for the Phoenix market.[41]  Sterling's damage calculations are based on the unit sales goals Steinway placed in the Phoenix Dealer Agreement that was executed in December 2010.  Steinway's unit sales goals in the Phoenix Dealer Agreement should have incorporated the prevailing economic conditions and did so according to Mr. Snyder.  Furthermore, economic conditions including housing prices, personal income, stock market prices and unemployment rates improved between 2010 and 2017.[42]  Yet, Sterling's damage calculations assume sales of 45 Steinway & Sons grand pianos in all years from 2011 to 2017, which was based on the prevailing economic conditions in 2010 according to Mr. Snyder.

- Another part of this section of Mr. Schwickerath's report includes citations/references from a December 2011 newspaper interview given by Mr. Rindlisbacher.[43]  Mr. Schwickerath's report fails to explain how any of the references/citations from the interview are evidence of market issues that Sterling failed to consider in its damage calculations.  Sterling considered Mr. Rindlisbacher's statements in the newspaper interview in the course of preparing the damage calculations in the Initial Report.

- Another part of this section of Mr. Schwickerath's report discusses Plaintiffs' expenditures on advertising and promotion and that the Phoenix dealership's revenues were highest in the year with the highest advertising and promotion expenses.[44]  Mr. Schwickerath's report fails to explain how this information is evidence of a market issue that Sterling failed to consider in its damage calculations.  On the contrary, Mr. Schwickerath's report acknowledges that Sterling had (i) analyzed Plaintiffs' expenditures for advertising, business promotion and outside shows/events as part of its damage analysis and (ii) deducted additional expenses for advertising, business promotion and outside shows/events in its damage calculations.  Specifically, Sterling deducted additional expenses for advertising, business promotion and outside shows/events equal to 8.9% of extra revenues in Scenario 1 and 3.6% of extra revenues in Scenario 2.[45]

- The final part of this section of Mr. Schwickerath's report contains statements about Mr. Rindlisbacher's piano stores in Arizona in 2018 and 2019.[46]  Mr. Schwickerath's report fails to explain how this information is evidence of a market issue that Sterling

---

[41]  "Third Amended Complaint" dated September 7, 2018, page 11; "Plaintiffs' Fourth Supplemental and Restated MIDP Responses" dated July 22, 2019, page 14.

[42]  Azeconomy.org; fred.stlouisfed.org; bigcharts.marketwatch.com.

[43]  Mr. Schwickerath's report, pages 32 and 33.  Deposition exhibit 120 (Steinway 344 to 348).

[44]  Mr. Schwickerath's report, pages 33 and 34.

[45]  Initial Report, Appendices F and K. ($404,289 + $145,514 + $61,084) / $6,889,510 = 8.9%; ($39,753 + $342,010 + $139,879) / $14,645,919 = 3.6%.

[46]  Mr. Schwickerath's report, page 34.

failed to consider in its damage calculations. Sterling understands Mr. Rindlisbacher does not sell new Steinway pianos in his current piano stores. Sterling's damage calculations in this matter run from January 2011 to July 2017 for benefit of the bargain damages and August 2017 to May 2018 for out of pocket losses.[47] Sterling's damages include no amounts for June 2018 onwards. The operations of Mr. Rindlisbacher's non-Steinway-dealer piano stores after May 2018 do not impact Sterling's damage calculations in this matter. Even so, Sterling did consider the website of Mr. Rindlisbacher's current piano stores in Arizona in the course of preparing the Initial Report.[48]

## 2.5   "Out of Pocket Losses"

Mr. Schwickerath's report states:

> "Sterling Group calculated out of pocket losses for Mr. Rindlisbacher after July 2017. Sterling Group stated that Plaintiffs needed to continue operations after the Steinway relationship ended to mitigate their damages. Sterling Group identified that Plaintiffs were unable to find an alternative dealer agreement until roughly May of 2018. Plaintiffs allege that they entered into the seven-year lease with a personal guarantee at the instruction of Steinway. As a result, Sterling Group determined the out of pocket losses for the Plaintiffs between August 2017 and April 2018, which totaled approximately 252,000.
>
> Yet, Sterling Group failed to address the right of the Plaintiffs to terminate the Steinway Dealer Agreement before signing the new lease in 2014. As stated in the agreement, the term was for one year and automatically renewed on an annual basis for the term of one year unless either party provides written notice of its intent not to renew 60 days prior to the end of the current term. As of the middle of 2013, Plaintiffs had seen more than 30 months of actual operations at the Phoenix location. Sterling Group has not addressed the Plaintiffs ability to end the Steinway Dealer Agreement as of December 1, 2013, prior to the new lease."[49]

The above statements are misleading because (i) Steinway recommended that Plaintiffs move to a smaller location in an upscale shopping area in 2014 to better follow the "recipe" for successful stores and (ii) Plaintiffs followed Steinway's recommendation with the expectation that it would increase sales.[50]

---

[47]  Initial Report, page 23.
[48]  Rivertonpiano.com on Appendix B to Initial Report.
[49]  Mr. Schwickerath's report, pages 34 and 35.
[50]  See citation from Plaintiffs' complaint earlier in this report for more details.

Sterling Group LLC
Rindlisbacher, et al. v. Steinway, Inc.

Furthermore, Plaintiffs made a profit operating the Phoenix Dealership in 2011, 2012 and 2013.[51] It would have been economically irrational for Plaintiffs to terminate a profitable dealership on December 1, 2013.

## 3. Conclusion

For the reasons explained in earlier sections of this report, there is nothing in Mr. Schwickerath's report that required any changes to the damage calculations in the Initial Report. Accordingly, Sterling's opinion of Plaintiffs' damages remains as stated in the Initial Report and summarized below:[52]

- Plaintiffs' benefit of the bargain damages for the time in which they were the Steinway dealer in Phoenix total at least:

  o $7,525,000 based on the information available to Plaintiffs around the time that they agreed to become the Phoenix dealer.

  o $8,623,000 based on the information available to Plaintiffs around the time that they agreed to become the Phoenix dealer and subsequently available information.

- Plaintiff also suffered a net loss of approximately $252,000 in the nine months between the end of their Steinway dealer relationship and the start of their Yamaha dealer relationship.

Sterling may revise or supplement its opinions if additional information is provided and/or further analysis is performed.

David R. Perry
Sterling Group LLC

Date 11/27/19

---

[51] Initial Report. Appendix J.
[52] Excluding prejudgment interest, if applicable.

APPENDIX OMITTED

# EXHIBIT 5

# EXHIBIT 5

| | |
|---|---|
| **From:** | Snyder, Robert <rsnyder@steinway com> |
| **To:** | rjsnyder@onlinemac com |
| **Sent:** | 12/8/2011 11 40 04 AM |
| **Subject:** | AZ Steinway article just posted |
| **Attachments:** | Dec 7 AZ article pdf |

**From:** Losby, Ron
**Sent:** Wednesday, December 07, 2011 11 02 AM
**To:** Snyder, Robert
**Cc:** Sanders, Todd
**Subject:** FW: Steinway article just posted

He really pants a rosy picture of the piano business in AZ  L

**From:** Christopher Bell [mailto christopher bell@themim org]
**Sent:** Wednesday, December 07, 2011 1 59 PM
**To:** Kevin Rindlisbacher (kevinr@steinwayarizona com)
**Cc:** Bill DeWalt, Losby, Ron, Coveleskie, Sally, frankmichael1952@tampabay rr com, Erin Kozak
**Subject:** FW: Steinway article just posted

Hi, Kevin.  I was pleased to read the following article in today's *Arizona Republic*.
http://www azcentral com/community/nephoenix/articles/2011/12
/01/20111201steinway-northeast-phoenix-scales-back-succeed.html

Congratulations on what you've done and continue to do to make Steinway Piano
Showroom a great success.  MIM is pleased to be your partner, as well as to remain
so closely associated with our numerous friends at Steinway & Sons throughout the
country.

Thanks for your partnership.  Have a happy holiday season and I'll look forward to
working with you in 2012 and beyond!

Chris

Christopher J Bell | Vice President of External Relations | MIM—Musical Instrument Museum
4725 E Mayo Boulevard | Phoenix AZ 85050 | 480 478 6000 main | 480 478.6014 direct
Christopher Bell@themim org | www themim org

This message (including any attachments) contains confidential information intended for a specific individual and purpose and is protected by law If you are not the
intended recipient, you should delete this message Any disclosure copying or distribution of this message or the taking of any action based on it, is strictly
prohibited Steinway & Sons has taken precautions to prevent the spread of viruses However the company accepts no liability for any damage caused by any virus
transmitted by this email



EXHIBIT 120
NAME Rindlisbacher
Meri Coash 7-17-19

STEINWAY00000344

Format Dynamics    CleanPrint    http //www azcentral com/community/nephoenix/article    Page 1 of 4



## Steinway in northeast Phoenix scales back to succeed

*by Eugene Scott - Dec 7, 2011 08 28 AM*
*The Republic | azcentral com*

During fall 2010, members of the Valley's arts community thought the area would lose the only Steinway dealer in the state But a year later, a new owner is confident that significant changes to the piano-sales business model may mean that Steinway is in Arizona to stay

"As a business owner, you're always looking to improve You're never really satisfied," said Kevin Rindlisbacher, owner of Steinway Piano Showroom in northeast Phoenix "But the reality is we've been happy with the first year "

**PHOTOS: Steinway Piano Showroom | Charity work inspired woman to buy Steinway**

Steinway Piano Showroom opened a year ago at 13802 N Scottsdale Road, near T hunderbird Road in the Thunderbird Square. The business is now in Suite 116, within walking distance from the Steinway of Phoenix store that closed in September 2010

That store was owned by the Sherman Clay Co , a national retailer of Steinways based in San Bruno, Calif

Rindlisbacher said a different economic climate and way of doing business is allowing his store to be in the black a year after opening Steinway of Phoenix had been in the red for four years before closing, he said

"The previous leadership signed a lease at the height of the real-estate boom, so their occupancy cost was incredibly high," Rindlisbacher said "They had an escape clause after five years in their lease and they exercised it "

In addition to high overhead, pianos sold in Phoenix declined over the past five years, Rindlisbacher said Those numbers mirror what's happened nationally, he said

"To put it in perspective, more than 30 years ago more than 300,000 pianos were sold each year Last year, there were less than 40,000 sold," Rindlisbacher said.

Pianos are not like cars and don't need to be replaced

"Our products last for a lifetime You buy one piano and it may be the last one you buy Our products are multigenerational The fact that pianos last so long, we end up competing with the pianos we sold 10 years ago," Rindlisbacher said.

Advertisement
☒

Print Powered By **FormatDynamics**

STEINWAY00000345



ARIZONA S HOME PAGE

And playing piano just isn't as popular as it used to be

"Piano lessons are not as high of a priority for kids as they were in a lot of households 30 years ago," Rindlisbacher said "We're competing for the attention span of children "

The future of piano sales is in small-business ownership, he said, not corporations

"The previous dealership operates very large stores in Seattle, Portland, San Francisco and Houston -- large stores in large markets," he said "In the piano world today, I'm not sure that kind of model works."

Steinway Piano Showroom is 5,000 square feet, less than half of the size of the previous store

"The days of needing 100 pianos to look at, I believe those days are over with," Rindlisbacher said "I don't need 17 of the same model in my store A smaller footprint is what makes it work for us

Despite operating other stores in Spokane, Wash , and Salt Lake City, Rindlisbacher moved to the Valley from Spokane to be present in his newest store

"I'm here on a daily basis I'm active on the showroom working," he said. "I don't think a business model works anymore with an absentee owner or large corporate structure with multiple layers of managers "

**Housing industry parallel**

Opening his Arizona location was a bit of a culture shock

"As an outsider who moved to Phoenix, I've probably been a little bit surprised with the breadth of the housing crisis," Rindlisbacher said "The situation was probably a little more involved than I expected it to be "

And he discovered that the number of prospective customers is much greater in the Valley than in Spokane and Salt Lake City

"There's more wealth, especially in the north Scottsdale area, from a market size perspective," Rindlisbacher said

Business at the Steinway store is now so busy that he does not publicize its events calendar Instead, staff stays in touch with the public through an e-mail list Rindlisbacher said there would be no space to hold everyone who might want to attend their events

"We have monthly concerts and seminars in our stores and we fill them up fast," he said "We put it on our e-mail list and we get 130 RSVPs within three or four hours "

Steinway pianos, which can cost five figures if not more, are a luxury for people, especially in this economy, Rindlisbacher

Advertisement

Print Powered By [FormatDynamics]

STEINWAY00000346



said  There's a direct correlation between the housing crisis that affected the Valley and the decline in local piano sales in recent years.

"My experience has been that just like in the housing industry, the high-end, the ultra-expensive houses are still selling and the very inexpensive housing is selling," he said "My impression is the middle ground, those houses are pretty hard sells right now  And that's kind of the way it is in the piano business "

But Rindlisbacher says a decline in purchases is not the same thing as lack of interest in purchasing pianos  "There's still a resiliency here that I sense," he said  "There are still people here who appreciate the quality and pride of ownership in a Steinway "

### Steinway presence at MIM

Chris Bell, vice president of external relations at the Musical Instrument Museum, said Valley residents' appreciation for Steinway is evidenced by the attention the exhibit named for the piano maker receives at the northeast Phoenix museum

"Our guests spend the most time at the Steinway exhibit of all of the exhibits in the museum, and we have more than 300 exhibits," he said

The Steinway exhibit allows museum visitors to study the history of the piano company over the years.

"We have a really good relationship with Steinway Piano Showroom," pointing to pianos that have been "generously" loaned to the MIM  "We are able to invite our guests

to sit down and play that piano, so it's not just a beautiful piano that people can't touch "

The store recently partnered with the Arizona Opera and will be the official piano supplier for the organization  Steinway Piano Showroom will host its first competition in January

Rindlisbacher believes the future will be promising for Steinway in Arizona  "I think as this economy is slowly gaining its upward traction, I'm pretty optimistic," he said  "I don't expect sales to go up 25percent, but I do expect sales to be up 3 to 5 percent over what they were last year, and I'll be absolutely satisfied with that "

Rindlisbacher encouraged other small-business owners to be patient and persistent in this economy.

"We're in an economy now where the turtle ends the race," he said  "Keep a steady course, keep offering exceptional service and exceptional value to your customer and you'll be successful in the long run "

Copyright © 2011 azcentral.com  All rights

Advertisement

Print Powered By  FormatDynamics™

STEINWAY00000347



reserved.
Users of this site agree to the Terms of Service,
Privacy Policy/Your California Privacy Rights
and Ad Choices

Advertisement

Print Powered By FormatDynamics

STEINWAY00000348

# EXHIBIT 6

# EXHIBIT 6

| | |
|---|---|
| **From:** | Kevin Rindlisbacher <kevinr@steinwayspokane.com> |
| **Sent:** | Tuesday, February 23, 2010 3:00 PM |
| **To:** | Snyder, Robert |
| **Subject:** | your thoughts |
| **Attachments:** | Ron Losby letter Dec 2009.doc |

Bob,

When I was on vacation the end of December I started to compose a letter to Ron Losby. I never completed it and while it was in the back of my mind, I assumed I would eventually go the way of my unused exercise bike. A comment by a customer this morning however prompted me to re-read what I had wrote. I would be interested in your thoughts.

Kevin H. Rindlisbacher
Steinway Piano Gallery of Spokane
509-32-PIANO (327-4266)
www.steinwayspokane.com



EXHIBIT **33**
NAME Rindlisbacher
Meri Coash 7-17-19

1

RIN019643

December 22, 2009


Mr. Ron Losby
President
Steinway & Sons – Americas
One Steinway Place
Long Island City, New York 11105

Dear Mr. Losby,

I am writing to express concern about the recently announced price increase and its long term impact on my business.  While the increase was reluctantly expected, I was hoping that the current economic climate would cause Steinway to temporarily reconsider this annual rite.  When I discussed the looming price increase with Bob Snyder he quickly shared your position that Steinway prices in America are a smaller percentage of household income than in Europe.  I apologize if I have misinterpreted the specific measurement but the intent of the message was clear---pianos are more costly in Europe and therefore concerns about pricing in America is not based on empirical evidence.

At first glance this appears to be a satisfactory approach.  But given time to contemplate various facts I am left asking two question "Is Europe the model we should emulate?" and "How does a company my size fit into a European distribution model?"

Steinway & Sons pianos are price sensitive.  While in college in the mid 1980's, I wrote an economic paper arguing that Steinway pianos were price inelastic (the same number of pianos could be sold regardless of the price).  I was wrong.  The number of Steinway & Sons pianos I have sold this year is down from previous years.  The number of prospects I have who are contemplating the purchase of a new Steinway & Sons piano is lower than when I opened three years ago.  Most telling to me is the reaction of the typical piano prospect upon finding out the price on a new Steinway & Sons piano---a purchase simply isn't within the realm of possibility.  Three years ago when our economic bubble was still growing I use to tell people that two different types of buyers purchase Steinway & Sons pianos.  The first were those who had money and only the best piano would suffice   The second group was those musicians who actually played and always wanted the best piano (Steinway) but had to scrap together a down payment and finance the balance.  Today the first group is much smaller and the second group doesn't exist.

Why?  Because recent Steinway & Sons price increases have outpaced the general economy.    Let's examine the historical price increases of a model B:

From the year 1900 – 1930, the price of a model B increased 110%.
From the year 1930 – 1960, the price of a model B increased 114%.
From the year 1960 – 1975, (when inflation was 20%), the price of a model B increased 89%
From the year 1980 – 2010, the price of a model B increased **372%.**

RIN019644

I understand that it has become a Steinway tradition to have an annual price increase. But prices can't continue to increase forever. I don't believe this rate of increase is sustainable given that these are not normal economic times. Housing prices have taken historical percentage decreases in the past two years. The stock market's volatility is unprecedented. Most American's real income has gone down Unemployment (and under-employment) rates are higher than we have seen in decades. This perfect economic storm is keeping buyers out of our stores.

Those who do venture into our store are armed with a historically unprecedented advantage---the internet. While the internet can be our friend, it is also causing two major issues to a Steinway dealer. First, buyers are being told that Steinway pianos can be purchased at discounted prices. As Steinway's prices go up and volume goes down, dealers are discounting Steinway & Sons pianos more than I have ever experienced in my career. Unlike prior years where a dealer could limit the impact of his pricing policy to his own market, my customer in Spokane now knows when a dealer in Alabama is selling Steinways at a discount. The internet is screaming to our customers that they are fools if they pay New York price for a Steinway. Second, thanks to the internet, my customers in Spokane can shop for a used Steinway across the country. The number of used Steinways that a customer can consider to purchase is exponentially higher than in previous times. As the price of used Steinways is driven down by a new-found supply (via the internet) and the gap between new and used Steinway's increase, more customers are turning to used Steinways.

The current economy plus the internet plus the continued price increase is creating a gigantic negative feedback cycle. As dealers sell less units, they will discount more. As dealers discount more, their profitability goes down. As profits go down, they will buy less pianos. As Steinway's production volume goes down the cost per unit goes up. As the increase unit cost is passed onto the dealer in the form of a price increase, the dealer sells less units and the cycle continues.

I question using the European model as a roadmap. I suspect that fewer pianos per capita are sold in Europe than America. I suspect there are fewer dealers per capita in Europe than America. Can New York survive if production drops to European levels?

# EXHIBIT 7

# EXHIBIT 7

**From:** Kevin Rindlisbacher <kevinr@steinwayarizona.com>
**Sent:** Thursday, April 13, 2017 11:46 PM
**To:** rlosby@steinway.com; Sanders, Todd (tsanders@steinway.com)
**Subject:** additional thoughts about Phoenix

Ron & Todd,

When I was appointed a dealer Bob Snyder told me that I could expect 1/3 of my Steinway sales to go to institutions, 1/3 to people who have always dreamed of owning a Steinway (teachers, musicians etc) and 1/3 to wealthy people who want the best.

I suspect that the above general prediction of Steinway sales goes a long way to explaining Phoenix's inability to meet the typical BPI predictor. With Institutional sales at virtually zero (a couple of churches a year) and given almost 33% Hispanic population (a heritage that generally doesn't value the piano) combined with a very low per capita income, it leaves Phoenix with only about 1/3 of the customer base of the "typical" Steinway piano market that Bob Snyder described to me. Additionally, the Asian community is extremely small in Phoenix

During the past couple of weeks of reflection about how/why are market expectations could be so far apart, I have realized that a lot of my marketing and time investment have been spent on trying to create sales in the areas of the least opportunity for success. While teacher, institutions, musicians shouldn't be ignored, there can be (and should be) a lot more effort focused on the 1/3 of people who can afford to buy a S&S piano---particularly the Spirio.

This is what happens when I have too many hours on an airplane thinking about what we should have discussed. ......

Best,
Kevin Rindlisbacher



EXHIBIT 140
NAME *Rindlisbacher*
Meri Coash 7-17-19

1

RIN024477

# EXHIBIT 8

# EXHIBIT 8

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kevin H. Rindlisbacher and Jami ) | |
| L. Rindlisbacher, husband and ) | |
| wife; and Piano Showroom of ) | |
| Arizona, Inc., an Arizona ) | |
| corporation, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| vs. ) | No. 2:18-cv-01131-JJT |
| ) | |
| Steinway, Inc., a Delaware ) | |
| corporation, ) | |
| ) | |
|     Defendants. ) | |
| _____) | |

DEPOSITION OF DAVID REGINALD PERRY

Volume 2

Pages 159 - 231

Phoenix, Arizona

December 20, 2019

Prepared by:

CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

David Reginald Perry                          12/20/2019
        Kevin Rindlisbacher v. Steinway, Inc.

165

1      Q    Okay.  And then let's turn to Exhibit M -- or

2  appendix M, I should say, which is for Phoenix.  And

14:04:44  3  appendix M has, it looks like three charts.  The top

4  chart shows a total of 443 piano sales for those years;

5  correct?

14:04:57  6      A    Yes.

7      Q    And again, these would be the Steinway Boston

8  and Essex pianos?

14:05:02  9      A    Yes.

10      Q    And that's for a six-and-a-half-year period?

11      A    Yes.

14:05:10  12      Q    And so if we take the 443 divided by six and a

13  half years, you'd get 68 pianos per year; correct?

14      A    I haven't done the math in my head to that one.

14:05:25  15      Q    I'd like you to -- let's just do the math as

16  what it is.

17          So we have 68 pianos per year in Phoenix, and

14:05:33  18  we have 59 and a half pianos per year in Spokane for the

19  years that you use; correct?

20      A    For these years, yes.  For those years we've

14:05:44  21  gone through on those two appendices, yes.

22      Q    And you've previously agreed that Phoenix and

23  Maricopa County is a much larger market than Spokane;

14:05:48  24  correct?

25      A    In terms of population, yes.

**David Reginald Perry**                                    **12/20/2019**
**Kevin Rindlisbacher v. Steinway, Inc.**

179

| | | |
|---|---|---|
| | 1 | 75,000 households with incomes greater than $250,000. |
| | 2 | Maricopa County -- |
| 14:27:41 | 3 |         MR. MORRILL:  It's 77. |
| | 4 |         MR. SAMUELS:  I'm sorry.  77.  Thank you, |
| | 5 | Mr. Morrill. |
| 14:27:43 | 6 | BY MR. SAMUELS: |
| | 7 |     Q    Let me start over because I misspoke. |
| | 8 |        Los Angeles County, there are 77,000 household |
| 14:27:55 | 9 | with incomes greater than $250,000.  In Maricopa County, |
| | 10 | there are 24,000 households with incomes greater than |
| | 11 | $250,000.  And Mr. Rindlisbacher observes that Spokane |
| 14:28:11 | 12 | County, there are 853 households with income greater |
| | 13 | than $250,000. |
| | 14 |        Did I read that correctly? |
| 14:28:17 | 15 |     A    Not the last one.  I think you said 853, and |
| | 16 | it's 1,853. |
| | 17 |     Q    If I did, I misspoke.  I agree with you. |
| 14:28:25 | 18 |        It does say 1,853; correct? |
| | 19 |     A    Yes. |
| | 20 |     Q    Thank you.  If I made that mistake, I |
| 14:28:30 | 21 | apologize. |
| | 22 |        So just comparing the 1,853 number versus the |
| | 23 | 24,000 number in Maricopa County, would you agree with |
| 14:28:41 | 24 | me that the market in Maricopa County is 13 times |
| | 25 | greater for that particular income threshold? |

David Reginald Perry                    12/20/2019
Kevin Rindlisbacher v. Steinway, Inc.

180

1      A      Well, it's certainly more than 10 and less than
2   15, so I think your 15 is -- 13 is probably reasonable.
14:28:56   3      Q      Okay.
4      A      I haven't done the math.
5             (The document was marked as Exhibit 280
14:29:38   6   for identification.)
7   BY MR. SAMUELS:
8      Q      Before moving to the next exhibit, is it your
14:29:47   9   understanding from the prior email that we discussed,
10   Exhibit 279, that Mr. Rindlisbacher viewed the $250,000
11   income threshold as a target market for the sale of
14:30:01   12   Steinway pianos?
13      A      I'm not sure I can say that's my understanding.
14   Obviously, he thought it was relevant enough to put it
14:30:12   15   in this email.  I can certainly say that.
16      Q      Okay.  Showing you what's been marked as
17   Exhibit 280.  This is part of your witness binder as
14:30:33   18   well, tab 47.  And this is -- this includes an article
19   published in Arizona for AZcentral.com on December 7,
20   2011; correct?
14:30:47   21      A      Yes.
22      Q      And in this article, Mr. Rindlisbacher is
23   quoted in various portions of the article; correct?
14:30:55   24      A      Yes.
25      Q      And Mr. Rindlisbacher is quoted as saying in

David Reginald Perry                                    12/20/2019
     Kevin Rindlisbacher v. Steinway, Inc.

187

```
 1    see that?
 2        A    I do.
 3        Q    Okay.  And this highlighted portion is an email
 4    in which Mr. Rindlisbacher states, During the past
 5    couple weeks of reflection about how/why -- how/why we
 6    are -- I'm sorry.  Let me start over.
 7            [Reading] During the past couple weeks of
 8    reflection about how/why our market expectations could
 9    be so far apart, I have realized that a lot of my
10    marketing and time investment have been spent on trying
11    to create sales in the areas of the least opportunity
12    for success.  While teacher institutions, musicians
13    shouldn't be ignored, they can be, and should be, a lot
14    more -- there can be, and should be, a lot more effort
15    focused on the one-third of people who can't afford to
16    buy an S&S piano, particularly the Spirio.
17            Did I read that correctly?
18        A    Yes.
19        Q    Okay.  Would you agree with me that
20    Mr. Rindlisbacher in this email is acknowledging that he
21    could have done things differently to sell more Steinway
22    & Sons pianos?
23            MR. MORRILL:  Object to form.
24            THE WITNESS:  Yes.  He's -- as I talked
25    about in my rebuttal report, he's saying, you know, that
```

David Reginald Perry                          12/20/2019
Kevin Rindlisbacher v. Steinway, Inc.

188

1   he wished, with the benefit of hindsight, he'd focused
2   more on the high net worth individuals who can afford to
14:40:30  3   buy a Steinway & Sons piano and not so much on the
4   teachers institutions and magicians -- excuse me,
5   musicians, which the ones Steinway had suggested he
14:40:41  6   focus on, at least significantly.
7   BY MR. SAMUELS:
8       Q    But you don't account for any of plaintiffs'
14:40:47  9   deficiencies in failing to sell pianos; correct?
10          MR. MORRILL:  Object to form.
11  BY MR. SAMUELS:
14:40:58  12      Q    Do you account for any of Mr. Rindlisbacher's
13  acknowledged deficiencies in selling -- in failing to
14  sell the number of pianos that Steinway had hoped he
14:41:07  15  would sell?
16      A    I made no adjustments.  My analysis is based on
17  the difference between the -- his reasonable
14:41:18  18  expectations going in as set out by Steinway in the
19  dealer agreement and his actual number of pianos sold.
20  I have not made any adjustments for that for any
14:41:30  21  reasons, nor do I think any adjustments should be made.
22  There's nothing to indicate any hard data, you know, for
23  the reasons I talked about in my rebuttal report.
14:41:44  24          (The document was marked as Exhibit 282
25   for identification.)

David Reginald Perry                           12/20/2019
Kevin Rindlisbacher v. Steinway, Inc.

208

1    Q    With regard to the out-of-pocket losses that

2    you opine about, what did you do to verify any

15:25:57   3    activities by Mr. Rindlisbacher to mitigate those

4    alleged damages after July 2017?

5                MR. MORRILL:  Object to form.

15:26:06   6                THE WITNESS:  Well, we went through in my

7    last deposition the income statements.  So, obviously,

8    he was making sales in those months, and I offset those

15:26:19   9    sales against his expenses.  Unfortunately, for those

10   eight months, the expenses exceed the sales, but he was

11   making sales of pianos where he could according to the

15:26:27   12   income statements.

13   BY MR. SAMUELS:

14   Q    All right.  But you don't know any specific

15:26:32   15   activities with regard to particular brands of pianos he

16   was selling during that time period; correct?

17   A    Not specifically.  Obviously, not new Steinway

15:26:42   18   pianos or new Yamaha pianos.

19   Q    In your sixth page, you -- at the first full

20   paragraph at the top, it says, It is typical and

15:27:15   21   sometimes compulsory for performance reviews to include

22   areas for improvement no matter how good an individual's

23   overall performance is.

15:27:20   24               Did I read that correctly?

25   A    Yes.

David Reginald Perry                                    12/20/2019
      Kevin Rindlisbacher v. Steinway, Inc.

217

1    Q    Would you agree that there are a number of
2  factors that can affect the sales performance of a piano
15:40:00  3  retailer?
4           MR. MORRILL:  Asked and answered in the
5  prior deposition.
15:40:05  6  BY MR. SAMUELS:
7    Q    Would you agree?
8    A    There are, you know, factors that would go into
15:40:13  9  performance, yes.
10    Q    Would you agree that the state of the economy
11  is one factor?
15:40:18  12    A    That would be one factor.
13    Q    Would you agree that consumer preferences and
14  buying trends can affect sales?
15:40:25  15    A    Yes.
16    Q    Would you agree that increased competition can
17  affect sales?
15:40:32  18    A    If we're talking generally now?
19    Q    Yes.
20    A    Yes.
15:40:43  21    Q    Would you agree that increased marketing and
22  distribution of cheaper digital pianos could affect
23  sales of certain --
15:40:52  24           MR. MORRILL:  Form.
25  BY MR. SAMUELS:

David Reginald Perry                          12/20/2019
Kevin Rindlisbacher v. Steinway, Inc.

218

1        Q      Let me make that more clear.

2               Would you agree that increased marketing and

15:40:58   3    distribution of cheaper digital pianos could affect

4        sales of certain pianos such as the Essex line among

5        certain consumers?

15:41:05   6    A      Yeah, I was going to say, again, as we talked

7        about earlier in this deposition, I would see those

8        different market segments.  Someone who wants a Steinway

15:41:15   9    & Sons piano is probably not going to be interested in a

10       cheap digital piano.

11       Q      Would you agree, though, that with regard to

15:41:24   12   the Essex line, that a digital piano could affect sales?

13       A      I don't know enough to -- about the different

14       price points.  They could still be significantly

15:41:32   15   different in price points and different quality of

16       product.  I mean, these are all Steinway-designated

17       pianos, which I understand are quality products.

15:41:39   18   Q      And I'm not here to suggest that a digital

19       piano's an equivalent, but I'm asking you whether

20       increased marketing and distribution of cheaper digital

15:41:50   21   pianos could affect the Essex line of pianos?

22       A      It is possible.

23       Q      Would you agree that the skills of the dealer's

15:41:57   24   salespeople could also affect piano sales?

25       A      It is possible.

David Reginald Perry                         12/20/2019
Kevin Rindlisbacher v. Steinway, Inc.

219

1      Q    Would you agree that if a dealer is difficult
2   to work for and has turnover among its sales team, that
15:42:07  3   the turnover could affect sales?
4                MR. MORRILL:  Object to form.
5                THE WITNESS:  It is possible.
15:42:08  6   BY MR. SAMUELS:
7      Q    Would you agree that the level of promotions
8   and advertising could affect sales?
15:42:15  9      A    It is possible.
10      Q    Would you agree that there are other variables
11   that can determine the level of sales of a piano
15:42:21 12   retailer?
13      A    Yes.
14      Q    And you didn't take into account the variables
15:42:31 15   that could -- the variables I just described that could
16   affect the sales of a piano retailer; correct?
17      A    I would say I've taken into account, you
15:42:45 18   know -- the way I did my calculation did not assume that
19   they would have gone up with the economy, the actual
20   number of expected units.  It stayed at the same level
15:42:57 21   it was in 2010, which was purported to be a bad time in
22   the piano industry.  So I didn't specifically do that,
23   and I didn't see any anything in Mr. Schwickerath's
15:43:06 24   report where he makes any adjustments for any of these
25   purported complaints about Mr. Rindlisbacher's

David Reginald Perry, Vol 2 - December 20, 2019          230

1    copy?

2                  MR. MORRILL:  Please.

3              (The proceedings concluded at 3:54 p.m.)

4

5

6    _____
              DAVID REGINALD PERRY
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



*1 of 1*

# ERRATA SHEET

DEPOSITION OF:      David Reginald Perry, Vol 2
DEPOSITION DATE:    12/20/2019
CAPTION:            Kevin Rindlisbacher vs. Steinway, Inc.

---

| PAGE/LINE NO. | CHANGE AND/OR CORRECTION | REASON |
|---|---|---|

170-13    "digital pianos page" s/b "digital pianos listing"
174-13    "aspects" s/b "markets"
177-17    "only" s/b "own"
188-20    first "for" s/b "to"
190-3     "probably it's" s/b "probably because it's"
190-4     "paid do" s/b "paid to it"
195-12    "got" s/b "done"
218-7/8   "those different" s/b "those as different"

SIGNATURE: _David Perry_          DATE: 1/16/20

OFFICE USE ONLY

Page _____ of _____

**David Reginald Perry**                              **12/20/2019**
        **Kevin Rindlisbacher v. Steinway, Inc.**

231

STATE OF ARIZONA   )
COUNTY OF MARICOPA )

    BE IT KNOWN that the foregoing deposition was taken

by me pursuant to stipulation of counsel; that I was

then and there a Certified Court Reporter in the State

of Arizona, and by virtue hereof authorized to

administer an oath; that the witness before testifying

was duly sworn by me to testify to the whole truth;

pursuant to request, notification was provided that the

deposition is available for review and signature; that

the questions propounded by counsel and the answers of

the witness thereto were taken down by me in shorthand

and thereafter transcribed into typewriting under my

direction; that the foregoing pages are a full, true and

accurate transcript of all the proceedings had upon the

taking of said deposition, all done to the best of my

skill and ability.

        I FURTHER CERTIFY that I am in no way related

to nor employed by any parties hereto; nor am I in any

way interested in the outcome thereof.

        Dated at Phoenix, Arizona, this 3rd day of

January, 2020.

                    _____
                    CINDY MAHONEY, RPR, RMR NO. 5068

# EXHIBIT 9

# EXHIBIT 9

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Kevin H. Rindlisbacher and        )
Jami L. Rindlisbacher, husband    )
and wife; and Piano Showroom of   )
Arizona, Inc., an Arizona         )
corporation,                      )
                                  )
     Plaintiffs,                  )
                                  )
v.                                ) No. 2:18-cv-01131-JJT
                                  )
Steinway, Inc., a Delaware        )
corporation,                      )
                                  )
     Defendant.                   )
_____   )

DEPOSITION OF JANET PRISET SANDINO

Phoenix, Arizona

October 1, 2019

Prepared by:

Meri Coash, RMR, CRR

Certified Reporter

Certification No. 50327

Janet Priset Sandino                    October 1, 2019

32

1      Q.    Right.

2            Did you --  When you sold a Steinway & Sons

3      piano -- and that would include Boston or Essex brands --

4      did you personally enter warranty information into the --

5      or submit warranty information to Steinway?

6      A.    I don't understand the question.

7      Q.    Sure.  Do you understand that Steinway has a

8      process by which warranties -- warranty information is

9      collected for customers from dealers?

10     A.    Yes.  I'm not sure if I submitted it or the

11     manager at the time.  All my sales contracts, if I wrote

12     them up, Mr. Geiger -- whoever the manager was, it went on

13     his desk for approval.  I can't remember --  It may have

14     been each salesperson's responsibility to file it with

15     Steinway.  I don't recall exactly.

16     Q.    Okay.  When the store opened --  Well, let me

17     ask, when do you recall the store opening with

18     Mr. Rindlisbacher and Steinway?

19     A.    Well, we had some -- I think there's some banners

20     that we made -- and it was in January and -- you know, to

21     let people know that we were there.

22     Q.    Who were the original employees at that store?

23     A.    Original employees, that I recall, are --

24     Mr. Rindlisbacher was the owner and manager, myself and a

25     gentleman named Ryan.  And I forget Ryan's last name.

Janet Priset Sandino                    October 1, 2019

1    Young fellow.

2        Q.    And was Ryan -- was it your understanding that he

3    came from somewhere else?

4        A.    He did come from somewhere else.

5        Q.    Did he previously work for Mr. Rindlisbacher

6    elsewhere?  Was that your understanding?

7        A.    He had previously worked for him.

8        Q.    Okay.  So was it your understanding that he did

9    not have experience in the Phoenix market previously?

10       A.    Yes, that's true.

11       Q.    And how long did Mr. -- did Ryan work at the

12   store?  Do you recall?

13       A.    Not very long.

14       Q.    Do you remember the circumstances that led to his

15   departure?

16       A.    I'm not sure what month it was in, whether it was

17   January or February.  I know that Mr. Rindlisbacher was

18   out of town.  I'm not sure if it was overseas or Utah,

19   wherever in Spokane.  But I went to work one morning and I

20   got a call from Ryan saying, "I'm not coming back to work

21   anymore.  You can tell Kevin for me or I'll call him,"

22   something like that.

23       Q.    Did he explain why he wasn't coming back to work?

24       A.    I don't remember the words exactly.  I don't know

25   if you want me to paraphrase, but --

Janet Priset Sandino                October 1, 2019

34

1      Q.    Yes, if you just give me your recollection as
2    to --
3      A.    He just said he just couldn't take it anymore,
4    that sort of thing.  He just didn't enjoy working there
5    and it was too difficult.  And I know he got home
6    infrequently to see his wife or family, and it was -- he
7    just didn't like the situation.  And he had worked for
8    Kevin before, so --  I don't really want to say more than
9    that --
10     Q.    Did he --
11     A.    -- because I think Kevin reemployed him later.
12     Q.    Did he work --  So is it your understanding or
13   recollection that he worked at the Scottsdale store for --
14     A.    Maybe two months.
15     Q.    A month or two?
16     A.    Yeah, a month or two.
17     Q.    Do you recall who --  Was there someone who
18   replaced Ryan after he resigned?
19     A.    It took --  What I recall is that it took Kevin a
20   while to find somebody to replace him.  I'm not sure who
21   he interviewed locally.  I know he ended up hiring --  It
22   took a few months, so it was just Kevin and myself for a
23   short -- two months or three months.  I don't remember.
24   But he found a gentleman in Florida that he brought up.
25     Q.    Do you remember his name?

Janet Priset Sandino                    October 1, 2019

54

1      Q.   It could have come up.  You don't recall one way
2  or the other?
3      A.   Right.  It probably did come up, but I can't say.
4  We talked about a lot of things.
5      Q.   Do you recall ever discussing Sherman Clay's
6  sales performance with Mr. Rindlisbacher, or is that
7  another subject that may have occurred, you just don't
8  remember?
9      A.   Well, the thing that I was --  Well, I'm saying
10 this now.  I don't know if I thought this then, but I'm
11 going to be honest with you.  If the things were so bad
12 for Sherman Clay, why would a successful dealer come into
13 Scottsdale to take over an unsuccessful business?
14     Q.   Did you have an understanding that
15 Mr. Rindlisbacher had done his own due diligence with
16 regard to opening --
17     A.   Assumed he had, yeah.
18     Q.   -- with regard to opening the store in Phoenix?
19     A.   Sure.  I assumed he had.
20          I will say one thing.  May I add something?
21     Q.   Sure.
22     A.   Turnover is the worst thing you have in business
23 if you have decent employees.  Decent.  Some sell more
24 than others.  Some are more responsible.  But there was a
25 lot of turnover, and that hurts business.

**Coash & Coash, Inc.**

Janet Priset Sandino                    October 1, 2019

55

1      Q.   When you say "there was a lot of turnover," you

2   were referring to --

3      A.   To the second Steinway dealership.  I was with

4   Sherman Clay for -- what? -- five years?  Five and a half?

5   I forget.  I think Denny -- a gentleman named Denny was

6   there for several years.  Scott was there for several

7   years.  I think that's important in all the businesses

8   I've been in because you do build relationships with

9   people.

10     Q.   So it sounds to me -- let me just see if I

11  summarized this correctly -- Sherman Clay had relatively

12  little turnover compared to Mr. Rindlisbacher?

13              MR. MORRILL:  Object to form.  Misstates

14  testimony.

15              THE WITNESS:  Oh, okay.  You know, I can't

16  really state that because I don't know about their other

17  stores.  I do know some of the other Sherman Clay

18  employees from other cities had been with them for a very

19  long time because I talked to them occasionally.

20  BY MR. SAMUELS:

21     Q.   And you said turnover is the worst thing for

22  business.  Is that something that you -- was that -- in

23  your opinion, was there --

24     A.   That's my personal opinion.

25     Q.   -- was there significant turnover within the

Janet Priset Sandino                October 1, 2019

59

```
 1              (Deposition Exhibit 254 was marked for
 2          identification.)
 3   BY MR. SAMUELS:
 4      Q.   Showing you what's been marked as Exhibit 254,
 5   this is an email that originates from you --
 6      A.   Yeah.
 7      Q.   -- to Mr. Losby.
 8      A.   Yes.  This, I think, I still have because it's on
 9   my . . .
10      Q.   So the way this prints out, the first email is on
11   the last of the email exchange here.  So on September 6th
12   at the bottom of page 2, it looks like you wrote to
13   Mr. Losby, correct?
14      A.   Yes.
15      Q.   Okay.
16      A.   I heard from -- I heard from several people and
17   somebody sent me a link.
18      Q.   And you heard from several people that
19   Mr. Rindlisbacher was suing Steinway?
20      A.   I heard that -- Yes.
21      Q.   Okay.  And you offered to --  You state to
22   Mr. Losby that you had to leave Mr. Rindlisbacher's
23   employment because of his treatment of you and others,
24   correct?
25      A.   Yes.
```

Janet Priset Sandino                    October 1, 2019

1      Q.    Mr. Losby wrote you back a couple days later, and
2   then on the 20th of September, you wrote back -- wrote him
3   back, which is the email that begins on the top -- or, the
4   bottom of page 1 of this exhibit.  Do you see that?
5      A.    Uh-huh.
6      Q.    In the second paragraph of the email on the first
7   page, you write that "The easiest description of Kevin is
8   that he is a bully and creates a hostile work
9   environment."  Do you see that?
10     A.    Yes.
11     Q.    Is your description of him as a bully a result of
12  him raising his voice with you?
13     A.    He raised his voice to me and to other employees,
14  and I heard him on phone conversations.  I don't know what
15  other word to use, but it became -- it was uncomfortable.
16  I'm not good at hearing loud discussions and things like
17  that.
18     Q.    And the other -- the phone calls you're
19  referencing, were those, you believe, with other employees
20  in other stores of his?
21     A.    Yes.
22     Q.    You --
23     A.    I didn't know this was going to be public.
24     Q.    You mentioned that he yelled -- in the second
25  sentence that he yelled and uses nasty language.  Do you

Janet Priset Sandino                  October 1, 2019

61

1   see that?

2        A.   He did on occasion.

3        Q.   And by "nasty language," is that essentially

4   profanity?

5        A.   Well, it depends in this day and age what you

6   consider profanity.  So I wasn't used to certain words

7   being used in a work environment.

8        Q.   What words do you recall him using that you were

9   not used to?

10       A.   I'm not exactly sure, but I think there were

11  things like "Damn it, Janet," and "What the hell?"  That

12  sort of language.  Nothing crude but still uncomfortable.

13       Q.   You mentioned in your next portion of this

14  sentence that he went to put his arm on your shoulder in a

15  harsh -- very harsh manner.  Describe what happened there.

16       A.   He did.  He was giving me a lecture on something,

17  and he just came over, and I wasn't used to being touched.

18  I'm not saying he hurt me.  Just physically came in my

19  space.

20       Q.   And was that in the context of an unfriendly

21  conversation?

22       A.   Yes.

23       Q.   And in this same paragraph, he -- you mentioned

24  that he had a habit of firing people and later rehiring

25  them.  And that's what you testified to earlier, correct?

Janet Priset Sandino                    October 1, 2019

62

1    A.    Yes, sir.

2    Q.    And that he admitted in a call to you that he was

3    an a--hole, in his words.

4    A.    No, that was in person.  I would never use that

5    word myself.  But . . .

6    Q.    So he referred to himself in a personal -- in an

7    in-person conversation with you or discussion with you --

8    A.    Yes.

9    Q.    -- that he was --

10    A.    Yes.  I wouldn't say that, but I agreed with him.

11    I will say that.  I agreed.  It's not something that I

12    would say.

13              It had nothing to do with money and pay --

14    or, commissions.  It had to do with just the whole -- the

15    atmosphere.  So that's a shame, that's all.

16              I'm also not exactly sure what this lawsuit

17    is about, so . . .

18    Q.    In the -- on the second page of this exhibit, you

19    mentioned to Mr. Losby that at least as of September 2018,

20    that you still had some communications from the time

21    period spring of '12 to March of '13.  Are those

22    communications you sent --

23    A.    Yeah.  I asked for some commissions.  And then I

24    dropped it.  It was too stressful.  So that was it.  When

25    he gave me my final -- whatever, that was it.

# EXHIBIT 10

# EXHIBIT 10

| From: | Wang, Jennifer <jwang@steinway com> |
|---|---|
| To: | Samuels, Bruce, Schmidt, Cindy |
| CC: | Brecher, Todd |
| Sent: | 9/20/2018 10 36 44 AM |
| Subject: | Fwd Lawsuit |

<div style="background:black;color:white;padding:10px;width:120px">REDACTED</div>

Sent from my iPhone

Begin forwarded message

**From:** "Losby, Ron" <rlosby@steinway com>
**Date:** September 20, 2018 at 12 59 29 PM EDT
**To:** "Wang, Jennifer" <jwang@steinway com>
**Subject: Fwd: Lawsuit**

PRIVILEGED AND CONFIDENTIAL

Jen

<div style="background:black;color:white;padding:20px;text-align:center">REDACTED</div>

Thx

Ron
Sent from my iPhone

Begin forwarded message

**From:** Janet Priset Sandino <janetpsandino@gmail com>
**Date:** September 20, 2018 at 1 00 27 AM EDT
**To:** "Losby, Ron" <rlosby@steinway com>
**Subject: Re: Lawsuit**



Dear Ron,

I apologize for taking so long to write you regarding Kevin Rindlisbacher, the whole ordeal six years ago came crashing back. I did have some tough managers at Sherman Clay, but the company as a whole was ethical and fair and I enjoyed working for them, and Steinway

==The easiest description of Kevin is that he is a bully and creates a hostile work environment== He yells, uses nasty language, and once put his arm on my shoulder in a very harsh manner  Often I heard him berating other salespeople in the store, or in his other facility   Many of his employees left because of him, although I was asked not to include their specific names  Kevin also had a habit of firing people and later re-hiring them, he also tried to re-hire people that quit, several times  He called me a couple of times, even though he admitted he was an a--hole (his words)  This was untenable since I had sent several legal correspondences which requested my full commissions be paid me, after I left, for deals that I had written up and received deposits  Kevin said there was a lot of work (lol) to finish up my transactions, but I had handled dozen of

STEINWAY00003995

situations for ex-employees regarding delivery, tuning, player system issues, etc, without extra compensation - I didn't expect it since it was part of the job, so I thought Kevin would not argue with me on my sales

I lost several thousand dollars, but could not afford to maintain the lawyer and take Kevin to court - he is aggressive, and even forbid me to communicate with any clients of the store (many of whom I had met BEFORE I worked for Kevin, and many who may have been interested in my new position at the gallery, etc )

I know I helped create a wonderful relationship between our store, Steinway, and the musical community in general  Caio Pagano, Fei Xu (Anna Han's teacher), and many others were quite complimentary - because of my relationship with several music professionals, I was able to continue doing the fundraiser for Physicians for the Phoenix Symphony, which I hosted at the gallery for three years  Many contacts from Sherman Clay were brought to Kevin through me, and I left dozens of good leads in the database after my departure

Please relay anything you'd like to your lawyers - I still have some communications in my hands from the time period of spring 2012 to March 2013

It was great to speak with you and I look forward to seeing you in the future  I will mention to Dr Gerd Wuestemann (President and CEO of the Scottsdale Arts Center) that we may be able to help him next spring with the four Steinway pianos for their fundraiser with the Museum of the West.

My sincerest and warm wishes,
Janet Priset Sandino

(by the way, after my resignation, I worked from June 2, 2012 to August 13 to secure and finalize my contracts but Kevin restricted my communication)


On Sat, Sep 8, 2018 at 11 12 AM, Losby, Ron <rlosby@steinway com> wrote
Dear Janet

So nice to hear from you and I hope all is well with you and your family  It has been a long time!

I would welcome an opportunity to speak and catch up  Please provide a day which works and I number to call  I am traveling for the next week so it might be best if I call you   Regina will set a date and time that works for us  My mobile is 646 519 0344

Looking forward to our chat

Best

Ron

Sent from my iPhone

> On Sep 6, 2018, at 5 37 PM, Janet Priset Sandino <janetpsandino@gmail com> wrote
>
> Dear Ron
> I understand that Kevin is suing Steinway for the loss of his franchise    As you remember, I had to leave his employment because of his treatment of myself and other employees  I loved working for Steinway, and if there's anything I can do to help your case, I would be honored to so  My warm wishes, Janet Sandino

STEINWAY00003996

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. Steinway & Sons has taken precautions to prevent the spread of viruses. However the company accepts no liability for any damage caused by any virus transmitted by this email.

--
*Janet Priset Sandino*
Senior Fine Art Consultant
The Marshall Gallery of Fine Art
(480) 970-3111 gallery
(602) 680-6090 mobile

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. Steinway & Sons has taken precautions to prevent the spread of viruses. However the company accepts no liability for any damage caused by any virus transmitted by this email.

STEINWAY00003997

# EXHIBIT 11

# EXHIBIT 11

| | |
|---|---|
| **From:** | Kevin Rindlisbacher <kevinr@steinwayarizona com> |
| **Sent:** | Friday, December 13, 2013 11:48 AM |
| **To:** | Snyder, Robert |
| **Subject:** | RE: what do you think of this article? |

The part that I thought was most interesting (and insightful) was the comment by the investment analyst who said that when a company can raise prices every year it indicates a lack of competition. ... .this is from a guy who probably followed the financial performance of Steinway more than anyone outside the company since I started listening to Steinway's quarterly conference calls many years ago. It think is an astute observation. We all know that the annual price increase has little to do with actual costs going up----Steinway's margins are higher than they have ever been and the Boston grand is a perfect example-----their costs are actually less than they were a year ago, and significantly less. We all want to raise our prices in our respective businesses but competition doesn't normally allow us to.
Kevin


**From:** Snyder, Robert [mailto:rsnyder@steinway.com]
**Sent:** Wednesday, December 11, 2013 7:34 PM
**To:** Kevin Rindlisbacher
**Subject:** RE: what do you think of this article?

Yes I saw this - - there are parts of it I like - - parts of it I don't
It's not a widely read website in the US - - and frankly, the article is so long that I think few people would make their way through it
I also think it's about a month beyond the time when there was a lot of interest
So at the end of the day - - I believe it'll have no impact
I saw it only because of google alerts - - my confident guess is that you saw it for the same reason
It won't hurt us at all, in my view

Bob S

--------------------------------
Robert J Snyder
Senior District Manager
Steinway & Sons
Phone  503-835-8042
Fax  718-267-3498
rsnyder@steinway.com

**From:** Kevin Rindlisbacher [mailto:kevinr@steinwayarizona.com]
**Sent:** Wednesday, December 11, 2013 4:08 PM
**To:** Snyder, Robert
**Subject:** what do you think of this article?



EXHIBIT 34
NAME Rindlisbacher
Meri Coash 7-17-19

1

STEINWAY: Behind the takeover of the world's premier maker of high-end pianos
http://ajw.asahi.com/article/globe/feature/piano/AJ201312060017

This message (including any attachments) contains confidential information intended for a specific individual and purpose  and is protected by law  If you are not the intended recipient, you should delete this message  Any disclosure, copying  or distribution of this message, or the taking of any action based on it  is strictly prohibited  Steinway & Sons has taken precautions to prevent the spread of viruses  However the company accepts no liability for any damage caused by any virus transmitted by this email

2

RIN022754

# EXHIBIT 12

# EXHIBIT 12

| | |
|---|---|
| **From:** | Kevin Rindlisbacher <kevinr@steinwayarizona com> |
| **Sent:** | Tuesday, March 12, 2013 7:18 PM |
| **To:** | Losby, Ron; Sanders, Todd |
| **Cc:** | Snyder, Robert |
| **Subject:** | Japanese yen |

Ron & Todd,

In the last six months the dollar has gained on the Japanese yen by over 25% (26.32% to be exact).    If my U of Utah math is correct, this means that a GP178 could sell for almost $4k less than it was last July and margins wouldn't be affected.  I'm not suggesting you lower the price but it seems to me this presents a uniquely great opportunity for Steinway to do some type of a promotion and/or rebate on the purchase of new Boston pianos by consumers while at the same time getting updated consumer trends and shopping experience as well i.e. give a sizeable rebate in exchange for the customer filling out an information sheet.  And of course, the dealer would have to re-order the product as well.  .. ..

Just trying to think of ways to boost sales.

Kevin H. Rindlisbacher
Steinway Piano Showroom of Arizona
480-368-8888
www.steinwayarizona.com

1



EXHIBIT 36
NAME _Rindlisbacher_
Meri Coash _7-17-19_

RIN022263

# EXHIBIT 13

# EXHIBIT 13

**From:**          Kevin Rindlisbacher <kevinr@steinwayarizona.com>
**Sent:**          Monday, January 05, 2015 7:52 AM
**To:**            msweeney@steinway.com; rlosby@steinway.com; Sanders, Todd
                   (tsanders@steinway.com)
**Cc:**            Snyder, Robert
**Subject:**       Steinway food for thought
**Attachments:**   Steinway letter Jan 2015.docx

I hope you had a great holiday season.  Best wishes for the new year.  Please read the brief note attached.

It is good to be a Steinway dealer. Thank You,
Kevin Rindlisbacher



EXHIBIT 37
NAME Rindlisbacher
Meri Coash 7-17-19

1

RIN023305

January 5, 2015

Michael, Ron, Todd, et al,

Todd mentioned that you are having your sales meetings in the near future.  With the recent price increase continuing to put Steinway pianos further away from competitive options for most consumers it seems an appropriate time to suggest a few things Steinway can do to help us.  Literally this morning I was able to close a Steinway model B sale to a consumer who came perilously close to purchasing a 12 year old used Steinway B from a private party for substantially less money.  As we in the retail world know, consumers have to be able to mentally justify their purchase but eventually purchase because of emotions.  I was able to make this sell because I convinced the purchaser that the Steinway grand built today is far better than the one built 12 years ago thus I provided him with some mental justification.  However, I believe he ultimately purchased the piano because the new one had the logos on the side (which I try and special order on pianos when I can wait for 4 or 5 months) and because it had an adjustable bench with the logos on the knobs.  I know it sounds silly, but I am confident those were the tipping points.  All the other stuff was difficult for the client to visually wrap his hands around, but those two items were clear to see.  He didn't say this, but when someone walks into his home, he wants them to see the Steinway logo   Any Steinway sales person can tell you similar stories.  Let's learn from this.

If you are looking for ways to continue to sell new Steinway pianos over used pianos and other competitive brands, I suggest the following, inexpensive changes:

- Put logos on the sides of every new piano.  For the cost of a $20 logo, it is a visual, obvious difference between used Steinways and new ones.  Put the larger logo on model B's & D's, the smaller logo on model A's and below.  Put it on every piano, including crown jewels.  If it looks good on the fallboard, it will look fine on the side.  It is time to make this standard.
- Making the fallboard a shiny finish on the satin ebony pianos was a good first step.  Now let's use polyester so the piano doesn't show all the fingernail scratches that make people cringe.
- Put adjustable benches with every new piano including crown jewels and Boston and Essex.  The cost to Steinway is virtually nothing and in fact would probably save money   There is way less damage on an adjustable bench than a wood top bench.  Non-adjustable benches should go the way of the ruler-slapping teaching method of motivation.
- Install slow close fallboards and lids.  With the prices of new Steinways, let's give the consumers what they want.  When you get past the rhetoric of "we don't have to do that at Steinway" there really isn't a good reason to not have these features   If it can be done on a piano I buy wholesale for $1.300.00, it should be able to be done on a Steinway & Sons.  The same people who are opposed to this are the same people who told me not that long ago that consumers don't want to buy shiny black pianos.

Let's not get caught with our heads in the sand and instead, let's give people what they want---and more importantly, give them reasons to justify buying a new Steinway rather than a used one.

Kevin Rindlisbacher

RIN023306

# EXHIBIT 14

# EXHIBIT 14

**From:** Kevin Rindlisbacher <kevinr@steinwayspokane.com>
**Sent:** Friday, November 04, 2011 1:25 PM
**To:** Edds, Tommy
**Subject:** FW: Steinway & Sons Price Increase Effective 12/4/2011

Tommy,

An amazingly aggressive push to get dealers to order pianos at the end of the third quarter, a follow up push at the end of October and now a price increase during the year. … ..very interesting…. …

Kevin Rindlisbacher
Steinway Piano Gallery of Spokane
509-32-PIANO (327-4266)
www.steinwayspokane.com

**From:** Sanders, Todd [mailto:tsanders@steinway.com]
**Sent:** Friday, November 04, 2011 12:31 PM
**Cc:** Sanders, Todd; Losby, Ron; Gilroy, Anthony; DiSalvo, John; Signorile, Michael; Conte, Gary; Hoover, James; Snyder, Robert; Edds, Tommy; Cicchetti, Domenic; Onnen, Dan
**Subject:** Steinway & Sons Price Increase Effective 12/4/2011

<u>**CONFIDENTIAL**</u>

**"Steinway & Sons Price Increase Announcement"**
**Effective Date: December 4, 2011**

Dear Valued Steinway Dealer,

As a result of increased costs associated with maintaining – and improving upon – our high standards on Steinway & Sons pianos, we have instituted our annual price increase to help offset these costs  This price increase is effective beginning December 4, 2011 – not December 31st as in years past  **Any in-stock pianos ordered prior to December 4th for immediate shipment will be at current 2011 pricing.**

- **View/download the 2012 Steinway & Sons price list: http://bit.ly/tbeiYX**

**Steinway & Sons Lacquer Finish Pianos** – We continue to invest more time and attention to each Steinway & Sons piano, which has resulted in a dealer-reported landed quality satisfaction rating in excess of 98%  As a result, we are compelled to **increase the prices of Steinway & Sons Lacquer finish pianos by an approximate average of 3%, beginning December 4, 2011.**

**Steinway & Sons Polyester Finish Pianos** – Pricing for polyester finish pianos is also outlined in the price list  Capability to produce "poly" finishes in-house within the NY factory was completed in 2011 and announced at

1

EXHIBIT 38
NAME Rindlisbacher
Meri Coash 7-17-19

RIN021182

this year's Steinway & Sons Dealer Meeting  While the polyester finish is more expensive than our lacquer finish, you should consider that prep time/cost will be significantly less on polyester pianos, helping to offset this difference

**Steinway & Sons "Imagine" Series Limited Edition Pianos** – For the first time since launching the John Lennon Limited Edition series in 2010, we are increasing the cost of these beautiful instruments  Worldwide demand for Imagine pianos continues to be high, and we announced three additional designs at this year's Dealer Meeting  With the "Self Portrait" series sold out, that leaves six total series/designs to choose from  Please view the price list for new pricing that will be in effect beginning December 4th

**Boston and Essex Pianos** – There will be **no increase in the prices of Boston and Essex pianos** at this time  The recent price increase for Boston pianos announced in late August 2011 is still in effect, and 2011 pricing for all Essex models continues into the start of 2012

### Institutional and C&A Pianos

- All selections will be price protected, provided that the selection date is secured prior to December 4, 2011 and the piano is selected and ships prior to January 31, 2012

- There will be **no increase in annual C&A fees** (which will remain at $4,300 per piano)  We hope that you follow the same policy as Steinway retail in charging Steinway Artists for out of pocket costs only

### Consumer Advertising Materials

- Now would be an ideal time to schedule a prospect cultivating event in your showroom (such as a screening of "Note by Note") where you would have the opportunity to personally announce the scheduled factory price increase

- In these times, now more than ever, the enduring investment value of a Steinway piano has greater resonance with your potential purchasers  A Steinway piano is not only a marvelous instrument and a beautiful addition to any home, but a wise investment that will hold its value through the years

- We also strongly recommend a direct mail campaign to  your existing prospect base, your piano owners list, affluent/cultural households, and physician's homes

- For many dealers, the "Price Increase" promotion is among the most effective urgency events on their promotional calendar  Please refer to Book #2 of our "Steinway Promotions" to review the comprehensive "Price Increase" script and to Book #7 which includes the radio spot and transcript

- We have seen enormous recent success from dealerships that have run events following prospecting efforts  In order to provide you with resources and tools to easily run events, we are launching new piano tour opportunities that include full Turn-Key Promotion packages  Your DSM can provide you with details (if they haven't already) and a comprehensive communication on these tours will be going out within a week

We have had a lot of very positive news as we enter the fall selling season  We're expecting more good news – particularly from those dealers that have an active and balanced promotional schedule  Good selling!

Sincerely,

RIN021183

Todd A Sanders
Vice President of Sales and Marketing
Steinway & Sons, Americas

This message (including any attachments) contains confidential information intended for a specific individual and purpose and is protected by law If you are not the intended recipient, you should delete this message Any disclosure copying, or distribution of this message or the taking of any action based on it, is strictly prohibited Steinway & Sons has taken precautions to prevent the spread of viruses However the company accepts no liability for any damage caused by any virus transmitted by this email

RIN021184

# EXHIBIT 15

# EXHIBIT 15

**From:**      Kevin Rindlisbacher <kevinr@steinwayarizona.com>
**Sent:**      Friday, January 09, 2015 10:47 PM
**To:**        Snyder, Robert
**Subject:**   price increase

Bob,
Again, I apologize for the timing of this email.  Frankly, when I received the price increase didn't want to believe that the prices could get any higher so I put my head in the sand and pretended it wasn't going to happen.  I glanced at Steinway & Sons but didn't really pay attention to Boston & Essex particularly given that the dealer survey from several months ago indicated the pianos were over-priced vs. competitive brands in the market.  Now that I am digging into them in detail I am shocked at the price increases in Essex pianos----particularly with the Essex uprights, nearly a 15% increase.  Something is wrong.  I buy a few containers a year for my Utah stores from a Chinese manufacturer and I haven't experienced any price increase at all----and I am paying under $1600 for a 48" polished ebony upright with slow fall.  So I am mystified that Steinway would price the Essex uprights to an almost unsellable price point--$8k for a furniture style piano—especially given the difficult time Steinway has had establishing a brand awareness for Essex.

Here's hoping I am worried about nothing. .. ...
Kevin



EXHIBIT 39
NAME Rindlisbacher
Meri Coash 7-17-19

1

RIN023319

# EXHIBIT 16

# EXHIBIT 16

# LEASE AGREEMENT

## BETWEEN

## EMERALD EQUITIES, L.L.C.,
### an Arizona limited liability company

## AND

## STEINWAY PIANO SHOWROOMS OF ARIZONA, INC.,
### an Arizona corporation

#3458015.2

RIN000808

# LEASE AGREEMENT

In consideration of the rentals, covenants, and conditions hereinafter set forth, Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the following described premises upon the terms and conditions set forth in this Lease ("Lease").

# ARTICLE 1
## SUMMARY OF LEASE PROVISIONS

1.1 **Tenant:** Steinway Piano Showroom of Arizona, Inc., an Arizona corporation

**Trade Name:** Steinway Piano Showroom

1.2 **Date of Lease:** February 7, 2014

1.3 **Landlord:** Emerald Equities, L.L.C., an Arizona limited liability company (ARTICLE 29.7)

1.4 **Premises.** (ARTICLE 2)

(a)    Store 105 (located as shown on the floor plan attached hereto as Exhibit "A") of those certain buildings as shown on the site plan attached hereto as Exhibit "B", and located at 4513-4601 North Scottsdale Road, Scottsdale, Arizona.

(b)    Size:    Approximately 2,185 Rentable Square Feet. (ARTICLE 2.6)

1.5 **Use of Premises.** (a) Primarily, retail sale of pianos and related accessories; and (b) as a related use to Tenant's primary use, Tenant may hold small recitals and small information seminars in the Premises, provided, however, any such recitals and seminars shall be intermittent, shall only be held after 3:00 p.m. Arizona Time, and shall not, under any circumstances be held during the period December 15-31 of any year. Except as otherwise expressly stated herein, the Premises may not be used for any other purpose. (ARTICLE 3)

1.6 **Initial Term:** Seven (7) lease years, commencing on the Commencement Date (as hereinafter defined). (ARTICLE 5)

1.6A **Option Period:** Tenant shall have the option to extend the Initial Term for one (1) five (5) year period (which if applicable, together with the Initial Term, shall be referred to herein as the "Term"). The Base Rent (as hereinafter defined) for the option period shall be as set forth in Section 1.8 below. (RIDER NO. 1, ARTICLE 27)

1.7 **Commencement Date:** The commencement date (the "Commencement Date") shall be March 1, 2014. Provided Tenant is in full compliance with the insurance provisions of this Lease applicable to Tenant, Landlord hereby agrees to grant Tenant access to the Premises prior to the Commencement Date.

1.7A **Rent Commencement Date.** The rent commencement date (the "Rent Commencement Date") shall be the Commencement Date. Notice of Lease (in the form attached as Exhibit G) will be signed and delivered within three (3) business days of the Delivery Date. (Exhibit G).

1.8 **Base Rent.** The amount of monthly Base Rent payable by Tenant for the Term commencing on the Rent Commencement Date set forth in Section 1.7 is pursuant to the schedule set forth herein. (ARTICLE 6):

| Lease Year 1 | $6,372.92 per month (plus NNN) |
| Lease Year 2 | $6,532.24 per month (plus NNN) |
| Lease Year 3 | $6,695.55 per month (plus NNN) |
| Lease Year 4 | $6,862.93 per month (plus NNN) |

1

RIN000813

| Lease Year 5 | $7,034.51 per month (plus NNN) |
| Lease Year 6 | $7,210.37 per month (plus NNN) |
| Lease Year 7 | $7,390.63 per month (plus NNN) |
| Option, Lease Year 8 | $7,575.40 per month (plus NNN) |
| Option, Lease Year 9 | $7,764.78 per month (plus NNN) |
| Option, Lease Year 10 | $7,958.90 per month (plus NNN) |
| Option, Lease Year 11 | $8,157.87 per month (plus NNN) |
| Option, Lease Year 12 | $8,361.82 per month (plus NNN) |

**1.9**    **Tenant's pro rata share of Monthly Direct Costs:**    Tenant's percentage pro rata share of Monthly Direct Costs ("Tenant's pro rata share"), which is determined by pro rata Rentable Square Feet of the Premises as compared to the total Rentable Square Feet of the Buildings, is 5.77%. Tenant's pro rata share of estimated Monthly Direct Costs for calendar year 2012 is estimated to be the approximate sum of $1,351.00 per month ($7.32 per rentable square foot of the Premises), which shall be payable monthly together with Base Rent, and shall be subject to annual adjustments. (ARTICLE 7)

**1.10**    **Percentage Rent:** NONE

**1.11**    **Security Deposit:** $6,372.92

**1.12**    **Addresses for Notices:** (ARTICLE 25)

To Landlord:    c/o Triyar Management of AZ, Inc.
4501 N. Scottsdale Road, Suite 201
Scottsdale, Arizona 85251
Tel. No.: (602) 748-8888
Fax No.: (602) 748-8889
Attn: Shawn Yari

To Tenant:    At the Premises.

or to such other address as may be specified in writing.

**1.13**    **Guarantor:**    Kevin Hal Rindlisbacher, an individual, and Jami L. Rindlisbacher, an individual, jointly and severally. (EXHIBIT C)

**1.14**    **Lease Rider:** Lease Rider No. 1.

**1.15**    **Summary Provisions in General:** Parenthetical references in this Article 1 to other Articles in this Lease are for convenience of reference, and designate some of the other Lease Articles where applicable provisions are set forth. All of the terms and conditions of each such referenced Article shall be construed to be incorporated within and made a part of each of the above-referenced Summary of Lease Provisions. In the event of any conflict between any Summary of Lease Provision as set forth above and the balance of the Lease, the latter shall control.

## ARTICLE 2
### BUILDINGS AND PREMISES

**2.1**    **Delivery of Premises.** Landlord shall deliver possession of the Premises to Tenant upon the later of mutual execution of this Lease and Tenant's compliance with its insurance obligations under this Lease (the "Anticipated Delivery Date"). The Premises shall be delivered by Landlord to Tenant empty and in broom clean condition. Tenant shall have no right to cancel the Lease subsequent to the full execution of this Lease for Landlord's failure to timely tender delivery of possession of the Premises to Tenant excepting only in the event Landlord has

2

RIN000814

RIN000815-RIN000834 OMITTED

**AGREED AND ACCEPTED:**

TENANT:

STEINWAY PIANO SHOWROOM OF
ARIZONA, INC., an Arizona corporation

By: _____
    Name: _Kevin Kindlisboate_
    Title: _Presidens_

LANDLORD:

EMERALD EQUITIES, L.L.C.,
an Arizona limited liability company

By: _____
    Name: _Shane Yari_
    Title: _manager_

23

RIN000835

# EXHIBIT 17

# EXHIBIT 17

| | |
|---|---|
| **From:** | Losby, Ron </O=STEINWAY & SONS/OU=WORKGROUP/CN=RECIPIENTS /CN=RLOSBY03777007> |
| **To:** | 'kevinr@steinwayarizona com', Snyder, Robert |
| **Sent:** | 11/13/2013 4 15 44 PM |
| **Subject:** | Re  Waterfront - Steinway Piano  LOD of suite 145 |

Kevin

Sorry to hear this  Rather surprising that they would want a clothing store over Steinway, but surmise they feel that would fit with the Nordstrom buyer better

I am sure something better may come along  The other space, though, was highly visible

Best

Ron

---

**From**  Kevin Rindlisbacher [mailto kevinr@steinwayarizona com]
**Sent**  Wednesday, November 13, 2013 05 33 PM Eastern Standard Time
**To**  Snyder, Robert, Losby, Ron
**Subject**  FW  Waterfront - Steinway Piano  LOD of suite 145

Bob & Ron,
I thought you may be interested in the response I received below from the agent for the space across the street from Nordstroms  You can read the entire thread if you are bored but the essence is that they don't want to rent to us----they want a clothing store there  I was quite surprised  It is owned by a bank out of Seattle and they have been quoted in newspaper articles that they are well capitalized and aren't compelled to do any rental deals
Kevin

---

**From:** Golden St John [mailto golden@corntore com]
**Sent:** Wednesday, November 06, 2013 10 38 AM
**To:** Kevin Rindlisbacher
**Subject:** Re  Waterfront - Steinway Piano  LOD of suite 145

Kevin-

I think in the future there may be a chance of doing something either in the 1,555sf space or perhaps a portion of the existing Urban Outfitters space, but right now the Landlord would prefer to wait until after Urban moves to the corner to see if that helps with putting more soft goods retailers around them as that is their preference  If after a few months we haven't been able to do anything I think they would then take another look at a more destination driven showroom use like yours  I realize that doesn't fit with your existing lease expiration and might not work though

If anything changes I will let you know  Best of luck

**Golden St. John**
*Associate Broker*
The Corntore Company
15044 N  Scottsdale Rd #240|Scottsdale, AZ 85254
O 480 947 7200 | F 480 947 4422 | C 602-692-7615
golden@corntore com | www corntore com

EXHIBIT  **31**
NAME *Rindlisbache*
Meri Coash *7-17-19*

On Nov 5, 2013, at 1 15 PM, Kevin Rindlisbacher <kevinr@steinwayarizona com> wrote

Golden,

Thank you for the reply. No, we are not interested in the larger space next to Primp & Blow. The proximity to Nordstrom's and the visibility from the parking garage is important to us. If we are going to be in the Waterfront, we definitely want to be on the northern side of the development.

While the 1555 sq. feet is a little small, I believe it can still work even with a restroom. I have a phone call into the Scottsdale City building code department to confirm the minimum bathroom size required. My guess is that given the size of the overall space, a 6'x 7' bathroom space will acceptable. This impacts the space by less than 50 square feet.

We are interested in discussing the space further but obviously the ball is in the Landlord's court. I don't want to read more into your email than you intended but if the landlord is not interested in having us in this space (or perhaps carving out some space in the current Urban Outfitter's location) then we will need to look elsewhere.

Best,
Kevin Rindlisbacher
Steinway Piano Showroom of Arizona

--------------------------------------------------------------------------------

**From:** Golden St John [mailto:golden@corritore.com]
**Sent:** Tuesday, November 05, 2013 11:29 AM
**To:** Kevin Rindlisbacher
**Subject:** Re: Waterfront - Steinway Piano LOD of suite 145

Hello Kevin-

First, regarding the bathroom, based on initial inquiries it looks like a restroom would be required (and it would need to be in the main space due to ADA requirements, etc.) As a result it looks like that space may end up too small to work after all.

In addition though, I had a long chat with the Landlord, and while they like your use, they feel it makes much more sense in the 2,565sf space next to Primp & Blow. Their concern is that with the relocation of Urban Outfitters they really would prefer to put traditional soft goods retail in that 1,555sf space.

So, due to the bathroom/size issue and the LL's desire to have you take a look at the larger space, is that something you would be interested in?

Regards,

Golden St. John
*Associate Broker*
The Corritore Company
15044 N. Scottsdale Rd #240 Scottsdale, AZ 85254
O 480 947 7200 | F 480 947.4422 | C 602-692-7615
golden@corritore.com | www.corritore.com

On Nov 1, 2013, at 11:01 AM, Kevin Rindlisbacher <kevinr@steinwayarizona.com> wrote:

Golden,

A little information about me and my company. I have a degree in Business Finance from the University of Utah. I have been in the musical instrument retail business since 1983. I operate three retail locations in the Salt Lake area---two for which I am a tenant, one, a 12,500 square foot building located on I-15 in Sandy, Utah, I own. In 2005 I was presented with an opportunity to become a Steinway piano dealer in Spokane, Washington. There are less than 60 independent Steinway dealerships in the United States. I built a 9,000 square foot building in Spokane. In December, 2010, Steinway offered me the Phoenix market after their current dealer closed. I opened in north Scottsdale in December, 2010. While I still own and operate the locations in Salt Lake and Spokane, my family and I live in Scottsdale.

My current lease expires the end of January, 2014  My current shopping center on the corner of Thunderbird & Scottsdale Road has been through bankruptcy during my 3 year lease  The new owners have a restaurant going into our current space which has prompted us to look at alternative locations  I have been doing this business for a long time and pay my bills on time

Steinway is the premier piano company in the world  Steinway is the standard by which all others are judged and has become a highly regarded luxury brand  Our motivation for your center is getting our pianos in front of an affluent clientele  I believe your center is a good fit  In 1500 square feet, the selection will not be overwhelming in quantity, but it will be very impressive in quality  The price ranges of our pianos will be from $5,000 to $160,000, with the average price being in the $60-70k range  Many of our instruments will have player systems installed so a non-piano player can have a Steinway experience in their home  Steinway & Sons originated in 1853  It had been a publicly traded company for a couple of decades until a few months ago when it was purchased by Jon Paulson and became privately held  The acquisition received a tremendous amount of publicity and was front cover story for all the major newspapers  While Steinway New York will not be a party to the lease, they have visited the site and have given their approval

I am open to a 3 year lease but would prefer a 5 year lease with a 5 year option  The entity that would enter into the lease agreement is Steinway Piano Showroom of Arizona, Inc  It is a C-corp of which I am the sole shareholder  The corporation was formed in the fall of 2010 just prior to our entering the Phoenix market  I would also personally guarantee the lease

I would appreciate it if you could get some answers about the requirement for a bathroom  I assume that the owner(s) of the building, when they carved out the 1500 square feet, would have realized that the city may require a restroom in the space  I do not have a contractor at this time  I assume the center interacts with the city planning department and getting an answer would be a matter of a couple of phone calls or perhaps a site plan visit with a planning department person  Knowing if a restroom is required and its attending size, is pretty critical given the small amount of footage to work with  Let me know what you find out.

Best,
Kevin Rindlisbacher
Steinway Piano Showroom of Arizona

---

**From:** Golden St John [mailto:golden@corritore.com]
**Sent:** Wednesday, October 30, 2013 1 49 PM
**To:** Kevin Rindlisbacher
**Subject:** Re  Waterfront - Steinway Piano  LOD of suite 145

Hello Kevin-

I will discuss further with the Landlord and work on putting together an LOI  In the meantime though, to assist in the process can you please provide me with some additional information as it relates to your company and this deal?  I'm not sure how the company is set up, but will this deal be under a newly formed LLC or is there a pre-existing corporate entity that will sign and or be responsible for this lease (if so how many locations, etc )?

The amount of TI they are willing to provide will be directly related to A) length of term, and B) financials behind the deal

As it relates to the restroom, it doesn't look like it would be possible to put an ADA restroom in the corridor area behind the space (per our Chief Building Engineer)  I don't have any connections with the city though, so finding out what is required based on size and use is probably best done by your contractor

Regards,

**Golden St John**
*Associate Broker*
The Corritore Company

15044 N  Scottsdale Rd #240 Scottsdale, AZ 85254
O 480 947 7200 | F 480 947 4422  C 602-692-7615
golden@corritore com | www corritore com

On Oct 30, 2013, at 11 27 AM, Kevin Rindlisbacher <kevinr@steinwayarizona.com> wrote

Golden,
Thank you for this information   I am interested in the space   Will you please prepare a Letter of Intent that outlines the
basic terms of a potential lease?  Also, please check with the city to determine if a restroom is required and its size
given the lease space   Speaking of restrooms, is there any way to fit it under the escalators?  I don't know if that is dead
space or if it would be structurally impossible      just a thought

Kevin Rindlisbacher
Steinway Piano Showroom of Arizona

---

**From:** Golden St John [mailto golden@corritore com]
**Sent:** Wednesday, October 30  2013 11 21 AM
**To:** Kevin Rindlisbacher
**Subject:** Waterfront - LOD of suite 145

Kevin-

Attached is the LOD I just received for the space we looked at yesterday at the Waterfront, along with a copy
of the sign criteria package

**Golden St. John**
*Associate Broker*
The Corritore Company
15044 N  Scottsdale Rd #240|Scottsdale, AZ 85254
O 480 947 7200 | F 480 947 4422 | C 602-692-7615
golden@corritore com | www.corritore.com

STEINWAY00000059

# EXHIBIT 18

# EXHIBIT 18

| | |
|---|---|
| **From:** | Snyder, Robert <rsnyder@steinway.com> |
| **Sent:** | Thursday, January 30, 2014 10:16 AM |
| **To:** | Kevin Rindlisbacher |
| **Subject:** | RE: following up on our phone conversation |

Thank you Kevin - - I appreciate it

When we do this again - - (and it'll be awhile!) - - I'd like to talk with you about this more along the terms of establishing a "budget" or "monthly sales target", rather than a prediction

For instance – if you had "3" as a target for May - - we'd need to make sure we had X number of new prospects who had been identified and cultivated to the point where, based on closing ratios and promotional plans, you literally planned for those 3 sales

In any event – we'll save that for another day - -

One more question   What promotion date would be the first one where my presence could be helpful to you?  Please let me know, and I'll try to be there

Thank you again, and also I hope that you have the info you need about the inventory    none is coming from CA

Best,

Bob S

---------------------------------
Robert J  Snyder
Senior District Manager
Steinway & Sons
Phone  503-835-8042
Fax  718-267-3498
rsnyder@steinway com

**From:** Kevin Rindlisbacher [mailto:kevinr@steinwayarizona.com]
**Sent:** Thursday, January 30, 2014 5:27 AM
**To:** Snyder, Robert
**Subject:** RE: following up on our phone conversation

Bob
January: 0 (we haven't sold one)
February: 8 (store closing sale)
March: 2 (follow up from store closing sale)
April: 2 (Opera Sale)
May: 2 (Tempe Center for the Arts Sale)
June: 1
July: 1
August: 1

1


EXHIBIT _118_
NAME _Rindlisbacher_
Meri Coash _7-17-19_

RIN014835

September: 2
October: 2
November: 2 (warehouse sale)
December: 3

While on paper this appears very obtainable to me, this market hasn't sold this number of Steinway & Son's units in a very long time---at least 8 years   So while I think it is a reasonable goal, the reality is it is going to be difficult to obtain.  Rest assured I will give it my best effort.
Kevin


**From:** Snyder, Robert [mailto:rsnyder@steinway.com]
**Sent:** Monday, January 27, 2014 5:00 PM
**To:** Steinway Piano Showroom of Arizona (kevinr@steinwayarizona.com)
**Subject:** following up on our phone conversation

Hello again Kevin –
Thanks for taking the time to chat today - -

If you would, please send me back your "Steinway grand pianos – sales budget by month" - - as discussed

If you started with 2 per month, then modified the months as appropriate (maybe one or two extra in the stronger months, one or two fewer in the weaker months, an extra two or three during a major promotional month, etc) I believe it will come together very quickly

Thanks for getting that to me as quickly as possible - - I appreciate it,

Bob S

--------------------------------
Robert J  Snyder
Senior District Manager
Steinway & Sons
Phone  503-835-8042
Fax  718-267-3498
rsnyder@steinway.com

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law  If you are not the intended recipient  you should delete this message  Any disclosure, copying  or distribution of this message, or the taking of any action based on it, is strictly prohibited  Steinway & Sons has taken precautions to prevent the spread of viruses  However the company accepts no liability for any damage caused by any virus transmitted by this email

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law  If you are not the intended recipient, you should delete this message  Any disclosure, copying  or distribution of this message, or the taking of any action based on it, is strictly prohibited  Steinway & Sons has taken precautions to prevent the spread of viruses  However the company accepts no liability for any damage caused by any virus transmitted by this email

RIN014836