**MORRILL LAW. P.L.C.**
Attorneys at Law
8857 N. 63rd Place
Paradise Valley, Arizona 85253
Telephone (602) 432-6291
Fax (480) 584-3157
K. Layne Morrill #004591
klaynemorrill@gmail.com
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kevin H. Rindlisbacher *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>Steinway, Inc.,<br><br>    Defendant. | Case No: 2:18-cv-01131-MTL<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO PRECLUDE EXPERT OPINIONS OF DAVID R. PERRY**<br><br>**(ORAL ARGUMENT REQUESTED)** |

**I. Introduction.**

Steinway filed on 4/20/20 its Motion to Preclude Expert Opinions of David R. Perry [Doc. 223 (the "Motion," cited as "M.")]. The Motion minimizes the breadth of Steinway's deception, inaccurately describes Mr. Perry's opinions, ignores evidence cited in Mr. Perry's report for each factor in his formula, cites language from cases that does not apply to Mr. Perry's opinions, and claims the *Daubert* standards are not met when clearly they are. Mr. Perry has the relevant expertise. His calculation formula is grounded in sound accounting and economic principles. His opinions fit the facts, will assist the jury in understanding the evidence and determining damages, and have no potential to create unfair prejudice. The Motion should be denied.

**II. Fair Summary of Plaintiffs' Claims.**

Steinway's statement of Plaintiffs' claims [M., at 2:21 to 4:5] fails to cover the full

range of Steinway's deception. Steinway held confidential relations toward Plaintiffs. [PMSJ-CF (Doc. 199); Reply-CF (Doc. 215); PRESP-L (Doc. 217).] Under this Court's prior Order, constructive fraud is essentially the abuse of that confidential relation. [Doc. 74, at 9:3 to 10:16.] Plaintiffs have shown the range of Steinway's constructive fraud and fraudulent omissions. [PSOF-CF (Doc. 198) ¶¶ 32-51; PRESP-L (Doc. 217), at 2:15 to 6:19.] The three Phoenix Market Undisclosed Facts rendered misleading Mr. Snyder's two Phoenix Market Statements; the three Hollywood Store Undisclosed Facts rendered misleading Mr. Snyder's two Hollywood Store Statements; and the three Sherman Clay Undisclosed Facts rendered his Sherman Clay Statement misleading. Contrary to Steinway's assertion [M., at 3:25 to 4:4], Plaintiffs' claims do not consist merely of Steinway's failure to disclose historical sales into the Maricopa County market.

Because Steinway held confidential relations to Plaintiffs, "it was under a duty to make a ***full*** and ***truthful*** disclosure of ***all material facts***" and to "disclose ***fairly*** and ***honestly*** to [Plaintiffs] ***all the facts*** which might be ***presumed to influence [them]*** in regard to [their] actions." *Stewart v. Phoenix Nat'l Bank*, 64 P.2d 101, 106 (Ariz. 1937) (emphasis added). Mr. Snyder made statements to Plaintiffs leading up to 12/1/10; and Steinway knew material facts that made them misleading. By not disclosing those material facts Steinway failed to make a "full" disclosure and to disclose "fairly and honestly." That failure is also a fraudulent omission. *Restatement (Second) of Torts* § 529 Cmt *a*. ("A statement containing a half-truth may be as misleading as a statement wholly false.")

### III. Fair Summary of Mr. Perry's Opinions.

Steinway's purported summary of Mr. Perry's opinions [M., at 4:18 to 6:3] bears scant resemblance to the thorough analysis of available evidence contained in his initial expert report [Doc. 223-1, Ex. 2, (the "Report")] and his rebuttal report. [Doc. 223-1, Ex. 4.] Mr. Perry used a formula based on sound accounting and economic principles commonly used in damages calculations. Every formula factor is cited to record evidence or sources of business/economic information from his research.

### A. *Lost-Profits Damages.*

Mr. Perry begins by observing expectation damages are "the difference between the amount which the plaintiff reasonably expected to receive and the actual amount received; also known as benefit-of-the-bargain (BOB) damages." [Report § 3.)] This is Mr. Perry's formula: (EUS – AUS) x ASP x IPP = LP, where EUS is expected unit sales; AUS is actual unit sales; ASP is average sale prices; IPP is incremental profit percentage; and LP is lost profits. That formula is based on fundamental accounting and economic principles governing the relationships between unit sales, revenues, expenses, and profits.[1] Mr. Perry then finds the value for each factor from record evidence or reliable sources of business/economic information. Mr. Perry includes two scenarios one using pre-2011 evidence and the other also considering post-2010 evidence. [*Id*. §§ 3.1 - 3.4]

The formula's first factor is expected unit sales. Mr. Perry identifies three pieces of evidence. [*Id*. § 3.1.1] First, Steinway's "annual sales performance goals reasonable for the territory" that it inserted in the 2010 Maricopa County dealer agreement. Second, Mr. Snyder's statements in September 2010 that: (i) the Phoenix market is capable of selling 70 Steinway Grands per year and (ii) under the economic conditions then prevailing, 45 Steinway Grands per year is a reasonable sales expectation for the Phoenix market. Third, Plaintiffs' Spokane store sales for 2007-10 that had met or exceeded Steinway's "annual sales performance goals reasonable for [that] territory."

The formula's second factor is actual unit sales, which Mr. Perry determined from Plaintiffs' Maricopa County sales records from 2011 to 2017. [*Id*. § 3.2.4.] Mr. Perry subtracted Plaintiffs' actual unit sales from the expected unit sales to arrive at the unit sales shortfall used to calculate lost profits.[2]

The formula's third factor is average sale prices. In Scenario 1, Mr. Perry obtained

---

[1] Expenses are accounted for in the IPP which is 100% of revenues minus the percentage that cost of goods sold bears to revenues and minus the percentage that variable operating expenses bear to revenues.

[2] The subtraction of actual unit sales from expected unit sales gives Steinway credit for the actual sales and profits made by Plaintiffs in Maricopa County from 2011 to 2017. Therefore, Steinway's lament about Plaintiffs' actual profits is groundless. [M., at 10:1-3.]

sales prices from Steinway's 2010 retail price lists. [*Id*. 3.1.3.] In determining average sale prices Mr. Perry used the lowest price edition and finish for each model, excluded the most expensive model, and did not include revenues from add-on player units. Based upon Steinway's history of annual price increases, Mr. Perry concluded average sales prices would have grown each year. To determine the appropriate growth rate Mr. Perry used evidence available in 2010. First, Steinway's actual price increases in 2009 over 2008, ranging from 3.3% to 18.4%. Second, the actual 2.7% general inflation rate from late 2008 to late 2009. Third, the musical instrument and accessories inflation rate for the same period of 1.3%. Fourth, a survey by the Federal Reserve Bank of Philadelphia in 2010 stating general inflationary growth was expected to average 2.2% between 2010 and 2019. [*Id*., § 3.1.4.] In scenario 1 Mr. Perry uses 2.2% annually to grow average sale prices even though Steinway price increases had been significantly higher.

The formula's fourth factor is incremental profit percentage ("IPP"). [*Id*. § 3.1.2.] In scenario 1, Mr. Perry examined evidence existing in late 2010. First, the income statements of Plaintiffs' Spokane Steinway store for 2007-10 reflected varying gross profit margins, net profit margins, and operating expenses for each year. Using those margins and operating expenses, and erring on the side of higher variable costs, Mr. Perry determined a 25.3% IPP. Second, he reviewed Steinway's wholesale and suggested retail prices for 2010. [*Id*. § 3.1.3] They showed gross margins, depending on brand, model, and type, that were substantially higher than the overall 43% gross margin Plaintiffs achieved in Spokane. Mr. Perry did not use Steinway's higher gross margins; noting only they confirmed the 25.3% IPP achieved in Spokane was reasonable and not excessive.

Using the fact-tied unit sales shortfall, average selling prices, and IPP, Mr. Perry calculated lost profits in scenario 1 of $7,525,199. [*Id*. § 3.3.1.] In scenario 2, Mr. Perry used the same formula but incorporated evidence from 2011 to 2017 on: (a) Steinway's actual average sales prices; and (b) Plaintiffs' actual revenues, expenses, and profit margins in Maricopa County. With the additional evidence Mr. Perry calculated scenario 2 lost profits damages of $8,623,288. [*Id*. § 3.3.2.] The main drivers of the increase are:

(a) Steinway increased its retail prices by more than the 2.2% per year used in scenario 1; and (b) Plaintiffs actually achieved in Maricopa County an overall IPP of 26.9%, higher than the 25.3% achieved in Spokane used in scenario 1. [*Id*. §§ 3.2.2, 3.2.3.]

When the evidence allowed a range of possibilities Mr. Perry chose conservatively. [*Id*. 3.3.] For example, his expected unit sales never exceed the 45 Steinway Grands Mr. Snyder told Plaintiffs they could reasonably expect in economic conditions of 2010, even though: (a) economic conditions improved from 2011 to 2017 and (b) Mr. Snyder had told Plaintiffs the Maricopa County market is capable of selling 70 Steinway Grands per year. Likewise, Mr. Perry calculated average sale prices using the lowest price edition and finish for each model, excluding the most expensive Steinway grand, and ignoring incremental lost revenue for player units likely to be sold with the shortfall units.

### B.   *Out-of-Pocket/Consequential Damages.*

Mr. Perry's analysis of out-of-pocket/consequential damages is also tied to facts in the record. [*Id*. § 4.] In 2014 Steinway disapproved Plaintiffs' new location; and then instructed Plaintiffs to find a 2,100 square foot store in an upscale shopping area which it would approve. Plaintiffs found a location meeting those criteria and Steinway approved it. As the new lease ran for several years beyond the Steinway's July 2017 termination date and the landlord refused to terminate the lease, Plaintiffs had to continue operations to mitigate the damages they would have suffered from closing the store. Plaintiffs were unable to return to profitable operations until they became Yamaha's Maricopa County dealer in May 2018. From 8/1/17 to 4/30/18, Plaintiffs suffered losses of $252,409 as shown by monthly profit and loss statements. Mr. Perry notes these damages do not duplicate the lost profits damages because they cover different periods of time.

### IV.   Mr. Perry's Expert Opinions Satisfy *Daubert*.

The *Daubert* gate-keeper factors of expertise, reliability, relevance and fit, and Rule 403 considerations are all satisfied in this case.

### A. *Expertise.*

Rule 702 requires an expert be qualified by "knowledge, skill, experience, training,

or education." Mr. Perry is a U.K. Chartered Accountant and a U.S. Certified Public Accountant. He has decades of experience in accounting and in determining damages for companies in many industries and businesses. [Report, Appendix A.] Steinway has no basis for attacking Mr. Perry's "knowledge, skill, experience, training or education" in the discipline of forensic accounting to determine economic damages.

Accounting and economic principles are the universal language of business. That body of fundamental principles is employed by accountants throughout the U.S. serving the myriad enterprises of the American economy. When determining profits and losses the Standard Industrial Code of a business is not important. That Mr. Perry has never **_operated_** a retail piano business or a piano manufacturing business [M., at 4:10-13] does not mean he lacks expertise to determine the lost profits of a retail Steinway dealer.[3]

### B. Reliability.

Mr. Perry's "expert findings are based on sound methodology" and have a "reliable basis in the knowledge and experience of the relevant discipline." *Daubert v. Merrell Dow Pharmaceuticals*, 409 U.S. 579, 592 (1993); *Kimbo Tire v. Carmichael*, 526 U.S. 137, 149 (1999). His damages formula is based on sound accounting and economic principles commonly used for such purposes. The data used in his formula is grounded In record evidence and reliable sources of business/economic information. See Part III.

The Motion does not identify any respect in which Mr. Perry's damages formula departs from or misapplies any relevant accounting or economic principle. Neither does Mr. Schwickerath's report [Doc. 221-2] nor his deposition testimony [Doc. 221-3].

### C. Relevance and Fit.

Mr. Perry's expert testimony is relevant if it assists the trier of fact in

---

[3]Steinway's expert also lacks experience in the retail piano or piano manufacturing businesses [Doc. 221-3, Schwickerath Depo., at 11:4-22.], but is still qualified to determine lost profits. Lack of that experience does, however, preclude him to opine whether Plaintiffs' sales performance in Maricopa County was par, above par, or below for all dealers; or whether Steinway's performance evaluations of Plaintiffs' on eight dealer-evaluation factors was par, above par, or below par for all dealers. See Plaintiffs' Motion to Exclude Certain Opinions of Mr. Schwickerath. [Doc. 221, at 4:22 to 12:23.]

6

understanding evidence or in determining a fact in issue. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591. His testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* It assists the jury by providing "information beyond the common knowledge of the trier of fact." *Id.*; *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).

Plaintiffs will present their evidence of Steinway's fraud and will testify they were harmed by it. If the jury concurs, Plaintiffs will recover lost profits damages and non-duplicative out-of-pocket/consequential damages. Damages is a constructive fraud and fraudulent omissions element, so expert testimony on damages is relevant under Rules 401-402. The quantification of the damages requires "knowledge beyond the trier of fact's common knowledge." The testimony of an accounting expert on the amount of damages is therefore helpful to the jury, and admissible under Rule 702.

Review of Part III's summary of Mr. Perry's report shows every factor in the damages formula is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." The Motion identifies no formula factor that is not based on evidence in the record or reliable sources of business/economic information. Neither does Mr. Schwickerath's report [Doc. 221-2] nor his deposition testimony [Doc. 221-3].

**D.    Rule 403 Considerations.**

Steinway cites Rule 403 [M., at 5:18, 6:12, 14:24] but articulates no Rule 403 basis for excluding Mr. Perry's testimony. Rule 403 states relevant evidence may be excluded if the "danger of unfair prejudice, confusion of issues, or misleading the jury," substantially outweighs its probative value. *Daubert*, 509 U.S. at 595.

"Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*. . . . The unfairness contemplated involves some adverse effect beyond tending to prove a fact or issue that justifies admission." *Costantino v. D.M. Herzog, M.D., P.C.*, 203 F.3d 164, 174-75 (2d Cir. 2000).

Mr. Perry's calculations of $7.8 to $8.9 million may be prejudicial to Steinway; but not "unfairly" so, because they prove Plaintiffs' damages amount.

### E. Daubert Factors Conclusion.

Mr. Perry has academic training, credentials, and decades of experience determining economic damages. His calculation formula is grounded in the sound accounting and economic principles commonly used for such purposes. He populates each formula factor from record evidence. His calculations will assist the jury, not skilled in the determination of economic damages, to understand the evidence and quantify Plaintiffs' damages. Nothing in Mr. Perry's calculations will unfairly prejudice Steinway.

### V.     Steinway's Misleading Use of *Daubert* Cases.

This case involves a relatively straightforward damages calculation. A single store in a one-county market. An established business with a narrow product line all supplied by the same defendant. Steinway cites 18 cases. [M., 6:4 to 14:19.] None of them – not one – involves a similar, relatively straightforward calculation of lost profits damages.

Rather, Steinway quotes rhetorical flourishes and implies (contrary to fact) that the finely turned phrases were inspired by facts similar to Mr. Perry's damages analysis. Steinway's cases all involve egregious reasons for exclusion that have no counterpart in Mr. Perry's analysis. Steinway's discussion is a dazzling "array of [words] conveying a delusive impression of exactness" that does not exist. [M., at 6:19-20; 17:16-24.] A brief review shows Mr. Perry's expert analysis involves none of the *Daubert* defects driving the courts to make the statements Steinway speciously quotes.

Several of Steinway's cases involved the intricate determination of antitrust damages across massive markets over long periods where expert testimony on causation is required. Where the economist "fails to segregate the losses, if any, caused by acts which were not antitrust violations from those that were," exclusion of opinions is appropriate.[4] Where the economist's market model "ignored inconvenient evidence" and did not incorporate "all economic aspects of the market he was modeling," exclusion is proper.[5] Where the economist used a number to represent the outstanding "non-shoe clicker

---

[4] *City of Vernon v. Southern California Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992).
[5] *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054-58 (8th Cir. 2000).

machines" that had no basis in fact and made no effort to separate the impact of the legal and illegal activities, exclusion was fitting.[6] Where the economist had no evidence to support his assumption that but for Western Union's illegal conduct "Olympia would have bought from Teletype Corporation and leased to Western Union's telex subscribers 10,000 more terminals" in a three-year period, exclusion was necessary.[7]

A few of Steinway's cases involve damages determinations covering multiple foreign and US markets. Where an economist fails to trace forward the manufacturer's foreign sales invoices to determine how many of its foreign-sold electric motors in fact entered the US as a component of an imported product, relying instead on published estimates, exclusion was mandatory.[8] Where sales in question were for specific product lines, but the expert used total gross sales; and drew market data from a different time period than that involved in the damages calculation, exclusion was appropriate.[9] Where the economist determined Baltic women's demand for pantyhose based on a survey of American women and calculated prospective earnings loss over 20 year periods when experience showed a 20-year customer relationship was rare, exclusion was required.[10]

Two of Steinway's cases involve market modeling for "fraud on the market" securities cases. When such a model was "totally lacking in a critical validation element" customarily found in such models, exclusion was appropriate.[11] And exclusion was necessary where the expert's methodology was "fatally flawed" because he "predetermines the result of his analysis" by making certain assumptions not supported in the record and made "no attempt to account for other possible causes" of post-corrective-disclosure share price declines besides "company-specific information" – such as industry specific news, market specific news, or other measurable macroeconomic variables.[12]

---

[6] *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 911-13 (2nd Cir. 1962).
[7] *Olympia Equip. Lsg. Co. v. Western Union Tel. Co.*, 797 F.2d 370, 381-83 (7th Cir. 1986).
[8] *Johnson Elec. N. A., Inc. v. Mabuchi Mtr. Am. Corp.*, 103 F.Supp.2d 268, 286 (S.D.N.Y 2000).
[9] *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 806-07 (9th Cir. 1988).
[10] *Lithuanian Comm. Corp. Ltd. v. Sara Lee Hos.*, 179 F.R.D. 450, 458-62 (D.N.J. 1998).
[11] *Kay v. First Continental Trading, Inc.*, 976 F.Supp. 772, 775-77 (N.D.Ill. 1997).
[12] *In re REMEC Inc. Securities Litigation*, 702 F.Supp.2d 1202, 1272 (S.D. Calif. 2010).

Some of Steinway's cases involved record evidence that undercut the theory of damages; or lack of record evidence on a factor in the damages formula. Where a contractor claimed delay damages due to the unavailability of a particular land parcel as a source of sand for the job, but there were always stockpiles of usable sand at other land parcels the contractor controlled, exclusion was appropriate.[13] In cases of "alternative investment" damage theories where there was no contemporaneous evidence that a specific alternative investment was under consideration, exclusion was necessary.[14]

Two cases involved total qualification failures. Where an expert failed to sign his report, refused to submit his resume, had never previously been asked to determine damages in a trademark case, and had never done a financial evaluation of a savings bank, exclusion was required.[15] Where a plaintiff claimed his accountant had valued its business, but the expert lacked qualification as a business appraiser and performed only mathematical calculations not amounting to an appraisal, exclusion was obligatory.[16]

Two cases involved scientific opinions on whether exposure to certain chemicals caused cancer, where expert testimony on causation is required. Where an expert's causal link of PCB's to the plaintiffs' injuries was based on published studies whose subjects were exposed to numerous potential carcinogens besides PCB's, exclusion was required.[17]

Mr. Perry's damages opinions have none of the *Daubert* defects present in Steinway's cases. His damages formula is firmly founded in sound accounting and economic principles commonly used for such purposes. Every formula factor is supported by citations to record evidence or reliable sources of business/economic information. And Steinway's own damages expert did not even suggest Mr. Perry used an inappropriate methodology, included inaccurate calculations, or relied on inappropriate data.

---

[13] *Tyger Const. Co., Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142-45 (4th Cir. 1994).
[14] *Resolution Trust Corporation v. Stroock & Stroock & Lavan*, 853 F.Supp. 1422, 1424-29 (S.D. Fla. 1994); *Weiner v. Ash*, 756 P.2d 329, 332 (Ariz. Ct. App. 1988); *Schuldes v. National Surety Corp.*, 557 P.2d 543, 547-49 (Ariz. Ct. App. 1976).
[15] *First Savings Bank, F.S.B v. U.S. Bancorp*, 117 F.Supp.2d 1078, 1083 (D.Kan. 2000).
[16] *Sun Ins. Mktg Netw. v. AIG Life Ins. Co.*, 254 F.Supp.2d 1239, 1244-45 (M.D. Fla. 2003).
[17] *General Elec. Co. v. Joiner*, 522 U.S. 136, 143-47 (1997); *Clear v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

### VI. Steinway's Non-*Daubert* Issues.

Steinway raises issues that are distinct from the gatekeeper functions under Rule 702 and *Daubert*. Steinway previously made these arguments [Doc. 207, at 5:10 to 7:16] and Plaintiffs responded. [Doc. 220, at 8:8 to 11:21.]

### A. Arizona Allows Lost Profits and Out-of-Pocket/Consequential Damages.

Steinway says damages "must be the direct and proximate result of the wrong alleged," citing *Schuldes v. National Sur. Corp.*, 557 P.2d 543, 548-49 (Ariz. Ct. App. 1976) [M., at 8:21-25.] While that is true, a fraud victim is entitled to "the full amount of money that will reasonably and fairly compensate [plaintiff] for damages proved by the evidence to have resulted from [defendant's] . . . . [fraud.]" RAJI (Civil) PIDI 1 (5th ed). The fraudulent-misrepresentation measure of damages also applies to constructive fraud. *Gonzalez v. Gonzalez,* 887 P.2d 562, 565-66 (App.1994).

The primary rule of general damages for fraud is "the difference between the value of what he has received in the transaction and the benefit the plaintiff would have realized had the defendant's misrepresentations been true." *Cole v. Gerhart*, 423 P.2d 100, 102-03 (Ariz. Ct. App. 1967). This rule "has been adopted to provide for fuller recompense to persons defrauded, not to limit damages proximately sustained as a result of fraudulent conduct." *Id.* Lost profits can be awarded in a business fraud case. *Short v. Riley*, 724 P.2d 1252, 1254-55 (App. 1986); *Rhue v. Dawson*, 841 P.2d 215, 224-25 (App. 1992). Once a plaintiff shows the fact of damage, proving the amount with mathematical certainty is not necessary; only providing a rational basis to estimate the loss. *Id.*[18]

The secondary rule of fraud damages is a plaintiff can also recover "out of pocket losses" including "consequential damages that may arise from the fraudulent conduct . . . as long as there is no 'double recovery' . . . ." *Cole v. Gerhart, supra*, 423 P.2d, at 102-03; *Ashley v. Kramer*, 442 P.2d 564, 567-68 (1968); *Restatement (Second) of Torts* § 549 Cmt

---

[18]Steinway cites RAJI for Fiduciary Duty [M., at 8:26 to 9:5] even though Steinway insists it is not a fiduciary [*E.g.*, Doc. 206 ¶ 33]; and Plaintiffs never asserted it is. Plaintiffs are prosecuting fraud claims not breach of fiduciary duty claims.

*d* and Illusts. 1-3 (consequential damages "are recoverable if the misrepresentation is a legal cause of them" – that is, the consequential damages "must be of a kind that might reasonably be expected to result from reliance on the misrepresentation.")

The lost-profits (benefit-of-the bargain) damages Mr. Perry calculates are recoverable under Arizona's primary rule of fraud damages. And his out-of-pocket/consequential damages are recoverable under the secondary rule.

### B. Plaintiffs Have Shown Loss Causation and Legal Cause.

Steinway asserts Mr. Perry "ignores the critical component – causation – which cannot be proven based on Rindlisbacher's testimony." [M., at 4:1-3.] He did not ignore the legal standards of loss causation and legal cause; he assumed them. Expert testimony on causation or legal cause is not required here. *Cf. Salica v. Tucson Heart Hosp.—Carondelet, LLC*, 231 P.3d 946, ¶ 16, 951 (Ariz. Ct. App. 2010) (expert medical testimony on causation is normally required in medical malpractice cases). Nor does Mr. Rindlisbacher's testimony mean loss causation or legal cause "cannot be proven."

Loss causation exists where a plaintiff shows defendant's statements were "a substantial factor" in bringing about the loss. *Thompson v. Better-Bilt Aluminum Products Co., Inc*, 832 P.2d 203, 207-08 (Ariz. 1992); *Restatement (Second) of Torts* § 546 & Cmt *b* (loss causation exists if plaintiff's reliance is a "substantial factor" in causing the loss; plaintiff need not show "that he would not have acted or refrained from acting as he did unless he had relied on the misrepresentation. It is enough that the representation played a substantial part, and so has been a substantial factor in influencing his decision."). The issue of legal cause is also addressed using the "substantial factor" analysis. *Thompson*, 832 P.2d at 207; *Restatement (Second) of Torts* § 431(a) ("legal cause" shown when defendant's conduct is a "substantial factor in bringing about the harm.")

Mr. Rindlisbacher's testimony as of the date of his deposition is: "I was never given that opportunity, so I –I don't know how I would – what I would have done." [Doc. 223-1, Ex. 1, at 250:17-22.] Steinway deleted that language from its "quotation." His testimony in the summary judgment record is:

> When I signed the Phoenix Dealer Agreement, signed the store lease, paid for tenant improvements, hired and trained employees, and purchased inventory from Steinway, and conducted our Maricopa County operations, I relied upon Mr. Snyder's [Phoenix Market Statements], [Hollywood Store Statements], and [Sherman Clay Statement], not knowing they were misleading due to undisclosed material facts. Mr. Snyder's statements were a substantial factor in that reliance and were more important than any other factor leading to those actions. [Doc. 216, ¶ 58.A., B. & and Exh. A (Doc. 216-1) ¶ 13.]

Mr. Rindlisbacher's uncontroverted testimony satisfies the "substantial factor" test for loss causation and legal cause. Expert testimony on those issues is not required.

Steinway asserts [M., at 15:12 to 17:9] Mr. Perry's post-termination damages calculation "does not pass *Daubert* requirements." But the analysis on qualification, reliability, and relevance and fit in Part IV applies as much to Mr. Perry's out-of-pocket/consequential calculation as to his lost-profits calculation. And the former is equally tied to the record facts. [Report § 4.] Steinway's real argument is loss causation and/or legal cause. [M., at 16:20 to 17:9.] When Steinway fraudulently induced Plaintiffs to become its Maricopa County dealer in 2010 and sign a store lease, it was obvious to both parties that store leases would continue as long as the dealer relationship. When Plaintiffs came to Steinway in late 2013 with their new location and later with the alternate location Steinway required, Steinway still had not discharged its obligation to disclose its 2010 fraud to Plaintiffs. Steinway's confidential relation when Plaintiffs were about to enter a lease extending beyond Steinway's 90-day termination window required disclosure of all material facts. Steinway failed to disclose its 2010 fraud. [PSOF-CF (Doc. 198) ¶¶ 41-43, 45-49; DCF-CR (Doc. 212) ¶¶ 45-46.] Plaintiffs' entering into the new lease was part of "conducting our Maricopa County operations" and Mr. Snyder's three sets of statements (reaffirmed by the periodic performance review letters and uncorrected by disclosure of Steinway's 2010 fraud) [PSOF-CF ¶¶ 44-49] were a substantial factor in Plaintiffs' decision to conduct those "Maricopa County operations."

C. **Mr. Perry's Damages Calculation are Not "Speculative."**

Steinway's $45,000 damages expert never states (in report or deposition) that Mr. Perry's calculations are based on an inappropriate methodology, are unsupported by the facts, or are "speculative." Yet Steinway's counsel apparently knows better, insisting Mr. Perry's damages calculations are "speculative" because they: (i) do not specifically adjust for "variables affecting business performance"; and (ii) make a "speculative and illogical leap" regarding Spokane. [M., 11:1 to 14:19.] These are addressed below.

1. <u>Alleged Failure to Address "Number of Business Variables."</u>

Steinway asserts first [M., at 11:2 to 14:24] that a variety of factors affect performance in the retail piano industry citing Mr. Perry's deposition testimony. And Steinway claims that Mr. Perry failed to consider those factors. That is not true.

Mr. Perry analyzed Plaintiffs' operations during 4 years in Spokane and 6.5 years in Maricopa County to determine gross profit percentages, net profit percentages, and IPP of a Steinway retail business. [Report § 3.1.1, at 6-7 and § 3.2.3, at 13-15.] The business performance variables obviously fluctuated over that 10.5 years so they are reflected in the numbers Mr. Perry used. Mr. Perry also looked to a template forecast produced by Steinway which corroborated the reasonableness of his overall IPP assessment. [*Id.* § 3.2.1, at 11-12.] Mr. Perry looked to 6.5 years' performance in Maricopa County to determine actual unit sales. [*Id.* § 3.2.4, at 15-18.] The variables affecting business performance obviously fluctuated over that period so they are reflected in his numbers.

Mr. Perry expressly considered those variables. Even though economic conditions improved dramatically from 2011 to 2017, Mr. Perry did not increase unit sales. [Report, § 3.3 at 21.]. Steinway's counsel expected an admission Mr. Perry had not considered those variables, but Mr. Perry disagreed. "I would say I've taken into account you know – the way I did my calculation did not assume that they would have gone up with the economy, the actual number of expected units. It stayed at the same level it was in 2010, which was purported to be a bad time in the piano industry." [Perry Depo., Vol. II, at 219:14 to 220:14, excerpts at **Exhibit A** hereto.]

If data existed allowing reliable quantification of the effect on damages of any of the variables Steinway alleges Mr. Perry ignored, Steinway could have asked its expert to incorporate that data and revise the calculations; but it did not.

Steinway refers [M., at 11:9-15] to Mr. Rindlisbacher's statement that in 2009 a "perfect storm" of economic and other factors kept customers out of his Spokane store. Mr. Perry considered those negative economic times. He notes as evidence of 2010 unit sales expectation that Mr. Snyder told Mr. Rindlisbacher the Phoenix market is ***capable of selling 70 Steinway Grands*** per year but that given the ***current economic conditions*** Plaintiffs should reasonably expect to sell ***45 Steinway Grands per year***. [Report § 3.1.1.] Steinway itself addressed the then negative economic times compared to more normal economic times in Mr. Snyder's statements to Plaintiffs. To be conservative, Mr. Perry's formula never adjusted for improved economic conditions after 2010. [*Id*. § 3.3, at 21.]

Steinway does not show that the extent of Mr. Perry's consideration of business performance variables (which it misstates in any event) rendered his reliable damages calculation "speculative." Steinway's damages expert does not conclude in his report or deposition testimony that Mr. Perry's alleged failure to consider these variables caused his reliable damages calculation to be speculative.

2. *"Speculative and Illogical Leap Regarding Spokane."*

Steinway asserts [M., 14:25 to 15:11] Mr. Perry makes a "speculative and illogical leap" by relying in 2010 on financial information from Plaintiffs' Spokane Steinway business from 2007-10 for evidence of unit sales expectations, because Spokane and Phoenix are "vastly different markets" and Maricopa County is "thirteen times greater in terms of relevant market than Spokane." [M., at 15:2-4.][19] The Spokane experience was ***not*** the primary evidence on 2010 unit sales expectations. ***The most important evidence came from Steinway itself***: (1) Mr. Snyder's statement that the Phoenix market was ***capable of selling 70 Steinway Grands per year*** but that given ***then economic conditions***,

---

[19]Actually, Mr. Perry did not use the words "vastly different"; he said "much larger market" in terms of population. [Doc. 223-1, Ex. 8 , at 165:22:25.]

15

Plaintiffs should **_reasonably expect_** to sell **45 Steinway Grands per year**; and (2) the fact that Steinway inserted 45 Steinway Grands per year in the dealer agreement as the "annual sales performance goals reasonable for the territory." [Report § 3.1.1.] Mr. Perry viewed the Spokane evidence as supporting Steinway's own evidence of unit sales expectations.

### 3.  *Steinway's Assertion is "Speculative by Ipse Dixit."*

Steinway fails to describe how Mr. Perry's damages analysis – using a formula built on sound accounting and economic principles in which each factor is tied to specific record evidence or authoritative data sources – was rendered "speculative." Indeed, Steinway fails to define "speculative." Instead, Steinway declares, solely on the "*ipse dixit*" of its counsel [M., at 9:9-12], that the two items it cites rendered Mr. Perry's reliable damages calculations "speculative."

Two Arizona damages cases Steinway knows well [DMSJ-D (Doc. 207), at 5:22-23, 7:4-11] provide a working definition of "speculative" damages. In *Coury Bros. Ranches, Inc. v. Ellsworth*, 446 P.2d 458, 464-66 (Ariz. 1968) a farmer claimed damages against a pasture lessor for sheep that died due to the lessor's breach. His damages were "speculative" because: (1) he did not count the dead sheep, relying instead on "before" and "after" counts of the animals; (2) he did not know how many sheep died from starvation (damages recoverable) and how many died from bloat or disease (damages not recoverable); and (3) although he testified to different values for "good breeding ewes" and "old ewes," he did not know how many of the dead sheep were in each category. Because several factors includible in any reasonable damages formula lacked supporting evidence in the record, the determination was speculative.

In *Schuldes v. National Sur. Corp.*, 557 P.2d 543, 548-49 (Ariz. Ct. App. 1976) [M., at 7:4-11] a bar owner claimed damages related not to "an existing business enterprise" but to a *hypothetical* one the plaintiff said he *would have formed* in Wisconsin *if he had sold* his Arizona bar, which he *could not do because of a wrongful attachment*. Given the absence of contemporaneous evidence the plaintiff actually had plans to do so and what profits expectations then existed, the claimed damages were speculative.

Under these cases, speculative damages either: (a) lack evidence needed to support a necessary factor in the damages formula (*Ellsworth*); or (b) are hypothetical, not grounded in reality (*Schuldes*). Mr. Perry's damages formula develops each of its four factors from evidence in the record or from authoritative sources of business and economic information; and his calculations do not relate to a hypothetical business but to two very real Steinway retail businesses Plaintiffs actually operated. Mr. Perry's damages conclusions are not "speculative" under either *Ellsworth* or *Schuldes*.

### D.  Conclusion on Non-Daubert Issues.

Mr. Perry's damages are recoverable under Arizona law of damages for fraud. Expert testimony is not required for loss causation or legal cause. Mr. Rindlisbacher's testimony satisfies the Arizona standard. Mr. Perry's damages formula is grounded in recognized principles and each factor is sourced to record evidence. It is not speculative.

### VII.  Conclusion.

Mr. Perry is clearly qualified. Sound accounting and economic principles commonly used to calculate damages provides the shared body of knowledge of the forensic accounting discipline. His damages formula is based on that common body of accounting and economic principles. Every factor in his damages formula is grounded in record evidence or authoritative sources of business and economic information. Although the calculated damages are prejudicial to Steinway, the prejudice is not unfair. The *Daubert* defects in Steinway's cases have no counterparts in Mr. Perry's damages opinions. Plaintiffs have shown loss causation and legal cause. Mr. Perry's damages calculations are not speculative because his formula is grounded in sound accounting and economic principles and every formula factor is fixed in record evidence or authoritative sources of business or economic information. The Motion must be denied.

RESPECTFULLY SUBMITTED this 30th day of April 2020.

**MORRILL LAW, P.L.C.**

By *s/K. Layne Morrill*
K. Layne Morrill #004591

8857 N. 63rd Place<br>
Paradise Valley, Arizona 85253<br>
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2020 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

  Bruce E. Samuels   bsamuels@lrrc.com

  Heather Stanton   hstanton@lrrc.com


*/s/ K. Layne Morrill*
K. Layne Morrill
Morrill Law PLC

**EXHIBIT A**
**DEPOSITION EXCERPTS FOR DAVID R. PERRY**