**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kevin H Rindlisbacher, et al., | No. CV-18-01131-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Steinway & Sons Incorporated, et al., | |
| Defendants. | |

The Court now addresses the parties' cross-motions for summary judgment (Docs. 192, 199, 205, 207) and Defendant's Motion for Sanctions (Doc. 202). The Court rules as follows.

## I.    BACKGROUND

Defendant Steinway, Inc. ("Steinway") is a manufacturer of high-end acoustic pianos. (Doc. 163 ("FAC") ¶¶ 19, 26.) For decades, Steinway has contracted with independent dealers in various markets to sell new Steinway pianos to retail customers. (Doc. 205 at 2.) Through its dealer agreements, dealers can purchase new pianos from Steinway at wholesale prices and sell those pianos to retail customers. (Doc. 206, Ex. 6 ¶ 6.) Steinway also has company-owned stores where it sells pianos directly to retail customers. (Doc. 206 ¶ 5.)

Plaintiffs Kevin and Jami Rindlisbacher (the "Rindlisbachers") have been in the retail piano business for 37 years. (FAC ¶ 32.) In 1991, Mr. Rindlisbacher took control of his father's music business in Salt Lake City, Utah. (*Id.*) The Rindlisbachers now own three

music stores in the Salt Lake City area. (*Id.*) In 2006, the Rindlisbachers expanded their business and entered into a dealer agreement with Steinway (the "Spokane Agreement"), which authorized them to sell Steinway pianos in Spokane, Washington. (*Id.* ¶¶ 37, 40–44.) The Rindlisbachers experienced great success in Washington and received Steinway's Partners in Performance Award for "best sales performance of a small market" in 2010. (*Id.* ¶¶ 46, 49–50.)

In September 2010, Mr. Rindlisbacher inquired whether Steinway would consider appointing him as the dealer for the Phoenix, Arizona market. (*Id.* ¶ 52.) Steinway had intended to convert a then-existing, unrelated dealership, Steinway of Phoenix, into a company-owned store. (*Id.* ¶ 52.) Instead, based on Mr. Rindlisbacher's stated interest, Steinway changed its plans and signed a dealer agreement (the "Phoenix Agreement") with the Rindlisbachers and their company, Piano Showroom of Arizona, Inc., later that year. (*Id.* ¶ 71.) The Phoenix Agreement allowed the Rindlisbachers to sell Steinway pianos in the Phoenix market.[1] (Doc. 206, Ex. 35 at 1, 7.) Between Mr. Rindlisbacher's initial inquiry and the execution of the Phoenix Agreement, the parties had multiple conversations about the Phoenix market, and the Rindlisbachers and Steinway's Western District Sales Manager, Robert Snyder, had visited the prior dealer's store in Scottsdale, Arizona and Steinway's company-owned Hollywood, California store. (FAC ¶¶ 58–62.) Mr. Rindlisbacher also spoke with Mr. Snyder and the Hollywood store's manager by phone after the Hollywood visit. (*Id.* ¶ 63.)

The Rindlisbachers' sales in the Phoenix market consistently fell far below the annual sales performance goals set forth in the Phoenix Agreement. (*Id.* ¶¶ 83–85.) Steinway terminated the Phoenix Agreement in July 2017. (*Id.* ¶ 94.)

This dispute arises from what the Rindlisbachers allege to be factual omissions by Steinway's representatives prior to the parties executing the Phoenix Agreement. Mr. Snyder allegedly told Mr. Rindlisbacher that "the Phoenix market is capable of selling 70 Steinway Grands per year" but "in the [2010] economic environment [he] should

---

[1] The Phoenix Agreement defines the relevant market as Maricopa County, Arizona. For purposes of this Order, the Court refers to this geographic area as the "Phoenix market."

reasonably expect to sell 45 Steinway Grands per year." (Doc. 217 at 2; FAC ¶ 58.) When entering the Phoenix Agreement, the parties agreed to the reasonableness of the annual sales goals established therein. (FAC ¶ 72.) The Phoenix Agreement provides that the annual sales performance goal reasonable for the Phoenix market is 45 Steinway grand piano sales. (*Id.* ¶ 68.) The Rindlisbachers now argue that Steinway's failure to disclose the historical sales of Steinway grand pianos in the Phoenix market and at its Hollywood store rendered Mr. Snyder's statements and the sales goals misleading. (FAC ¶¶ 97–98.) Mr. Rindlisbacher, a sophisticated and experienced businessman, who conducted some amount of due diligence before entering into the Phoenix Agreement—and who had the ability to do more—did not ask Steinway's representatives or Eric Schwartz, the owner of the previous Phoenix-market Steinway dealer, about historical sales in the Phoenix market or at Steinway's Hollywood store. (*Id.* at ¶¶ 58, 62–63; Doc. 206, Ex. 33 at 27–28.)

The Rindlisbachers claim they first discovered the alleged factual omissions on May 27, 2015, during a Steinway-dealer meeting in Florida. (FAC ¶ 109.) On that day, the Rindlisbachers had lunch with Mr. Schwartz. (*Id.*) During their conversation, Mr. Schwartz said, "Let me guess: Steinway told you 25 Steinway & Sons grand pianos per year was reasonable; and you sell about 10 or 12." (*Id.* ¶ 111.) Mr. Schwartz also told the Rindlisbachers that his business sold only 10 to 15 Steinway grand pianos each year between 2005 and 2010. (*Id.* ¶ 112.)

The Rindlisbachers initiated this action on April 12, 2018. (Doc. 1.) The Court has already dismissed some of the Rindlisbachers' claims. The claims that remain are labelled in their Fourth Amended Complaint ("FAC") as (1) Nondisclosure/Constructive Fraud, and (2) Fraudulent Representations and Omissions.[2] The parties now move for summary judgment on several different theories. (*See* Docs. 192, 199, 205, 207.)

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material

---

[2] The Court dismissed the fraudulent representations portion of the Rindlisbachers' second claim in a previous order. (Doc. 113.)

1  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

2  genuine issue of material fact exists if "the evidence is such that a reasonable jury could

3  return a verdict for the nonmoving party," and material facts are those "that might affect

4  the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477

5  U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant

6  is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255

7  (internal citations omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127,

8  1131 (9th Cir. 1994) (court determines whether there is a genuine issue for trial but does

9  not weigh the evidence or determine the truth of matters asserted). That said, "[w]hen

10 opposing parties tell two different stories, one of which is blatantly contradicted by the

11 record, so that no reasonable jury could believe it, a court should not adopt that version of

12 the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550

13 U.S. 372, 380 (2007).

14 **III.    DISCUSSION**

15        Steinway argues the Rindlisbachers' remaining claims are barred by the statute of

16 limitations. (Doc. 205 at 1.) Steinway contends that the Rindlisbachers "had actual

17 knowledge of the sales history of the prior Steinway dealer" and were aware of "the decline

18 in sales in the Phoenix market" in 2011 but failed to initiate this lawsuit until April 2018.[3]

19 (*Id.* at 7.) The Rindlisbachers allege that their fraud claims, arising from the historical sales

20 in the Phoenix market, did not accrue until their May 27, 2015 conversation with

21 Mr. Schwartz. (Doc. 217 at 12). Additionally, the Rindlisbachers contend that Steinway is

22 not entitled to summary judgment as to their claims premised on eight other factual

23 predicates that accrued within the relevant limitations period. (*Id.* at 2–4, 10.)

24        In reply, Steinway argues the Rindlisbachers have improperly raised "entirely new

25 allegations about alleged omissions that were not raised in their Fourth Amended

26 Complaint." (Doc. 227 at 1.) The Court ordered the parties to each file a supplemental brief

27 ─────────────────────
[3] Steinway also argues that any alleged omissions regarding the Rindlisbachers' business
28 opportunities with Arizona State University are time-barred. (Doc. 205 at 8–9.) Because
   the Rindlisbachers concede this point, the Court will not address the argument. (Doc. 217
   at 15, n.7.)

to more fully develop arguments related to this issue. (Doc. 246.) Steinway concedes that the Rindlisbachers properly pleaded two factual bases for their fraud claims: (1) the historical sales of Steinway grand pianos in the Phoenix market, and (2) the sales of Steinway grand pianos at Steinway's Hollywood store during 2009 and 2010. (Doc. 248 at 3.) But Steinway argues that the Court should not consider the factual allegations that the Rindlisbachers have purportedly raised for the first time in opposition to Steinway's motion for summary judgment.[4] (Doc. 248 at 5–6.) As a threshold matter, the Court must determine whether to consider the facts at issue.

### A.   New Factual Allegations

Rule 8(a) of the Federal Rules of Civil Procedure requires that a civil complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The United States Supreme Court has interpreted the "short and plain statement" requirement to mean that the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal quotations and alternations omitted). The Rindlisbachers contend "it would be unjust" to exclude the facts at issue because they "are consistent with the pleadings and do not introduce any new issue." (Doc. 249 at 7.) Steinway argues that the Rindlisbachers assert new omissions "to try to salvage their time-barred claims," and because Steinway did not receive notice of those allegations, Steinway says, "they should not be considered at summary judgment." (Doc. 248 at 7.) In support of its argument, Steinway relies on two Ninth Circuit cases, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000), and *Pickern v. Pier I Imports (U.S.), Inc.*, 457 F.3d 963 (9th Cir. 2006).

In *Coleman*, the Ninth Circuit prohibited the plaintiffs from proceeding with an age

---

[4] The allegedly new allegations are: (1) Steinway's unit sales of grand pianos declined by 50-percent in 2009 to 2010 compared to average unit sales from 2001 to 2008; (2) Steinway did not consider past sales in the Phoenix market when setting the annual sales performance goals; (3) the greater Los Angeles market included Los Angeles County, which Steinway's Hollywood store served, and Orange County, which a different Steinway-dealer served; (4) Steinway's sales to its Orange County dealer in 2009 and 2010; (5) the previous Phoenix-market Steinway dealer proposed to lease a smaller space; (6) the previous Steinway-dealer's decisionmakers rejected that lease proposal; and (7) the previous Steinway-dealer had no regrets leaving the Phoenix market. (Doc. 217 at 2–4.) The Court refers to these factual predicates collectively as "the facts at issue."

discrimination claim based on a disparate impact theory because the plaintiffs' complaint only alleged disparate treatment and plaintiffs first raised the disparate impact theory in their motion for summary judgment. 232 F.3d at 1292–93 (explaining that a disparate impact theory "requires that the defendant develop entirely different defenses" than what is "necessary to defend against a disparate treatment theory"). The Rindlisbachers argue Steinway's reliance on *Coleman* is misplaced because they have not asserted a new legal theory. (Doc. 249 at 5.) The Court agrees. Rather than raising a distinct legal theory in their Response, the Rindlisbachers argue the same legal theories predicated on the facts at issue. Thus, *Coleman* and its progeny do not control.

The Court, however, is persuaded by Steinway's argument based on *Pickern*. Steinway contends that the Court should not consider the facts at issue because, like the plaintiff in *Pickern*, the Rindlisbachers "here raised seven new factual allegations for the first time in their opposition to Steinway's motion for summary judgment." (Doc. 248 at 5.) In *Pickern*, the plaintiff's complaint alleged a violation of the Americans with Disabilities Act ("ADA") based on a failure to provide a ramp and other ADA violations based on facts including, but not limited to, a list of possible architectural barriers. 457 F.3d at 968–69. After the close of discovery and in opposition to a motion for summary judgment, the plaintiff "raised issues of ADA violations that went beyond a failure to provide a ramp." *Id.* at 968. The Ninth Circuit affirmed the district court's holding that factual bases beyond the failure to provide a ramp would not be considered because the defendant lacked adequate notice of the new allegations. *Id.* The court rejected the plaintiff's "attempt[] to justify the[] new factual allegations as falling within the original complaint under Rule 8's liberal notice pleading standard" and emphasized that the plaintiff should have moved to file an amended complaint to properly assert the additional factual allegations, but the plaintiff failed to do so. *Id.* at 968–69.

The Rindlisbachers contend that they "consistently alleged Steinway had an obligation, because of its confidential relation toward [them], to disclose *all material facts* before [executing the Phoenix Agreement]." (Doc. 249 at 5 (emphasis in original).) The

Rindlisbachers attempt to distinguish *Pickern* by arguing that the facts at issue were disclosed by Steinway during discovery. (*Id.* at 6.) And they further argue that Steinway will not be prejudiced if the Court considers the facts at issue when ruling on the pending motions. (*Id.* at 7.) The Court addresses the Rindlisbachers' arguments in turn.

First, the Court rejects the Rindlisbachers' argument that Steinway had adequate notice of the facts at issue because they "consistently alleged" that Steinway must disclose "all material facts."[5] Providing vague and generic allegations, like the Rindlisbachers do here, "is not a substitute for investigating and alleging the grounds for a claim." *Pickern*, 457 F.3d at 969. To hold otherwise would read the fair notice requirement out of Rule 8. *See id.* Thus, the Rindlisbachers' first argument does not persuade the Court.

Second, the Rindlisbachers' attempt to distinguish *Pickern* is at odds with Ninth Circuit law. *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908–09 (9th Cir. 2011) ("The issue underlying *Pickern* . . . is whether the defendant had fair notice as required by Rule 8. In general, only disclosures [of factual allegations] in a properly pleaded complaint can provide such notice; a disclosure made during discovery . . . would rarely be an adequate substitute."). Requiring Steinway to guess whether facts disclosed during discovery would become the basis of the Rindlisbachers' claims would seriously undermine the "fair notice" requirement in Rule 8. *See Pickern* 457 P.3d at 969. Thus, the Court is not persuaded by the Rindlisbachers' second argument.

Last, the Rindlisbachers' argument regarding prejudice misconstrues the underlying concern in *Pickern*. "*Pickern*'s focus is on whether the complaint provides the requisite notice under Rule 8." *Pena v. Taylor Farms Pac., Inc.*, 2014 WL 1330754, at *5 (E.D. Cal. Mar. 28, 2014) (citing *Pickern*, 457 F.3d at 368–69, and *Oliver*, 654 F.3d at 908–09). In contrast to *Pickern*, *Coleman* asks whether a party suffers prejudice from a belated disclosure. *Id.* Because *Pickern* rather than *Coleman* applies to the current dispute, the Court's inquiry is not whether Steinway suffered prejudice but whether Steinway had

---

[5] As support, the Rindlisbachers cite to thirty paragraphs in their FAC—none of which make any reference to the facts at issue. (*See* Doc. 249 at 5; FAC ¶¶ 32–51, 96–98, 120–21, 125, 127–30.)

adequate notice of the grounds on which the Rindlisbachers' claims rest. Steinway did not have adequate notice that the facts at issue formed the basis of the Rindlisbachers' claims. Thus, for the reasons stated, the facts that the Rindlisbachers presented for the first time on summary judgment, which were not included or even grounded in their FAC, will not be considered.

### B.    Statute of Limitations

The Court will now proceed to analyze the Rindlisbachers' claims relating to the historical sales of Steinway grand pianos in the Phoenix market and at Steinway's Hollywood store. In a previous order, the Court considered Steinway's statute of limitations defense. (Doc. 74 at 4–6.) Steinway, in a motion to dismiss, argued that Arizona's three-year statute of limitations barred the Rindlisbachers' claims because Mr. Rindlisbacher "knew or should have known about the alleged fraud before April 2015." (Doc. 26 at 11.) The Court acknowledged Mr. Rindlisbacher's sophistication in piano retail, the opportunities for the Rindlisbachers to conduct due diligence, and assertions that seemed to indicate that Mr. Rindlisbacher knew of the conditions in the Phoenix market. But because the issue was raised in a motion to dismiss, the Court deferred the matter post-discovery. (Doc. 74 at 6 ("The question of when Plaintiffs reasonably should have discovered any alleged fraud must be left to a stage of the case when evidence reveals Plaintiffs' efforts to investigate and Defendant's responses to those efforts.").)

Now, at the summary judgment stage, Steinway renews its statute-of-limitations argument. (Doc. 205 at 6.) This time, Steinway argues that the Rindlisbachers' remaining claims are duty-based claims, akin to negligence. (*Id.* at 7.) Advancing that argument, Steinway contends that the Rindlisbachers' claims are time-barred under the two-year statute of limitations set forth in A.R.S. § 12-542. (*Id.*) The Rindlisbachers maintain that their claims are governed by the three-year limitations period in A.R.S. § 12-543(3). (Doc. 217 at 7–9.) Thus, before the Court can evaluate whether the Rindlisbachers' claims survive the statute of limitations, it must determine the applicable limitations period.

### 1.   Applicable Statute of Limitations

"The very purpose of enacting a statute of limitations is to fix a limit within which an action must be brought and to prevent the unexpected enforcement of stale claims against persons who have been thrown off their guard by want of prosecution." *Hall v. Romero*, 685 P.2d 757, 763 (Ariz. Ct. App. 1984). The Arizona Legislature has enacted a series of statutes setting limitations periods on common law causes of action, but the Legislature did not expressly categorize either of the two claims asserted here within a specific statute. Where the Legislature has not assigned a statute of limitations to a cause of action, the Court must determine which limitations period applies by evaluating the asserted cause of action and the potentially applicable statutes of limitations. *See Dunlap v. City of Phoenix*, 817 P.2d 8, 11–13 (Ariz. Ct. App. 1990). If doubt exists "as to which of two limitations periods apply, courts generally apply the longer." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 968 (Ariz. 1995).

The Rindlisbachers have two remaining claims, labelled as: (1) Nondisclosure/Constructive Fraud, and (2) Fraudulent Representations and Omissions. (FAC at 17, 20.) The Rindlisbachers argue the three-year limitations period in A.R.S. § 12-543(3) governs their claims. To support that position, the Rindlisbachers contend that A.R.S. § 12-542 does not, on its face, apply to constructive fraud or fraudulent omission claims and assert that Arizona courts have applied A.R.S. § 12-543(3) to actions for constructive fraud.[6] (Doc. 217 at 8–9.) Steinway argues the relevant statute is A.R.S. § 12-542 because "[t]he essence of this action is not actual fraud, it is the breach of an alleged duty of disclosure." (Doc. 227 at 4–5.) The Court now addresses which statute governs each of the Rindlisbachers' remaining claims.

---

[6] The Rindlisbachers further argue the Court must apply A.R.S. § 12-543(3) based on the doctrine of the law of the case. (Doc 217 at 8.) "For the doctrine to apply, the issue in question must have been decided either expressly or by necessary implication in [a] previous disposition." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993) (internal quotations omitted). When resolving Steinway's motion to dismiss, the Court did not decide which limitations period applied to either claim. And the Rindlisbachers concede the Court dismissed some of their claims "on 12(b)(6) grounds, not on statute of limitations grounds." (Doc. 241 at 8.) Thus, the Court is not persuaded by the Rindlisbachers' law-of-the-case argument.

1

### i.    Constructive Fraud

2

Under Arizona law,

> Fraud is generally classified under two major headings, actual
> and constructive. The former is distinguished by the presence
> of an actual intent to deceive, while the latter is characterized
> by a breach of duty actionable at law irrespective of moral
> guilt, and arising out of a fiduciary or confidential relationship.

*In re McDonnell's Est.*, 179 P.2d 238, 241 (Ariz. 1947). The text of A.R.S. § 12-543(3) provides "[t]here shall be commenced and prosecuted within three years after the cause of action accrues . . . [actions] [f]or relief on the ground of fraud or mistake." This language, taken in conjunction with the Arizona Supreme Court's assertion that constructive fraud is one category of fraud, suggests the three-year statute of limitations should govern claims for constructive fraud.

Arizona courts, however, have not squarely addressed which statute of limitations applies to constructive fraud claims. On the one hand, Arizona courts have held the "two-year limitations period [in A.R.S. § 12-542] applies to claims for breach of fiduciary duty, professional negligence, and negligent misrepresentation." *Coulter v. Grant Thornton, LLP*, 388 P.3d 834, 838 (Ariz. Ct. App. 2017). This is true even when a plaintiff successfully tolls the statute of limitations under a constructive fraud theory. *See Morrison v. Acton*, 198 P.2d 590, 594–96 (Ariz. 1948). But in *Rhoads v. Harvey Publications, Inc.*, a case in which the plaintiff asserted a constructive fraud claim, the parties did not contest that the three-year limitation period for fraud applied. 700 P.2d 840, 845 (Ariz. Ct. App. 1984); *see also Gonzalez v. Gonzalez*, 887 P.2d 562 (Ariz. Ct. App. 1994) (applying A.R.S. § 12-543(3) to a plaintiff's constructive fraud claim).

Where the answer is not readily available in Arizona caselaw, it is helpful to survey decisions from other jurisdictions. This statute of limitations issue, it turns out, has been analyzed by courts in other states. The Idaho Supreme Court has ruled that claims for constructive fraud are governed by that state's three-year statute of limitations for fraud. *Doe v. Boy Scouts of Am.*, 356 P.3d 1049, 1056 (Idaho 2015). In rejecting an argument that

the breach-of-fiduciary-duty limitations period should apply, the Idaho Supreme Court observed that intent need not be proven for constructive fraud claims because "it is inferred directly from the relationship and the breach." *Id.* at 1055 (internal quotations omitted). The Idaho Supreme Court "conclude[d] that a constructive fraud claim is not removed from the fraud statute of limitations merely because it involves a breach of fiduciary duty." *Id.* at 1056. And the Idaho Supreme Court recognized that other jurisdictions have applied their respective state's fraud statute of limitations to constructive fraud actions. *Id.* (Montana, Virginia, Indiana, and California). Thus, based on the text of A.R.S. § 12-543(3) and the foregoing caselaw, the Court concludes that A.R.S. § 12-543(3) applies to constructive fraud claims.

The inquiry, however, does not stop there. The Court must also determine whether the fraud limitations period should apply to the Rindlisbachers' first claim, labelled "Nondisclosure/Constructive Fraud." As explained in *Dunlap v. City of Phoenix*, when determining the applicable statute of limitations, the "essence or gravamen of the cause of action" is dispositive. 817 P.2d at 13. Under Arizona law, the elements of constructive fraud are (1) "a fiduciary or confidential relationship," (2) "a breach of duty by the person in the confidential or fiduciary relationship," and (3) "that the person in breach induced justifiable reliance by the other to his detriment." *Green v. Lisa Frank, Inc.*, 211 P.3d 16, 34 (Ariz. Ct. App. 2009) (internal quotations omitted).

Here, the Rindlisbachers allege that due to a relation of trust and confidence, Steinway had a duty to disclose the facts necessary to avoid any representations from being materially misleading. (FAC ¶¶ 96–97.) As a result of Steinway's alleged breach of that duty, the Rindlisbachers argue they suffered damage in the form of lost profits. (*Id.* ¶ 102.) Steinway argues the essence of the Rindlisbachers' first claim is the breach of an alleged duty of disclosure because they need not prove intent, as required for a claim of actual fraud. (Doc. 227 at 5.)

Considering the elements of constructive fraud and the Rindlisbachers' FAC, the Court finds the essence of the Rindlisbachers' first claim sounds in fraud. Despite having

no intent requirement, Arizona courts consider constructive fraud one of the two major categories of fraud. *See In re McDonnell's Est.*, 179 P.2d at 241. Thus, contrary to Steinway's argument, the lack of an intent requirement does not preclude a finding that the Rindlisbachers' claim is a fraud claim. Moreover, if the existence of a fiduciary or confidential relation compels a finding that the essence of a claim is mere negligence, the three-year statute of limitations would never be applied to constructive fraud claims—a result contrary to Arizona caselaw. *See e.g.*, *Gonzalez*, 887 P.2d at 562 (applying A.R.S. § 12-543(3) to a constructive fraud claim); *Rhoads*, 700 P.2d at 845 (same). Finally, in cases where Arizona courts have applied the two-year statute of limitations, constructive fraud was not the *claim* being alleged. Rather, the parties in those cases employed the *theory* of constructive fraud to toll the statute of limitations applicable to their other claims. *See Morrison*, 198 P.2d at 593 (tolling the statute of limitation for a negligence claim on constructive fraud grounds). That is not the case, here. Accordingly, the Court agrees with the Rindlisbachers that a three-year limitations period governs their constructive fraud claim.

### ii.      Fraudulent Omissions (Nondisclosure)

The Rindlisbachers' second claim is labelled as "Fraudulent Representations and Omissions." (FAC at 20.) When determining the applicable statute of limitations, however, the form in which a cause of action is pleaded is not dispositive. *See Dunlap*, 817 P.2d at 13. Rather, as noted, the essence of the claim controls the inquiry. *Id.* Steinway argues that the Rindlisbachers' second claim is for nondisclosure, as defined in the Restatement (Second) of Torts (the "Restatement") § 551(2)(b). (Doc. 205 at 7.) Thus, Steinway says, because the Rindlisbachers' second claim is a duty-based claim, the two-year statute of limitations applies. (*Id.*) In response, the Rindlisbachers argue that Steinway "erroneously asserts" that their "claims are for 'negligent nondisclosure'" and maintain that their second claim sounds in fraud. (Doc. 217 at 7.)

As noted throughout this litigation, the causes of action in the various iterations of the Rindlisbachers' complaint are difficult to discern. (*See* Doc. 74 at 8–9; Doc. 113 at 2.)

And the Rindlisbachers have been inconsistent with their own characterization of their second claim. To illustrate, the Rindlisbachers, in a motion for reconsideration, argued that "the fraudulent omissions claim should be available as an alternative theory of recovery" to their constructive fraud claim. (Doc. 75 at 2.) Specifically, they relied on Restatement § 551(2)(b) to argue that, in addition to a relation of trust and confidence, "other circumstances also trigger th[e] duty [to disclose], including matters that a speaker knows to be necessary to prevent his 'partial or ambiguous statement' from being misleading." (*Id.* (quoting Restatement § 551(2)(b)).) Considering just that assertion, it appears the Rindlisbachers' position is that their second claim is nondisclosure, which requires a duty to disclose and not an intentional act. But at other times, the Rindlisbachers have relied on caselaw where fraudulent concealment—an intentional tort—was alleged. (*See* Doc. 34 at 11; Doc. 75 at 2.) "[D]uty has no relevance in a tort requiring an intentional act." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 34, n.22 (Ariz. 2002). Thus, the Rindlisbachers' reliance on cases in which fraudulent concealment was alleged appears at odds with their argument based on Restatement § 551. The Rindlisbachers now say they are prosecuting a claim for fraudulent omissions, (Doc. 217 at 7), even though Arizona caselaw is largely devoid of any reference to "fraudulent omission" claims. And they further assert that Steinway's alleged "omissions were intentional acts." (*Id.*)

In ruling on the Rindlisbachers' motion for reconsideration, the Court noted that "[t]he label 'nondisclosure' more appropriately describes the fraudulent omissions outlined in Count II and reflected in § 551 of the Restatement." (Doc. 113 at 2, n.1.) And the Court ultimately held that the Rindlisbachers' "claim for fraudulent omissions (nondisclosure) should have survived [Steinway's] Motion to Dismiss." (*Id.* at 4.) Thus, the only portion of the Rindlisbachers' second claim that survived Steinway's motion to dismiss is a claim for nondisclosure.

Arizona courts look to § 551 of the Restatement when determining whether a party

1    is liable for nondisclosure.[7] *See King v. O'Rielly Motor Co.*, 494 P.2d 718, 720 (Ariz. Ct.

2    App. 1972). In § 551(1), the Restatement provides:

3        One who fails to disclose to another a fact that he knows may
4        justifiably induce the other to act or refrain from acting in a
         business transaction is subject to the same liability to the other
5        as though he had represented the nonexistence of the matter
         that he failed to disclose, if, but only if, he is under a duty to
6        the other to exercise reasonable care to disclose the matter in
7        question.

8    One party is under a duty to disclose "matters known to him that he knows to be necessary

9    to prevent his partial or ambiguous statement of the facts from being misleading."

10   Restatement § 551(2)(b).

11       Steinway relies on *Van Buren v. Pima Community College*, 546 P.2d 821 (Ariz.

12   1976), to argue a two-year statute of limitations governs claims for nondisclosure.

13   (Doc. 205 at 7.) But the plaintiffs in *Van Buren* alleged two claims: fraudulent failure to

14   disclose and negligent failure to disclose. 546 P.2d at 822. The Arizona Supreme Court

15   explained that a claim for *negligent* failure to disclose, as defined in § 552 of the

16   Restatement, "is one governed by the principles of the law of negligence." *Id.* at 823. The

17   court, however, did not address whether a claim arising under § 551 of the Restatement is

18   governed by principles of negligence or whether a two-year or three-year limitations period

19   applies to the claim.

20       Steinway also relies on *Crook v. Anderson*, 565 P.2d 908 (Ariz. Ct. App. 1977).

21   (Doc. 205 at 7.) In *Crook*, the plaintiff asserted several claims, including breach of

22   fiduciary duty. 565 P.2d at 908. The Arizona Court of Appeals, in *Crook*, applied the two-

23   year limitations period to the breach of fiduciary claim. *Id.* at 909. Although breach of

24   fiduciary claims and claims for nondisclosure under § 551 of the Restatement may, at

25   times, overlap, breach of fiduciary claims can arise from factual scenarios not involving

26   _____

27   [7] To dispel any remaining doubt, the Rindlisbachers' remaining claims are both analogous
     to § 551 of the Restatement. The Rindlisbachers' first claim for constructive fraud is set
28   forth in Restatement § 551(2)(a), which imposes a duty of disclosure when "a fiduciary or
     other similar relation of trust and confidence" exists between the parties. The
     Rindlisbachers' second claim for nondisclosure is set forth in Restatement § 551(2)(b).

nondisclosure. The facts of *Crook* illustrate that point. In *Crook*, an agreement between the plaintiff and the defendants provided that the defendant was to collect premiums on insurance policies and hold the sums in trust for the plaintiff. *Id.* at 908. In its complaint, the plaintiff alleged that the defendants were guilty of "willful and fraudulent conversion" and a "breach of fiduciary duty" in connection with the insurance premiums collected by the defendants. *Id. Crook*, therefore, does not involve a nondisclosure claim. Moreover, the Rindlisbachers' second claim arises under § 551(2)(b), which makes no mention of a fiduciary duty. *Compare* Restatement § 551(2)(a) *with* Restatement § 551(2)(b).

Arizona courts distinguish between claims for nondisclosure and intentional tort claims, like fraudulent concealment. *Wells Fargo Bank*, 38 P.3d at 21 ("Negligence and nondisclosure claims differ from intentional tort claims . . . ; each has different elements and different requirements of proof."). To illustrate, duty is a specific concept applicable to nondisclosure. *Id.* But, in a fraudulent concealment action, "a party may be liable for acts taken to conceal . . . , even in the absence of a fiduciary, statutory, or other duty to disclose." *Id.* Notwithstanding this distinction, Arizona courts recognize that "[i]t is often difficult to distinguish . . . fraudulent concealment from mere nondisclosure." *King*, 494 P.2d at 721. The inconsistencies in the Rindlisbachers' filings reinforce that notion.

That said, the Arizona Supreme Court has explained that both nondisclosure and concealment can form the basis of a fraud action. *Wells Fargo Bank*, 38 P.3d at 34, n.22. The court specifically noted that "liability for nondisclosure occurs under § 551 of the [Restatement] and lies against 'one who fails to disclose to another a fact . . . if, but only if, he is under a duty to the other . . . to disclose the matter in question.'" *Id.* (quoting Restatement § 551(1)); *see King*, 494 P.2d at 720–21 (explaining that a failure to establish the existence of the duty set forth in Restatement § 551(2) "would preclude an action for fraud").

Considering the facts of this case and Arizona caselaw, the Court finds the essence of the Rindlisbachers' second claim is fraud. While it is true that the Rindlisbachers' portrayal of their claim has wavered throughout this litigation between nondisclosure and

fraudulent concealment, this Court has explicitly held that their "claim for fraudulent omissions (nondisclosure) should have survived Defendant's Motion to Dismiss." (Doc. 113 at 4.) The Arizona Supreme Court treats nondisclosure as a class of fraud. *See Wells Fargo Bank*, 38 P.3d at 34, n.22. And fraud claims are governed by the three-year limitation period provided in A.R.S. § 12-543(3). The Court further notes that this finding is consistent with Arizona's preference to apply the longer limitations period when doubt exists as to which limitations period should apply. *See Gust, Rosenfeld & Henderson*, 898 P.2d at 968. Accordingly, the three-year limitations period in A.R.S. § 12-543(3) governs the Rindlisbachers' nondisclosure claim.

### 2.    The Rindlisbachers' Claims are Time-Barred

Pursuant to A.R.S. § 12-543, the limitations period for fraud claims is three years from accrual. Arizona courts have interpreted the limitations period "to begin running when the defrauded party discovers or with reasonable diligence could have discovered the fraud." *Mister Donut of Am., Inc. v. Harris*, 723 P.2d 670, 672 (Ariz. 1986). Accordingly, the statute of limitations "may begin to run before a person has actual knowledge of the fraud or even all the underlying details of the alleged fraud." *Id.* Ordinarily, when discovery occurs and a claim accrues are questions of fact for the jury. *Doe v. Roe*, 955 P.2d 951, 961 (Ariz. 1998) (citing *Gust, Rosenfeld & Henderson*, 898 P.2d at 969). But "summary judgment is warranted . . . if the failure to go forward and investigate is not reasonably justified." *In re Est. of Benson*, 2016 WL 821522, *7 (Ariz. Ct. App. Mar. 2, 2016) (quoting *Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002)).

This lawsuit commenced on April 12, 2018. (Doc. 1.) Because the three-year limitations period governs the Rindlisbachers' claims, the claims will be barred by the statute of limitations if they accrued before April 12, 2015.

### i.    Historical Sales in the Phoenix Market

In September 2010, Mr. Snyder, Steinway's Western District Sales Manager, allegedly told Mr. Rindlisbacher that "the Phoenix market is capable of selling 70 Steinway Grands per year" but "in the [2010] economic environment [he] should reasonably expect

to sell 45 Steinway Grands per year." (Doc. 217 at 2.) The parties later agreed, in December 2010, that an annual goal of 45 Steinway grand pianos was reasonable for the Phoenix market. (FAC ¶ 72.) The Rindlisbachers argue that Steinway failed to disclose the actual historical sales of Steinway grand pianos in the Phoenix market, which rendered the annual sales goals misleading. (Doc. 217 at 2.) The Rindlisbachers contend their claims, arising from this alleged omission, did not accrue until May 27, 2015, when they discussed the matter with Mr. Schwartz, the previous Phoenix-market Steinway dealer. (Doc. 217 at 4.) That conversation, the Rindlisbachers say, "was the first moment [they] ever felt like Steinway had 'lied'" about the Phoenix market's historical sales. (*Id.*)

Steinway's position is that the Rindlisbachers' claims accrued in January 2014, at the latest. (Doc. 205 at 8.) Steinway substantiates its allegation with a newspaper article from 2011 and an e-mail Mr. Rindlisbacher sent in 2014. (*Id.* at 7–8.) An article from January 2011, published shortly after the Rindlisbachers opened Piano Showroom of Arizona, quotes Mr. Rindlisbacher saying: "In the current economic climate, I'm not sure that the Sherman Clay model works anymore." (Doc. 206, Ex. 38.) Sherman Clay, a large piano retailer, owned Steinway of Phoenix—the dealer that immediately preceded the Rindlisbachers in the Phoenix market. (FAC ¶ 53.) That article noted: "The economy hit [Steinway of Phoenix] hard as the number of customers able to pay $20,000 or more for one of the instruments decreased significantly." (Doc. 206, Ex. 38.)

In a second article, published in December 2011, Mr. Rindlisbacher made additional remarks about the weakness of the Phoenix market. (Doc. 206, Ex. 52.) That article states: "[P]ianos sold in Phoenix declined over the past five years, Rindlisbacher said. Those numbers mirror what's happened nationally, he said." (*Id.*) Mr. Rindlisbacher is also quoted saying: "To put it in perspective, more than 30 years ago more than 300,000 pianos were sold each year. Last year, there were less than 40,000 sold." (*Id.*) Mr. Rindlisbacher went on to explain that "[a]s an outsider who moved to Phoenix, I've probably been a little bit surprised with the breadth of the housing crisis. The situation was probably a little more involved than I expected it to be." (*Id.*) And he noted: "I think as this economy is slowly

gaining its upward traction, I'm pretty optimistic. I don't expect sales to go up 25 percent, but I do expect sales to be up 3 to 5 percent over what they were last year, and I'll be absolutely satisfied with that." (*Id.*)

An e-mail that Mr. Rindlisbacher sent to Mr. Snyder in January 2014 (the "January 2014 e-mail") further demonstrates his understanding of the Phoenix market. (Doc. 206, Ex. 53.) After outlining his monthly sales goals for Steinway grand pianos in 2014—the sum of which totaled only 26—Mr. Rindlisbacher wrote: "While on paper this appears very obtainable to me, this market hasn't sold this number of Steinway & Son's units in a very long time—at least 8 years. So while I think it is a reasonable goal, the reality is it is going to be difficult to obtain." (*Id.*)

The Rindlisbachers concede that, "[o]f course Mr. R[indlisbacher] knew about the recession and that piano sales had declined." (Doc. 217 at 13.) But they argue Mr. Rindlisbacher "did not know the decline in Steinway Grand piano sales, either nationally or in Phoenix.[8] (*Id.*) The Rindlisbachers characterize the January 2014 e-mail as merely a "hasty, emotional, and irrational response" to Mr. Snyder's request for a monthly sales budget. (*Id.* at 14.) When asked about the e-mail during his deposition, Mr. Rindlisbacher denied having actual knowledge of the prior Steinway dealer's sales and testified he "was guessing" about the historical sales. (Doc. 206, Ex. 5 at 211:4–7.)

Mr. Rindlisbacher is a businessman with almost four decades of experience in piano

---

[8] In December 2009, however, Mr. Rindlisbacher drafted a letter to Steinway's President, in which he wrote:

> The number of Steinway & Sons pianos I have sold this year is down from previous years. The number of prospects I have who are contemplating the purchase of a new Steinway & Sons piano is lower than when I opened three years ago. Most telling to me is the reaction of the typical piano prospect upon finding out the price on a new Steinway & Sons piano—a purchase simply isn't within the realm of possibility.

(Doc. 206, Ex. 3.) The Court notes that, in 2009, the Rindlisbachers operated as a Steinway dealer only in Spokane, Washington. But given Mr. Rindlisbacher's statements affirmatively professing his knowledge of the decline in sales, no reasonable jury could find in Mr. Rindlisbacher's favor based on his current, self-serving testimony claiming that he was completely unaware of the decline in piano sales. *Anderson*, 477 U.S. at 254; *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

retail. (FAC ¶ 32.) He has owned and operated retail piano stores in three states: Utah, Washington, and Arizona. (*Id.* ¶¶ 32, 40, 71.) As the Steinway dealer in the Phoenix market, the Rindlisbachers had actual knowledge that their own sales of Steinway grand pianos were substantially lower than the annual sales goals set forth in the Phoenix Agreement. (*Id.* ¶ 84.) Despite "exercise[ing] their best efforts to perform as a Steinway dealer in the Phoenix market, hiring experienced and skilled sales people, and employing the same programs, procedures, and techniques that had been successful in the Spokane market," the most Steinway grand pianos the Rindlisbachers sold in the Phoenix market, in any year, is 24—far less than the annual sales goal of 45.[9] (*Id.* ¶¶ 82, 84.) Mr. Rindlisbacher's own testimony suggests he had doubts about the accuracy of the annual sales goals. Indeed, at his deposition, Mr. Rindlisbacher explained that, in the January 2014 e-mail, "I was basically saying, 'Bob, get off my back. I'm doing the best I can. . . . If the 45 [annual sales goal] is wrong, here's an opportunity to have a conversation about it.'" (Doc. 206, Ex. 5 at 209:15–20.) Finally, it is worth noting that, in September 2010, Mr. Snyder warned Mr. Rindlisbacher about the economic condition of the Phoenix market. (Doc. 206, Ex. 31.) In an e-mail to Steinway's President, Mr. Snyder writes: "[Mr. Rindlisbacher] is extremely excited about the market. Any attempt I made to encourage caution (which I most certainty did)—seemed to have the opposite effect." (*Id.*)

The discovery rule does not allow the Rindlisbachers "to profess longstanding ignorance when a reasonable investigation . . . would have alerted [them] to what [they] now allege[] to have been [Steinway's] misconduct many years earlier." *Isgro v. Wells Fargo Bank, N.A.*, 2019 WL 273373, *4 (Ariz. Ct. App. Jan. 22, 2019) (citing *Gust, Rosenfeld & Henderson*, 898 P.2d at 967). The Rindlisbachers repeatedly emphasize that they lacked actual knowledge of the historical sales of Steinway grand pianos in the Phoenix market. (Doc. 217 at 13.) But actual knowledge is not required to trigger accrual. *Coronado Dev. Corp. v. Super. Ct. of Ariz.*, 678 P.2d 535, 537 (Ariz. Ct. App. 1984) ("The

---

[9] Plaintiffs sold 24 pianos in 2014. (FAC ¶ 84.) Plaintiffs say "[t]hat volume was achieved due to a heavily advertised 'store closing sale' incident to the Rindlisbachers' move to the new Scottsdale Fashion Square location." (*Id.*)

statute of limitations in a fraud case begins to run when the plaintiff by reasonable diligence could have learned of the fraud, whether or not he actually learned of it."). There is substantial evidence—the newspaper articles, the January 2014 e-mail, Mr. Rindlisbacher's deposition testimony, and the Rindlisbachers' own sales of Steinway grand pianos in the Phoenix market—to put a reasonable person on notice to investigate the historical sales of Steinway grand pianos in the Phoenix market. But the Rindlisbachers chose not to.

"Although courts generally prefer to resolve claims on their merits, those that are 'clearly brought outside the relevant limitations period are conclusively barred.'" *In re Est. of Lake*, 2019 WL 258718, *3 (Ariz. Ct. App. Jan. 18, 2019) (quoting *Montano v. Browning*, 48 P.3d 494, 496 (Ariz. Ct. App. 2002)). The Court finds there is no genuine dispute as to when the Rindlisbachers had notice to investigate Steinway's alleged fraud. With reasonable diligence, the Rindlisbachers would have discovered the historical sales in the Phoenix market. Indeed, they later discovered the prior Steinway dealer's sales data simply by asking Victor Geiger, the prior Phoenix-market dealer's manager who Mr. Rindlisbacher had known for years. (Doc. 216, Ex. 9 at 24:20–25:20, 82:1–3; Doc. 206, Ex. 23 ¶ 17.) The Rindlisbachers' claims arising from the alleged omission of historical sales in the Phoenix market therefore accrued in 2014, at the latest.

In addition, the Rindlisbachers argue that an alleged confidential relationship "mitigate[s] any duty [they had] to discover Steinway's fraud on their own." (Doc. 217 at 10.) The Rindlisbachers' argument assumes a confidential relationship exists. As discussed in Part III.C of this Order, *infra*, the Rindlisbachers have not established a disputed issue of fact for trial that a confidential relationship between the parties existed. But even if a confidential relationship did exist, the Rindlisbachers largely misstate the law. They rely on four cases to support their position. Not only are the cases distinguishable from the present action, none of the cases absolve the Rindlisbachers from exercising reasonable diligence to investigate the alleged fraud.

The Rindlisbachers first rely on *Lasley v. Helms*, 880 P.2d 1135 (Ariz. Ct. App.

1994). (Doc. 217 at 11.) In *Lasley*, a patient and his family sued a doctor for medical malpractice for prescribing the patient a sleeping pill, which the plaintiffs argued was an addictive drug. 880 P.2d at 1136. The doctor assured his patient, on multiple occasions, that taking the drug was safe. *Id.* Indeed, the doctor "affirmatively denied the possibility that [the patient] was addicted and was being harmed by the drug." *Id.* at 1137. The plaintiffs relied on the discovery rule to toll the statute of limitations applicable to their malpractice claim. *Id.* The Arizona Court of Appeals explained that, when analyzing the discovery exception applicable to malpractice cases,

> [T]he professional's fiduciary and confidential relationship with his client or patient both compels the professional to disclose, rather than conceal, his error and mitigates the injured person's duty to discover it independently. A delayed limitations period encourages the professional tortfeasor to fulfill his fiduciary duty of full disclosure; it prevents the fiduciary from obtaining immunity for an initial breach of duty [i.e., the malpractice] by a subsequent breach of the obligation of disclosure.

*Id.* (alternations in original) (internal quotations omitted).

The Rindlisbachers rephrase the language from *Lasley* to argue that the alleged confidential relationship between them and Steinway,

> [C]ompels Steinway 'to disclose, rather than conceal, [its] error and mitigates [Plaintiffs'] duty to discover it independently.' Delaying accrual encourages Steinway to fulfill its duty 'of full disclosure; it prevents [Steinway] from obtaining immunity for an initial breach of duty [i.e., its 2010 fraud] by a subsequent breach of the obligation of disclosure.

(Doc. 217 at 10 (alterations in original).)

As the unaltered version of the text makes clear, *Lasley* pertained to a malpractice claim and a doctor-patient relationship. The Court is unpersuaded by the imprecise modifications the Rindlisbachers made to fit the language from *Lasley* to the facts of this case. Moreover, contrary to the Rindlisbachers' position, the court in *Lasley* specifically notes that "[c]onstructive fraud, if proven, is sufficient to toll the running of a statute of limitations *until the plaintiff either knows, or through due diligence should have known, of*

*the fraud.*" *Lasley*, 880 P.2d at 1138 (emphasis added).

The Rindlisbachers also rely on *Walk v. Ring*, 44 P.3d 990, (Ariz. 2002). (Doc. 217 at 11.) Like *Lasley*, *Walk* involved a professional negligence claim, and the court "examined the manner in which the discovery rule and constructive fraud theories apply to toll the statute of limitations." 44 P.3d at 992. The "core question" in *Walk* was "whether a reasonable person would have been on notice to investigate" the defendant-dentist's negligence. *Id.* at 996. The Arizona Supreme Court held that "[t]o trigger the statute of limitations, something more is required than the mere knowledge that one has suffered an adverse result *while under the care of a professional fiduciary*." *Id.* at 997 (emphasis added). The Rindlisbachers summarize *Walk* but make no effort to analogize that case to the present action. Rather, they merely assert, in obscure fashion, that the *Walk* case "show[s] Steinway cannot obtain immunity from its 2010 fraud by violating its very sacred duty to disclose that fraud to Plaintiffs, which it never did." (Doc. 217 at 12.) The present case does not involve a professional fiduciary, and thus, like *Lasley*, *Walk* is factually distinguishable.[10] Moreover, the court in *Walk* deemed summary judgment to be warranted when, as is the case here, a plaintiff's "failure to go forward and investigate is not reasonably justified." *Walk*, 44 P.3d at 995–96 ("The statute of limitations protects defendants from stale claims where plaintiffs have slept on their rights.").

In addition, the Rindlisbachers summarize *Gonzalez v. Gonzalez*, 887 P.2d 562 (Ariz. Ct. App. 1994). (Doc. 217 at 11–12.) In that case, the jury found a confidential relationship existed between a plaintiff-parent and a defendant-child. *Gonzalez*, 887 P.2d at 565. The court noted, however, that absent a confidential relationship, a plaintiff must exercise reasonable care to protect itself. *Id.* at 564. As the Court explains in detail in Part III.C, *infra*, no confidential relationship exists between the Rindlisbachers and Steinway. Thus, the Rindlisbachers were required exercise reasonable diligence to

---

[10] The Court notes that, in *Walk*, the plaintiff also relied on a theory of fraudulent concealment to toll the statute of limitations for her dental malpractice claim. As explained in Part III.B.1.ii, *supra*, the surviving portion of the Rindlisbachers' second claim is nondisclosure. The Rindlisbachers have not alleged a fraudulent concealment claim, wherein a defendant commits a positive act to conceal a cause of action from a plaintiff.

investigate Steinway's alleged fraud.

Last, the Rindlisbachers rely on *Mister Donut of America, Inc. v. Harris*, 723 P.2d 670 (Ariz. 1986). (Doc. 217 at 12.) In *Mister Donut of America*, which involved a franchisor-franchisee relationship, the Arizona Supreme Court reversed the Arizona Court of Appeals finding that the franchisee's fraud claim was time-barred. 723 P.2d at 672. For three years, the franchisor repeatedly assured the franchisee that the company's unique donut mix used in the franchise's donuts would soon be available in Arizona. *Id.* at 671. In reality, a restrictive covenant prohibited the donut mixes from being sold in the state. *Id.* The court reasoned that "[w]hile [the franchisee] may eventually have had a duty to investigate or risk losing his fraud claim surely he was entitled to rely, at least for a while, on the constant assurances of Mister Donut, his franchisor, that all the problems would be remedied." *Id.* at 673. Contrary to the Rindlisbachers' argument, the case does not stand for the assertion that a confidential relationship "mitigate[s] any duty to discover" potential fraud. (Doc. 217 at 10.) Rather, a party to a confidential relationship "may eventually have [] a duty to investigate or risk losing [its] fraud claim." *Mister Donut of Am., Inc.*, 723 P.2d at 673. That said, no confidential relationship exists between the Rindlisbachers and Steinway, and thus this case is unhelpful to the Rindlisbachers' argument.

By January 2014, at the latest, a reasonably prudent person in the Rindlisbachers' position would have been suspicious of Steinway's alleged fraud and taken steps to investigate. But the Rindlisbachers did nothing to either go forward and investigate or commence their lawsuit. By waiting to bring this action until April 2018, the Rindlisbachers allowed the statute of limitations to expire. Accordingly, the Court finds their claims are time-barred under A.R.S. § 12-543(3).

### ii.   Historical Sales at the Hollywood Store

The Rindlisbachers argue their claims also rest on alleged omissions regarding the sales at Steinway's company-owned Hollywood, California store in 2009 and 2010. Before entering the Phoenix Agreement, Mr. Snyder told Mr. Rindlisbacher the Hollywood store was "very successful" and "very profitable." (FAC ¶ 58.) Mr. Snyder also told

Mr. Rindlisbacher that, based on the Buying Power Index ("BPI"), the Phoenix market is about one-third the size of greater Los Angeles. (*Id.* ¶ 64.) In October 2010, Mr. Rindlisbacher paid a visit to Steinway's Hollywood store. (*Id.* ¶ 62.) Mr. Rindlisbacher, Mr. Snyder, and the Hollywood store's manager also spoke by phone after the visit occurred. (*Id.* ¶ 63.)

Steinway calculates the sales performance goals for its dealers using the BPI. (Doc. 206 ¶ 11.) The BPI is an objective metric created by a third party, which represents the perceived financial purchasing power for a given market. (*Id.*, Ex. 8 at 104:9–11, Ex. 23 ¶¶ 9–12.) In 2010, Steinway "applied across the dealer network a goal of 30 Steinway & Sons grand pianos per BPI point." (*Id.*, Ex. 6 ¶ 16.) Steinway "did not deviate from that formula based on sales performance in any particular market during [Mr.] Rindlisbacher's dealership agreements with Steinway." (*Id.* ¶ 17.) Mr. Rindlisbacher, in his declaration, concedes that, when determining the annual sales performance goal for the Phoenix market, Steinway "had given no consideration to its actual prior sales to its Maricopa County dealers," let alone its sales in a different market. (Doc. 216, Ex. A ¶ 7.C.)

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." By the terms of Rule 56, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). Whether a fact is material depends on the relevant substantive law. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The substantive law governing the Rindlisbachers' claims is summarized in § 551 of the Restatement. That section provides that "[o]ne who fails to disclose to another a fact that he knows may *justifiably* induce the other to act or refrain from acting" may be liable

for nondisclosure or constructive fraud if he is under a duty to disclose the fact in question. Restatement § 551(1) (emphasis added). To justifiably induce action or inaction, an omission must be "material," meaning "a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question," or the party who made the omission "knows or has reason to know that its recipient regards or is likely to regard the matter as important." Restatement § 538(2); *see also Rhoads*, 640 P.2d at 201.

In 2009, the year in which the store opened, Steinway sold nine Steinway grand pianos at its Hollywood store. (Doc. 227 at 6.) In 2010, the Hollywood store sold 46 Steinway grand pianos. (*Id.*) The Rindlisbachers allege Mr. Snyder's statements concerning the Hollywood store's success and profits were rendered misleading by Steinway's failure to disclose the store's sales. (FAC ¶¶ 97–98, 101.) They further argue that the alleged omissions caused the annual sales performance goals in the Phoenix Agreement to be misleading. (*Id.*) Steinway contends there is no evidence that the statements were false or misleading and alleges Mr. Rindlisbacher could have, but did not, ask Mr. Snyder or the manager of the Hollywood store to provide the Hollywood store's historical sales numbers. (Doc. 227 at 6.)

Considering the relevant facts and applicable law, the Court finds that the Rindlisbachers have not established a genuine dispute of *material* fact for trial. Under Arizona law, the alleged omissions pertaining to the Hollywood store's sales would be material only if a reasonable person would attach importance to them when determining whether to enter the Phoenix Agreement, or if Steinway knew or should have known that the Rindlisbachers regarded the sales as important. *See* Restatement § 538(2). Neither scenario exists here.

As to the Hollywood store's success and profits, there is no evidence in the record that these statements were false or misleading. The Rindlisbachers' own performance in the Phoenix market demonstrates that a store can be profitable by selling pianos below the

market's perceived potential.[11] And to the extent the statements were misleading, there is no evidence that Steinway considered the success or historical sales of the Hollywood store when determining the annual sales goals for the Phoenix market.

To the contrary, there is ample evidence suggesting that the sales goals were calculated using the relevant market's BPI, regardless of that market's past sales. (Doc. 206 ¶¶ 11–13, 15–16.) The Phoenix Agreement expressly states the BPI for the Phoenix market. (*Id.*, Ex. 35 at 7.) And when Mr. Rindlisbacher inquired into becoming the Phoenix-market dealer, the parties, within days, discussed this index. (*Id.*, Ex. 29.) Moreover, when visiting the Hollywood store and then speaking with the store's manager, Mr. Rindlisbacher, an experienced piano retailer, attached interest to the Hollywood store's "recipe," which included the manager's "approach to the store, promotional calendar, staffing schedule, product mix, use of the CRM, what he would change, etc."—but not the store's historical sales. (Doc. 227 at 6.) Considering these facts, the Court finds that the Hollywood store's historical sales are not material to the Rindlisbachers' claims. Accordingly, Steinway is entitled to summary judgment. *See Anderson*, 477 U.S. at 248.

Even if the Hollywood store's historical sales are material, the Court finds the Rindlisbachers' claims are nevertheless time-barred under A.R.S. § 12-543(3). As noted, the limitations period in A.R.S. § 12-543(3) begins "running when the defrauded party discovers or with reasonable diligence could have discovered the fraud." *Mister Donut of Am., Inc.*, 723 P.2d at 672. The Rindlisbachers contend that Steinway has cited no evidence that they discovered the Hollywood store's historical sales before the commencement of this litigation. (Doc. 217 at 10.) But "a person does not have to know every fact about [a] fraud claim before the statute [of limitations] begins to run." *Coronado Dev. Corp.*, 678 P.2d at 537. The evidence pertaining to Mr. Rindlisbacher's understanding of the Phoenix market, including the statements he made in the 2011 newspaper articles, the January 2014 e-mail, and the Rindlisbachers' own sales as the Phoenix-market dealer, establishes that

---

[11] Piano Showroom of Arizona, Inc. generated a profit for each year it operated as a Steinway dealership. (Doc. 206, Ex. 5 at 260:9–17.) As the Steinway dealer for the Phoenix market, the Rindlisbachers generated almost $2 million in combined total profit. (*Id.*)

the Rindlisbachers had grounds for suspecting a fraud case in 2014, at the latest. While it may be true that the Rindlisbachers did not know every detail of the alleged fraud at that time, actual knowledge of every factual predicate is not required for the statute of limitations to run. *See Coronado Dev. Corp.*, 678 P.2d at 537.

The Court finds that, by January 2014, the Rindlisbachers discovered, or through reasonable diligence should have discovered, the alleged fraud in this case. The Rindlisbachers are experienced, successful, and savvy piano retailers. The law required them to exercise reasonable diligence in their dealings with Steinway. They did not. Under these circumstances, the Rindlisbachers' claims are barred by A.R.S. § 12-543(3) and the discovery rule.

### iii.    Facts at Issue

The Court further notes that had it considered the facts at issue, which the Rindlisbachers raised for the first time in opposition to Steinway's motion for summary judgment, rather than exclude those facts under *Pickern*, the facts at issue would not affect the Court's statute-of-limitations conclusion. *See supra* Part III.A, n.4. The Rindlisbachers say they did not learn the facts at issue until after this lawsuit commenced. (Doc. 217 at 10.) But, as noted, "a person does not have to know every fact about his fraud claim before the statute [of limitations] begins to run." *Coronado Dev. Corp.*, 678 P.2d at 537. The Rindlisbachers' claims accrued, at the latest, within three years of January 2014. Considering the facts at issue would not change that conclusion. Thus, even if the Court had found that the Rindlisbachers provided Steinway with adequate notice of the facts at issue, the Rindlisbachers' claims would still be barred by A.R.S. § 12-543(3).

### C.    Constructive Fraud: Confidential Relationship

As noted, one of the Rindlisbachers' statute-of-limitations arguments is premised on an alleged confidential relation between them and Steinway. (Doc. 217 at 10.) Specifically, the Rindlisbachers contend that this alleged confidential relationship "mitigate[s] any duty [they had] to discover Steinway's fraud." (*Id.*) Finding no genuine issue of material fact, the Court concludes that the Rindlisbachers and Steinway were not

engaged in a confidential relationship.

Arizona courts have "repeatedly held that when fraud is relied upon, either in the complaint or the answer, it must be established by clear and satisfactory evidence." *Brazee v. Morris*, 204 P.2d 475, 476 (Ariz. 1949). Under Arizona law, constructive fraud is "a breach of a legal or equitable duty which irrespective of the moral guilt or intent of the party charged, the law declares fraudulent." *Rhoads*, 700 P.2d at 846. "Where a relation of trust and confidence exists between two parties so that one of them places peculiar reliance in the trustworthiness of another, the latter is under a duty to make a full and truthful disclosure of all material facts . . . ." *Id.* at 846–47. A breach of that duty gives rise to an action in constructive fraud. *Id.* at 847.

Arizona courts recognize two separate relations of trust and confidence: fiduciary relationships and confidential relationships. *In re McDonnell's Est.*, 179 P.2d at 241. A fiduciary relationship is "something approximating business agency, professional relationship, or family tie." *Id*. Although "[t]here is no uniform practice among the courts in the use of the phrases 'fiduciary relation' and 'confidential relation,'" a confidential relation "does not fall into any well-defined category of law." *Rhoads*, 700 P.2d at 847 (internal quotations omitted). Rather, a confidential relationship is "a relation of parties in which one is bound to act for the benefit of the other and can take no advantage to himself from his acts relating to the interest of the other." *Id.* Confidential relationships require "great intimacy, disclosure of secrets, intrusting of power, and superiority of position in the case of the representative." *Id.* Neither "mere confidence or implicit faith in another's honesty and integrity" nor "mere friendly relations" are enough to constitute a fiduciary or confidential relation. *Id.*

Under Arizona law, confidential relations have been found to exist between "husband and wife, parent and child, guardian and ward, attorney and client, partnership, [and] joint adventurers." *Stewart v. Phx. Nat'l Bank*, 64 P.2d 101, 106 (Ariz. 1937). Courts have declined to find confidential relations when the relationship between the parties arises from an arms-length commercial transaction. *Brazee*, 204 P.2d at 477 (finding no

confidential relationship because the parties "operated at arm's length throughout all of their dealings"); *see also Rhoads*, 700 P.2d at 847–48 (finding no confidential relation between parties engaged in a 23-year business relationship); *Klinger v. Hummel*, 464 P.2d 676, 679 (Ariz. Ct. App. 1970) (finding no confidential relation between a buyer and seller in a real estate transaction even though "the parties had known each other for a long time," "were friends," and only one party "was experienced in real estate transactions while the [others] were not").

There is a reason why courts impose a duty of disclosure where true relations of trust and confidence exist. They commonly involve situations where one party has placed its trust in another to perform a task or provide counseling and the other party has greater knowledge or a specialized skill. *See* Restatement § 551, cmt. f ("[R]elations of trust and confidence include those of the executor of an estate and its beneficiary, . . . those of physician and patient, attorney and client, priest and parishioner, . . . and guardian and ward."). Without this duty of disclosure, the party with whom trust or confidence is placed might exploit the knowledge disparity or conceal potential conflicts of interest. The disclosure requirement protects against this concern.[12] *See e.g.*, *Gonzalez*, 887 P.2d at 565 (finding a relation of trust and confidence and thereby imposing a duty of disclosure where a son took advantage of his mother who "never attended school," "understood little English," and required assistance when reading documents in English). Furthermore, it is well established that "[a]n essential element of the principal-agent relationship which carries a fiduciary responsibility is the ability of the agent to act on behalf of his principal with third parties." *Barlage v. Valentine*, 110 P.3d 371, 376 (Ariz. Ct. App. 2005) (quoting *Equitable Life & Cas. Ins. Co. v. Rutledge*, 454 P.2d 869, 876 (Ariz. Ct. App. 1969)). By requiring full and truthful disclosure of all material facts, a basic principle of the law of

---

[12] This situation, where an agent's best interests diverge from those of its principal, is often referred to as the principal-agent problem. "Generally speaking, an agent always has some incentive to pursue her own interests . . . ." Benjamin Hoorn Barton, *Why Do We Regulate Lawyers?: An Economic Analysis of the Justifications for Entry and Conduct Regulation*, 33 ARIZ. ST. L. J. 429, 465, n.150 (2001). A principal "can guard against this phenomena by closely monitoring the work of the agent," but "this impinges upon the original purpose of the agency relationship" and "the costs of monitoring an agent's behavior will be high." *Id.*

agency—"*qui facit per alium, facit per se, i.e.*, one acting by another is acting for himself"—is preserved. *Id.* (quoting *Gustafson v. Rajkovich*, 263 P.2d 540, 543 (Ariz. 1953)).

The Rindlisbachers contend that, because of an alleged relation of trust and confidence between them and Steinway, they had no obligation to exercise due diligence and investigate Steinway's alleged factual omissions. (Doc. 217 at 10.) Steinway argues that no fiduciary or confidential relation exists in this case. (Doc. 205 at 11.) Specifically, Steinway says that it "did not agree to act as a fiduciary or in a similar capacity" to the Rindlisbachers and contends Mr. Rindlisbacher, in his deposition, "could not identify what 'great intimacy, disclosure of secrets, or entrusting of power' he had given Steinway." (*Id.* at 12–13.)

The Rindlisbachers, in their Response to Steinway's Motion for Summary Judgement #1 (Liability), make no argument and cite no legal authority to rebut Steinway's position as to the existence of a confidential relationship. Rather, they assert, in conclusory fashion, that a confidential relation exists and then "incorporate" the arguments made in their Motion for Summary Judgment on Constructive Fraud (Doc. 199) and corresponding Reply (Doc. 215). (Doc. 217 at 15.) The Court notes that the Rindlisbachers' attempt to incorporate by reference arguments made in one motion to oppose a new motion circumvents this Court's local rules governing page limits. *See D'Agnese v. Novartis Pharms. Corp.*, 952 F. Supp. 2d 880, 885 (D. Ariz. 2013). And generally, the Court will not sift through incorporated documents to determine which arguments are relevant to the issue presently before the Court. *See e.g.*, *Orr v. Bank of Am.*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted) ("Judges need not paw over the files without assistance from the parties."). Nevertheless, the Rindlisbachers' Motion for Partial Summary Judgment on Constructive Fraud is also pending before the Court, and Parts VI and VII, therein, pertain to whether a confidential relation exists between them and Steinway. (Doc. 199 at 11–14.) Thus, the Court, in its discretion, will consider the arguments the Rindlisbachers made in their Motion for Partial Summary Judgment on Constructive Fraud

as well as the arguments Steinway raises in response to that motion and in its own Motion for Summary Judgment #1 (Liability). The Rindlisbachers make three arguments in support of finding a confidential relationship. The Court will address each argument in turn.

### 1.    Business Agency, Professional Relation, Family Tie

First, the Rindlisbachers contend Steinway's relation towards them "is akin to 'business agency, professional relation, or family tie.'" (Doc. 199 at 13.) Considering Arizona law, the Rindlisbachers are essentially arguing that a fiduciary relationship exists between them and Steinway. *See In re McDonnell's Est.*, 179 P.2d at 252–53. ("[T]o establish a fiduciary relationship . . . there must be something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise."). "Generally, commercial transactions do not create a fiduciary relationship unless one party agrees to serve in a fiduciary capacity." *Cook v. Orkin Exterminating Co., Inc.*, 258 P.3d 149, 152 (Ariz. Ct. App. 2011). And Arizona caselaw expressly "distinguishes a fiduciary relationship from an arm's length relationship." *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 335 (Ariz. Ct. App. 1996). Whether a fiduciary or confidential relationship exists typically is a question of fact. *Cook*, 258 P.3d at 151. But when the evidence would be insufficient to support a verdict, the court may rule as a matter of law. *Id.* The Court finds the evidence in this case insufficient to support a verdict in the Rindlisbachers' favor.

The Rindlisbachers say Steinway "viewed the dealer relation as akin to a partner relation, which is a classic 'business agency,'" because Steinway recognized its dealers with "Partners in Performance" awards and described its marketing programs as "Steinway Partnership Programs." (Doc. 199 at 13.) Steinway argues "the use of 'partner' in an award title or a marketing program cannot create a legal partnership." (Doc. 211 at 12.) The Court agrees with Steinway.

Under Arizona law, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership." A.R.S. § 29-1012(A). There is no evidence that the Rindlisbachers and Steinway were co-owners of Piano Showroom of

1   Arizona. Rather, the express terms of the Phoenix Agreement provide that no joint venture
2   between the parties had been created and characterize the Rindlisbachers as "an
3   independent contractor only." (Doc. 206, Ex. 35 at 5.) In addition, Mr. Rindlisbacher
4   testified that the Rindlisbachers and Steinway never agreed to share in one another's profits
5   or losses. (Doc. 212, Ex. 5 at 280:16–18.) *See* A.R.S. § 29-1012(C)(3) ("A person who
6   receives a share of profits of a business is presumed to be a partner in the business . . . .").
7   The Rindlisbachers and Steinway did not form a partnership, and thus the Court finds there
8   is no business agency between the parties based a partner relation.

9          The Rindlisbachers, advancing their business agency argument, also emphasize that
10  they were Steinway's exclusive sales representative for a specific territory and that the
11  dealer agreement prohibited sales beyond the territory, sales of competing lines of pianos,
12  and sales for resale. (Doc. 199 at 13.) Relying only on an opinion by the Oregon Court of
13  Appeals and a Third Circuit opinion, which considered New Jersey and Connecticut law,
14  the Rindlisbachers argue that when "a manufacturer appoints a dealer with an exclusive
15  territory arrangement the level of mutual trust and confidence approximates a business
16  agency." (*Id.* at 12.) The Rindlisbachers have not provided the Court with any Arizona
17  authority establishing that proposition. And the Court will not expand Arizona law to find
18  a confidential relationship based solely on an exclusive territory agreement between a
19  dealer and manufacturer.

20         The Rindlisbachers' business agency argument also fails considering the express
21  language in the Phoenix Agreement. When "parties have expressly characterized their legal
22  relationship, such characterization will be persuasive on the issue of the parties'
23  capacities." *Urias v. PCS Health Syss., Inc.*, 118 P.3d 29, 35 (Ariz. Ct. App. 2005). In
24  *Urias*, for example, an agreement provided that the parties were "'independent contractors'
25  and that 'they shall have no other legal relationship under or in connection with [the
26  agreement].'" *Id.* The Arizona Court of Appeals held that no fiduciary relationship existed
27  between the parties and emphasized that if one party "had intended to create a fiduciary
28  relationship, it could have negotiated for specific language in the [a]greement to that

1    effect." *Id.*

2            Here, the Phoenix Agreement expressly provides:

3                    This Agreement does not create an employer-employee
                    relationship, an agency or joint venture between Steinway and
4                    Dealer. Dealer shall have no authority to act for or to bind
                    Steinway in any way, to execute agreements on behalf of
5                    Steinway or to represent that Steinway is in any way
                    responsible for the acts or omissions of Dealer. Dealer shall be
6                    an independent contractor only.

7    (Doc. 206, Ex. 35 at 5.) The Phoenix Agreement did not vest any authority in the

8    Rindlisbachers to act as Steinway's legal agent. Instead, the Phoenix Agreement created a

9    contractual arrangement whereby Steinway agreed to provide the Rindlisbachers with

10   pianos to sell, distribute, and deliver in the Phoenix market. "A commercial contract creates

11   a fiduciary relationship only when one party agrees to serve in a fiduciary capacity." *Urias*,

12   118 P.3d at 35. The Phoenix Agreement does the opposite by establishing an independent

13   contractor arrangement. The Court therefore rejects the Rindlisbachers' argument that a

14   fiduciary relationship in the form of a business agency exists between the parties.

15           The Rindlisbachers next argue that they "entrusted Steinway with confidential

16   information, as happens in 'professional relations.'" (Doc. 199 at 13.) They do not provide

17   additional detail concerning the nature of that allegedly confidential information. Nor do

18   they cite legal authority establishing that the provision of confidential information to

19   another party is enough to establish a fiduciary or confidential relation. It appears, from

20   Steinway's Motion for Summary Judgment #1 (Liability), that the confidential information

21   the Rindlisbachers are referring to is financial information, information about relationships

22   with music teachers and loan programs, and employee performance evaluations. (Doc. 205

23   at 13–14.) But the fact the Rindlisbachers provided Steinway with this information does

24   not show that they substituted Steinway's will for its own. *See Standard Chartered PLC*,

25   945 P.2d at 336.

26           The Rindlisbachers also contend the dealer relation is comparable to a family tie

27   considering Steinway's "We Are Family" slogan and Steinway's President and CEO's

28   encouragement that dealers view one another as family. (Doc. 199 at 13.) Arizona caselaw

contradicts this argument. In *Rhoads v. Harvey Publications, Inc.*, 700 P.2d 840, 844 (Ariz. Ct. App. 1984), the defendant allegedly told the plaintiff that he was "a trusted and valued member of the [defendant's] family." 700 P.2d at 844. But, as the Arizona Court of Appeals made clear, "[t]hose words are not actionable." *Id.* Moreover, in cases where Arizona courts have allowed familial ties to serve as the basis of a confidential relationship, the cases involved actual family members. *E.g.*, *Gonzalez*, 887 P.2d at 565–66 (parent-child). The Court declines to expand the scope of "family ties" for purposes of confidential relations beyond the distinct familial relationships set forth in Arizona caselaw. Thus, the Court finds there is no evidence in the record to support a fiduciary or confidential relationship on the basis of family ties, professional relations, or business agency. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.").

### 2.    Superiority of Position

Second, the Rindlisbachers argue that Steinway "clearly had 'superiority of position' compared with Plaintiffs." (Doc. 199 at 13.) They emphasize that the "ratio of Steinway's average annual net sales to Plaintiffs' average annual net sales is 214 to 1," that Steinway has 125 patents on various aspects of piano manufacturing, and that Steinway's 157 years of experience in the piano industry provides "an unparalleled level of brand loyalty and brand dominance." (*Id.* at 14.)

As this Court has already noted in a previous order, "Plaintiffs equate the term of art 'superiority of position' to include 'market superiority,' but they do not cite to any published legal opinion establishing this equivalence." (Doc. 112 at 6.) Contrary to the Rindlisbachers' interpretation, superiority of position, in the context of fiduciary or confidential relations, is "demonstrated in material aspects of the transaction at issue by a 'substitution of [the fiduciary's] will." *Standard Chartered PLC*, 945 P.2d at 335 (alternations in original) (quoting *Herz & Lewis, Inc. v. Union Bank*, 528 P.2d 188, 190 (Ariz. Ct. App. 1974)). The Rindlisbachers have made no showing that "an ordinarily prudent person in the management of his business affairs" would "repose that degree of

confidence in [Steinway] which largely results in the substitution of [Steinway's] will for his in the material matters involved in the transaction." *See Herz & Lewis, Inc.*, 528 P.2d at 190 (internal quotations omitted). Thus, the Court is unpersuaded by the Rindlisbachers' second argument.

In addition, the Rindlisbachers claim Steinway's alleged superior position induced them to place "peculiar reliance" in Steinway. (Doc. 199 at 13–14.) To support their "peculiar reliance" argument, the Rindlisbachers make parenthetical references to two Arizona cases. (*Id.* at 12.) Both cases are distinguishable.

The Rindlisbachers correctly note that the Arizona Supreme Court found a confidential relationship to exist between a bank and its customer in *Stewart v. Phoenix National Bank*, 64 P.2d 101 (Ariz. 1937). In *Stewart*, the plaintiff had been a customer of the defendant-bank for 23 years. 64 P.2d at 106. The defendant's officers and directors had served as the plaintiff's financial advisers, and the plaintiff repeatedly relied on their advice when making financial decisions. *Id.* Thus, the plaintiff entrusted the bank's officers as financial advisors based on their specialized knowledge and skill. *Id*. In finding a confidential relation, moreover, the court emphasized the unique relationship between modern banks and their customers. *Id.* Specifically, the court explained that investors commonly seek and rely upon their banks' advice before making investments, and banks, almost universally, advertise their ability to perform services that are confidential in nature, such as trustee, executor, or administrator, for all who do business with them. *Id.* In contrast, the *Stewart* court distinguished the relationship between a bank and its depositors. *Id*. "The relation between a bank and a simple depositor therein is that of debtor and creditor, and ordinarily no confidential relation arises out of such circumstances . . . ." *Id*.

The Rindlisbachers make no effort to analogize *Stewart* to the present case. Their reference to *Stewart* is merely in a parenthetical in a separate section of their motion. (Doc. 199 at 12.) There is no evidence in this case that Steinway acted as an advisor for the Rindlisbachers or that they relied on Steinway's express advice. Rather, the evidence only shows that a sophisticated retailer, the Rindlisbachers, conducted due diligence and entered

an arms' length dealership agreement with a sophisticated manufacturer. The Rindlisbachers had a commercial relationship with Steinway and nothing more. Steinway's supposed market superiority does not transform the arms' length transaction between them into a confidential relationship similar to the one found in the *Stewart* case.

Nor does the Rindlisbachers' reference to *Mister Donut of America Inc. v. Harris*, 723 P.2d 670 (Ariz. 1960), persuade the Court. As explained elsewhere in this Order, *Mister Donut of America* involved a "special franchisor-franchisee relationship." 723 P.2d at 673. No franchise relationship exists here. Moreover, as Steinway points out, the Ninth Circuit, applying Arizona law, has explained that a franchisee-franchisor relationship "is not generally a 'special relationship'" for constructive fraud purposes. *Simmons v. Mobil Oil Corp.*, 29 F.3d 505, 512 (9th Cir. 1994) ("While there is generally a disparity in bargaining power in the franchise context, more is required [to establish a confidential relation]."). Thus, *Mister Donut of America* is unhelpful to the Rindlisbachers.

The Rindlisbachers further argue that they "intrusted power over their business to Steinway" by abiding by certain sales restrictions, displaying signage, utilizing certain interior décor and layouts of merchandise, and training employees. (Doc. 199 at 14.) In response, Steinway contends that sales restrictions, such as the exclusivity of sales territories, operated to the Rindlisbachers' benefit because the restrictions ensured that the Rindlisbachers would be paid by any other Steinway dealer selling new Steinway pianos into the Phoenix market. (Doc. 211 at 13.) Steinway also argues that the Rindlisbachers' "allegations related to Steinway's alleged control over [their] business arise from [a] trademark license agreement," which the Rindlisbachers "were not obligated to enter . . . to become a Steinway dealer" but did so to use the "Steinway" name. (*Id.* at 13–14.)

The Arizona Court of Appeals has explained that "intrusting of power" in another is an indication of a confidential relationship. *Rhoads*, 700 P.2d at 847. But, "[i]t is well established that when the owner of a trademark licenses the mark to others, he retains a duty to exercise control and supervision over the licensee's use of the mark." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 992 (9th Cir. 2006) (internal quotations omitted).

"The duty does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question." *Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1327 (7th Cir. 1979); *First Interstate Bancorp v. Stenquist*, 1990 WL 300321, *3 (N.D. Cal. July 13, 1990) ("[T]he Ninth Circuit has [] recognized that the amount of control a licensor must have over a licensee is limited to that which is necessary to prevent deception . . . ."). And "such a license, without more, does not create a fiduciary [or confidential] relationship." *Weight Watchers of Que. Ltd. v. Weight Watchers Intern., Inc.*, 398 F. Supp. 1047, 1053 (E.D.N.Y. 1975); *Transgo, Inc. v. Ajac Transmission Parts Corp*, 768 F.2d 1001, 1018 (9th Cir. 1985) (internal quotations omitted) ("The purpose of the Lanham Act is to ensure the integrity of registered trademarks, not to create a federal law of agency.").

The licensing agreement between the parties provides: "Dealer agrees to consult with Steinway" on matters including (1) "room lay-out; interior decoration; and product presentation;" (2) "[s]ignage;" and (3) "[s]taff training." (Doc. 206, Ex. 36 at 2.) By agreeing to be bound by the terms of the licensing agreement, the Rindlisbachers obtained permission to use the name "Steinway" in conjunction with their company name, Piano Showroom of Arizona. (*Id.* at 1.) Contrary to their assertions, the Rindlisbachers did not entrust power over their business to Steinway. Rather, under well-established trademark law, Steinway merely retained the right to exercise control and supervision over its trademark. And, as discussed, the Rindlisbachers have not provided the Court with any legal authority establishing that sales restrictions transform an otherwise arm's length relationship into a confidential relationship.

The Rindlisbachers also contend they entrusted power to Steinway because it could render "a huge investment of [their] effort and money" worthless by having the ability to terminate the Phoenix Agreement for no reason. (Doc. 199 at 14.) The Court is unpersuaded by the Rindlisbachers' fragmentary account of the termination clause. By the Phoenix Agreement's terms, the Rindlisbachers also had the power to "cancel th[e] Agreement at any time for any reason upon ninety (90) days prior written notice." (Doc. 206, Ex. 35 at

4.) Thus, the Court finds that the Rindlisbachers have failed to raise a genuine issue of material fact as to Steinway's alleged "superiority of position."

### 3. Superior Knowledge

Last, the Rindlisbachers allege that Steinway's "superior knowledge" establishes a confidential relationship. (Doc. 199 at 14.) Reliance on superior knowledge only creates a confidential relationship if "the knowledge is of a kind beyond the fair and reasonable reach of the alleged beneficiary and inaccessible to the alleged beneficiary through the exercise of reasonable diligence." *Standard Chartered PLC*, 945 P.2d at 336; *see Taeger v. Cath. Fam. & Cmty. Servs.*, 995 P.2d 721, 727–28 (Ariz. Ct. App. 1999) (explaining the plaintiffs did not merely defer to a defendant's knowledge but they were required to rely on the defendant's knowledge because they had no other way to attain the information).

Specifically, the Rindlisbachers contend that Steinway "had dealers in Maricopa County for at least 35 years before 2010, so it knew much more than Plaintiffs about Steinway's experience in the market." (Doc. 215 at 10.) They further suggest that Steinway's "125 patents on various aspects of piano manufacturing and its 160-year history of manufacturing best-in-class pianos gave it a vast reservoir of technical knowledge [the Rindlisbachers] would never have." (Doc. 199 at 14.) While it is likely true that Steinway possessed more knowledge about its historical success in the Phoenix market, *more* knowledge is not equivalent to *inaccessible* knowledge. *See Standard Chartered PLC*, 945 P.2d at 336; *Cook*, 258 P.3d at 152 ("The law does not create a fiduciary [or confidential] relation in every business transaction involving one party with greater knowledge, skill, or training, but requires peculiar intimacy or an express agreement to serve as a fiduciary.").

The Rindlisbachers have provided the Court with no evidence showing that Steinway had a means of knowledge about the Phoenix market to which they could not have reasonably obtained through their own due diligence. Indeed, the Rindlisbachers ultimately discovered the Phoenix market's past sales simply by asking the prior Phoenix-market dealer's manager, who Mr. Rindlisbacher had known for years. (Doc. 216, Ex. 9 at 24:20–25:20, 82:1–3.) Thus, the evidence pertaining to Steinway's alleged "superior

knowledge" is insufficient to support a verdict in the present action.

The Rindlisbachers have failed to raise a genuine dispute of material fact for trial. Therefore, the Court concludes the evidence in this case is insufficient to establish the existence of a fiduciary or confidential relationship between the parties. The Rindlisbachers' statute of limitations argument that is dependent on a confidential relationship thereby fails. In addition, because liability for constructive fraud only arises when a fiduciary or confidential relationship exists, Steinway is entitled to judgment as a matter of law on the merits the Rindlisbachers' constructive fraud claim.

### D.   Damages

As discussed, the Rindlisbachers' two remaining claims are barred by the statute of limitations, and Steinway is entitled to summary judgment on the merits of their constructive fraud claim because the Rindlisbachers have not established a genuine dispute of material fact on the issue of a confidential relation. Alternatively, Steinway is entitled to summary judgment on both of the Rindlisbachers' claims on the issue of damages.[13]

The Rindlisbachers seek damages of $7.5 million to $8.6 million in alleged lost profits, $252,000 in out-of-pocket damages arising from a lease they signed in 2014, and punitive damages. (FAC at 28–29.) The claimed lost profit damages are calculated by combining the annual sales goals in the Phoenix Agreement, which total 1,521 pianos, subtracting the 443 pianos that the Rindlisbachers actually purchased from Steinway and sold to customers, and then calculating the profit they would have earned had each of those 1,078 pianos been sold. (Doc. 208, Ex. 25 at 20–22.) The Court first addresses the Rindlisbachers' alleged lost profit and out-of-pocket damages on the issue of causation because the Court finds that issue is dispositive. The Court then addresses the Rindlisbachers' request for punitive damages.

#### 1.   Causation

A victim of fraud is "entitled to compensation for every wrong which was the natural

---

[13] The Court notes that this alternative holding has no impact on the Court's statute of limitations analysis. The Court evaluates Steinway's Motion for Summary Judgment #2 (Damages) on the assumption that the Rindlisbachers' damages expert's testimony is admissible.

1    and proximate result of the fraud."[14] *Cole v. Gerhart*, 423 P.2d 100, 103 (Ariz. Ct. App.

2    1967) (internal quotations omitted); *see also S Dev. Co. v. Pima Cap. Mgmt. Co.*, 31 P.3d

3    123, 136 (Ariz. Ct. App. 2001) (explaining that if a defendant is liable to a plaintiff for

4    negligent misrepresentation by omission or fraud, the defendant must compensate the

5    plaintiff for pecuniary loss if the misrepresentation is a legal cause of the loss). The

6    Restatement further provides that fraudulent conduct must be the cause in fact and legal

7    cause of pecuniary loss to support a damages award. Restatement §§ 546, 548A.

8    Section 546, which relates to causation in fact, provides that a defendant is subject to fraud

9    "liability for pecuniary loss suffered by one who *justifiably relies* upon the truth of the

10   matter misrepresented, if his *reliance* is a *substantial factor* in determining the course of

11   conduct that results in his loss." Restatement § 546 (emphasis added). "A fraudulent

12   misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in

13   reliance upon it if, but only if, the loss might *reasonably be expected to result from the*

14   *reliance*." Restatement § 548A (emphasis added).

15          Steinway argues the Rindlisbachers "cannot prove that the alleged omissions were

16   the proximate cause of their claimed damages." (Doc. 207 at 9.) Specifically, Steinway

17   contends that there is no evidence showing that the Rindlisbachers would have acted

18   differently had they known the historical sales in the Phoenix market and that the

19   Rindlisbachers' damages expert's opinions are speculative. (*Id.* at 5–6, 9.) Steinway further

20   argues there is no evidence that, had the Rindlisbachers "known about the prior dealer's

21   actual sales, they would have actually sold 234 pianos per year for six and a half years

22   (instead of averaging 64.5) or generated $6 million in annual gross piano sales (instead of

23   $2.2 million)." (*Id.* at 9.) In response, the Rindlisbachers claim the alleged omissions were

24   a "substantial factor" in their decision to enter the Phoenix Agreement. (Doc. 220 at 9.)

25   ───────────
[14] The parties disagree as to whether law pertaining to duty-based claims or law regarding
26   fraud claims is applicable to the current matter. At times, the Rindlisbachers cite law
     applicable to negligence claims (i.e., Restatement § 431), and at other times they cite law
27   applicable to fraud claims. For purposes of damages, both categories of claims require
     causation in fact and legal causation. *Compare* Restatement §§ 546, 548A, *with Valley*
28   *Nat'l Bank v. Brown*, 517 P.2d 1256, 1260 (Ariz. 1974) ("Recovery in a tort action is
     limited to those damages which are the direct and proximate consequence of the
     defendant's wrongful acts.").

1    The Rindlisbachers say they "have shown loss causation and legal cause." (*Id.* at 8.) But
2    they do not cite to particular parts of the record to rebut Steinway's contentions.

3          The Rindlisbachers have not provided the Court with evidence showing that the
4    alleged omissions caused their lost profit damages. *See Cole v. Gerhart*, 423 P.2d at 103
5    (explaining damages are recoverable only if they are "the proximate result of the wrong []
6    committed"). As Steinway correctly points out, the Rindlisbachers' lost-profits damages
7    theory requires the Court to assume that, had the alleged omissions been disclosed, the
8    Rindlisbachers would have nonetheless entered the Phoenix Agreement, met the sales goals
9    set forth therein, and generated an additional $4 million in annual revenue. (Doc. 207 at 6.)
10   As noted, the Rindlisbachers contend that Mr. Snyder's statements were a "substantial
11   factor" in their decision to expand their business into the Phoenix market. (Doc. 220 at 9.)
12   But the Rindlisbachers have not provided the Court with any evidence showing that they
13   would have sold more than 1,000 additional pianos in six years. The sales goals in the
14   Phoenix Agreement were simply that, goals. There is no evidence that those goals were a
15   contractual guaranty. (Doc. 208, Ex. 1 ¶ 14.) And no reasonable person would rely on these
16   projections as a guarantee of future sales. The Rindlisbachers are only entitled to damages
17   if the alleged loss is "the natural and proximate result of the [alleged] fraud." *Cole*, 423
18   P.2d at 103; *see* Restatement §§ 546, 548A. That is not the case, here.

19         In addition, the Rindlisbachers' theory of damages with respect to lost profits is too
20   speculative to support a judgment. *See Coury Bros. Ranches, Inc. v. Ellsworth*, 446 P.2d
21   458, 464 (Ariz. 1968) ("Damages that are speculative, remote or uncertain may not form
22   the basis of a judgment."). To accept the Rindlisbachers' lost-profit damages theory, the
23   Court would be required to make numerous, unjustified inferential leaps that are wholly
24   unsupported by the record. That is, the Court would need to assume that, had the
25   Rindlisbachers known the historical sales in the Phoenix market or at the Steinway-owned
26   Hollywood store, they would have still entered the Phoenix Agreement, met the sales goals
27   for each year they served as the Phoenix-market dealer, and thereby generate more than
28   $6 million per year in revenue. (Doc. 208 ¶ 44.) Nothing in the record, except mere

speculation, suggests that the Rindlisbachers would have achieved the annual sales performance goals had the alleged omissions been disclosed. To the contrary, the record reveals that the lost-profits damages theory is at odds with the reality of the Rindlisbachers' business model. The Rindlisbachers employed only two salespeople in the Phoenix market, and the sales objective for each salesperson was $1 million in annual revenue. (Doc. 208, Ex. 9 at 166:19–22, Ex. 26.) The notion that the Rindlisbachers reasonably expected to, and ultimately would have, generated $6 million in revenue each year—$4 million in excess of their own salespeople's annual goals—is unsupported by the record. The Rindlisbachers' alleged lost profit damages are therefore too speculative and conjectural to be the basis of a judgment. *See e.g.*, *Schuldes v. Nat'l Sur. Corp.*, 557 P.2d 543, 548 (Ariz. Ct. App. 1976) ("[N]o damages can be allowed for the loss of profits which is determined to be uncertain, contingent, conjectural, or speculative.").

The Court further finds that the Rindlisbachers' claim for out-of-pocket damages cannot form the basis of a judgment. For context, the Court will briefly address the facts relevant to the alleged out-of-pocket damages. In March 2014, the Rindlisbachers entered a seven-year lease (the "2014 lease"). (FAC ¶ 78.) Mr. Rindlisbacher personally guaranteed the 2014 lease, but Steinway was not a guarantor. (FAC ¶ 78; Doc. 208, Ex. 1 ¶ 18.) In July 2017, Steinway exercised its right to terminate the Phoenix Agreement. (FAC ¶ 94.) The Rindlisbachers became a Yamaha dealer in May 2018. (Doc. 208, Ex. 25 at 23.)

The Rindlisbachers, in reliance on the 2014 lease, seek to recover the overall net loss they suffered "in the nine months between the end of their Steinway dealer relationship and the start of their Yamaha dealer relationship." (Doc. 208, Ex. 25 at 23.) Steinway argues that the Rindlisbachers "cannot establish a causal connection between the 2014 lease and the alleged omission of information by Steinway about the prior dealer's sales [in 2010]." (Doc. 207 at 14.) The Rindlisbachers assert that "[n]on-duplicative out-of-pocket/consequential damages are allowed on fraud claims" but, again, do not rebut Steinway's allegations as to causation. (Doc. 220 at 8.)

The Rindlisbachers are correct that, under Arizona law, consequential damages are

available if they arise from fraudulent conduct. *Cole*, 423 P.2d at 102. But, as noted above, a victim of fraud is only entitled to compensation if the wrong was the natural and proximate result of the fraud. *Id.* at 103. The Rindlisbachers have made no attempt to address the extremely attenuated nature of their alleged out-of-pocket damages. At the time they entered the 2014 lease, the Rindlisbachers knew their annual sales were falling far below the sales goals in the Phoenix Agreement. (FAC ¶ 84.) The record further suggests that they had notice to investigate, if not actual knowledge of, the historical sales in the Phoenix market. (Doc. 206, Ex. 38, 52–53.) *See supra* Part III.B.2. The Rindlisbachers knew that both they and Steinway had the option to terminate the Phoenix Agreement for any reason with written notice. (Doc. 206, Ex. 35 at 4.) And, in the Rindlisbachers' own words, Steinway's representatives had "accus[ed] Mr. R[indlisbacher] of lacking commitment to Steinway." (Doc. 217 at 14.) Nonetheless, the Rindlisbachers entered a seven-year lease in 2014. Any reliance claimed on the Phoenix Agreement continuing for seven more years is unreasonable and no reasonable jury could find otherwise. The Rindlisbachers have provided the Court with no evidence showing a causal connection between Steinway's alleged omissions and the net losses the Rindlisbachers' sustained seven years later. Thus, the Court finds Steinway is entitled to summary judgment on the issue of out-of-pocket damages.

In addition, "[o]ut-of-pocket damages are calculated as of the date of [the relevant transaction] and do not include collateral expenses incurred before or after the transaction." *Standard Chartered PLC*, 945 P.2d at 345. Steinway made the alleged omissions in 2010. (FAC ¶ 98.) The Rindlisbachers' alleged out-of-pocket damages did not arise until more than seven years later, after the Phoenix Agreement had been terminated. (Doc. 208, Ex. 25 at 23.) Because their only theory of alleged out-of-pocket damages are collateral expenses incurred after the Phoenix Agreement's termination, the Rindlisbachers have not established a genuine issue of material fact on the issue of out-of-pocket damages.

The Rindlisbachers have failed to provide the Court with any evidence showing that the alleged omissions were the natural and proximate cause of their alleged damages. *See*

*Cole*, 423 P.2d at 103. Thus, the Rindlisbachers' alleged lost profit and out-of-pocket damages cannot form the basis of a judgment, and Steinway is entitled to judgment as a matter of law on the Rindlisbachers' remaining claims. *See Nelson v. Pima Comm. Coll.*, 83 F.3d 1075, 1082–83 (9th Cir. 1996) (applying Arizona law and affirming summary judgment where alleged fraud did not result in any damages).

### 2.    Punitive Damages

The Rindlisbachers seek punitive damages in order to deter Steinway from engaging in conduct similar to the facts alleged in this matter and to punish Steinway for its allegedly fraudulent conduct. (FAC at 29.) This Court has previously held that the Rindlisbachers "have failed to allege sufficient facts that [Steinway's] omission of statements relevant to the issue of a reasonable annual sales goal was based on motives 'so improper' or 'conduct so oppressive, outrageous or intolerable' that an 'evil mind' could be inferred strictly from the omission of relevant information." (Doc. 112 at 16.) At this stage, the Court remains convinced that the Rindlisbachers have not provided evidence to support an award of punitive damages.

"Punitive damages are awarded only in the most egregious of cases, where a plaintiff proves by clear and convincing evidence that the defendant engaged in reprehensible conduct and acted with an evil mind." *Medasys Acquisition Corp. v. SDMS, P.C.*, 55 P.3d 763, 767 (Ariz. 2002) (internal quotations omitted). "The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways." *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986). First, "[i]t may be found where defendant intended to injure the plaintiff." *Id.* The Rindlisbachers concede Steinway did not consciously seek to damage them, and thus they cannot establish an evil motive on the first basis. (Doc. 220 at 15.) Second, an evil mind may also be found where a "defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 726 P.2d at 578. The Rindlisbachers contend that "the evidence would allow a jury to find Steinway took intentional actions that consciously disregarded the justifiable risk of significant harm to [them] and other dealers." (Doc. 220

at 15.) This allegation is premised on Steinway's alleged "core values" pertaining to family, integrity, and honesty, and Steinway's executives alleged "repudiation" of those values. (*Id.* at 16–17.) The Rindlisbachers further contend Steinway's decision to forgo its plans to open a company-owned store in Phoenix and instead allow the Rindlisbachers to serve as the Phoenix-market dealer "subject[ed] [them] to substantial unknown risks." (*Id.* at 16.)

Punitive damages are not recoverable in every fraud case. *Dawson v. Withycombe*, 163 P.3d at 1062. Indeed, under Arizona law, punitive damages are rarely available. *Medasys Acquisition Corp.*, 55 P.3d at 767. A motion for summary judgment on the availability of punitive damages "should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence." *Dawson*, 163 P.3d at 1061 (internal quotations omitted). The record presented at summary judgment provides no indication of an evil mind on behalf of Steinway. An alleged shift away from, what the Rindlisbachers say, are Steinway's core values does not establish clear and convincing evidence of evil motive. Moreover, there are unknown risks in virtually all commercial contracts. The harm Steinway allegedly created is not entirely clear from the Rindlisbachers' Response. As this Court has previously explained, "at best, [the Rindlisbachers] assert [Steinway] induced them into signing a contract which actually resulted in some, but not as much, income to both parties as both parties had hoped." (Doc. 112 at 16–17.) This alleged harm is insufficient for a reasonable jury to find that Steinway acted with the oppressive, outrageous, or intolerable conduct necessary to establish an evil mind. Accordingly, Steinway is entitled to summary judgment on the issue of punitive damages.

**E.  Steinway's Motion for Sanctions**

Steinway requests sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. (Doc. 202 at 1.) Steinway argues that the Rindlisbachers "have, from the outset, lied" about whether this lawsuit is stale. (*Id.* at 1–2.) The Court finds that sanctions are not justified in this case. Accordingly, Steinway's Motion for Sanctions is denied.

**F.  Steinway's Request for Attorneys' Fees and Costs**

Steinway requests that the Court "award it its attorneys' fees and costs under A.R.S.

§§ 12-341 and 12-341.01." (Doc. 205 at 17.) The Court "may award attorney fees only when they are 'expressly authorized by contract or statute,' and the party seeking fees must prove that the statute is applicable and authorizes compensation in his or her case." *Dos Picos Land Ltd. P'ship v. Pima Cty.*, 240 P.3d 853, 855 (Ariz. Ct. App. 2010). The Rindlisbachers have not addressed whether they believe an award of attorneys' fees and costs is appropriate in this case.

At this time, the Court makes no findings with respect to whether attorneys' fees are warranted, or on what grounds. The Court will consider a motion for attorneys' fees if timely filed.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED granting** Steinway's Motion for Summary Judgment #1 (Liability) on the statute of limitations issue as to both of the Rindlisbachers' remaining claims and the duty to disclose issue as to the merits of the Rindlisbachers' constructive fraud claim (part of Doc. 205).

**IT IS FURTHER ORDERED denying** the Rindlisbachers' Motion for Partial Summary Judgment on Constructive Fraud (Doc. 199).

**IT IS FURTHER ORDERED granting** Steinway's Motion for Summary Judgment # 2 (Damages) on the issues of causation and punitive damages (part of Doc. 207).

**IT IS FURTHER ORDERED denying** Steinway's Motion for Sanctions (Doc. 202).

**IT IS FURTHER ORDERED** that the following motions are denied as moot and without prejudice: the Rindlisbachers' Motion for Partial Summary Judgment on Certain Defenses (Doc. 192); Steinway's Motion for Summary Judgment # 1 (Liability) as to the issue of detrimental reliance (part of Doc. 205); Steinway's Motion for Summary Judgment # 2 (Damages) on the issues of benefit-of-the-bargain damages and mitigation (part of Doc. 207); the Rindlisbachers' *Daubert* Motion to Exclude Certain Proffered Testimony

1   of David A. Schwickerath (Doc. 221); Steinway's *Daubert* Motion to Preclude Opinions

2   of David R. Perry (Doc. 223); and Steinway's Motion for Leave to Supplement Trial

3   Exhibits (Doc. 242).

4          **IT IS FINALLY ORDERED** that the Clerk of Court shall enter judgment in favor

5   of Defendant Steinway, Inc. and against Plaintiffs Kevin and Jami Rindlisbacher and Piano

6   Showroom of Arizona, Inc. The Clerk of Court shall close this case.

7          Dated this 30th day of October, 2020.

8

9

10                                   Michael T. Liburdi
                                     _____
11                                   Michael T. Liburdi
                                     United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28