UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Kevin H. Rindlisbacher, et al., | ) ) | |
| | ) | CV 18-01131-MTL |
| Plaintiffs, | ) ) | |
| | ) | Phoenix, Arizona |
| vs. | ) ) | May 14, 2021 9:58 A.M. |
| Steinway, Inc., | ) ) | |
| Defendants. | ) ) | |

_____

BEFORE:  THE HONORABLE MICHAEL T. LIBURDI, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

ORAL ARGUMENT RE MOTION FOR ATTORNEY'S FEES

APPEARANCES:

For the Plaintiff:
          Morrill Law, PLC
          By: KENNETH LAYNE MORRILL, ESQ.
          8857 North 63rd Place
          Paradise Valley, AZ  85253

For the Defendant:
          Papetti Samuels Weiss, LLP
          By: BRUCE E. SAMUELS, ESQ.
          15169 North Scottsdale Road, Suite 205
          Scottsdale, AZ  85254


Official Court Reporter:
Barbara H. Stockford, CRR, RMR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          THE COURTROOM DEPUTY:  This is Case No. CV18-1131.

2    Rindlisbacher versus Steinway & Sons, Inc.  Before the Court

3    for a motion hearing.

4          Counsel, please announce your presence for the record.

5          MR. MORRILL:  Your Honor, Layne Morrill for the

6    plaintiffs.

7          MR. SAMUELS:  Good morning, Your Honor.  Bruce

8    Samuels, Papetti Samuels Weiss, for Steinway, Inc.

9          THE COURT:  Okay, thank you.  Good morning, Mr. and

10   Mrs. Rindlisbacher.  Thanks for coming.

11         All right.  So I've read the motion.  I've read your

12   response, Mr. Morrill.  Some pretty complicated issues here.

13   So why don't we devote about an hour and a half to it if we

14   need that much time.  I do want to end at 11:30.  So be

15   efficient with the time that you have.

16         Mr. Samuels, if you would like to proceed.

17         MR. SAMUELS:  Sure, Your Honor.  May I go to the

18   podium, please?

19         THE COURT:  You may.

20         MR. SAMUELS:  And may I remove my mask for purposes of

21   argument?

22         THE COURT:  You may.

23         MR. SAMUELS:  Thank you.

24         Your Honor, as the Court most likely recollects from

25   the summary judgment ruling, plaintiffs' liability theories in

1    this case and the damages theories in this case both arise out

2    of contract.  Plaintiffs' liability theories are premised on an

3    alleged duty to disclose unrequested information about the

4    prior dealer's sales performance in Maricopa County.  That

5    alleged duty, in turn, is based on the contractual relationship

6    that the Rindlisbachers had with Steinway in Spokane,

7    Washington, before they considered moving to Arizona.

8          The Rindlisbachers claim in particular that, because

9    they were a Steinway dealer in Spokane, that they -- that

10   Steinway had a duty to disclose the information about the sales

11   performance even though they never asked for it.  In each of

12   their five complaints, they went into great detail about their

13   contractual relationship with Steinway in Spokane which began

14   in 2006 and lasted through the time they entered into the

15   contract in Arizona and beyond.  They claim that the

16   contractual relationship resulted in a relationship of trust

17   and confidence.  An example is from the fourth amended

18   complaint which is the most recent complaint filed in January

19   of 2020.  The Court need look no further than Paragraph 1 of

20   that complaint in which it says -- it states:  In 2010, while

21   Steinway occupied a longstanding relationship of trust and

22   confidence toward Rindlisbachers as its Spokane, Washington,

23   dealer, Steinway induced the contract at issue in Maricopa

24   County.

25          Paragraph 41 of the same complaint states that the

1    dealer contract, referring to the Spokane dealer contract,

2    confirms Steinway's position of prominence and control over the

3    Rindlisbachers' position of dependence and subservience.

4    Paragraph 51 alleges that, because of their extensive

5    interactions as a Steinway dealer in Spokane, Steinway occupied

6    a relationship of trust and confidence.  These claims, the

7    remaining claims, could not exist but for the contract -- the

8    claims that remained at the time of summary judgment before it

9    was ruled upon by the Court.

10           The but-for-the-contract standard, Judge, is the

11    standard by which Arizona courts apply 12-341.01 to claims that

12    are tort claims but that arise out of contract.  And there's a

13    number of cases we've cited for that proposition including the

14    *Caruthers* case which is 230 Ariz. 513 at Paragraph 57.

15           Now Steinway countered that no confidential

16    relationship existed between a manufacturer and a potential

17    retailer and Steinway argued on summary judgment that, if the

18    Court were to agree with plaintiffs, a retailer could sit back

19    for years, make a profit and, only upon termination of the

20    agreement, seek to impose liability for information never

21    requested seven years earlier.

22           Last June, in arguing summary judgment before this

23    Court, plaintiffs asserted that the situation was actually

24    narrower than Steinway had portrayed and that the situation

25    only applied -- the argument only applied when there was a

```
 1   preexisting dealer agreement between the prospective retailer
 2   and the manufacturer as there was in this case.
 3            Let's turn then briefly to the damages theory which
 4   also very much depend on, is modeled on, the contract.
 5            THE COURT:  Can I ask you a quick clarifying question
 6   or two?
 7            MR. SAMUELS:  Yes, of course.
 8            THE COURT:  I don't want to get you off track,
 9   Mr. Samuels, but just two things.  The first is, on behalf of
10   Steinway, are you requesting fees for the contract claims that
11   were dismissed by Judge Tuchi or is that -- is that part of
12   this?
13            MR. SAMUELS:  No, Your Honor.  No, thank you, and I'm
14   sorry if I interrupted.  We are only seeking fees based on ARS
15   12-341.01.
16            THE COURT:  Okay.  So 341.01 as it applies to the tort
17   claims --
18            MR. SAMUELS:  Correct.
19            THE COURT:  -- that were asserted.  Okay.
20            Then my second question -- I just want to follow up on
21   this -- is, in Footnote 1 of your motion, you -- it looks like
22   you cited some *Restatements*, but then I think in your reply you
23   withdrew this argument; is that correct?
24            MR. SAMUELS:  Yeah, Footnote 1 was inartfully drafted
25   and we clarified in our reply that it's basically what we meant
```

1    to say is it's an alternative theory we could have raised, we

2    didn't raise in our answer and so, in our reply, we clarified

3    that we're not seeking fees pursuant to the contract itself.

4              THE COURT:  Okay.  All right.  Very good.  So go ahead

5    and proceed.

6              MR. SAMUELS:  Sure.  Thank you, Your Honor.

7              So we -- I spoke briefly about the liability theories

8    arising out of contract.  Let me turn then to the damage theory

9    which also very much arises out of contract.  As the Court may

10   recall, in the dealer agreement, Steinway and Rindlisbacher

11   agreed to a reasonable sales performance goal of 234 pianos per

12   year and it's undisputed that that goal was missed by

13   Mr. Rindlisbacher by an average of 70 percent per year and yet

14   the damages sought -- the theory that was both asserted in the

15   complaint and elaborated in their expert's report was that the

16   damages that plaintiffs were entitled to were contract damages,

17   were lost profit damages, were damages that arose from their

18   inability to sell 234 pianos per year which they wanted to

19   place on Steinway's back.  They, in fact, sought 7-1/2 million

20   to 8-1/2 million dollars of lost profit damages for 1,073

21   pianos that they neither purchased from Steinway nor sold to

22   any customer.  That is a damage claim arising out of contract.

23             So we've got liability claim arising out of contract

24   and damage claim arising out of contract.  Under both theories

25   of their case, as set forth in all of their complaints

1    including their most recent one, the fourth amended complaint,

2    they are unable to escape the reality that this case arose out

3    of contract for 12-341.01 purposes.

4            Let me turn to the standards that the Court must

5    review in determining whether a party is entitled to fee

6    recovery under ARS 12-341.01 and, pursuant to local rule 54.2,

7    we set forth the three requirements:  eligibility, entitlement

8    and reasonableness.

9            THE COURT:  Before you get there, could we talk a

10   little bit more about the Rindlisbachers' argument that New

11   York law should apply to your -- to whether you even get to

12   eligibility?

13           MR. SAMUELS:  Sure.

14           THE COURT:  So the way I understand what Mr. Morrill

15   is saying is that, because there is the choice-of-law provision

16   in New York, I should just follow that choice-of-law provision,

17   apply New York law which does not allow for fee shifting under

18   these circumstances.  Now, I've read what you've had to say.

19   I've done quite a bit of research.  Could you help me clarify

20   what the Arizona cases say about whether the *Restatement*

21   applies, how I'm supposed to apply the *Restatement* and then

22   perhaps help me reconcile some of these Arizona cases like

23   *Sienna Capital Funding* and other cases which I'm having trouble

24   finding a consistent rule there?

25           MR. SAMUELS:  Sure, Your Honor.

1    THE COURT:  I know there's a lot for you to unpackage

2  with that question; so go ahead and take your time.

3    MR. SAMUELS:  I appreciate the opportunity.

4    So, first of all, Arizona law governs.  That's my

5  first point.  And even if Arizona law didn't govern and New

6  York law applied, New York law, as determined by the *Sienna*

7  *Capital* case, determines fees are procedural in nature and,

8  therefore, they would be recoverable in this case because, in

9  Arizona, fees are recoverable.  So either way we get to the

10  same destination, but our primary argument is Arizona law

11  applies.  And let me elaborate on that issue and I can

12  elaborate on, if the Court determines New York law applies, we

13  still are entitled to fees under 12-341.01 within the Court's

14  discretion, of course.

15    *Sienna Capital* is one of the primary cases that is

16  only from 2017, but it's, you know -- so it's a fairly recent

17  case.  And, in that case, just to frame the issue, there was a

18  company that borrowed $1.1 million to purchase a hotel in

19  Safford.  The debt was guaranteed by some other people.  The

20  borrower defaulted and filed bankruptcy.  The creditor sued the

21  guarantors.  And the claims in that case were ruled upon on a

22  motion for partial summary judgment in the trial court on

23  liability for the contract claim.

24    Now, in that case, there was a choice-of-law provision

25  that gave the -- the creditor the option to choose New York or

1    Arizona law.  And what was -- there are a lot of interesting

2    details in this case, but the Court determined -- the Court of

3    Appeals determined that, as the forum state, the law of Arizona

4    governs procedural matters as well as choice of substantive law

5    and also concluded that, absent a contrary indication of

6    intention, a choice-of-law provision means that the state's

7    local law rather than its whole law applies.  That's

8    Paragraph 11.

9         And I agree with you, Judge, these issues are

10   complicated, but let me do my best to try to explain.  When

11   I say "these issues," these conflict-of-law principles.

12   There's three conflict of laws under the *Restatement* that are

13   at issue in this case.  Plaintiffs want the Court to focus on

14   and apply *Restatement* 187 which applies when there is a

15   choice-of-law provision.  And Steinway, in turn, asserts that

16   *Restatement* Section 145 applies which is the statute that -- or

17   the *Restatement* section that applies to tort claims.  And

18   *Restatement* Section 7 is also at issue here which is more of

19   a -- which is defined "characterization" in the *Restatement*.

20        But in going back to *Sienna*, the *Sienna* court

21   observed, and I quote, that New York regards the issue of

22   attorney's fees as procedural for choice-of-law purposes and

23   then, therefore, determined that the local law of the forum

24   governs procedural matters -- that is, the local law of

25   Arizona -- and determined that because -- or even though *Sienna*

1    cited to the Arizona attorney's fees statute, nonetheless it

2    was consistent with its later selection of New York law to

3    govern the guarantees.

4            So, in that case, Judge, the Court addressed the same

5    argument that plaintiffs are asserting here which is that, if

6    the Court is inclined to determine that New York law applies,

7    we're still entitled to request fees under 12-341.01 because of

8    the procedural nature of that request under New York law.

9            Let me turn then to the other case -- a couple other

10   cases we've actually relied upon which will, hopefully, be

11   helpful to the Court.  In the *Magellan Real Estate versus Losch*

12   which is at 109 F.Supp. 2d, 1144, which is District Court of

13   Arizona 2000 case in front of Judge Silver, that was involving

14   a real estate investment trust that sued its founders for

15   allegedly mismanagement.  And, in the context of a motion to

16   dismiss for forum non conveniens, the Court had to determine

17   various issues including what law applies.  And Judge Silver

18   determined that the -- well, certain contracts in that case had

19   Ontario law as a choice-of-law provision in those contracts.

20   And in those -- in those cases that required determining rights

21   and responsibilities under those contracts, the Court said

22   Ontario law would apply, but, in the other claims that were not

23   dependent on those contracts, the Court determined that Arizona

24   law would apply in particular to the tort claims.  So it's a

25   very interesting and -- case because it applies a similar

1    situation to what we have in front of the Court today.

2         A number of details in this case are important as

3    well.  The Court determined that the fee provision -- I'm

4    sorry -- the -- let me step back -- the choice-of-law provision

5    in that case with Ontario was very narrow.  It stated, and I'm

6    quoting, that "This agreement shall be governed by and

7    construed in accordance with the laws of the Province of

8    Ontario."  The Courts, because of the narrow nature of that

9    provision, said it only applied to disputes about the

10   agreements and their construction.

11        Steinway's agreement is identical with the exception

12   of it says New York law instead of Ontario.  Steinway's

13   agreement says "This agreement shall be governed by and

14   construed in accordance with the laws of the State of New

15   York."  Exact same language verbatim.  It's coincidental, but

16   nonetheless true.  And so, under the opinion in *Magellan*, the

17   Court should look to the agreement and determine that it's

18   narrow in scope and only apply it to any issues that basically

19   apply to disputes about their agreements and their

20   construction.

21        Plaintiffs' claims don't require that.  Plaintiffs'

22   claims, in fact, are extra-contractual.  Plaintiffs' claims

23   arise from the contractual relationship, as I stated at the

24   beginning, because of their Spokane dealer agreement and the

25   license agreement, but they do not require an interpretation of

UNITED STATES DISTRICT COURT

1  the contract.

2         Judge Silver noted that -- in that *Magellan* case that

3  the choice-of-law provision did not contain expansive terms

4  such as "related to" or "in connection with" that the Court

5  will sometimes see and found that to be persuasive in

6  determining that it was a narrow provision.  Steinway's

7  agreement does not have that type of language either.

8         The Court determined in *Magellan* that the claims

9  encompassed by the choice-of-law provision are governed by the

10 laws contained in that provision, Ontario, but further stated

11 that the tort claims were governed by Arizona law despite the

12 choice-of-law provision and looked to *Restatement* Section 145

13 for that purpose, and that's at 109 F.Supp. at 1155-56.

14        The Court concluded, and I'm quoting, "These tort

15 claims are not within the narrow scope of the choice-of-law

16 provision in the three agreements at issue in this action." The

17 tort claims that Mr. Rindlisbacher raised in this case

18 similarly are not within the narrow scope of the choice-of-law

19 provision in the Steinway dealer agreement.

20        Let me turn then to another compelling case, Your

21 Honor, which is *Sutter Homes Versus Vintage*, a Ninth Circuit

22 case, 1992.  In that case -- it was filed in Arizona.  It was a

23 winemaker suing a wine distributor claiming that the wine

24 distributor owed the winemaker money for wine delivered and

25 never purchased.  And the distributor, in turn, countersued

1    because the contract had been terminated.  Again, similar to

2    what we have in this case where, once the contract was

3    terminated, these claims arose that were filed by plaintiffs in

4    this case.

5         The counterclaims filed by the distributor included

6    unfair competition, consumer fraud and

7    breach-of-implied-covenant claims.  The district court granted

8    Sutter Home's motion for judgment on the pleadings on all

9    claims and denied fees, applying *Restatement* Section 187 --

10   *Restatement Conflicts* Section 187 which is the section that

11   applies to choice-of-law provisions.  The Ninth Circuit

12   reversed.  The Ninth Circuit ruled that the Court erred in not

13   applying Arizona law to the tort claims.  The Ninth Circuit

14   determined that tort claims, quote, "are not ordinarily

15   controlled by contractual choice-of-law provision; rather, they

16   are decided according to the law of the forum state"; in that

17   case, Arizona, just like this case.  And that's at 971 F.2d at

18   407.  The Court did not get to the fee issue in that case

19   because it remanded for further litigation based on the Court's

20   ruling and found that the fee issue at that point was

21   premature.

22        So then let's fast-forward to a case that did decide

23   fees which we cite in our papers.  *Atkins versus Calypso*

24   *Systems* is a 2017 District of Arizona opinion by Judge Wake.

25   It's at 2017 WL 1019661.  That case arose out of a stock

1   conversion agreement that had a California choice-of-law

2   provision.  The Court ruled -- granted fees both under its

3   inherent powers against the plaintiff for -- as a sanction, but

4   also under 12-341.01 on the tort claims and determined that the

5   tort, because -- because that case arose out of contract,

6   12-341.01 fees were awardable and were awarded even though

7   there was a California choice-of-law provision.  Same arguments

8   in this case, Judge.

9           And, interestingly, in that case, the Court also

10  addressed an issue that plaintiffs raised in their response

11  which was that Steinway's refusal to settle this case should

12  somehow affect the entitlement and eligibility for fees.  Well,

13  first of all, Steinway didn't refuse to settle this case, but

14  Steinway was certainly refusing to pay millions of dollars that

15  were being demanded by plaintiffs throughout this litigation to

16  settle the case.  But the Court, in *Calypso -- Atkins versus*

17  *Calypso* -- determined that was a nonissue.  The Court -- well,

18  the plaintiff in that case argued that defendants failed and

19  refused to pay reasonable sums greater than the nuisance value

20  leaving the plaintiff with no choice but to initiate

21  litigation.  And Judge Wake concluded that this position was

22  tone deaf and that --

23           THE COURT:  Were those his words -- "tone deaf"?

24           MR. SAMUELS:  Those were his exact words -- "tone

25  deaf."

1          THE COURT:  That sounds like Judge Wake.

2          MR. SAMUELS:  Exactly, Your Honor.

3          -- and that the litigation could have been avoided by

4     not bringing the action in the first place or dropping it at

5     some point before it reached finality.  That's at Star, Page

6     No. 4.

7          So, again, we've raised a number of different cases

8     that support the eligibility and entitlement to fees under

9     Arizona law.  The Court should not apply *Restatement* 187 which

10    is the *Restatement* provision that applies to choice-of-law

11    provisions but, rather*, Restatement* 145 that applies to torts

12    because there's no question in this case that the claims that

13    remained after breach of -- after dismissal of the

14    breach-of-contract claim at the 12(b)(6) stage were tort

15    claims.

16          THE COURT:  So now I suppose you're going to want to

17    talk about why the tort claims fit under 341.01 being a

18    contractual-based fee shifting statute.

19          MR. SAMUELS:  Exactly, Your Honor.

20          THE COURT:  So go ahead with that.

21          MR. SAMUELS:  Sure.  So let me first start by

22    saying -- and I don't mean to repeat myself, but I started this

23    session with the -- the reality which is that this case, these

24    claims, could not exist but for the underlying contract.

25          THE COURT:  Um-hmm.  I think what you said was -- at

1    the beginning was, you know, for example, the Rindlisbachers

2    asserted a claim based on a confidential relationship created

3    by the contract.

4            MR. SAMUELS:  Correct.

5            THE COURT:  Okay.  So go ahead.

6            MR. SAMUELS:  And the contract, to be specific, as

7    elaborated in detail in the fourth amended complaint which goes

8    on for some 50 pages, I believe, is centered on the

9    relationship that Steinway had with the Rindlisbachers in

10   Spokane.  So the theory was four years of relationships -- four

11   years of contractual relationship with the plaintiffs in

12   Spokane led to a duty, an extra-contractual duty to disclose

13   details about the sales performance in Maricopa County by the

14   prior dealer who was going out of business.  That's exactly

15   what plaintiffs alleged in a nutshell.

16           There's lots of detail in the complaint about, you

17   know, what that relationship meant, that Steinway allegedly

18   imposed its will on the Rindlisbachers pursuant to the

19   contract.  The contract at issue -- among the contracts at

20   issue in Spokane were the dealer agreement and the license

21   agreement.  The trademark license agreement, of course, gives

22   Steinway certain rights to protect the trademark and the use of

23   the Steinway name.  And plaintiffs argued that, because of

24   those protections in the trademark license agreement, that

25   Steinway had the ability to impose its will or substitute its

```
 1    will for the Rindlisbachers which led to a constructive fraud
 2    claim.  So, again, but for the preexisting relationship in
 3    Spokane, under plaintiffs' own theory, there would be no claim
 4    under their own theory and that's why it arises out of contract
 5    and that's why 12-341.01 should apply.
 6              THE COURT:  It seems to me that the Arizona courts,
 7    when they interpret 341.01, delve deeper into the issue rather
 8    than just saying, okay, this was a breach-of-contract claim
 9    that was asserted; so, therefore, there's an entitlement under
10    341.01.  I think that the case law from Arizona supports the
11    notion that you really have to apply a holistic approach or
12    delve deeper beyond what the claim is labeled.  Is that what
13    you're saying?
14              MR. SAMUELS:  100 percent, Your Honor.  The case --
15    I mean the statute says "arises out of contract."  If the
16    legislature intended it to -- intended the statute to be
17    limited to breach-of-contract actions, claims --
18              THE COURT:  It would have said "breach-of-contract
19    claim."
20              MR. SAMUELS:  It could have used very precise words,
21    but the "arises out of" is broader than that, and that's what
22    all the cases we cite rely upon.  And, in fact, Judge, a really
23    interesting case on this very point is *ML Servicing versus
24    Kohls* which we cited which is 235 Ariz. 562.  The Court of
25    Appeals 2014 decision, and I'm quoting Paragraph 30 where the
```

1    Court of Appeals stated the meaning, quote, "arises out of

2    contract," end quote, is broad for the purposes of the statute.

3    And the Court continued in Paragraph 31:  The test to determine

4    if an action arises out of contract is whether the plaintiff

5    would have a claim even in the absence of a contract.

6         So let's talk about that for a moment.  If Steinway

7    and the Rindlisbachers had never met one another until they

8    showed up in Maricopa County to do their due diligence about

9    the dealership opportunity when the other dealer was shutting

10   down, plaintiffs don't make a claim that they -- of trust and

11   confidence resulting from a potential retailer pursuing a

12   potential -- a dealer agreement in Arizona.  The whole claim is

13   premised on their preexisting contractual relationship.  And

14   under the *ML Servicing* case which I just quoted, and to further

15   elaborate on the Court's question, the "arise out of" contract

16   is much broader than "breach of contract."

17        *Caruthers versus Underhill* is another case that is

18   worth mentioning and discussing.  That is at 230 Ariz. 513,

19   approximately a decade ago Court of Appeals decision where the

20   plaintiff alleged that the defendant in that case had

21   fraudulently misrepresented the value of stock and failed to

22   disclose certain, quote, "special facts," end quote.  And the

23   trial court granted summary judgment and awarded fees based on,

24   even though this was a fraudulent misrepresentation claim among

25   other claims, that -- let me step back.  Basically, the Court

1    concluded on fees that the contract must be an essential basis
2    of the action and not merely a factual predicate.  And that's
3    what we have here.  It's not a factual predicate.  It's an
4    essential basis for the plaintiffs' claims.  The fees were
5    awardable in that case, the *Caruthers*, "where the tort claims
6    would not exist" -- I'm quoting -- "where the tort claims would
7    not exist but for the allegedly fraudulent induced contract."
8    That's at Paragraph 59.  Exactly what's going on in this case,
9    Your Honor.  The tort claims, as set forth in a 50-page
10   complaint by the Rindlisbachers, would not exist but for the
11   contract at issue in Spokane.
12           So let me turn then to some of these --
13           THE COURT:  Is the Spokane contract the only contract
14   that you are basing the claim on or is it also the Arizona
15   dealer agreement?
16           MR. SAMUELS:  The Arizona dealer agreement is also
17   important and applicable because of the damage theory.
18           THE COURT:  Um-hmm.
19           MR. SAMUELS:  You know, in Spokane, they had a
20   reasonable sales goal of, I don't know, 15 pianos a year,
21   really modest sales goal, and they met that goal.  They come to
22   Phoenix and they have a much broader, much bigger goal because
23   of the size of the market and they were unable to meet that
24   goal.  They nonetheless -- Mr. Rindlisbacher is a very savvy
25   business person and nonetheless figured out a way to make a

1    profit, $2 million of profit over seven years.  But,

2    absolutely, the dealer agreement for Maricopa County is in play

3    here and is applicable here because of their damages theory.

4            THE COURT:  Um-hmm, okay.  I think I'd like you to

5    have another 10 minutes and then I want to turn it over to

6    Mr. Morrill.

7            MR. SAMUELS:  Sure, absolutely.

8            THE COURT:  So I don't know if there's anything more

9    you want to say about -- about eligibility under the statute.

10   If not, do you want to talk about the factors for entitlement?

11   And, in particular, I might have some questions for you about

12   some of the billing entries.

13           MR. SAMUELS:  Sure.  So let me first address the

14   billing entries issue since that's a point of contention.

15   Plaintiffs only complied with LR 54.2C with regard to $13,000

16   of the billing entries.  Where they put -- we put our billing

17   entries on an Excel spreadsheet.  They objected and we

18   responded to those objections or replied to those objections as

19   the case may be.  The rest of it was multiple pages of mostly

20   indecipherable task codes and I found it dense and not just

21   dense, but impossible to follow and not rule-compliant which is

22   most important.

23           And, Judge, these blocked billing type objections or,

24   you know, "they billed too much" type objections are too vague.

25   They didn't comply with the obligations in challenging the vast

1    majority of the fees at issue.  And it's not --

2         THE COURT:  Do they -- if there's a block-billing

3    entry, our local rule does require that fee applications be

4    supported by individualized time entries.  So isn't it a proper

5    objection for plaintiffs to state just generally that this was

6    a block-billed time entry and, therefore, fees should not be

7    awarded?

8         MR. SAMUELS:  If that block bill was accurate -- that

9    block bill objection was accurate, the vast majority -- I can't

10   remember -- I can't sit here and tell you there are no examples

11   of numerous entries where there might be a point -- where there

12   might not be a .2 and a .3 and a 1.7, but it's my practice and

13   it's the practice of those who I work with -- and maybe a few

14   slipped in, but we're not dealing with a seven-hour day with no

15   differentiator between how the time was spent.  Rather, I'm

16   very careful, knowing the rule exists, that I put down a .2 for

17   this task and a .7 for that task and 2.0 for the next task.

18   So, if the Court were to look at our fee applications,

19   supporting documentation including the time entries, I think

20   the Court can fairly conclude that we complied with the rule.

21        THE COURT:  And even if the plaintiffs haven't stated

22   a precise objection, I still have authority under the statute

23   to apply a reasonableness standard.  And so, for example, you,

24   personally, as a partner, summarize depositions.  So can't

25   I apply my own experience and what I view as reasonable and

```
1    perhaps say a partner shouldn't be summarizing depositions;
2    that that task should be assigned to either an associate or a
3    paralegal and determine what to do about that?
4              MR. SAMUELS:  Well, you have absolute discretion.  You
5    can determine that some or all of the fee entries -- you can
6    determine that no fees are allowed in this case because of your
7    discretion.
8              I don't know that -- I mean, I don't think that that
9    would be following the factors that are required under the
10   entitlement because I don't think plaintiffs have met their
11   burden of proving the reasons why that they say fees should not
12   be awarded at all.  But if the Court were to determine that
13   certain fee entries were either not appropriate for a partner
14   or should have been less time spent -- and, absolutely, the
15   judge -- you, as the judge, has absolute discretion to reduce
16   the fee award to whatever amount the Court deems appropriate.
17             In terms of summarizing depositions, since that's been
18   raised, I was there.  I defended all the depositions.  We had a
19   court reporter in New York who Mr. Morrill hired who was a
20   disaster.  Typos galore.  And I felt like it would be an
21   impossible task for someone who was not present to summarize
22   those depositions because I had to look at the transcript for
23   accuracy and --
24             THE COURT:  Did the New York paralegal fly out to
25   Arizona or were these depositions of your client
```

1    representatives taken in New York?  Is that why this was a New

2    York paralegal -- or excuse me -- a New York court reporter?

3              MR. SAMUELS:  It was a New York court reporter because

4    the depositions of the Steinway -- of two of the Steinway

5    witnesses as well as the 30(b)(6) witness were all taken in New

6    York.

7              THE COURT:  Okay.

8              MR. SAMUELS:  That's just an example of why I felt it

9    was important for me to review the transcripts because, if I am

10   going to review the transcripts for accuracy, it wasn't going

11   to take a whole lot more time to summarize them in the process,

12   but that's just an example.

13             And I do -- I do make an effort, cognizant of clients'

14   concerns about billing rates and so on, to delegate as much

15   work as possible to the associates and paralegals.  I had two

16   associates on this matter -- Cindy Schmidt initially and

17   Heather Stanton when Cindy left the firm.  They both did a

18   tremendous amount of work.  They both were excellent in

19   accomplishing Steinway's defense.  But there were certain

20   things that I felt were more appropriate for me to handle

21   because of the aggressive nature of plaintiffs' counsel.  And

22   I would not, for example, have sent Ms. Stanton to New York to

23   defend those depositions.  That would just not have been a very

24   smart move on my part.

25             THE COURT:  Okay.

1          MR. SAMUELS:  So let me talk about some of the other

2    factors for entitlement.

3          THE COURT:  Why don't we do this if that's okay.

4    I would like to give Mr. Morrill time.

5          MR. SAMUELS:  Sure.

6          THE COURT:  Keeping time here.  Why don't we reserve

7    some time for you to have rebuttal.

8          MR. SAMUELS:  Absolutely, Your Honor.  Thank you.

9          THE COURT:  And then we'll give -- because I'd like to

10   give Mr. Morrill 40 minutes here.  I think that's about the

11   time that you've had.

12         MR. SAMUELS:  Thank you, Your Honor.

13         THE COURT:  Okay.  All right.  Thank you, Mr. Samuels.

14         THE COURTROOM DEPUTY:  Check the document camera.

15         MR. MORRILL:  Thank you, Your Honor.

16         The Phoenix dealer agreement by its express terms

17   precludes the fee shifting that Steinway seeks here.  The legal

18   argument supporting that result is straightforward.  It is

19   unassailable.  It was laid out for Steinway in detail in

20   plaintiffs' MIDP disclosures long before this motion was filed.

21         In its reply, Steinway did not address a single one of

22   the legal authorities that plaintiffs cited and analyzed to

23   support that argument, not a single one.  Today, in this oral

24   argument, Steinway has not cited a single -- not even one of

25   the authorities that we cited in support of the proposition

1    that the Phoenix dealer agreement drafted by Steinway precludes

2    the fee shifting that Steinway seeks.  So that argument is

3    straightforward and I'll show you how straightforward it is.

4          The agreement that the parties signed, Article XXII,

5    just barely above the signature page -- the signatures of the

6    parties where they evidence their mutual assent to this

7    agreement, the parties agreed this agreement shall be governed

8    by and construed in accordance with the laws of the State of

9    New York without regard to its conflict of laws principles.

10          THE COURT:  You said Article XXII, but it's Article

11    XX.

12          MR. MORRILL:  I'm sorry.  Article XX.

13          THE COURT:  Go ahead.

14          MR. MORRILL:  So the parties agreed that this

15    agreement will be governed by and construed in accordance with

16    the laws of the State of New York without regard to its

17    conflicts of laws principles.

18          Same provision applied to the Spokane agreement.  Same

19    provision is in the licensing agreement.  So, as a matter of

20    New York law, what does it mean to adopt this choice-of-law

21    provision?  As a matter of New York law, the impact of a

22    provision such as this is that it incorporates into the

23    agreement by reference every provision of the law of New York.

24    That is what the New York court -- the New York court held in

25    *Katz*, which is the quote that's on the board now.  And it cited

| | |
|---|---|
| 1 | *Freedman*.  You see there:  By agreeing that English law would |
| 2 | govern the U.S. agreement, it is as though the law of England |
| 3 | were incorporated into the agreement by reference.  Freedman |
| 4 | reaches exactly the same result and uses the same language |
| 5 | that's quoted from *Freedman*. |
| 6 | So the Court goes on to say that the parties to the |
| 7 | U.S. agreement incorporated English law into their agreement. |
| 8 | Because they did, the parties' agreement provides for the |
| 9 | recovery of attorney's fees because the English rule is that |
| 10 | you get attorney's fees.  The New York rule, the American rule, |
| 11 | is that you don't get attorney's fees. |
| 12 | So the impact of the choice-of-law provision, as a |
| 13 | matter of New York law where the contract is governed and |
| 14 | construed, is that the choice-of-law provision incorporates |
| 15 | into the contract every provision of New York law.  So it's |
| 16 | undisputed, Your Honor, that New York law contains the American |
| 17 | rule.  Okay.  And as if this doctrine of incorporation by |
| 18 | reference weren't enough from the New York courts, the |
| 19 | *Restatement* also specifically states that the rule of this |
| 20 | subsection, which is 187, is a rule providing for incorporation |
| 21 | by reference and is not a rule of choice of law.  The parties |
| 22 | have the power to determine the terms of their agreement.  They |
| 23 | may spell out the terms in the contract.  In the alternative, |
| 24 | they may incorporate into contract by reference extrinsic |
| 25 | material which may, among other things, be the provisions of |

1    some foreign law.  In such instances, the forum will apply the

2    applicable provisions of the law of the designated state in

3    order to effectuate the intention of the parties.

4         So we have two New York cases holding that the effect

5    of a New York choice-of-law provision is to incorporate every

6    provision of New York law into the contract.  Steinway never

7    addressed that in its reply.  It didn't address it today.  And

8    the reason it didn't is that it can't.  I mean, it's the law.

9    The choice-of-law provision the parties agreed upon

10   incorporated into the contract every provision of New York law

11   including its American rule precluding fee shifting.

12        Now, Steinway has argued, devoted a long period of

13   time to arguing that 12-341 can apply to contract -- to tort

14   claims that are related to a contract.  We don't disagree with

15   that.  In our response, we admitted that that's the case, that

16   12-341 is that broad.  However, we can't even get to 12-341.01

17   because the parties' agreement precludes shifting of fees by

18   virtue of its incorporation by reference of the American rule

19   of New York through the choice-of-law provision.  The

20   *Restatement*, as I said, also confirms that that incorporation

21   by reference is the effect of the choice-of-law provision.

22        THE COURT:  What does it mean, in the contract that

23   you had up, "without regard to choice of law principles"?

24        MR. MORRILL:  It means that only the substantive law

25   of New York applies.  Arizona courts, because Arizona is the

1    forum, uses its own choice-of-law rules to determine which law
2    will apply.  So the impact of this provision is to say that
3    we're going to leave it to the forum to apply its own
4    principles of conflict of laws to determine what law is going
5    to apply.  We are not telling any forum that they have to apply
6    New York conflict of laws principles.  That's why the case
7    cited by Steinway is totally inapposite.  What New York
8    conflict of law provision views attorney's fees as is
9    irrelevant because the parties agreed that the conflict of law
10    provisions of New York have no application here.  Rather, the
11    substantive law of New York incorporated by reference is the
12    American rule precluding attorney's fees.
13         Now, Steinway wants to get around this agreement that
14    it drafted.  It wants to get around the choice-of-law provision
15    that it drafted which, under New York law which it chose,
16    incorporates by reference every provision of the law of New
17    York including the American rule precluding attorney's fees.
18    Well, Steinway cannot avoid the contract.  Why not?  Because
19    Arizona follows Section 187 of the *Restatement* and
20    Section 187.1 says the law of the state chosen by the parties
21    to govern their contractual rights and duties will be applied
22    if the particular issue is one which the parties could have
23    resolved by an explicit provision in their agreement directed
24    to that issue.
25         Translated to our situation, could the parties have

1    inserted a provision -- an express provision in the agreement

2    saying no party will have the right to recover attorney's fees

3    in litigation arising in this contract?  Yes, they could have

4    done that.  Nothing precludes them -- nothing would have

5    precluded them from asserting that provision in their contract.

6    By incorporating by reference all of the laws of New York

7    through the choice-of-law provision, they did that.  They

8    incorporated the American rule which precludes fee shifting.

9           And when you think about it, it's pretty easy to

10   understand why Steinway wanted to draft and did draft the

11   agreement this way.  Steinway is a big company.  It can afford

12   to pay its own attorney's fees.  Dealers, on the other hand,

13   are small businesses working generally in a single store in a

14   single location.  They can't afford the attorney's fees to

15   mount an assault on Steinway.  So Steinway wanted to force its

16   dealers, if they got into litigation with Steinway, to bear

17   their own attorney's fees and to have no right to recover those

18   attorney's fees against Steinway.  That's clearly what was in

19   their best financial interest.  That's why they drafted the

20   agreement the way they did, Your Honor, because the last thing

21   Steinway ever wanted was to have dealer litigation that it lost

22   and it have to pay the attorney's fees of the dealer.  That

23   would unload a raft of dealer litigation against Steinway

24   because they would know that they would have the right to

25   recover attorney's fees against Steinway.

UNITED STATES DISTRICT COURT

1          So where does 12-341 fit in?  As I have explained it,

2    you can't even get to 12-341.01 because the parties have

3    expressly agreed that there will be no fee shifting in any

4    cases arising out of that contract, end of story.  You can't

5    even get to 12-341.01.

6          But let's look at 12-341.01.  Did the legislature

7    intend that 12-341.01 could be applied to award fees when the

8    contract between the parties says there will be no fee shifting

9    between these parties?  Did the legislature intend that?

10          THE COURT:  Well, the contract doesn't say that.

11    You're saying that it --

12          MR. MORRILL:  But, Your Honor, it does say it.  It

13    incorporates by reference every provision of New York law.

14          THE COURT:  That's the nuance that I was looking for.

15    I just want to be clear.  The contract is silent on the

16    attorney's fees issue, but your argument is, by virtue of the

17    choice-of-law provision, the New York rule on fee shifting

18    applies.

19          MR. MORRILL:  It may be a matter of semantics,

20    Your Honor, but the choice-of-law provision is an express

21    provision of the agreement and the American rule is an express

22    provision of New York law.  So I don't think it's a stretch to

23    say that the contract provides that there will be no fee

24    shifting.  I mean, that's the impact of New York law as it

25    applies here.

1          So let's look at 12-341.01.  It has a very

2    inconvenient sentence -- a very inconvenient sentence that

3    Steinway did not quote, did not address at all in its reply and

4    it didn't address today in its argument to you, Your Honor.

5    The last sentence of 12-341.01(A) says:  This section shall not

6    be construed as altering, prohibiting or restricting present or

7    future contracts or statutes that may provide for attorney's

8    fees.  In other words, if your contract determines the issue of

9    fee shifting, we're not going to apply 12-341.01.  Your

10    contract is going to control.  That's the impact of that

11    language, and it's not just me saying that, Your Honor.  It's

12    the Arizona Supreme Court saying that in the case of *American*

13    *Power Products versus CSK Auto, Inc.*  The highlighted language,

14    the Court says:  Thus, rather than being completely supplanted

15    by any attorney fee provision in the parties' contract, the

16    statute, consistent with its plain language, applies to any

17    contested action arising out of contract to the extent the

18    contract -- to the extent the statute does not conflict with

19    the contract.

20          And further down:  Because the MVA here did not define

21    "prevailing party" and expressly provided that Arizona law

22    shall apply and govern the rights and remedies of the parties,

23    and because the second sentence of 12-341.01(A) does not

24    directly conflict with the MVA's attorney's fee provision, that

25    statutory attorney's fee provision is incorporated by operation

1    of law into the MVA for the limited purpose of defining

2    "successful party" under the circumstances present here.

3            Now, 12-341.01 directly conflicts with the agreement

4    of these parties in the Phoenix dealer agreement and the

5    Spokane dealer agreement that substantive New York law applies

6    and every provision of substantive New York law is incorporated

7    by reference into the contract including the American rule that

8    precludes fee shifting.

9            So the last sentence in Subsection A of 12-341.01

10   shows the legislature did not intend to run counter to the

11   agreement of the parties providing for no fee shifting by

12   allowing fee shifting under 12-341.01.  That last sentence

13   precludes application of 12-341.01(A) even if the contract

14   between the parties did not preclude fee shifting which, of

15   course, the contract itself precludes fee shifting.  So you

16   don't even need to get to 12-341.01, but, if you do, 12-341.01

17   says it can't apply here because that would directly conflict

18   with the agreement of the parties that there be no fee

19   shifting.

20           Now, Steinway -- as I said, Steinway doesn't address

21   this case in which the Arizona Supreme Court illuminated the

22   impact of that last sentence of 12-341.01(A).  In fact, I was

23   correct when I said at the beginning that none of the cases or

24   other authorities that support the legal argument that the

25   Phoenix dealer agreement precludes the fee shifting that

1    Steinway seeks -- Steinway hasn't responded to any of those

2    authorities either in its reply or here before you today.  They

3    just ignored them.  They ignored them.  And, instead, what

4    Steinway came up with is nothing more than a smoke screen.  Why

5    is it a smoke screen?

6            Excuse me.

7            THE COURT:  Do you want a cough drop?

8            MR. MORRILL:  No, I'm good.  Thank you.

9            It is a smoke screen because none of the cases that

10   Steinway cites -- well, none of the cases that Steinway cites

11   actually holds that 12-341.01 will be applied where the

12   contract between the parties precludes fee shifting.  I've read

13   every case they cited, Your Honor.  There is no case with that

14   holding where the contract says no fee shifting can 12-341.01

15   be applied to require fee shifting.  There is no such case.

16   They haven't cited it.

17           However, there is an Arizona case which provides the

18   template, Your Honor, for how this issue needs to be resolved

19   in this case.  And, of course, Steinway didn't cite that case

20   or address that case in its reply even though we laid it out in

21   the response.  And, of course, Steinway didn't address that

22   case in its presentation here today either.  Steinway is giving

23   you a smoke screen.  Here is the case:  The case is *Monroe*

24   *versus Arizona Acreage LLC*, 443 P.3d 954 at Page 964, and it's

25   Paragraph 43 in the opinion that we're dealing with.

1          So that was another one of these lender-borrower

2    cases.  Lender sues for a deficiency -- lender forecloses on

3    the real property.  Lender sues for a deficiency and lender

4    prevails, gets a deficiency judgment.  So in *Monroe versus*

5    *Arizona Acreage*, the lenders asked for attorney's fees under

6    12-341.01.  The borrower did not oppose the request, but the

7    Court did not grant fees under 12-341.01 because the contract

8    said Nevada law applies.  So the Court looked to Nevada law to

9    see whether Nevada would allow an award of attorney's fees.

10   And by surprise-surprise, Nevada law said that, if the parties

11   in a contract include an attorney's fees provision, then

12   attorney's fees can be awarded.  So the Arizona forum looked

13   not to 12-341.01, but looked to Nevada law to see -- that's the

14   governing law -- looked to Nevada law to see whether Nevada law

15   permitted an award of fees, and it did, and so the Court

16   awarded fees under Nevada law.  It did not award fees under

17   12-341.01.

18          Now, even apart from the last sentence of 12-341.01

19   which, by its own terms, excludes its application where a

20   contract prohibits or precludes fee shifting, in our response,

21   we cited 12 cases from other jurisdictions, state and federal,

22   in which forum state courts uniformly declined to apply a forum

23   state statute for contract fee shifting where the law of the

24   chosen state follows the American rule that precludes fee

25   shifting.  They're all there, twelve of them.  Rather, in those

1    cases, the forum state court will apply a statute of the chosen

2    state's law to apply attorney's fees if the chosen state has a

3    statute that allows award of attorney's fees.  Of course,

4    Steinway doesn't address any one of those 12 cases in its

5    reply.  Nor has it addressed any of them today.

6            So, to summarize, Your Honor, neither plaintiffs nor

7    Steinway, as a successful party in litigation arising out of

8    the dealer agreement, can shift fees to the other party.  That

9    is what Steinway proposed in the Phoenix dealer agreement.

10   That's what the plaintiffs accepted in the Phoenix dealer

11   agreement.  Allowing a fee award under 12-341.01 would directly

12   conflict with a dealer agreement because the dealer agreement,

13   through incorporation by reference of the choice-of-law clause,

14   adopts New York's American rule precluding fee shifting.

15           So Steinway has cited a bunch of cases and it has

16   spent a lot of time today going through those cases as if they

17   had any application to the issue before the Court.  They have

18   no application to the issue before the Court because the issue

19   before the Court is resolved by the dealer agreement, by New

20   York law that says the effect of a choice-of-law clause

21   choosing New York law is that it incorporates every provision

22   of New York law into the contract.  Undisputed New York follows

23   the American rule.  Undisputed New York law prohibits fee

24   shifting.  That's the rule that was incorporated into this

25   agreement by virtue of the choice-of-law provision.  And as we

1    have pointed out, 12-341.01 cannot be applied by virtue of its

2    own exclusion provision where the contract itself precludes

3    shifting of fees.

4            THE COURT:  What about the Spokane dealer agreement?

5    So Mr. Samuels spoke quite a bit about that Spokane agreement.

6    Does it include the same choice-of-law provision?

7            MR. MORRILL:  Exactly the same choice-of-law

8    provision, Your Honor, as does the license agreement for

9    Spokane and the license agreement for Phoenix.

10           THE COURT:  Okay.

11           MR. MORRILL:  So --

12           THE COURT:  Why don't we talk about this.  So let's

13   just get past this issue, the threshold issue, and assume that

14   the correct answer is that the *Restatement* analysis is applied

15   and that -- and that I'm going to examine the applicability of

16   the statute, the fee shifting statute.  Could you address

17   Steinway's argument that -- that the plaintiffs have relied on

18   Arizona law throughout the litigation and now is looking to

19   avail themselves of New York law in terms of this fee shifting

20   issue?

21           MR. MORRILL:  Your Honor, nothing could be further

22   from the truth.  Tort claims -- the tort claims that we

23   asserted are governed by Arizona law because the provisions of

24   the choice-of-law provision of the agreement do not cover tort

25   claims.  They only cover claims arising out of the contract.

| | |
|---|---|
| 1 | But, as Steinway itself has argued, these tort claims arise out |
| 2 | of the contract.  If they didn't arise out of the contract, |
| 3 | they would have no argument that 12-341.01 could apply.  So the |
| 4 | contract is the sine qua non of 12-341.01. |
| 5 | THE COURT:  But you've argued for, I think, two years |
| 6 | that Arizona law established a -- what were the claims? |
| 7 | MR. MORRILL:  Those are tort claims, Your Honor, yes. |
| 8 | THE COURT:  Those two tort claims. |
| 9 | MR. MORRILL:  Those are tort claims. |
| 10 | THE COURT:  So now -- just let me finish my question. |
| 11 | I'm not trying to be argumentative.  I'm trying to get your |
| 12 | take on this. |
| 13 | But now you're -- so, to back up for myself, what were |
| 14 | the two claims that were asserted? |
| 15 | MR. MORRILL:  Two claims are constructive fraud and |
| 16 | fraudulent omissions. |
| 17 | THE COURT:  Right.  So constructive fraud and |
| 18 | fraudulent omissions and they were both -- |
| 19 | MR. MORRILL:  Tort claims. |
| 20 | THE COURT:  -- tort claims, but Arizona tort claims, |
| 21 | right? |
| 22 | MR. MORRILL:  Well, Steinway never argued that New |
| 23 | York law should govern the tort claims. |
| 24 | THE COURT:  I'm not asking what Steinway argued.  I'm |
| 25 | asking you. |

```
 1              MR. MORRILL:  We never argued that New York should
 2    apply.
 3              THE COURT:  Pardon me?
 4              MR. MORRILL:  We never argued that New York should
 5    apply to the tort claims.
 6              THE COURT:  But here is the thing, Mr. Morrill.
 7    Again, please don't interrupt.  I want to have a dialogue with
 8    you.
 9              You asserted two Arizona-based tort claims.
10              MR. MORRILL:  Yes.
11              THE COURT:  And you cited Arizona cases.  We talked
12    about Arizona law.  Never once did we talk about whether New
13    York law established those tort claims or whether New York law
14    should govern the adjudication of those tort claims.  All
15    right.  So now we're in a position where Steinway prevailed on
16    those two tort claims.  Mr. Samuels just told me that they're
17    not seeking to recover fees for their successful defense of the
18    breach-of-contract claim, all right.  So we're just talking
19    about these Arizona tort claims.
20              So shouldn't it then follow that 341.01's terms should
21    apply and, you know, whether your claims arose under or not,
22    shouldn't I at least get to the contract to -- I mean, pardon
23    me -- get to the statute to evaluate whether the -- whether
24    341.01 should apply?
25              MR. MORRILL:  No, Your Honor.  You should not get to
```

```
 1   the statute.
 2            THE COURT:  I feel like I'm an engineer on a train and
 3   it's going in a direction and now there's a switch track and
 4   you've kind of pulled the switch track.  I was on path on
 5   Arizona, but now I'm going --
 6            MR. MORRILL:  Your Honor, nothing could be further
 7   from the truth and I'm happy --
 8            THE COURT:  We're talking over again.  Remember, let's
 9   not talk over each other.
10            I want to just have a dialogue.  I really don't want
11   to be argumentative.  Just wait for me to ask the question and
12   you could respond.
13            MR. MORRILL:  I'm sorry, Your Honor.  I thought you
14   had finished the question and wanted me to address it.
15            THE COURT:  Go right ahead.
16            MR. MORRILL:  Thank you.
17            Recoverability of attorney's fees does not depend upon
18   which law governs tort claims.  Has nothing to do with
19   recoverability of attorney's fees.  Arizona law governs the
20   tort claims from a substantive standpoint, but the ability to
21   recover attorney's fees is a matter of contract between the
22   parties.  And that contract between the parties says, by
23   incorporation by reference of every provision of New York
24   substantive law, these parties will not have or seek fee
25   shifting in any case arising out of this agreement.  That's a
```

UNITED STATES DISTRICT COURT

1  matter of the New York contract saying we won't allow fee

2  shifting.

3          THE COURT:  But the contract doesn't say that.  The

4  contract says that it shall be governed by the laws of the

5  State of New York without regard to the choice of law.

6          MR. MORRILL:  And the law of the State of New York,

7  without regard to choice of law, is the American rule denying

8  fee shifting.  And the New York cases say that the effect of a

9  New York choice-of-law provision is to incorporate by reference

10 every provision of New York law into the contract.

11         THE COURT:  Shouldn't that have foreclosed your

12 constructive fraud and fraudulent inducement claims based on

13 Arizona law?

14         MR. MORRILL:  Absolutely not.

15         THE COURT:  Why?

16         MR. MORRILL:  Because the choice-of-law agreement does

17 not apply to tort claims.

18         THE COURT:  Okay.  So then shouldn't 341.01 be

19 evaluated with respect to the tort claims?

20         MR. MORRILL:  Absolutely not.

21         THE COURT:  Okay.

22         MR. MORRILL:  Let me remind the Court of something

23 that the Court did before this Court took over the case.

24         THE COURT:  You could just say "Judge Tuchi" if you'd

25 like if that's what you mean.

1          MR. MORRILL:  When Judge Tuchi had the case, Steinway

2   filed a motion to dismiss the breach-of-contract claims and

3   Steinway argued that the New York statute of limitations

4   applied, not the Arizona statute of limitations, because of the

5   choice-of-law provision.  We argued that, no, there is a

6   provision in the *Restatement* that Arizona follows that says

7   that the statute of limitations of the forum always applies.

8   And Judge Tuchi, at Document 74 I believe it was, around

9   Page 10 maybe -- I don't remember the page cite -- but Judge

10  Tuchi said, "No, I'm not going to follow the *Restatement*

11  provision on statute of limitations because the parties agreed

12  that New York law would apply."

13          Now, what Steinway is trying to get you to do is to

14  apply the *Restatement* provision on torts, okay, to apply the

15  *Restatement* provision on torts that Arizona law applies to get

16  around 187.1 of the *Restatement* which says that, if the

17  parties -- if the parties could have resolved an issue in the

18  contract by an express provision, then that is binding and

19  enforceable on them.  So this Court has already held that New

20  York law precluded us from asserting breach-of-contract claims

21  because of 187-1.  The same reasoning as the Court employed in

22  that ruling requires that this Court apply 187-1 to determine

23  that the contract between the parties as it relates to the

24  issue of attorney's fees is binding.  The choice of New York

25  law is binding under 187-1 because the parties could have

1    inserted a fee shifting provision in that agreement.

2    Therefore, Steinway cannot get around that contractual

3    provision by arguing some other provision of the *Restatement*.

4    That's what we did in the motion to dismiss context and

5    Judge Tuchi rejected that argument.  You can't apply 187-1

6    there and not apply 187-1 here.

7         THE COURT:  Could we -- we have limited time.  So, if

8    it's okay with you, I'd like to move on to another area where

9    I have some questions.

10        MR. MORRILL:  Sure.

11        THE COURT:  So let's get to the entitlement -- the

12   entitlement issue.  Now, you've submitted some declarations

13   concerning financial hardship or extreme financial hardship.

14   And that is part of the test.  I think that's an important part

15   of the test on whether a fee award is reasonable.  But there

16   isn't a lot of supporting documentation that's been -- that was

17   filed to support Mr. Rindlisbacher's declaration.  So I'm

18   wondering if you could talk a little more about that.  Like how

19   would an award of -- in the amount that Steinway is requesting

20   impose an extreme financial hardship?  And even if -- if I do

21   get to an award, if I do reduce it by some amount, talk about

22   the financial hardship that would be associated with a

23   reduction.

24        MR. MORRILL:  Yes, Your Honor.  We provided a detailed

25   declaration of Mr. Rindlisbacher relating to the hardship

1    issues.

2                    THE COURT:  Right.

3                    MR. MORRILL:  He averred in that declaration that he

4    has personal knowledge of all matters described in the

5    declaration.  He attached to the declaration and authenticated

6    excerpts, schedules, other portions of his federal income tax

7    returns for the two years most -- the two most recent years

8    that were available in January of this year when the response

9    was filed.  So those documents are there.  The tax return

10   documents support the assertions that Mr. Rindlisbacher made

11   about them in his declaration.

12                    And the bottom line, Your Honor, is that the only

13   thing that the Rindlisbachers have is these piano dealer

14   businesses that they have built up over a lifetime.  Those

15   piano dealer businesses are highly leveraged as are the

16   buildings that are used in the operation of those businesses.

17   And we showed you from the tax returns the amount -- the

18   amounts of debt that encumber the operating company's business

19   and the amount of debt that encumbers each of the assets.  We

20   provided documentation about the value of the residence, about

21   the liens that are against the residence which, at present,

22   total about 80 percent, as I recall, of --

23                    THE COURT:  There was an assertion -- I apologize for

24   interrupting you.  Can I ask you a question or do you want to

25   finish what you were saying?

UNITED STATES DISTRICT COURT

1          MR. MORRILL:  Sure.  No, go ahead.

2          THE COURT:  Okay.  There was an assertion made that a

3    fees award might be an event of default under certain financial

4    agreements.  Could you tell me a little bit more about that?

5          MR. MORRILL:  Yes, Your Honor.  I've represented

6    lenders and borrowers for 40 years.  I'm sure you've had some

7    experience with that as well.

8          THE COURT:  I have.

9          MR. MORRILL:  And a standard provision in any and

10   every lender agreement that is worth its salt says that, if

11   there is a judgment against the borrower that remains

12   unsatisfied for a period of 30 or 45 days, that will be an

13   event of default under all these agreements.  I mean, that's

14   common knowledge, Your Honor.  It's common experience.  And the

15   fact that Steinway would suggest that we needed to attach loan

16   documents to document that when Mr. Rindlisbacher is intimately

17   aware of those loans and their provisions is really an insult,

18   Your Honor.  Everybody knows that those agreements contain

19   those provisions and these do.  Mr. Rindlisbacher testified in

20   his declaration that he is familiar with their contents and

21   that it does have a default-upon-unsatisfied-judgment

22   provision.

23         THE COURT:  Okay.

24         MR. MORRILL:  So let me just leave the Court with my

25   thoughts and suggestions as to all of the factors that should

be considered by the Court in the exercise of discretion as to whether or not to award fees.  And I'm going to list them for you in what we consider to be the order of descending significance; in other words, the most important factor in my mind is the relative financial position of the parties.  In biblical terms, Steinway is Goliath and Kevin is David and he doesn't have a slingshot.  So the relative position of the parties is something that courts can and do consider.  And none of the cases that Steinway cites on this issue have a magnitude of disparity in financial resources anywhere approaching the difference between Steinway and an individual Steinway dealer.

       The second most important factor in exercising discretion is that the prospect of a $1 million fee award would totally discourage any Steinway dealer, small business, from ever asserting any claim against Steinway even if it was legitimate because, if they lost, they would go bankrupt.  So an award of a million dollars in fees against a single Steinway dealer would discourage other Steinway dealers from asserting legitimate claims.

       The third most significant factor is hardship which we've already discussed.

       The fourth most significant factor, in my opinion, in my submission, Your Honor, is the issues that were litigated here are not novel at all.  There's nothing novel about them that required any particular extraordinary amount of time or

1    any particular extraordinary skill.  They are not novel issues.

2    They are run-of-the-mill issues.

3         And the last factor that is significant, Your Honor,

4    but I think probably the least significant of the factors, is

5    that 12-341.01 is to encourage the parties to resolve their

6    disputes early.  We attempted to engage Steinway early, one or

7    two days after the complaint was filed.  And my declaration

8    contains that document.  It just outright stated that we're

9    going to get two years down the road and you will have incurred

10   more attorney's fees than it would cost you to settle the case.

11   So Steinway did not respond favorably to plaintiffs' attempt to

12   engage at the inception.

13        But, to summarize, the parties agreed in their

14   contract that New York law would apply.  New York law is

15   incorporated into the contract.  New York law precludes fee

16   shifting.  You can't get to 12-341.01.  12-341.01 itself

17   contains an escape clause which, if you happen to get in it by

18   mistake, forces you back out of it because applying the statute

19   here would directly conflict with the provision of the Steinway

20   dealer agreement.  And even if the Court were to get to the

21   discretionary factors, we submit that the Court should exercise

22   its discretion toward zero fees.

23        THE COURT:  Okay.  Thank you.

24        Okay.  Mr. Samuels, why don't you try to focus for

25   about five minutes or so.  Is that possible?

1          MR. SAMUELS:  Whatever the Court will allow me, I'll

2    take advantage of it.

3          THE COURT:  Yes, five minutes.

4          MR. SAMUELS:  Thank you.

5          Let me ask first, Judge, because there are a lot of

6    areas I could talk about, but given my time is limited, is

7    there a particular area that the Court is most curious or

8    concerned about at this point?

9          THE COURT:  No.  It's your time.

10         MR. SAMUELS:  Okay, terrific.  Let me just then

11   briefly touch on some of the arguments made by Mr. Morrill.

12         The hardship argument is -- is unpersuasive.  The

13   Rindlisbachers own properties in three states.  They own music

14   retail stores in three states.  The -- as supported by the

15   declaration of Dave Schwickerath which we submitted in reply,

16   the Rindlisbachers have cherry-picked certain financial details

17   about their financial situation as of 2019.  We're now a year

18   and a half later and they are supposedly satisfying a

19   million-dollar mortgage debt on their home with a $50,000

20   income.  The math doesn't work, Judge.  So I think the Court

21   should just simply reject this hardship notion.

22         The idea a bank default might result would mean that

23   fees would never be shifted to or against a party that files a

24   lawsuit and fails to succeed in that lawsuit when there's any

25   kind of loan in place, that's not supported by Arizona law.

1    Almost every party has a loan of some sort.  If the
2    Rindlisbachers were concerned about triggering a default, they
3    would have responded to the settlement offer that Steinway made
4    before filing the fee application.  That offer went -- they
5    were silent.  They didn't want to settle this issue.  They'd
6    rather litigate it.  So here we are, Judge.  So, Judge, the
7    Court should just reject the hardship issue as not supported or
8    supported only by cherry-picked and selective self-serving
9    evidence.

10           On the cases that Mr. Morrill cited, there are some
11    important distinctions.  He focused in particular on *American*
12    *Power Products versus CSK Auto.*  That case, Judge, actually had
13    attorney's fees provision in the contract at 396 P.3d at 603.
14    There's no attorney's fee provision in the contract at issue.

15           As the Court has commented twice now, the dots that
16    plaintiffs want the Court to connect that, because New York law
17    applies to breaches of contract, that no fees are awardable
18    would require the Court to reject all the cases cited in our
19    papers including the *Sienna* case, including the *Magellan* case,
20    including the wine case, the *Sutter Home* case, in which all
21    those cases had out-of-state choice-of-law provisions.

22           And it's notable that ARS 12-341.01 is a pretty unique
23    statute.  It does not exist in most other states or equivalent
24    does not exist in most other states and, yet, courts in Arizona
25    have had no trouble saying that, even when there's a

1    choice-of-law provision that has an out-of-state choice-of-law

2    provision, that, when the case asserts tort claims arising out

3    of contract, the fees are awardable.

4          One other case I want the Court to be aware of that is

5    cited in our papers and is very clear on this exact point is

6    the Ninth Circuit case called *Consolidated Data Terminals*

7    *versus Applied Digital Data Systems*, 708 F.2d 385.  It's a 1983

8    case, Judge.  And in Footnote 3 -- it's hard to read on this

9    screen.

10          THE COURT:  Did you print that off a dot matrix

11    printer?

12          (Laughter)

13          MR. SAMUELS:  Judge, I just started a new firm and

14    that's about it.  I got a dot matrix printer.  No, I'll try to

15    zoom this in.  But, anyway, let me see if I can just read it to

16    you.  It says in Footnote 3:  New York law applies to all the

17    contract issues in the case per the New York choice-of-law

18    provision -- that's underlined -- but then it continues to say,

19    the Ninth Circuit:  Other issues in this case which involve

20    tort law and the law of punitive damages are not controlled by

21    the contract choice-of-law provision and applied California law

22    to those tort claims.

23          So this is not a new concept, Judge.  This law has

24    been around for decades.  And Mr. Morrill really is -- his case

25    is not supported by the case law, his defense to the claims.

1          The Court asked about the significance of the

2     provision in the agreement, the dealer agreement, that says

3     "without regard to the principles of conflicts of laws" and

4     kind of what that means.  And we have an Arizona case that

5     discusses an exact type of provision with that language but

6     applying Texas law, and this is *Swanson versus Image Bank*.  A

7     defending party in that case says that the provision forecloses

8     the application of conflicts of laws principles set forth in

9     the *Restatement* because, by including this phrase, they express

10    their unequivocal intent for Texas law to control the

11    relationship.  But the Court concluded, rejecting that

12    argument, that these arguments are not sound and we do not

13    adopt them, and then drops a footnote with some similar -- or

14    with some further analysis.  So, if the Court is inclined to

15    further inquire about the significance of that provision in the

16    dealer agreement, then it need look no further than *Swanson*

17    *versus Image Bank*.  The idea that the contract says no fee

18    shifting, doesn't say that.  It simply doesn't.  The language

19    doesn't exist.  So Mr. Morrill is asking the Court to again

20    connect dots that should not be connected.

21          And, with that, Judge, I think I've taken up my five

22    minutes.  Unless the Court has any questions -- let me say one

23    more thing before I rest.

24          The notion that an award of fees would discourage

25    Steinway dealers from pursuing tenable and legitimate claims

1    should also be rejected.  Steinway doesn't get sued very

2    often -- in fact, hardly ever.  This is a very unique situation

3    for Steinway.  And so -- but the Court can nonetheless take

4    judicial notice of a case that was filed since the fee

5    applications were -- well, since the case was resolved here.

6    It's a Tucson district court case, a District of Arizona case

7    filed in Tucson by the former dealer there, and it's Case No.

8    4:20-CV-00498.  In that case, Judge, the former dealer asserted

9    claims against Steinway.  We filed a motion to dismiss on

10   behalf of Steinway.  We wrote a letter to the plaintiff's

11   lawyer explaining why his claims are illegitimate and

12   meritless.  And, in that case, unlike this case, the record

13   will reflect that the Court can take judicial notice of, the

14   plaintiff dismissed the lawsuit while the motion to dismiss was

15   pending.

16        So there's no discouragement here of tenable claims.

17   That's the standard.  What it will discourage, Judge, is having

18   people pursue claims that are time-barred, that are based on

19   illegitimate legal theories and illegitimate damage theories

20   and to hire a lawyer who seeks sanctions against Steinway and

21   its lawyer 13 times throughout the nature of this proceeding.

22        So there's a big reason why the fees got so expensive

23   here and that is because of the aggressive nature of

24   Mr. Morrill, and we should not be questioned as to our ability

25   to defend Steinway and Lewis Roca's interest in defeating every

1      one of those sanctions motions.

2              As the Court observed in the last sanctions motion,

3      that filing a sanctions motion can, by itself, be sanctionable.

4      The Court declined to order sanctions in this case, but it

5      demonstrates that this case took a lot of time and effort to

6      deal with all the issues that plaintiffs raised in this case

7      and did so successfully.

8              Thank you, Your Honor.

9              THE COURT:  Thank you.  I'm going to take the matter

10     under advisement.  I'll try to get an order out promptly.

11             One thing that I wanted to ask you both while you're

12     here is this:  The Ninth Circuit does have a mediation program

13     and I -- I've personally never participated in it, but

14     I understand that it is -- it could be effective.  So I was

15     wondering if -- if you've made a decision either way whether to

16     participate in that, Mr. Morrill.

17             MR. MORRILL:  Your Honor, the mediator for the Ninth

18     Circuit reached out to us, spoke with me and I think also spoke

19     with Mr. Samuels, and I think our mutual conclusion was that it

20     didn't make sense to mediate at the very outset of the appeal

21     which is when that conversation occurred.  I did suggest to her

22     that, after the briefing was complete, it might be a different

23     situation and that it might be wise at that time to consider

24     mediation, but the briefing is not yet complete.

25             THE COURT:  Thank you, Mr. Morrill.

1           Mr. Samuels, is there anything you would like to add?

2           MR. SAMUELS:  No, Judge.  Steinway is always happy to

3     talk potential resolution.  We just have been unable to bridge

4     the gap thus far.

5           THE COURT:  Okay.  So this -- my understanding here

6     may not be right, but my assumption is, while a motion is

7     pending, it might be difficult to engage in settlement

8     discussions because either party might think that they are

9     going to prevail, and then once -- once the motion is decided

10    by the Court, then that may give parties guidance on how to

11    proceed with settlement.  So I am going to try and get this

12    order out quickly.  I'm not making any guarantees, but I'm

13    hoping by the end of the month.  And whichever way it goes,

14    perhaps that might assist in the settlement analysis.  But I do

15    want to, beyond saying that so that you both understand, you

16    know, my preference on moving forward, I would hope that you

17    would take a realistic view of settlement and taking advantage

18    of the Ninth Circuit mediation program and, if you could

19    resolve these disputes -- or this dispute, I really do think it

20    would be in the best interest of both parties at this point.

21           I've said that; so I also have to clarify, saying that

22    it is completely -- it is completely up to you,

23    Mr. and Mrs. Rindlisbacher and up to Steinway's corporate

24    representatives as to whether a settlement is in the best

25    interests or whether you should pursue litigation which is your

1    right to do.  Okay?

2             Do either of you have anything that you would like to

3    present to me before we adjourn?

4             MR. MORRILL:  No, Your Honor.

5             MR. SAMUELS:  No, Your Honor.  Thank you for your

6    time.

7             THE COURT:  All right.  Thank you, both.  Thank you

8    for the briefing and thank you for being flexible with your

9    schedules.  I very much appreciate it.  We're adjourned.

10             (Proceedings adjourned at 11:32 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                    C E R T I F I C A T E

 2

 3          I, BARBARA H. STOCKFORD, do hereby certify that I am

 4   duly appointed and qualified to act as Official Court Reporter

 5   for the United States District Court for the District of

 6   Arizona.

 7          I FURTHER CERTIFY that the foregoing pages constitute

 8   a full, true, and accurate transcript of all of that portion of

 9   the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 19th day of May 2021.

13

14

15                       /s/ Barbara H. Stockford
                    Barbara H. Stockford, RMR, CRR, CRC
16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT